UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TINA CABISCA

               **Plaintiff,**

                      **STATEMENT OF UNDISPUTED FACTS**

       -vs-

                      **Civil Action No. 14-CV-6485**

CITY OF ROCHESTER, NEW YORK
DARYL HOGG, JAYSON PRINZI, NOLAN WENGERT,
CARRIE BERKSTRESSER, and
K. TURNER

               **Defendants.**

---

1. On September 7, 2013 Officer Nolan Wengert of the Rochester Police Department was en route to an interview of a burglary suspect,when he spotted the suspect pushing two bicycles down a sidewalk.  See Police Reports attached as Exhibit A.

2. The suspect was found to be in possession of marijuana and latex gloves. Exhibit A, Incident Report.

3. The suspect had two bicycles in good repair, was in possession of marijuana and Officer Wengert reasonably believed he had committed the crime of either burglary or larceny. See Deposition transcript of Nolan Wengert dated 4/26/16 attached as Exhibit B pgs. 8-9.

4. Investigator Wengert testified that the suspect latex gloves are commonly used by criminals during burglaries and that because the suspect was already under investigation for the theft of a cell phone, he had reason to believe the bicycles in the suspect's possession were stolen. Exhibit B, pg. 10:2-14.

5. Moreover, based on Investigator Wengert's training and expertise, the subject area where he stopped the suspect, PSA 53 (Plaintiff's neighborhood) is subject to numerous burglaries including, bicycle thefts. Ex. B, pgs 11:22-25, 12:1-20.

6. The suspect was detained in handcuffs for suspicion of burglary/larceny, Wengert called for assistance from other officers, and relocated to Plaintiff's address, 207 Kingsboro

Road , to corroborate the suspect's claim of having taken the discarded bikes from Plaintiff's curb. Exhibit B, pgs. 42:11:24, 43:1-6.

7. Wengert testified that the individual in his custody was suspected of the violent, class C felony offense of burglary and he felt the need to investigate thoroughly and immediately. Exhibit B, pgs. 44:1-25.

8. Based on his training and experience Wengert went to Plaintiff's home and knocked on the door. Exhibit B, pg 46:6-15.

9. Wengert and two other officers walked up to Plaintiff's home and both rang the doorbell and knocked on the door.  Pg. 51:1-21.

10. Wengert was on the front porch when he heard the door open. Exhibit B, pg. 54:5-7.

11. He came off the porch, and walked to the side of Plaintiff's home where he was confronted by multiple dogs charging up the driveway towards him.  Exhibit B, pg. 54:13-15.

12. Wengert retreated back up the front porch with the dog in pursuit.  Exhibit B, pg. 54:24-25.

13. Wengert testified that the dogs, which appeared to be a Boxer and a German Shepherd, were aggressively charging down the driveway towards the officers. Exhibit B, pg. 55:8-16, 56:4:10.

14. The Boxer turned and ran up the stairs towards Wengert. Exhibit B, pg. 56:4-25.

15. Wengert backed up on the porch until he had "nowhere to go", drew his pistol and fired at the dog who continued to charge him.  Exhibit B, pg. 57:19-25.

16. Plaintiff testified that her dogs were "mid-sized".  See deposition transcript of Tina Cabisca, attached as Exhibit C, pg. 14:1-4.

17. Plaintiff acknowledge seeing police in front of her home prior to exiting.  Exhibit C, pg. 21:13-19.

18. She also testified that her Boxer "stepped out" with her without a collar or leash. Exhibit C, pgs. 21:17-19, 22::9.

19. She also testified that her Border Collie was outside without a leash. Exhibit C, pg. 30:9-11.

20. Plaintiff stated that Officer Wengert identified himself as "Rochester City Police". Exhibit C, pg. 32:16-20.

21. Wengert is an Investigator and is not required to wear an RPD uniform.  Investigators do display Rochester Police Department neck badges while on duty.  See deposition Transcript of Jason Prinzi dated 4/26/16, attached as Exhibit D, pg. 22:9-21.

22. Officer Jason Prinzi was present on the scene and testified that Plaintiff's dog, in fact, charged Investigator Wengert. Exhibit D, pg. 24:16-17.

23. Officer Prinzi also testified that Investigator Wengert was attempting to make contact with the homeowner when he was charged by the dog. Exhibit D, pg. 26:7-17.

24. As Investigator Wengert attempted knocking on the Plaintiff's door, two dogs came towards the front of the home. One stopped, and turned up the stairs towards investigator Wengert.  Exhibit D, pg. 33:19-23.

25. The incident occurred quickly, between five and ten seconds between the time dogs emerged from the side doorway and attempted to pursue Investigator Wengert on the front porch. Exhibit D, pg. 33:11-15.

26. Prinzi described the dog as "barking and coming at him [Wengert] kind of aggressively". Exhibit D, pg. 37:13-16.

27. Prinzi also stated that prior to shooting the dog, Wengert "attempted to back up, almost like he was looking to stand up on something or get away first." Ex. D, pg. 38:18-20.

28. Officer Darryl Hogg, who was also present at Plaintiff's home to assist Investigator Wengert's investigation testified that three dogs came out of Plaintiff's home unleashed, that Officers yelled many times to "put the dogs away", and that the dog that was shot ran down the driveway towards Officers, then turned abruptly upon seeing Investigator Wengert and quickly ran up the front porch towards him.  See deposition transcript of Daryl Hogg dated 4/28/16, attached as Exhibit E, pgs. 45:8-25, 46:1-25, 47:18-23.

29. Rochester Police Department General Order #340 Use of Deadly Force, Section II states the following:

## II. FIREARM GUIDELINES

A. *Members are justified in removing firearms from holsters and/or gunmounts and pointing the firearm if the member reasonably believes:*

1. *That a person or a situation poses or may pose an immediate threat of death or serious physical injury either to themselves or another person.*

2. *There is justification to use a firearm against an animal pursuant to Section II.B. below.*

B. *Members may use firearms against animals when they are:*

*1. Attacking or presenting an imminent danger to any person.*

*2. Destructive, injured, or threatening, with supervisory approval when there is time to obtain it.*

*C. Warning shots are prohibited.*

30. Investigator Wengert testified that the dogs appeared dangerous and posed a threat of imminent danger. Exhibit B, pgs. 76:20-25, 77:9-13.

31. After Plaintiff's dog was shot, she admits she was using expletives and she refused lawful orders from Officers who warned her she would be arrested if she did not cooperate. Exhibit C, pgs. 35:3-15, 37:7-19, 38:8-11.

32. Plaintiff also testified that she put her hands straight out in a shoving motion and told Officers "you need to step back and get away from me." Ex. C, pg. 39:22-24.

33. Additionally, after she was told she was going to jail, Plaintiff admits she tried to "get away". Ex. C, pg. 40:18-22.

34. Plaintiff was brought to the ground per standard police procedures and when she informed Officers she was asthmatic, she was allowed to get up. Ex. C. pg. 41:1-25.

35. She was allowed to go inside her home and check on her grandchildren and call family members. Ex. C, pg. 42:1-25.

36. Plaintiff was allowed to call her neighbor and her son who assisted her. Exhibit C, pgs. 53:13-25, 54:1-3.

37. Plaintiff's daughter arrived on scene and was allowed to take Plaintiff to the hospital. Ex. C. pgs. 59-60.

38. Plaintiff was told Officers had to secure the scene due to the shooting and that she had to move away from her dog. Ex. B, pgs. 75:7-25, 76:1-6.

39. Plaintiff was yelling obscenities at Officer Hogg and shoved him. Ex. B, pg. 78:1-4, Ex. D, pg. 50:15-17, 60:10-20, Ex. E, pgs. 61: 13-25, 80:19-25.

40. Besides "escorting" Plaintiff to the ground and stabilizing her shoulders to handcuff her, no force was used on Plaintiff. Ex. E, pgs. 62-64.

41. Plaintiff was charged with Harassment 2nd and given an appearance ticket as a courtesy. She physically shoved Officer Hogg and could have gone to jail. Ex. B, pgs. 93:15-25, 94:1-25.

42. Plaintiff's Harassment charge was not dismissed.  She received an adjournment in contemplation of dismissal.  Ex. B, pg. 98:18-25.


**BRIAN F. CURRAN**
**CORPORATION COUNSEL**

s/Spencer L. Ash

Dated:  January 30, 2017
       Rochester, New York

Spencer L. Ash, Esq. *Of Counsel*
*Attorneys for Defendants*
Office and Post Office Address
City Hall Room 400A, 30 Church Street
Rochester, NY 14614-1295
Telephone: (585) 428-6699
ashs@cityofrochester.gov

TO:    E. Robert Fussell, Esq.
       *Attorney for Plaintiff*
       46 Wolcott Street, Suite One
       Le Roy, NY 14482
       (585) 768-2240

# EXHIBIT A

| Page 1 of 4 | ROCHESTER POLICE DEPARTMENT | CR # |
| --- | --- | --- |
| | INCIDENT REPORT | 2013-00260555 |

**DETAIL**

| Incident Type | Report Date | Report Time | Date From | Time From | Date To | Time To |
| --- | --- | --- | --- | --- | --- | --- |
| IR- Non-Criminal Incident | 09/07/2013 | 21:50 | 09/07/2013 | 21:50 | 09/07/2013 | 21:50 |

| Incident Address | PSA | Campus Code |
| --- | --- | --- |
| 207 KINGSBORO ROAD | 62 | |

Violent Crime Context

**OFFENSES**

| Statute · | Attempt/Commit · | Counts · |
| --- | --- | --- |

Description ·

| Location | Weapon |
| --- | --- |

| Larceny Type | Aggravated Assault Circumstances | Gang Related | Computer |
| --- | --- | --- | --- |

| Bias Type | Entry Point | Method of Entry | # of Premises Entered |
| --- | --- | --- | --- |

| Statute · | Attempt/Commit · | Counts · |
| --- | --- | --- |

Description ·

| Location | Weapon |
| --- | --- |

| Larceny Type | Aggravated Assault Circumstances | Gang Related | Computer |
| --- | --- | --- | --- |

| Bias Type | Entry Point | Method of Entry | # of Premises Entered |
| --- | --- | --- | --- |

**VICTIM**

| Victim Type | Victim Name (Last, First, Middle) |
| --- | --- |

| Address | Date of Birth | Age | Sex | Race | Ethnicity | Residence Status |
| --- | --- | --- | --- | --- | --- | --- |

| City State Zip | Victim/Offender Relationship (Offender Name, DOB, Relationship) |
| --- | --- |

| Telephone | Level of Injury | Type of Injury | Medical Treatment |
| --- | --- | --- | --- |

**PERSONS**

R = Reporting Person    W = Witness    PK = Person w/Knowledge    NI = Not Interviewed

| Type | Name (Last, First, Middle) | DOB | Sex | Race | Eth | Address | Telephone No |
| --- | --- | --- | --- | --- | --- | --- | --- |
| PK | CABASCA, TINA, L | 4/5/1961 | F | W | N | | (585)484-9704 |
| PK | WINDSOR, LEONARD, D | 1/18/1966 | M | W | N | | (585)663-3334 |
| RP | WENGERT, NOLAN | | M | W | N | | (585)428-9610 |

**SUSPECT / MISSING PER**

| Type · | Suspect Name (Last, First, Middle) | Nickname |
| --- | --- | --- |

| Address | Date of Birth | Age | Sex | Race | Ethnicity | NCIC / JCN # |
| --- | --- | --- | --- | --- | --- | --- |

| Height | Weight | Hair Color | Hair Length | Eye Color | Glasses | Complexion | Build | Facial Hair | Gang Affiliation |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

| Clothing Jewelry Distinguishing Features | Offender Condition | Scars Marks Tattoos |
| --- | --- | --- |

| Mothers Maiden Name | Place of Birth | School Name / ID # |
| --- | --- | --- |

**INVESTIGATION**

Modus Operandi

| | | |
| --- | --- | --- |
| 01. Witness to the offense? | 05. Can a suspect be described? | 09. Is there significant Modus Operandi present? |
| 02. Surveillance footage of event? | 06. Can a suspect be identified? | 10. Is there significant physical evidence present? |
| 03. Can a suspect be named? | 07. Can a suspect vehicle be identified? | 11. Has evidence tech work been performed? |
| 04. Can a suspect be located? | 08. Is stolen property traceable? | 12. Preliminary investigation NOT completed? |

| Case Status | Exceptional Clearance | Assigned Bureau | Review Box |
| --- | --- | --- | --- |
| Not Applicable (non-crime) | | West - Patrol | PDW 3rd |

| Reporting Officer | EM # | Date | Reviewed By |
| --- | --- | --- | --- |
| RIVERS        JON | 1476 | 09/08/2013 | |

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

# ROCHESTER POLICE DEPARTMENT
## INCIDENT REPORT

Page 2 of 4

CR # 2013-00260555

### ADD'T'L OFFENSE

| Statute - | Attempt/Commit - | Counts - |
|---|---|---|

Description -

| Location | | Weapon |
|---|---|---|

| Larceny Type | Aggravated Assault Circumstances | | Gang Related | Computer |
|---|---|---|---|---|

| Bias Type | Entry Point | Method of Entry | # of Premises Entered |
|---|---|---|---|

### VICTIM #2

| Victim Type | Victim Name (Last, First, Middle) | | | | | | |
|---|---|---|---|---|---|---|---|

| Address | | Date of Birth | Age | Sex | Race | Ethnicity | Residence Status |
|---|---|---|---|---|---|---|---|

| City State Zip | Victim/Offender Relationship (Offender Name DOB Relationship) |
|---|---|

| Telephone | Level of Injury | Type of Injury | Medical Treatment |
|---|---|---|---|

### PERSONS

R = Reporting Person    W = Witness    PK = Person w/Knowledge    NI = Not Interviewed

| Type | Name (Last, First, Middle) | DOB | Sex | Race | Eth | Address | Telephone No |
|---|---|---|---|---|---|---|---|
| W | HOGG, DARYL | | M | W | N | | (585)428-6610 |
| W | PRINZI, JASON | | M | W | N | | (585)428-6610 |

### SUSPECT #2

| Type - | Suspect Name (Last, First, Middle) | | | Nickname |
|---|---|---|---|---|

| Address | | Date of Birth | Age | Sex | Race | Ethnicity | MeNIS / JCR # |
|---|---|---|---|---|---|---|---|

| Height | Weight | Hair Color | Hair Length | Eye Color | Glasses | Complexion | Build | Facial Hair | Gang Affiliation |
|---|---|---|---|---|---|---|---|---|---|

| Clothing Jewelry Distinguishing Features | Offender Condition | Scars Marks Tattoos |
|---|---|---|

### PROPERTY

| Property Code | Property Type | Property Value | Serial Number |
|---|---|---|---|

| Item Type and Description | | Color |
|---|---|---|

| Quantity | Unit of Measure | Measurement Source | Drug Type |
|---|---|---|---|

### PROPERTY

| Property Code | Property Type | Property Value | Serial Number |
|---|---|---|---|

| Item Type and Description | | Color |
|---|---|---|

| Quantity | Unit of Measure | Measurement Source | Drug Type |
|---|---|---|---|

### FIREARMS

| Firearm Property Code | Firearm Value | Make | Model | Finish |
|---|---|---|---|---|

| Caliber | Capacity | Type | Action | Serial Number |
|---|---|---|---|---|

| Description | | Recovery Date |
|---|---|---|

### VEHICLE

| Vehicle Status | Year | Make | Model | Style | Color |
|---|---|---|---|---|---|

| State | Plate Number | VIN # | Recovery Date |
|---|---|---|---|

| Additional Description | |
|---|---|

| Reporting Officer | | IBM # | Date | Reviewed By |
|---|---|---|---|---|
| RIVERS | JON | 1476 | 09/08/2013 | |

Incident Report  Page 2 OF 4

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)



**ROCHESTER POLICE DEPARTMENT**
INCIDENT REPORT

Page 3 of 4

CR #
2013-00260555

**NARRATIVE**

ON 09/07/2013, INVESTIGATOR WENGERT WAS IN THE AREA OF KINGSBORO RD AND OBSERVED A SUBJECT IN POSSESSION OF 2 BICYCLES. INVESTIGATOR NOLAN WENGERT (PLAIN CLOTHES WEARING DRESS SLACKS, DRESS SHIRT, TIE AND DISPLAYING HIS ROCHESTER POLICE INVESTIGATOR BADGE ON A LANYARD AROUND HIS NECK CLEARLY VISIBLE) DETAINED THIS MALE AND UNIFORMED OFFICERS HOGG AND PRINZI RESPONDED TO ASSIST. THE MALE INFORMED THEM THAT HE "FOUND" THE 2 BICYCLES ON THE FRONT LAWN OF 207 KINGSBORO RD. INVESTIGATOR WENGERT AND OFFICERS HOGG AND PRINZI SECURED THE MALE IN A MARKED POLICE CRUISER ALONG WITH THE BICYCLES. THEY THEN WENT TO SPEAK WITH THE HOMEOWNER AT 207 KINGSBORO RD TO DETERMINE IF A BURGLARY OR LARCENY WAS COMMITTED.

INVESTIGATOR WENGERT WALKED UP THE DRIVEWAY AND WALKED UP THE STEPS LEADING TO THE OPEN FRONT PORCH. THE HOME INTERIOR HOUSE LIGHTS WERE ON AND THE PORCH WAS DIMLY LIT. IT WAS DARK OUTSIDE (9:50PM) AND THIS WAS A RESIDENTIAL SINGLE FAMILY HOME. THE TEMPERATURE OUTSIDE WAS 61 DEGREES FAHRENHEIT AND IT WAS CLOUDY WITH RECENT RAINFALL. OFFICERS HOGG AND PRINZI WERE STANDING AT THE END OF THE DRIVEWAY NEAR THE SIDEWALK IN POLICE UNIFORM. INVESTIGATOR WENGERT RANG THE DOORBELL AND KNOCKED ON THE FRONT DOOR AT WHICH TIME THE SIDEDOOR OPENED AND 3 LARGE DOGS CAME RUNNING OUTSIDE FROM INSIDE THE HOUSE. 2 DOGS WERE LARGE BOXERS AND THE OTHER WAS A GERMAN SHEPPARD. THE 2 BOXERS RAN DOWN THE DRIVEWAY PASSED WENGERT WHO WAS STILL STANDING ON THE FRONT PORCH TOWARDS THE UNIFORM OFFICERS. THEN 1 BOXER IMMEDIATELY TURNED AND RAN UP THE FRONT STEPS AGGRESSIVELY CHARGING AT INVESTIGATOR WENGERT. WENGERT ATTEMPTED TO RETREAT BACKWARDS ON THIS PORCH AND THE DOG CONTINUED UP ONTO THE PORCH TOWARDS HIM. WENGERT THEN REMOVED HIS DEPARTMENT ISSUED GLOCK 45 CALIBER MODEL 30SF SEMI-AUTOMATIC (10 ROUND MAGAZINE AND 1 ROUND IN CHAMBER-TOTAL 11 SERVICE AMMO ROUNDS) (SERIAL#TZX894) CARRIED IN HIS DEPARTMENT ISSUED CONCEALMENT PADDLE HOLSTER AND FIRED 2 ROUNDS STRIKING THE DOG IN THE FACE AND SHOULDER AREA. WENGERT FIRED IN A DOWNWARD MOTION AT THIS DOG WHO WAS COMING UP BRICK STEPS ONTO A WOODEN FLOOR PORCH. THE DOG IMMEDIATELY TURNED AWAY AND FELL DECEASED ON THE DRIVEWAY AT THE BOTTOM OF THE STEPS.

I DID CONFIRM BY INSPECTING INVESTIGATOR WENGERTS WEAPON THAT HE DID INDEED FIRE 2 ROUNDS OF DEPARTMENT ISSUED FEDERAL HST 230 GRAIN ROUNDS AND I DID OBSERVE 2 CASINGS ON THE FRONT PORCH. TECHNICIAN WALTON FROM 1ST PLATOON RESPONDED FOR PHOTOGRAPHS AND COLLECTED THE 2 CASINGS.

ANIMAL CONTROL (3805) OFFICER KARI BERKSTRESSER IBM#2292 REPSPONDED TO THE SCENE TO ASSIST. I DID SPEAK WITH HER AND LEARNED THAT THE 3 DOGS WERE LICENSED BY THE OWNER PK (TINA CABISCA). SHE FURTHER INFORMED ME THAT BASED ON HER INVESTIGATION AT THE SCENE SHE ISSUED A TOTAL OF 6 TICKETS TO THE DOG OWNER FOR UNLEASHED DOGS AND DANGEROUS DOGS (2 TICKETS WRITTEN FOR EACH DOG). THE DOG WAS DECEASED AND THE ANIMAL WAS RELEASED TO PK WINDSOR WHO IS THE BOYFRIEND TO THE DOG OWNER.

I ALSO LEARNED AT THE SCENE THAT THE DOG OWNER HAS "INVISIBLE FENCE" AND UTILIZES THIS FOR HER DOGS. 3805 INFORMED ME THAT THE "INVISIBLE FENCE" IS NOT A PROPERLY RECOGNIZED RESTRAINT IN THE CITY OF ROCHESTER WHICH IS WHY TICKETS WERE WRITTEN FOR UNLEASHED DOGS.

THE DOG OWNER (PK CABISCA) WAS ALSO TAKEN INTO CUSTODY FOR HARASSMENT AND RESISTING ARREST CR#13-260442 AFTER SHE SHOVED OFFICER WENGERT DURING THIS INCIDENT. SHE WAS RELEASED ON AN APPEARANCE TICKET. SHE ALSO CLAIMED THAT HER NECK WAS "HURTING" HER AND RURAL METRO AMBULANCE AND RFD RESPONDED TO THE SCENE TO

| Reporting Officer | | IBM # | Date | Released By |
|---|---|---|---|---|
| RIVERS | JON | 1476 | 09/08/2013 | |

Incident Report  Page 3 OF 4

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

## ROCHESTER POLICE DEPARTMENT
### INCIDENT REPORT

Page 4 of 4

CR #
2013-00260555

ASSIST HER.  SHE REFUSED MEDICAL TREATMENT AND HAD NO VISIBLE INJURIES.  SHE CLAIMED THAT SHE WOULD SEEK HER OWN MEDICAL TREATMENT AND SHE WAS UTILIZING HER INHALER FOR ASTHMA WHICH SHE CLAIMED TO HAVE.  PHOTOGRAPHS WERE TAKEN FOR THE SRR.
LT ANZALONE WHO WAS STAFF DUTY WAS NOTIFIED.

NARRATIVE

| Reporting Officer | | ID# | Date | Reviewed By |
|---|---|---|---|---|
| RIVERS | JON | 1476 | 09/08/2013 | |

Incident Report Page 4 OF 4

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

**2013-1142**

**SUBJECT**

| 1. LAST NAME CABISCA | FIRST TINA | M.I. L | 2. DATE 9/7/13 | 3. TIME 2150 | 4. CR # 13-260442 |
|---|---|---|---|---|---|

| 5. DOB 4/5/61 | 6. SEX Female | 7. RACE White | 8. HEIGHT 5'2" | 9. WEIGHT 160 | 10. INCIDENT LOCATION 207 KINGSBORO RD | PSA 53 |
|---|---|---|---|---|---|---|

**11. ARREST?**  ☐ NO – release approved by:
☒ YES – charges: HARASSMENT 2ND, RESISTING ARREST

**12. SUBJECTS ACTIONS**

Subject resisted by (check all that apply and explain in narrative)

**13. TACTIC EFFECTIVENESS**

Check the appropriate box indicating whether the tactic was used. If the tactic was used write the number (1,2,3,..) indicating what order the tactics were used in column one (1). In column two (2) write E, for *Effective*, ME, for *Moderately Effective* and NE, for *Not Effective*.

| 12. Subjects Actions | 13. Tactic | Order | Effectiveness | 13. Tactic | Order | Effectiveness |
|---|---|---|---|---|---|---|
| ☒ **Verbal Resistance** (Failing to adhere to verbal commands) | ☒ Verbal | 1 | NE | ☐ Forward Spin | | |
| | ☐ Mandibular Angle | | | ☐ Shin Sheer | | |
| | ☐ Hypoglossal Nerve | | | ☐ Arm Lock | | |
| | ☐ Jugular Notch | | | ☐ Front Jab w/Baton | | |
| | ☐ Clavical Notch | | | ☐ Rear Jab w/ Baton | | |
| ☐ **Passive Resistance** (dead weight) | ☐ Brachial Stun | | | ☐ Flat Chop | | |
| | ☐ Suprascapular Stun | | | ☐ Upper Chop | | |
| | ☐ Jab | | | ☐ Forward Spin | | |
| | ☐ Front Kick | | | ☐ Reverse Spin | | |
| | ☐ Straight Punch | | | ☐ Inside Spin | | |
| ☒ **Active Resistance** (pulling away, striking or attempt assault) | ☐ Angle Kick | | | ☐ Power Spin | | |
| | ☐ Forearm Strike | | | | | |
| | ☐ Knee Strike | | | ☐ OC | | |
| | ☐ Defensive Wedge | | | ☐ Taser | | |
| | ☐ Hooking Technique | | | ☐ Bean Bag | | |
| ☐ **Armed Resistance** (uses or attempts to use a weapon or dangerous instrument) | ☒ Ground Stabilization (ie. 3-Point Landing, joint manipulation) | 3 | E | ☐ Hand Gun | | |
| | | | | ☐ Long Gun | | |
| | | | | ☒ Other: STRT ARM BAR | 2 | E |
| | | | | ☐ Other: | | |

**14. Narrative** *(If officer is in plainclothes, describe own clothing. If tactic(s) used on subject were ineffective, explain reason(s) why.)*

ON 9/7/13 AT APPROXIMATELY 2150HRS, RO WAS ON SCENE AT 207 KINGSBORO RD ASSITING INV WENGERT. DURING THE INVESTIGATION, INV WENGERT WAS FORCED TO DESPATCH A LARGE BREED, AGGRESSIVE DOG WHICH WAS OWNED BY (A1) CABISCA. (A1) WAS VERY IRRATE AND BELLIGERANT TOWARDS ALL RO'S. (A1) WAS TOLD MULTIPLE TIMES TO RETURN HER REMAINING DOGS BACK INTO THE RESIDENCE. WHEN (A1) RETURNED OUTSIDE, I ATTEMPTED TO SPEAK WITH HER TO EXPLAIN THE REASONING FOR OUR BEING AT HER HOME. (A1) CONTINUED TO SWEAR AND REFUSED TO ALLOW ME TO EXPLAIN. AS (A1) CONTINUED TO YELL, SHE CHARGED TOWARDS RO'S CONTINUING TO YELL OBSCENITIES SUCH AS "FUCK" AND CALLING RO'S "ASSHOLES."

WHEN (A1) GOT IN FRONT OF ME, SHE REACHED OUT WITH BOTH HANDS AND PUSHED ME BACKWARDS BY PLACING BOTH HER HANDS INTO MY CHEST. UNDERSTANDING THAT (A1) WAS EMOTIONAL, I TRIED AGAIN TO SPEAK TO HER BUT SHE CHARGED BACK TOWARDS ME. I THEN GRABBED (A1'S) RIGHT WRIST WITH MY RIGHT HAND AND DIRECTED HER TO THE GROUND USING A STRAIGHT ARM BAR TAKEDOWN AS I WAS TRAINED. I MANUEVERED HER ARM BEHIND HER BACK USING A 2-POINT LANDING, AS TRAINED, TO SECURE HER FROM ATTEMPTING TO GET UP. BOTH TECHNIQUES WERE EFFECTIVE AS (A1) REMAINED ON THE GROUND BUT CONTINUED TO YELL AT ME.

| Officer: ☒ Primary Officer   ☐ Assisting Officer   Name: DARYL HOGG | ID# 2036 |
|---|---|

SUBJECT                                                                    Page 2 of 3

| 1. LAST NAME CABISCA | | FIRST TINA | | M.I. L | 2. DATE 9/7/13 | 3. TIME 2150 | 4. CR # 13-260442 | |
|---|---|---|---|---|---|---|---|---|
| 5. DOB 4/5/61 | 6. SEX Female | 7. RACE White | 8. HEIGHT 5'2" | 9. WEIGHT 160 | 10. INCIDENT LOCATION 297 KINGSBORO RD | | | PSA 53 |

**11. ARREST?** ☐ NO – release approved by:
☒ YES – charges: HARASSMENT 2ND, RESISTING ARREST

**12. SUBJECTS ACTIONS**

Subject resisted by (check all that apply and explain in narrative)

☐ **Verbal Resistance** (Failing to adhere to verbal commands)

☐ **Passive Resistance** (dead weight)

☐ **Active Resistance** (pulling away, striking or attempt assault)

☐ **Armed Resistance** (uses or attempts to use a weapon or dangerous instrument)

**13. TACTIC EFFECTIVENESS**

Check the appropriate box indicating whether the tactic was used. If the tactic was used write the number (1,2,3...) indicating what order the tactics were used in column one (1). In column two (2) write E, for *Effective*, ME, for *Moderately Effective* and NE, for *Not Effective*.

| | Order | Effectiveness | | Order | Effectiveness |
|---|---|---|---|---|---|
| ☐ Verbal | | | ☐ Forward Spin | | |
| ☐ Mandibular Angle | | | ☐ Shin Sheer | | |
| ☐ Hypoglossal Nerve | | | ☐ Arm Lock | | |
| ☐ Jugular Notch | | | ☐ Front Jab w/Baton | | |
| ☐ Clavical Notch | | | ☐ Rear Jab w/ Baton | | |
| ☐ Brachial Stun | | | ☐ Flat Chop | | |
| ☐ Suprascapular Stun | | | ☐ Upper Chop | | |
| ☐ Jab | | | ☐ Forward Spin | | |
| ☐ Front Kick | | | ☐ Reverse Spin | | |
| ☐ Straight Punch | | | ☐ Inside Spin | | |
| ☐ Angle Kick | | | ☐ Power Spin | | |
| ☐ Forearm Strike | | | | | |
| ☐ Knee Strike | | | ☐ OC | | |
| ☐ Defensive Wedge | | | ☐ Taser | | |
| ☐ Hooking Technique | | | ☐ Bean Bag | | |
| ☐ Ground Stabilization (ie. 3-Point Landing, joint manipulation) | | | ☐ Hand Gun | | |
| | | | ☐ Long Gun | | |
| | | | ☐ Other: | | |
| | | | ☐ Other: | | |

**14. Narrative** (*If officer is in plainclothes, describe own clothing. If tactic(s) used on subject were ineffective, explain reason(s) why.*)

CONTINUED FROM PAGE 1

DUE TO SMALL, UNATTENDED CHILDREN INSIDE THE LOCATION WITH THE REMAINING TWO DOGS, RO'S DECIDED TO ALLOW (A1) TO STAND AND ATTEND TO THE CHILDREN. (A1'S) NEIGHBOR, (NO1) BRANTLEY AGREED TO ASSIST (A1) BY WATCHING THE CHILDREN UNTIL ANOTHER ADULT ARRIVED. ONCE (NO1) TOOK OVER, (A1) WAS TAKEN INTO CUSTODY BY PO'S HOGG AND PRINZI WITHOUT INCIDENT. (A1) WAS TAKEN TO THE PATROL CAR OF PO TURNER WHERE SHE WAS ISSUED AN APPEARANCE TICKET (209460) FOR THE ABOVE CHARGES. RURAL METRO RESPONDED AS (A1) COMPLAINED OF AN ANXIETY ATTACK, BUT (A1) REFUSED TO SPEAK TO THE EMS CREW. I TOOK PHOTOS OF (A1) FOR THIS REPORT. (A1) WAS FURTHER RELEASED WITH HER APPEARANCE TICKET.

| Officer: ☒ Primary Officer   ☐ Assisting Officer   Name: DARYL HOGG | ID# 2036 |
|---|---|

Page 3 of 3

| 15. Name | ID # | Height | Weight | Division | Pltn | Uniform | Injured/ Treated | Cover Page |
|----------|------|--------|--------|----------|------|---------|------------------|------------|
| PRIMARY: DARYL HOGG | 2036 | 6'0" | 195 | West | 3rd | Yes | No | Yes |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**WITNESSES** – Conduct a neighborhood check and indicate with code: W – Witness/Deposed, NI – Not Interviewed,
NO – Interviewed/No Information,  WR – Witness/Refused Deposition.

| 16. NAME | ADDRESS | DAY PHONE | EVENING PHONE | WITNESS CODE |
|----------|---------|-----------|---------------|--------------|
| GAIL BRANTLEY | 211 KINGSBORO RD | 436-2045 | SAME | NO |
| ADAM JUHASZ | 377 GENESEE PARK BLVD | 260-4210 | SAME | NO |
| NICOLE EDDY | 355 GENESEE PARK BLVD | 436-3164 | SAME | NO |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**MEDICAL**                                                                 *Attach and forward a copy of all depos to PSS and PDS

17. Condition of subject:   ☒ Sober   ☐ Alcohol Influence   ☐ Intoxicated (alcohol)   ☐ Drugs

18. Subject injured prior to incident:   ☒ No   ☐ Yes, describe:

19. Subject injured during incident:   ☒ No   ☐ Yes, describe:

20. If subject was exposed to O.C., was subject treated:   ☐ No   ☐ Yes   ☐ At hospital   ☐ PSB eyewash station

21. Hospitalization:   ☒ No – Reason:  *NO COMPLAINT OF PAIN OR INJURY*
       ☐ Yes – Transport via   ☐ RPD vehicle #   ☐ Ambulance Co/Veh #   ☐ Other

22. Hospital:                                    23. Attending medical professional:

24. Subject: ☐ Admitted   ☐ Treated and Released   ☒ No Treatment   ☐ Refused   25. Time of treatment/refusal:

26. Witness to refusal:

27. Technician work performed: ☐ No – Reason:
       ☒ Yes by: HOGG (2036)             ☒ Photos   ☐ Diagram   ☐ Other:

Photos of: ☒ Member(s)                   ☒ Subject   ☐ Other:

28. Reports completed: ☒ Crime       ☐ Incident          ☐ Investigative action
(DO NOT ATTACH)  ☒ Prisoner data   ☐ Addendum(s)   ☒ Technicians report
       ☒ Other: INFO'S                   ☒ CR #'s: 13-260442

29. Commanding Officer at scene: RIVERS         Rank: Sergeant         Division: West

## ADMINISTRATIVE REVIEW

30. Reviewing Supervisor:  *SGT Riv #1476*                 Date: 11/03/2013

31. Platoon Commanding Officer:  *Lt.*  *1012*             Date: 11/3/13

| Page 1 of 1 | ROCHESTER POLICE DEPARTMENT PRISONER DATA REPORT | MoRIS # new |
|---|---|---|

## ARRESTEE INFORMATION

| Prisoner Name (Last, First, Middle Suffix) | | | | | | Original CR# 2013-00260402 |
|---|---|---|---|---|---|---|
| cabisca, tina, lynn | | | | | | |

| Alias and/or Maiden Name (Last, First, Middle, Suffix) | | Nickname | Social Security # 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 | Arrest CR# 2013- |
|---|---|---|---|---|

| Address 207 kingsboro ROAD Rochester, 14619 | | Phone # Home (585)464-9704 |
|---|---|---|

| Date of Birth 04/05/1961 | Age 52 | Sex F | Race W | Height 5' 2 | Weight 160 | Hair Color Blonde | Hair Length Medium | Eye Color Blue | Complexion Light | Build Medium |
|---|---|---|---|---|---|---|---|---|---|---|

| Facial Hair | Ethnicity Non Hispanic | Residence Station Resident | Citizen Yes | Place of Birth (City, State or Country) elmira | Court Supervision |
|---|---|---|---|---|---|

| Glasses | Gang Affiliation No | Religion | Education Level 16 | Scars, Marks or Tattoos S-Chest T-Foot-"noah" |
|---|---|---|---|---|

| Dominant Hand Right | Military Service? | Marital Status Married | # of Children 2 | |
|---|---|---|---|---|

## ARREST INFORMATION

| Address of Crime 207 kingsboro ROAD | | Date of Crime 09/07/2013 | Address of Arrest 207 kingsboro ROAD | | Date of Arrest 09/07/2013 | Time of Arrest 21:50 | PSA 52 |
|---|---|---|---|---|---|---|---|

| Arrest Type Crime in Progress | App Ticket # 209460 | Arresting Officer #1 TURNER | IBM# 2091 | Arresting Officer #2 HOGG | | IBM# 2036 |
|---|---|---|---|---|---|---|

| Statute - PL 240.26  01   V2 | Attempt/Commit - Completed | Counts - 1 | Larceny Type - |
|---|---|---|---|
| Description - Harassment 2nd: Physical Contact | | | |
| Statute - PL 205.30    AM0 | Attempt/Commit - Completed | Counts - 1 | Larceny Type - |
| Description - Resisting Arrest | | | |
| Statute - | Attempt/Commit - | Counts - | Larceny Type - |
| Description - | | | |
| Statute - | Attempt/Commit - | Counts - | Larceny Type - |
| Description - | | | |
| Statute - | Attempt/Commit - | Counts - | Larceny Type - |
| Description - | | | |
| Statute - | Attempt/Commit - | Counts - | Larceny Type - |
| Description - | | | |
| Statute - | Attempt/Commit - | Counts - | Larceny Type - |
| Description - | | | |

| Arrestee Weapon Information None Not Applicable | Searched Completed By TURNER | IBM# 2091 | Fingerprintable? Yes | Positive ID? Yes | Wanted by Other Jurisdiction? No |
|---|---|---|---|---|---|

## REMARKS

(A) DID PUSH OFFICER HOGG
(A) WAS GIVEN AN A.P.T (209460) FOR SEPTEMBER 18, 2013 AT 0930 HOURS

## CONTACT INFO

| Occupation NURSE | Employer BANKER CONSECO | Address WILLOWBROOK Rochester, NY | Phone # |
|---|---|---|---|
| Mother's Name CABISCIA, SHRILEY, | | Address Rochester, NY | Phone # |
| Father's Name DEAD, | | Address Rochester, NY | Phone # |
| Spouse/Girlfriend/Boyfriend Name WINDSOR, LEONAID, | | Address 207 KINGSBORO ROAD Rochester, NY 14619 | Phone # (585)464-9704 |

## JAIL INFO

| Searched by Jail | Amount of Money | Released to Custody of | Date | Time |
|---|---|---|---|---|
| Released on Bail | Bail Amount | Released By | | |

Booking Deputy's Remarks / Signature & ID# (include Medical Notes, Injuries, Etc.)

PDR 2013002260402 Page 1 OF

| Page 1 of 2 | ROCHESTER POLICE DEPARTMENT | CR # |
|---|---|---|
| | INCIDENT REPORT | 2013-00260442 |

**DETAIL**

| Incident Type | Report Date | Report Time | Date From | Time From | Date To | Time To |
|---|---|---|---|---|---|---|
| 17. Public Order Offenses | 09/07/2013 | 21:50 | 9/7/2013 | 21:50 | 09/07/2013 | 21:50 |

| Incident Address | PSA | Campus Code |
|---|---|---|
| 207 kingsboro ROAD | 53 | |

Violent Crime Context

**OFFENSES**

| Statute - PL 240.26  01  V2 | Attempt/Commit - Completed | Counts - 1 |
|---|---|---|

Description - Harassment 2nd: Physical Contact

| Location | Weapon |
|---|---|
| Single Family Home-01 | Semiautomatic Handgun-03 |

| Larceny Type | Aggravated Assault Circumstances | Gang Related | Computer |
|---|---|---|---|
| | Other Circumstances | No | No |

| Bias Type | Entry Point | Method of Entry | # of Premises Entered |
|---|---|---|---|
| No Bias-Not Applicable-77 | | | |

| Statute - PL 205.30  AM0 | Attempt/Commit - Completed | Counts - 1 |
|---|---|---|

Description - Resisting Arrest

| Location | Weapon |
|---|---|
| Single Family Home-01 | |

| Larceny Type | Aggravated Assault Circumstances | Gang Related | Computer |
|---|---|---|---|
| | | No | No |

| Bias Type | Entry Point | Method of Entry | # of Premises Entered |
|---|---|---|---|
| No Bias-Not Applicable-77 | | | |

**VICTIM**

| Victim Type | Victim Name (Last, First, Middle) |
|---|---|
| Society Public-S | City of Rochester |

| Address | Date of Birth | Age | Sex | Race | Ethnicity | Residence Status |
|---|---|---|---|---|---|---|
| 185 Exchange BLVD | | | | | | Not Applicable |

| City, State, Zip | Victim/Offender Relationship  (Offender Name, DOB, Relationship) |
|---|---|
| Rochester, NY 14614 | |

| Telephone | Level of Injury | Type of Injury | Medical Treatment |
|---|---|---|---|
| (585)428-1110 | Business - NA | Business - NA | Business - NA |

**PERSONS**

R = Reporting Person     W = Witness     PK = Person w/Knowledge     NI = Not Interviewed

| Type | Name (Last, First, Middle) | DOB | Sex | Race | Eth | Address | Telephone No |
|---|---|---|---|---|---|---|---|
| NO | BRANTLEY, GAIL | 01/29/1946 | F | B | N | 411 KINGSBORO ROAD Rochester, NY 14611 | (585)438-2045 |
| NO | JUHASZ, ADAM | 11/01/1984 | M | W | N | 177 GENESEE PARK BLVD Rochester, NY 14611 | (585)260-4210 |
| NO | EDDY, NICOLE | 02/10/1972 | F | W | N | 188 GENESEE PARK BLVD Rochester, NY 14611 | (585)438-3164 |

**SUSPECT / MISSING PER**

| Type - S | Suspect Name (Last, First, Middle) | Nickname |
|---|---|---|
| Arrestee | cabisca, tina, lynn | |

| Address | Date of Birth | Age | Sex | Race | Ethnicity | MoRIS / JCR # |
|---|---|---|---|---|---|---|
| 207 kingsboro ROAD Rochester, NY 14619 | 4/5/1961 | 52 | F | W | N | new |

| Height | Weight | Hair Color | Hair Length | Eye Color | Glasses | Complexion | Build | Facial Hair | Gang Affiliation |
|---|---|---|---|---|---|---|---|---|---|
| 5' 2 | 160 | Blonde | | Blue | | | | | |

| Clothing, Jewelry, Distinguishing Features | Offender Condition | Scars, Marks, Tattoos |
|---|---|---|
| | Apparently Normal | |

| Mothers Maiden Name | Place of Birth | School Name / ID # |
|---|---|---|

**INVESTIGATION**

| Modus Operandi |
|---|
| Used Physical Force |

| | |
|---|---|
| ☐ 01. Witness to the offense? | ☐ 05. Can a suspect be described? | ☐ 09. Is there significant Modus Operandi present? |
| ☐ 02. Surveillance footage of event? | ☐ 06. Can a suspect be identified? | ☐ 10. Is there significant physical evidence present? |
| ☐ 03. Can a suspect be named? | ☐ 07. Can a suspect vehicle be identified? | ☐ 11. Has evidence tech work been perfomed? |
| ☐ 04. Can a suspect be located? | ☐ 08. Is stolen property traceable? | ☐ 12. Preliminary investigation NOT completed? |

| Case Status | Exceptional Clearance | Assigned Bureau | Review Box |
|---|---|---|---|
| Cleared by Arrest - Adult | | West - Patrol | PDW 3rd |

| Reporting Officer | | IBM # | Date | Reviewed By |
|---|---|---|---|---|
| HOGG | DARYL | 2036 | 09/08/2013 | jr1476|RIVERS, JON S.|9/8/2013|01:38 |

2013-00260442 Page 1 OF 1

ON 9/7/13 AT APPROXIMATELY 2150HRS, RO'S WERE ASSISTING INV. WENGERT INVESTIGATING A POSSIBLE LARCENY AT 207 KINGSBORO RD. INV WENGERT WENT TO THE SEMI-ENCLOSED FRONT PORCH AND KNOCKED ON THE DOOR LOUDLY MULTIPLE TIMES. THERE WERE LIGHTS ON INSIDE THE HOUSE. RO'S WERE STANDING AT THE END OF THE DRIVEWAY NEAR THE SIDEWALK WITH 2 MARKED PATROL VEHICLES PARKED IN THE STREET, IN FRONT OF 207 KINGSBORO RD.

INV. WENGERT YELLED "HELLO" AS THE SIDE DOOR OPENED. TWO LARGE BREED DOGS BEGAN TO BARK AND RAN OUT OF THE DOOR AND THEN DOWN THE DRIVEWAY. AS THE DOGS WERE COMING OUT OF THE HOUSE (A1) CABISCA FOLLOWED BEHIND THEM. RO'S BEGAN TO YELL TO (A1) TO PUT THE DOGS AWAY BUT (A1) DID NOT. AS THE DOGS PASSED THE STAIRS OF THE PORCH WHERE INV. WENGERT WAS STANDING, ONE DOG STOPPED, TURNED AND RAN UP THE STEPS CHARGING AT INV. WENGERT, STILL BARKING LOUDLY. AS THE AGGRESSIVE DOG CHARGED INV. WENGERT, HE SHOT 2 ROUNDS INTO THE DOG FROM HIS DUTY WEAPON. THE SECOND DOG TURNED AND RAN BACK TOWARDS THE HOUSE. RO'S CONTINUED TO YELL TO (A1) TO RETURN THE DOGS BACK INSIDE BUT SHE REFUSED AND BEGAN YELLING "WHAT THE FUCK DO YOU WANT AND WHY THE FUCK ARE YOU HERE?" THE DOG THAT WAS SHOT LAYED ON THE GROUND AT THE BASE OF THE STEPS.

(A1) FINALLY PUT THE OTHER DOG BACK INTO THE RESIDENCE AND THEN CAME BACK OUT SCREAMING AT RO'S. RO'S ATTEMPTED TO SPEAK WITH (A1) BUT HER IRATE ATTITUDE AND DEMEANOR KEPT HER FROM LETTING RO'S SPEAK. RO'S THEN BEGAN TO MAKE APPROPRIATE NOTIFIES (ANIMAL CONTROL) WHEN (A1) CHARGED DOWN THE DRIVEWAY AT PO'S HOGG AND PRINZI YELLING AND SCREAMING VARIOUS THINGS INCLUDING "FUCK" AND "ASSHOLES." AS (A1) GOT CLOSE TO PO HOGG, (A1) PUSHED PO HOGG BACKWARDS USING BOTH HANDS INTO PO HOGG'S CHEST AREA. PO HOGG IMMEDIATELY USED TRAINED TECHNIQUES TO SECURE (A1) (SEE SRR).

(A1) WAS CLEARLY AND VISIBLY UPSET OVER THE FACT OF HER DOG BEING SHOT AS WELL AS THERE BEING A 6 MONTH OLD INFANT AND ANOTHER YOUNG CHILD ALONE INSIDE THE HOUSE. (A1) STATED NO OTHER ADULTS WERE HOME. RO'S THEN MADE A DECISION TO ALLOW (A1) TO ATTEND TO THE UNSUPERVISED CHILDREN INSIDE THE HOME. AS (A1) WENT BACK TO ATTEND TO THE CHILDREN, RO'S ORDERED (A1) TO SECURE THE THIRD DOG INSIDE THE HOUSE FOR OFFICER SAFETY FACTORS. (A1) CONTINUED TO CURSE AT RO'S AS SHE WAS GOING TOWARDS THE HOUSE. (A1) WAS GIVEN NUMEROUS OTHER ORDERS TO SECURE THE DOGS FOR EVERYONE'S SAFETY.

WHEN (A1) CAME BACK OUTSIDE, STILL UPSET AND CURSING AT RO'S, SHE GAVE PERMISSION TO (NO1) BRANTLEY, WHO IS HER NEIGHBOR TO WATCH THE UNATTENDED CHILDREN INSIDE THE HOME. (A1) WAS THEN TAKEN INTO CUSTODY WITHOUT FURTHER INCIDENT.

PO PRINZI CONTACTED SGT RIVERS, RPD ANIMAL CONTROL AND REQUESTED A TECHNICIAN TO RESPOND. PO PRINZI ALSO PERFORMED A NEIGHBORHOOD CHECK WITH NEGATIVE RESULTS (SEE ASSOCIATED PERSONS).

SGT RIVERS, ANIMAL CONTROL 3805 AND TECHNICIAN WALTON (6811) ALL RESPONDED TO THE SCENE. (A1'S) HUSBAND WHO REFUSED PEDIGREE INFORMATION TO RO'S REFUSED TO ALLOW ANIMAL CONTROL TO TAKE CUSTODY OF THE DOG.

PO HOGG TOOK PHOTOS PRIOR TO TECH RESPONDING (SEE TECH SHEET).

(A1) REQUESTED AN AMBULANCE FOR HER ANXIETY BUT REFUSED TO SPEAK TO EMS (RURAL METRO RIG #9439) UPON THEIR ARRIVAL. (A1) WAS ISSUED AN APPEARANCE TICKET FOR HER CHARGES AND WAS RELEASED.

| Reporting Officer | | IBM # | Date | Reviewed By |
|---|---|---|---|---|
| HOGG | DARYL | 2036 | 09/08/2013 | jr1476|RIVERS, JON S.|9/8/2013|01:38 |

# EXHIBIT B

5

NOLAN WENGERT - BY MR. FUSSELL

1
2 just say so.
3     A.  Certainly.
4     Q.  And you can -- the general rule is, you
5 can approximate.  Guessing is so far off the realm of
6 truth that you don't need to guess.  If you need a
7 break, say so.  There's no reason why we can't take
8 breaks if you need a break.  And if you -- I'm sure
9 you've heard this a hundred times at least.  Don't do
10 head nods or uh-huhs or uh-uhs.  If the answer is yes
11 or no, just say yes or no for the court reporter's
12 benefit.
13         I wasn't planning to do it this way, but
14 now that you gave me Exhibit 4, let's do Exhibit 4.
15 I'm looking at the top of the first page of Exhibit 4.
16 Are you looking at the same thing?
17     A.  Yes, I am.
18     Q.  Who is Cali Zimmerman?
19     A.  Cali Zimmerman would be the victim who
20 reported her cell phone being stolen.
21     Q.  Is she related to any member, present or
22 past, of the Rochester Police Department?
23     A.  I believe she is the relative of a retired
24 member of the RPD.
25     Q.  Who is that member, if you know?

6

NOLAN WENGERT - BY MR. FUSSELL

1
2     A.  His last name is Zimmerman.  There's two
3 Zimmerman brothers associated with the police
4 department.  I don't recall which Zimmerman brother.
5     Q.  You've got on the top line 60 Browns Race,
6 Rochester.  What is that?
7     A.  That would be the occurrence, the location
8 where the theft occurred.
9     Q.  And who was the -- I see a suspect, Tyrone
10 Williams.  Is that the same as Tyrone Flowers?
11     A.  No.  That is a different person.
12     Q.  Same first name?
13     A.  Same first name.  They live on the same
14 road.
15     Q.  They both live on Kingsboro Road?
16     A.  Oddly enough.
17     Q.  I see.  So Tyrone Williams is at 2
18 Kingsboro Road?
19     A.  Correct.
20     Q.  And what address is Tyrone Flowers, if you
21 know?
22     A.  35 Kingsboro.
23     Q.  Is the paper you're looking at to see 35
24 part of Exhibit 4?
25     A.  Yes.

7

NOLAN WENGERT - BY MR. FUSSELL

1
2     Q.  Okay.  In the first line of the narrative
3 portion on page 1 of Exhibit 4, there's a reference to
4 an S.  Who is the S?
5     A.  The S is a Tyrone Williams.
6     Q.  Who is the PK?
7     A.  PK would be Tyrone Flowers.
8     Q.  So did you -- the next line, it says,
9 "Flowers returned with no pawn history."  Did you or
10 anyone else from the RPD check to see whether Flowers
11 had had a history of criminal involvement regarding
12 pawn?  I don't know how to phrase that.
13     A.  I understand the sum and substance of your
14 question.  To see if he had a criminal history?
15     Q.  Correct.
16     A.  And yes, I did.  And yes, there was a
17 minor -- what I would, in my opinion, describe as
18 minor.
19     Q.  Okay.  Do you know what it was?
20     A.  I don't recall at this state.
21     Q.  When you say "minor," would it have been a
22 misdemeanor or a violation maybe?
23     A.  Yes.
24     Q.  Do you know whether it was a misdemeanor
25 or a violation?

8

NOLAN WENGERT - BY MR. FUSSELL

1
2     A.  I don't recall.
3     Q.  It was not a felony?
4     A.  To my recollection, no.
5     Q.  Do you know how old, approximately, Tyrone
6 Flowers was in September of 2013?
7     A.  His date of birth is 1988, which --
8     Q.  That's fine.  That's good enough.  I can
9 do the math, hopefully.
10         You mentioned in the report that Tyrone
11 Flowers was pushing two bicycles down the sidewalk.
12 Can you describe the bicycles?
13     A.  To my recollection now, I believe they
14 were of -- I believe one was a mountain-style bicycle
15 and one was a BMX-style bicycle based on the frames.
16 Past that, I don't have specific recollection.
17     Q.  Do you have a recollection as to whether
18 they looked as if they were new or had been used?
19     A.  They looked like bicycles in decent repair
20 that were rideable.
21     Q.  How did you find out that he had a small
22 amount of marijuana?
23     A.  Because when I detained him, he admitted
24 to me that he did have a small amount of marijuana.
25     Q.  Did you ask him if he had marijuana?

**9**

NOLAN WENGERT - BY MR. FUSSELL

2   A.   I don't specifically recall.

3   Q.   What led up to his telling you he had

4   marijuana?

5   A.   He was detained in the front yard area on

6   the sidewalk in front of his house. Based on my

7   observations, to my recollection, he smelled like

8   marijuana and somehow the conversation of marijuana

9   came up. I don't know if he brought it up and

10   admitted to me as I was searching him that he had

11   marijuana or if I asked him as I searched him if he

12   had marijuana.

13   Q.   When you said you detained him, what

14   exactly did you do?

15   A.   I stopped him and I placed handcuffs on

16   him.

17   Q.   Why did you put handcuffs on him?

18   A.   Because I believed -- I reasonably

19   believed that he had just committed a crime.

20   Q.   What crime?

21   A.   The crime of either burglary or larceny.

22   Q.   Why did you reasonably -- what reasons did

23   you have to reach the belief that he had committed

24   burglary or larceny?

25   A.   First off, in my investigation of the

**10**

NOLAN WENGERT - BY MR. FUSSELL

2   larceny, at the time this report is written, it's a

3   report written on September 10th, which allowed me to

4   conduct more of the investigation than at the time

5   that I had stopped Mr. Flowers. But being that

6   Mr. Flowers was a person of interest in the theft of a

7   cell phone, I was going to interview him in regards to

8   that incident. And I observed him pushing two

9   bicycles down a dark residential street with latex

10   gloves on, which is commonly used by criminals to

11   prevent fingerprints and DNA evidence from being left

12   at the scene of burglaries or on property that they

13   steal from burglaries. I believe that it was

14   reasonable that he had just stolen those bicycles.

15   Q.   What is 60 Browns Race? What is it?

16   A.   I don't specifically know. I believe it's

17   a convention center of some sort or, like, a

18   party-hosting venue. But I don't specifically know

19   what it's called.

20   Q.   What was your understanding was

21   Mr. Williams and Mr. Flowers doing at 60 Browns Race

22   on August 24, 2013?

23   A.   They were providing some sort of service

24   to the people hosting whatever the event was.

25   Q.   What type of service was it your

**11**

NOLAN WENGERT - BY MR. FUSSELL

2   understanding?

3   A.   I don't recall specifically. I believe it

4   was catering assistance.

5   Q.   Don't caterers often wear latex gloves?

6   A.   I'm not familiar with the catering

7   industry.

8   Q.   List all the reasons you had to conclude

9   that Mr. Flowers was under suspicion for larceny or

10   burglary if you haven't already listed them.

11   A.   Specifically -- I took up the

12   investigation at this point. But there was prior

13   investigation done and prior reports made by the

14   business owners.

15   Q.   I'm talking about the bicycle issue.

16   A.   The bicycle issue.

17   Q.   Right. What did you reasonably -- what

18   factual evidence did you have to make you reach the

19   conclusion that Tyrone Flowers had committed a larceny

20   or a burglary or may have committed a larceny or a

21   burglary?

22   A.   Based upon my training and experience in

23   that specific area, Kingsboro, the lower -- what at

24   the time was called the PSA 53 area, I had worked down

25   there for approximately seven to eight years. I have

**12**

NOLAN WENGERT - BY MR. FUSSELL

2   investigated and arrested numerous burglars, numerous

3   garage larcenists, if you will, in that precise area,

4   in the immediate radius of that area.

5   It's common when people steal bicycles --

6   obviously if they steal multiple bicycles, they can't

7   ride multiple bicycles away. So it's common for

8   people to steal multiple bicycles and push them away.

9   It's a common understanding based on the training and

10   experience in the Rochester Police Department.

11   Further, I had observed someone at night

12   pushing these bicycles wearing latex gloves, which are

13   a common accessory of burglars and thiefs these days

14   to, again, avoid leaving evidence of fingerprints, of

15   DNA, of things of that nature. Combined with the

16   knowledge that had been relayed to me about his

17   involvement in other thefts, I drew the conclusion

18   that the individual that I saw possibly and reasonably

19   may have stolen those items requiring further

20   investigation.

21   Q.   What information had you had about

22   Mr. Flowers involved in burglaries or larcenies or

23   other criminal events other than what you just

24   testified to, that he had had one event that involved

25   a minor crime?

---

41

NOLAN WENGERT - BY MR. FUSSELL

02:47:01  2    A.    At what point in time?

02:47:02  3    Q.    Would there be -- once you decided to go

02:47:06  4  from Tyrone Flowers' residence to 207 Kingsboro, did

02:47:15  5  you check in with 911 or any other agency or

02:47:21  6  establishment to let them know you were going to 207?

02:47:24  7    A.    The uniformed officers would do that.

02:47:29  8  That wouldn't necessarily be my position. So the

02:47:32  9  uniformed offices I was with, before relocating to

02:47:35  10  207, would have updated that information because they

02:47:37  11  have computers and all that. I don't.

02:47:40  12    MR. FUSSELL:  So, again, if that's

02:47:41  13  included in -- I'm asking for that information if I

02:47:46  14  haven't already asked for it. Whatever 911 or other

02:47:48  15  such information, I'm requesting.

02:47:59  16    Q.    Do you remember the weather that night?

02:48:03  17    A.    It was somewhat chilly and damp.

02:48:06  18    Q.    Do you know if either of those bicycles

02:49:01  19  have a license plate on them or any other

02:49:04  20  identification mark or number?

02:49:05  21    A.    They certainly wouldn't have had license

02:49:11  22  plates.

02:49:11  23    Q.    They wouldn't?

02:49:12  24    A.    They would not have had license plates.

02:49:14  25  And I don't recall seeing any specific identifying

---

42

NOLAN WENGERT - BY MR. FUSSELL

02:49:16  2  numbers or anything of that nature.

02:49:25  3    Q.    Did you or -- strike that.

02:49:28  4    At some point when you were at

02:49:31  5  Mr. Flowers' house did Officers Prinzi and Hogg

02:49:34  6  appear --

02:49:34  7    A.    Yes.

02:49:35  8    Q.    -- at his house?

02:49:35  9    A.    Yes.

02:49:36  10    Q.    Why did they show up?

02:49:38  11    A.    I requested their assistance.

02:49:39  12    Q.    So you got there before they did?

02:49:42  13    A.    Correct.

02:49:42  14    Q.    Why did you request their assistance?

02:49:44  15    A.    Because I wanted their assistance in

02:49:46  16  transporting Mr. Flowers back to the scene where he

02:49:50  17  explained that he had found the bikes.

02:49:52  18    Q.    Why did you need two officers to do that?

02:49:59  19    A.    I suppose I could have just used one. I

02:50:02  20  didn't request a certain number. Two officers

02:50:05  21  arrived.

02:50:05  22    Q.    So you made a request and two officers

02:50:07  23  arrived?

02:50:08  24    A.    Correct.

02:50:08  25    Q.    Once those officers arrived, what

---

43

NOLAN WENGERT - BY MR. FUSSELL

02:50:15  2  happened?

02:50:15  3    A.    We relocated to 207 Kingsboro.

02:50:20  4    Q.    Okay. How many vehicles were there that

02:50:23  5  relocated to 207 Kingsboro?

02:50:24  6    A.    A total of three.

02:50:29  7    Q.    So each officer had its own vehicle?

02:50:31  8    A.    Correct.

02:50:31  9    Q.    His own vehicle. I'm sorry.

02:50:33  10    A.    Correct.

02:50:33  11    Q.    And whose decision was it to go to 207?

02:50:38  12    A.    Mine.

02:50:39  13    Q.    I may have asked this because I'm skipping

02:50:40  14  a lot because we already covered what I was planning

02:50:52  15  to ask already, so I'm not sure. Could you have

02:50:57  16  waited till the next day during daylight hours to

02:51:01  17  check with the occupants of 207 to find out whether

02:51:07  18  their bicycles had been stolen or burglarized or

02:51:11  19  whether they had just been left out for Mr. Flowers or

02:51:13  20  somebody else to take?

02:51:14  21    A.    Based on the potential seriousness of the

02:51:17  22  incident, I would say no.

02:51:19  23    Q.    Why?

02:51:19  24    A.    Because it had the potential to be a

02:51:23  25  felony burglary where we have the gentleman who would

---

44

NOLAN WENGERT - BY MR. FUSSELL

02:51:26  2  have committed that burglary, had the bikes been

02:51:28  3  stolen, in custody. It's a serious felony. I

02:51:31  4  wouldn't feel comfortable not investigating that

02:51:33  5  thoroughly as immediately as possible.

02:51:36  6    Q.    Why not? I mean, he's -- you know where

02:51:38  7  he lives; right?

02:51:40  8    A.    Yes.

02:51:42  9    Q.    Okay. Are there any other reasons other

02:51:50  10  than you've given as to why you would be uncomfortable

02:51:54  11  waiting for the next day --

02:51:55  12    A.    Yes.

02:51:55  13    Q.    -- under all the circumstances?

02:51:59  14    A.    Many of them.

02:51:59  15    Q.    What are they?

02:51:59  16    A.    First off, obviously burglary is a violent

02:52:02  17  C felony. Second degree burglary of a residence is a

02:52:08  18  violent C felony under New York State Penal Law.

02:52:12  19    Q.    Let me ask you -- I'm not a criminal law

02:52:15  20  expert, but where's the violent aspect?

02:52:16  21    A.    It's considered a violent felony offense.

02:52:20  22  It's categorized -- even if there isn't a direct

02:52:23  23  physical use of violence, it's categorized as a

02:52:28  24  violent felony offense, which is about as serious as

02:52:28  25  it gets.

---

45

NOLAN WENGERT - BY MR. FUSSELL

02:52:28 2    Q.   Okay.  I understand.

02:52:28 3    A.   So I don't want to expose the public to

02:52:32 4  further victimization which could result in --

02:52:35 5  burglaries commonly spiral out of control into

02:52:38 6  assaults, into murders, into high-speed police chases.

02:52:41 7  There's a fear that if I was derelict in my duties,

02:52:45 8  which is what that would be, failing to investigate

02:52:48 9  fully the night of the incident when I have the

02:52:50 10  gentleman with me -- if something else occurred down

02:52:54 11  the road, A, it would be a moral obligation that I

02:52:58 12  would have on me that I was derelict and failed to do

02:53:00 13  my job; B, it would subject the city to liability.

02:53:04 14  And quite frankly, it's just poor policing.

02:53:07 15    Q.   Okay.  Did you have any reason to believe

02:53:11 16  the taking of the bikes was a robbery?

02:53:14 17    A.   Specifically a robbery, no.  I believed it

02:53:17 18  was more likely it would have been probably a

02:53:19 19  burglary.

02:53:19 20    Q.   Okay.  Did you make any effort to

02:53:28 21  contact -- oh.  Another question.

02:53:30 22         Were you informed by Mr. Flowers or anyone

02:53:38 23  else that there were dogs at 207 Kingsboro Road?

02:53:41 24    A.   No, I was not.

02:53:44 25    Q.   Did you make any effort to contact the

46

NOLAN WENGERT - BY MR. FUSSELL

02:53:48 2  residents of 207 Kingsboro before you went up to the

02:53:52 3  front door?

02:53:53 4    A.   No.

02:53:53 5    Q.   Why not?

02:53:56 6    A.   Because to me, and in my common training

02:54:01 7  and experience, the first step to make contact with

02:54:03 8  somebody when you're almost within sight of their

02:54:06 9  house is simply to knock on the door.

02:54:08 10    Q.   Does the time of day or night matter when

02:54:12 11  you make that decision?

02:54:14 12    A.   In a situation like this, unfortunately

02:54:16 13  no, it doesn't.  You know, we'd prefer not to

02:54:20 14  inconvenience people.  But in this particular

02:54:23 15  situation, I observed there was lights on in the

02:54:25 16  house.

02:54:28 17    Q.   Had there not been lights on in the house,

02:54:28 18  would you have knocked on the door?

02:54:32 19    A.   Yes.

02:54:32 20    Q.   Because of the seriousness of -- the same

02:54:35 21  reasons you've already given?

02:54:37 22    A.   Yes.

02:54:37 23    Q.   How were the three -- where were the three

02:54:48 24  cars parked once the three cars arrived at 207

02:54:54 25  Kingsboro?

47

NOLAN WENGERT - BY MR. FUSSELL

02:54:55 2    A.   We were parked in a line on the north side

02:54:58 3  of the street.  I was the first car.  The uniformed

02:55:02 4  cars were parked directly behind me.  They would have

02:55:06 5  been essentially directly across from the head of the

02:55:09 6  driveway because the driveway is on what would be best

02:55:12 7  described as the south portion of the street.  They

02:55:15 8  were parked on the north portion of the street

02:55:17 9  directly behind me.  And I was slightly to the west of

02:55:23 10  the driveway.  So they would have been smack dab at

02:55:26 11  the end of the driveway on the opposite side of the

02:55:28 12  street.

02:55:28 13    Q.   Opposite side from 207?

02:55:31 14    A.   Correct.

02:55:31 15    Q.   Okay.  Were the cars parked in such a way

02:55:38 16  that the individuals in the cars, before they got out,

02:55:43 17  had a clear view of the house and the driveway?

02:55:47 18    A.   You mean the officers that were in the

02:55:51 19  marked vehicles?

02:55:51 20    Q.   Yes.

02:55:52 21    A.   I would -- since I wasn't in the car, I

02:55:55 22  can't say I have firsthand knowledge.

02:55:58 23    Q.   What about your car?

02:55:58 24    A.   In my car?  Where I was parked I could see

02:56:02 25  the porch portion and I could see the western portion

48

NOLAN WENGERT - BY MR. FUSSELL

02:56:08 2  of the house.  I don't believe I could see down the

02:56:11 3  driveway portion of the home.

02:56:14 4    Q.   But the cars behind you, maybe they could

02:56:16 5  have?

02:56:16 6    A.   Perhaps they could have.  Yes.

02:56:18 7    Q.   And which -- assuming your car is the

02:56:28 8  first car, which car was -- did Mr. Flowers go with

02:56:36 9  you?

02:56:36 10    A.   Yes.

02:56:36 11    Q.   Which car was he in?  First, second or

02:56:39 12  third.

02:56:39 13    A.   To my recollection, he was in my car

02:56:41 14  because he was directing me to 207.

02:56:44 15    Q.   Okay.  Is that your recollection?

02:56:51 16    A.   Yes.

02:56:51 17    Q.   And where was he in the car?

02:56:56 18    A.   He would have been in the backseat of the

02:56:58 19  car.

02:56:58 20    Q.   Was there anything that you know of that

02:57:15 21  blocked his view of the house and the driveway?

02:57:17 22    A.   No, not that I'm aware of.

02:57:19 23    Q.   What were you wearing that night?

02:57:29 24    A.   I was dressed in a similar fashion to what

02:57:32 25  I am now, except I had additional items on.  I had a

49

NOLAN WENGERT - BY MR. FUSSELL

02:57:36  2  shirt and tie and dress pants on with a badge
02:57:42  3  displayed outside my clothes hanging from my neck. I
02:57:45  4  had my pistol on my hip. I have a radio on my left
02:57:48  5  hip. In front of that I would have had a magazine
02:57:52  6  carrier with a set of handcuffs. And then on my belt
02:57:55  7  in the rear, I would also have a set of handcuffs
02:57:58  8  hanging.
02:57:59  9      Q.   Now, was the lanyard virtually identical
02:58:03 10  to the one you're wearing now?
02:58:05 11      A.   Yes.
02:58:05 12      Q.   What are the dimensions of the one you're
02:58:07 13  wearing now, the best you can?
02:58:10 14      A.   The best I could tell you, it appears to
02:58:13 15  be about 8 inches by -- 8 inches tall and 6 inches
02:58:18 16  wide.
02:58:20 17      Q.   I don't think I brought my ruler at this
02:58:28 18  time. It doesn't look that way at all to me. I don't
02:58:33 19  think I brought my ruler.
02:58:38 20      MR. FUSSELL:   Mr. Ash, could we get a
02:58:42 21  ruler and measure that? It doesn't look to me to be
02:58:46 22  remotely close to those dimensions, but I may be
02:58:50 23  wrong.
02:58:50 24      MR. ASH:   You want me to go find a ruler
02:58:52 25  so you can measure?

50

NOLAN WENGERT - BY MR. FUSSELL

02:58:54  2      MR. FUSSELL:   Or you can measure. I don't
02:58:57  3  care if I measure or not. I'd like to have that
02:59:00  4  measured.
02:59:01  5      (There was a pause in the proceeding.)
02:59:40  6      MR. ASH:   Investigator, can you measure
02:59:42  7  that, please?
02:59:44  8      THE WITNESS:   Sure. What I described in
02:59:47  9  the tall dimensions, which may not be fashionably
02:59:52 10  correct as the "tall dimension," it's 4 and a half
02:59:54 11  inches. And then it's 3 inches in the width.
03:00:00 12      MR. FUSSELL:   Okay. Thank you.
03:00:03 13      Q.   What color shirt were you wearing, if you
03:00:05 14  recall?
03:00:05 15      A.   I don't recall.
03:00:07 16      Q.   I assume Hogg and Prinzi were both wearing
03:00:16 17  standard officer uniforms?
03:00:17 18      A.   Correct.
03:00:17 19      Q.   Did any one of you walk up to the house?
03:00:31 20      A.   I walked up to the house. Yes.
03:00:33 21      Q.   Whose decision was that that you walk up
03:00:36 22  to the house?
03:00:38 23      A.   I suppose it was my decision.
03:00:42 24      Q.   Whose decision was it that you walk up by
03:00:45 25  yourself?

51

NOLAN WENGERT - BY MR. FUSSELL

03:00:47  2      A.   Well, I didn't walk up by myself. I was
03:00:48  3  just the first to walk up. The other officers were
03:00:51  4  proceeding behind me.
03:00:53  5      Q.   Okay. Did you give them any directions
03:00:55  6  like "Stay here at the end of the driveway" or "Follow
03:00:58  7  me" or anything like that?
03:01:00  8      A.   No.
03:01:00  9      Q.   Okay. Did you announce that you were
03:01:05 10  going to walk up to the house? Did you tell the
03:01:08 11  officers that you were?
03:01:08 12      A.   No. It's just assumed police procedure.
03:01:10 13      Q.   Where were the other two officers when you
03:01:15 14  left, let's say, the sidewalk and started to walk up
03:01:17 15  to the house? Where were they?
03:01:19 16      A.   They were somewhere near the head of the
03:01:21 17  driveway.
03:01:27 18      Q.   And then what did you do? You walked up
03:01:29 19  to the porch?
03:01:29 20      A.   I walked right up onto the porch and rang
03:01:32 21  the doorbell and knocked on the door.
03:01:32 22      Q.   Did you see an invisible fence sign as you
03:01:38 23  walked up the driveway?
03:01:43 24      A.   No.
03:01:43 25      Q.   Did you have a light on -- did you, like,

52

NOLAN WENGERT - BY MR. FUSSELL

03:01:51  2  have a flashlight with you?
03:01:52  3      A.   I did have a flashlight with me, but I
03:01:54  4  didn't have it lit.
03:01:55  5      Q.   Why didn't you light it?
03:02:02  6      A.   Because it was well lit and I could see
03:02:03  7  where I was going.
03:02:04  8      Q.   Where were the lights?
03:02:06  9      A.   There was a light on over the porch.
03:02:08 10  There was ambient light from the headlights from the
03:02:12 11  cars because the cars were left running.
03:02:14 12      Q.   You're saying the porch light was on?
03:02:17 13      A.   Yes.
03:02:17 14      Q.   Had the porch light been off, would you
03:02:20 15  have had your flashlight on?
03:02:25 16      A.   If I needed to see, I may have turned the
03:02:29 17  flashlight on. But in this situation, I don't believe
03:02:32 18  I would have. I mean, I'm just essentially
03:02:35 19  approaching to knock on a citizen's door.
03:02:38 20      Q.   Had you had your flashlight on, might you
03:02:40 21  have seen the invisible fence sign?
03:02:43 22      A.   If there was an invisible fence sign. I
03:02:47 23  can't speculate onto whether I would have seen it or
03:02:48 24  not because I have no idea if there was one and, if
03:02:51 25  so, where it was.

53

NOLAN WENGERT - BY MR. FUSSELL

03:02:52  2    Q.  Okay.  You said you had your flashlight.
03:03:12  3  Did you have it in your hand?
03:03:13  4    A.  No.  At the time I had a tactical
03:03:15  5  flashlight that would clip to my pocket.
03:03:17  6    Q.  How long were you on the porch before you
03:03:24  7  rang the doorbell?
03:03:26  8    A.  Essentially immediately upon going to the
03:03:28  9  porch, I knocked on the door and rang the doorbell.
03:03:32  10    Q.  Do you do both of those simultaneously?
03:03:35  11    A.  Within a contemporary period of one
03:03:38  12  another.  Yes.
03:03:39  13    Q.  What does that mean?
03:03:39  14    A.  It means I don't know if I rang the
03:03:41  15  doorbell first and then knocked or if I knocked and
03:03:44  16  then rang the doorbell, but it would have been within
03:03:47  17  close proximity to one another.  Sometimes doorbells
03:03:50  18  don't work.
03:03:51  19    Q.  What happened immediately after you
03:03:52  20  knocked on the door and rang the doorbell?
03:03:55  21    A.  Nothing initially.  I thought I might have
03:03:58  22  heard some movement in the house.  And then
03:04:01  23  eventually --
03:04:02  24    Q.  Did you hear any barking?
03:04:04  25    A.  No, I did not.

54

NOLAN WENGERT - BY MR. FUSSELL

03:04:05  2    Q.  Or growling of dogs or anything like that?
03:04:10  3    A.  Absolutely not.
03:04:10  4    Q.  So then what happened?
03:04:12  5    A.  I heard the side door of the house, which
03:04:15  6  would have been on the driveway, which was not visible
03:04:17  7  to me because I was on the front porch --
03:04:20  8    Q.  Right:
03:04:20  9    A.  I audibly heard that door open.  So I
03:04:23  10  immediately walked off the porch to come around the
03:04:26  11  corner and said hello.
03:04:28  12    Q.  Then what happened?
03:04:32  13    A.  I was shocked to see multiple dogs, no
03:04:35  14  people, and then the dogs charging up the driveway.
03:04:38  15    Q.  And where were you at the time you saw the
03:04:42  16  dogs?
03:04:43  17    A.  I was right on the edge of the stairs.
03:04:46  18  Because you walk down the stairs into the driveway to
03:04:49  19  go --
03:04:49  20    Q.  Were you at the bottom of the stairs?
03:04:51  21    A.  Yes.  I was at the bottom of the stairs
03:04:53  22  just in the driveway.  Just barely past the stairs.
03:04:58  23    Q.  Okay.  And then what happened?
03:04:59  24    A.  I immediately ran back up onto the porch
03:05:01  25  as the dogs were running at me.

55

NOLAN WENGERT - BY MR. FUSSELL

03:05:03  2    Q.  How fast were the dogs going?
03:05:05  3    A.  Pretty quick.
03:05:06  4    Q.  Was one going quicker than the others
03:05:11  5  or --
03:05:12  6    A.  There was two identical dogs, essentially.
03:05:15  7    Q.  Okay.
03:05:15  8    A.  I believe they were large boxers or pit
03:05:20  9  mixes.  Something consistent with that.  They were
03:05:23  10  large and they looked pretty much identical.  They
03:05:26  11  were running aggressively, charging up.  The German
03:05:30  12  shepherd was running around -- there was a German
03:05:34  13  shepherd/golden retriever, I believe, behind them that
03:05:37  14  was running, as well, but he didn't seem to be as
03:05:39  15  aggressive in charging.  He was just kind of running
03:05:42  16  and then he was running in circles.
03:05:43  17    Q.  Okay.  So as the boxer dogs are running
03:05:53  18  towards you, you -- what did you do specifically?  I
03:05:58  19  know you've already said it, but I'm not sure exactly
03:06:00  20  how you phrased it.
03:06:01  21    A.  I retreated by running back up the porch
03:06:04  22  to get on the porch.
03:06:06  23    Q.  Did you run backwards or did you turn
03:06:08  24  around and run frontwards?
03:06:10  25    A.  I would say I went sideways.  I went up

56

NOLAN WENGERT - BY MR. FUSSELL

03:06:13  2  the stairs sideways.
03:06:15  3    Q.  Then what happened?
03:06:16  4    A.  Then as the dogs continued to run, the two
03:06:23  5  boxers -- there was two of them.  They were running
03:06:23  6  towards Officer Prinzi and Hogg at the head of the
03:06:26  7  driveway.  One of them, the one closest to the stairs,
03:06:30  8  runs to the stairs, stops, presumably because it sees
03:06:34  9  me, then turns and then aggressively runs up the
03:06:38  10  stairs at me.
03:06:38  11    Q.  How long was he stopped?
03:06:41  12    A.  Oh.  Just momentarily.
03:06:43  13    Q.  Okay.  And then after he stopped
03:06:50  14  momentarily, what did he do?
03:06:51  15    A.  I suppose the better way to describe it
03:06:55  16  was that he turned rather than he stopped.  He stopped
03:06:58  17  proceeding towards them and he chose to proceed
03:07:00  18  towards me.  So he turned towards me.
03:07:02  19    Q.  He turned left?
03:07:03  20    A.  Yes.  He turned left and ran up the stairs
03:07:05  21  directly at me.
03:07:08  22    Q.  Okay.  How fast was he -- was he bounding
03:07:09  23  up the stairs?  What words would you describe?
03:07:11  24    A.  Exactly the word that I described.
03:07:12  25  Running at me.

57

NOLAN WENGERT - BY MR. FUSSELL

03:07:14  2    Q.  Okay.  And at the point he was running --
03:07:20  3  at the moment you saw him running at you directly
03:07:23  4  towards you after he made the left turn, where were
03:07:27  5  you?
03:07:27  6    A.  I was either towards the top of the stairs
03:07:30  7  or had just cleared the top stair of the porch.
03:07:35  8    Q.  And how far was he from the bottom step
03:07:38  9  when he started coming towards you?
03:07:39 10    A.  Well, he would have been at the bottom
03:07:42 11  step because the bottom step meets the driveway.
03:07:45 12    Q.  So he would have been right where the
03:07:47 13  bottom step met the driveway?
03:07:48 14    A.  Yes.
03:07:54 15    Q.  Okay.  Then what happened next?
03:07:55 16    A.  I began backing up as quickly as I could
03:07:57 17  while drawing my pistol.
03:07:58 18    Q.  Okay.
03:07:59 19    A.  And I walked back.  I felt something
03:08:01 20  against my back.  I'm not exactly sure what it was.  I
03:08:05 21  believe it might have been some sort of furniture or
03:08:08 22  something to that effect.  Obviously I had nowhere to
03:08:10 23  go.  The dog continued up, charging at me as if it was
03:08:14 24  going to bite me.  And I fired my handgun into the
03:08:16 25  dog.

58

NOLAN WENGERT - BY MR. FUSSELL

03:08:17  2    Q.  How many times did you shoot the dog?
03:08:22  3    A.  Twice.
03:08:23  4    Q.  What part of the dog did you hit?
03:08:25  5    A.  I don't specifically recall what part of
03:08:28  6  the dog I hit.
03:08:31  7    Q.  What part of the dog were you aiming for?
03:08:34  8    A.  I was aiming for the dog as a whole.  I
03:08:37  9  don't think there was a specific part.  I think I was
03:08:39 10  focused on the face of the dog just because that's
03:08:42 11  where your attention is drawn.  But at that range,
03:08:45 12  it's an instinctive shooting.  You're not using your
03:08:51 13  sights.
03:08:51 14    Q.  Where were you when you began to reach
03:08:55 15  towards your holster?
03:08:58 16    A.  I would have been on the stairs.
03:09:03 17    Q.  As you were going sideways up the stairs?
03:09:05 18    A.  I don't know.  It's such a short
03:09:07 19  stairwell.  I couldn't give you the precise...
03:09:16 20    Q.  Okay.  In terms of the hierarchy, are you,
03:09:16 21  as an investigator, higher in the RPD hierarchy than
03:09:25 22  Officers Hogg or Prinzi?
03:09:26 23    A.  Yes.
03:09:27 24    Q.  In terms of the hierarchy between
03:09:39 25  investigators and sergeants, is there a difference in

59

NOLAN WENGERT - BY MR. FUSSELL

03:09:43  2  the level of seniority?
03:09:46  3    A.  Well, there wouldn't be a difference in
03:09:49  4  seniority because seniority is calculated on how long
03:09:52  5  you've been in grade.
03:09:53  6    Q.  Okay.  Poorly asked question.
03:09:55  7    A.  But what -- I think what you're getting at
03:09:57  8  is, essentially there's -- it's kind of a unique
03:10:01  9  situation within RPD which is different from a lot of
03:10:04 10  places.
03:10:05 11    Q.  Okay.
03:10:05 12    A.  There's what's called parity between
03:10:08 13  sergeants and investigators.  So essentially you make
03:10:12 14  the same amount of money.  A sergeant's duty is
03:10:15 15  managerial, so he manages other officers.  An
03:10:19 16  investigator's duty is specialized criminal
03:10:22 17  investigations and supervision of criminal
03:10:24 18  investigations.
03:10:26 19    Q.  Go ahead.  So in a sense you're on the
03:10:28 20  same hierarchical level with sergeants?
03:10:31 21    A.  Correct.  Just different responsibilities.
03:10:33 22    Q.  You're making the same amount of money;
03:10:35 23  you just have different jobs?
03:11:13 24    A.  Exactly.
03:11:13 25    Q.  Going back to Sergeant Rivers' report.

60

NOLAN WENGERT - BY MR. FUSSELL

03:11:24  2  You've testified as to what parts of this report,
03:11:27  3  which is part of Exhibit 3, were given to Sergeant
03:11:35  4  Rivers by yourself.  Were you present when Sergeant
03:11:38  5  Rivers talked to either Prinzi and/or Hogg?
03:11:40  6    A.  I don't recall being present for the
03:11:42  7  conversation.  I'm sure I was present in the general
03:11:48  8  area.
03:11:51  9    Q.  Well, if you can answer this question,
03:11:52 10  fine.  If you can't, that's fine too.  Do you know
03:11:54 11  which statements in Rivers' incident report, part of
03:12:01 12  Exhibit 3, were given to him by Hogg?
03:12:03 13    A.  It would just be speculation.  So no, I
03:12:06 14  can't answer.
03:12:07 15    Q.  The same -- it would be the same answer
03:12:11 16  with respect to --
03:12:12 17    A.  Prinzi?  Yes.
03:12:13 18    Q.  -- Prinzi?  Okay.
03:12:18 19    I may have asked it a different way.  Was
03:12:34 20  there anything in this incident report, to your
03:12:37 21  knowledge, that's not accurate?
03:12:39 22    A.  To my preliminary review of it, I don't
03:12:41 23  see anything that's inaccurate.
03:12:42 24    Q.  Okay.  At some point did you see
03:13:07 25  Ms. Cabisca?

73

NOLAN WENGERT - BY MR. FUSSELL

03:27:24   2   A.   Because at the time the dogs weren't

03:27:28   3   coming at me.

03:27:27   4   Q.   Okay. Do you know if the other officers

03:27:28   5   drew their guns?

03:27:30   6   A.   I don't have specific knowledge of that.

03:27:47   7   Q.   Was anything else said before the dogs

03:27:50   8   were put in the house by either the three of you or

03:27:54   9   Ms. Cabisca that you haven't already testified to

03:27:59   10   today?

03:27:59   11   A.   Like I said --

03:28:00   12   Q.   That you can recall.

03:28:01   13   A.   Like I said, there was a wide variety of

03:28:04   14   expletives that she had been yelling at us, demands

03:28:09   15   for information that she had been making of us.

03:28:13   16   Q.   What demands was she making of you? What

03:28:15   17   demands for information was she making?

03:28:17   18   A.   She was demanding to know, A, what

03:28:20   19   happened when she came out of the house. Then she was

03:28:23   20   demanding to know, "Did you shoot my dog?"

03:28:25   21   Q.   Okay.

03:28:25   22   A.   Then she demanded to know, "Who shot my

03:28:28   23   dog?"

03:28:28   24   Q.   Okay.

03:28:29   25   A.   At which point I explained to her that I

74

NOLAN WENGERT - BY MR. FUSSELL

03:28:32   2   had shot her dog.

03:28:32   3   Q.   Okay.

03:28:34   4   A.   And, you know, there was lawful orders

03:28:38   5   given to her to basically calm down and stop screaming

03:28:43   6   so that the dog could be secured. And I specifically

03:28:46   7   told her, "I don't want to shoot any of your dogs.

03:28:49   8   Please put your dogs away," several times. And that

03:28:54   9   was almost verbatim, the language I used most of the

03:28:57   10   time when I told her to put the dogs away.

03:29:01   11   Q.   Did she ask you to give your

03:29:04   12   identification?

03:29:04   13   A.   No.

03:29:04   14   Q.   Did she ask you for your badge number?

03:29:09   15   A.   Later on, yes.

03:29:10   16   Q.   Did she ask you for your name?

03:29:13   17   A.   I presume she did, yes. I don't

03:29:17   18   specifically recall it, but I would assume that she

03:29:20   19   did.

03:29:20   20   Q.   Did you give her your name?

03:29:21   21   A.   Yes.

03:29:21   22   Q.   Right after she asked for it or later?

03:29:25   23   A.   More or less right after she asked for it.

03:29:28   24   Q.   Okay. What was going on when she asked

03:29:28   25   for it, if you remember -- strike.

75

NOLAN WENGERT - BY MR. FUSSELL

03:29:36   2   Did she ask for it before she put the dogs

03:29:38   3   in?

03:29:39   4   A.   No. No, she did not.

03:29:40   5   Q.   Okay. So at some point she did put the

03:29:47   6   dogs in. Then what happened?

03:29:48   7   A.   Then she continued -- she came back up the

03:29:52   8   driveway. Was still very, very angry. At one point

03:29:58   9   she called the uniformed officers assholes or

03:30:02   10   something to that effect. Was repeatedly swearing and

03:30:06   11   cursing and stuff like that.

03:30:07   12   I allowed the uniformed officers --

03:30:09   13   because obviously I would presume that she would be

03:30:11   14   angry with me, I kind of allowed them to try to do the

03:30:15   15   talking and stabilize the scene after I initially

03:30:18   16   explained to her what happened or just the fact that I

03:30:21   17   had shot her dog. I wanted them to explain to her why

03:30:25   18   and hopefully calm her down and advise her what other

03:30:28   19   steps they needed to take further.

03:30:30   20   Because we did have Animal Control en

03:30:33   21   route. We have to explain to her some of the options

03:30:35   22   that she has. She's allowed obviously to go get

03:30:37   23   treatment for the dog if she wants. Animal Control

03:30:40   24   will come out and provide services to the dog, but I

03:30:45   25   would presume most people would want to take their own

76

NOLAN WENGERT - BY MR. FUSSELL

03:30:47   2   dog to their own vet. We tried to explain that to the

03:30:51   3   people at the scene.

03:30:52   4   She was completely uncooperative, yelling,

03:30:54   5   screaming, flailing her arms around and just yelling a

03:30:58   6   variety of insults towards the officers.

03:31:01   7   Q.   Could you blame her?

03:31:04   8   MR. ASH:   Form.

03:31:06   9   Q.   You can answer.

03:31:07   10   A.   What do you mean by that question?

03:31:10   11   Q.   Could you blame her for screaming?

03:31:12   12   A.   In what aspect?

03:31:13   13   Q.   Her dog had just been shot; three officers

03:31:16   14   were there at her place at 10 at night for apparently

03:31:21   15   no reason. Could you blame her for being upset and

03:31:23   16   screaming?

03:31:23   17   A.   So you're asking me for my opinion, if you

03:31:27   18   would blame her?

03:31:27   19   Q.   Yeah.

03:31:27   20   A.   My opinion on the matter would be that she

03:31:30   21   should understand that when she releases large dogs

03:31:32   22   that are dangerous to other people on the police,

03:31:37   23   she's responsible for creating that situation. And I

03:31:40   24   could certainly understand her grief. I have a pet.

03:31:43   25   I've had dogs in the past. I certainly cannot

77

NOLAN WENGERT - BY MR. FUSSELL

1
2  understand her abusiveness and refusal to comply with
3  lawful orders.
4      Q.  Did you know that she knew that those dogs
5  were dangerous in any way before she let them out of
6  the door on September 7th at close to 10 p.m.?
7      A.  In my opinion --
8      Q.  Right.
9      A.  -- I would say yes because it's
10 presumptive that dogs that large, approaching
11 100 pounds, by the nature of being so large, are by
12 default potentially dangerous depending on the
13 situation.
14     Q.  Do you know how much the dog weighed that
15 you shot?
16     A.  I'm visually approximating.  But it was a
17 very large-breed dog.  It had to be between 70, 75 and
18 100 pounds.
19     Q.  Did you -- after all this was over, did
20 you ever find out whether those dogs had ever been
21 vicious before?
22     A.  No.
23     Q.  Okay.  What happened after she came back
24 and she was again irate?  What took place then?
25     A.  I was standing a short distance away.  She

78

NOLAN WENGERT - BY MR. FUSSELL

1
2  was irate and yelling at Officer Hogg.  At one point
3  she took both hands and she shoved Officer Hogg in the
4  chest.
5      Q.  Then what happened?
6      A.  And at that point --
7      Q.  Strike that.
8          What happened to Mr. Hogg after she pushed
9  on him?
10     A.  He went back.
11     Q.  What do you mean, "He went back"?
12     A.  He moved back.
13     Q.  What does it mean?  Did his feet move
14 back?  Did his chest move back?  Did his head move
15 back?  What do you mean?
16     A.  His body reacted to her push and he was
17 moved backwards in space.
18     Q.  How far backwards did he go?
19     A.  About a step.
20     Q.  Okay.  Did both feet go back or just one,
21 if you know?
22     A.  I was looking at his upper body, so I
23 don't know.
24     Q.  Which part of his body went backwards?
25 Upper body?

79

NOLAN WENGERT - BY MR. FUSSELL

1
2      A.  His upper body, yes.
3      Q.  Okay.  How far back did it go?
4      A.  Based upon my observations of his upper
5  body, I would presume that he went about one step
6  backwards based on the bend of his body.
7      Q.  Okay.  So you don't know whether either of
8  his feet went back, but his upper body went back to
9  the distance that would be consistent with going back
10 one step; is that an accurate rendition of what you
11 saw?
12     A.  Yes.
13     Q.  Then what happened?
14     A.  Officer Hogg approached her to take her
15 into custody.
16     Q.  Okay.
17     A.  It appeared to me that she went like this
18 and pulled away from him (indicating).
19     Q.  The record doesn't show that.  I mean, it
20 appeared to you that she leaned backwards?
21     A.  No.  That she took her arms and violently
22 pulled her arms away from him.
23     Q.  Okay.  Back towards herself?
24     A.  In the direction away from Officer Hogg,
25 whether it was to herself or somewhere else --

80

NOLAN WENGERT - BY MR. FUSSELL

1
2      Q.  Okay.
3      A.  -- in a resistive-tension manner.
4      Q.  And then what happened?
5      A.  At that point he escorted her to the
6  ground.
7      Q.  What does that mean, "escorted her to the
8  ground"?
9      A.  Essentially he grabbed one of her limbs,
10 which I believe was her arm.  I don't know which -- I
11 can't recall which, if it was left or right arm.  And
12 he loudly told her to get on the ground while
13 maintaining control of that arm and applying pressure
14 to her arm while ordering her to the ground.
15     Q.  Okay.  What happened to her body?
16     A.  It went down to the ground.
17     Q.  Okay.  How quickly did it go to the
18 ground?
19     A.  I would say relatively slowly.
20     Q.  What does that mean?
21     A.  Well, essentially there's different ways
22 you can go to the ground.  You can go to the ground
23 quickly, which would be being physically forced and
24 smashing into the ground.
25     Q.  Okay.

93

                    NOLAN WENGERT - BY MR. FUSSELL

03:51:28  2      A.  I presumed -- but I guess you're asking
03:51:33  3   for knowledge, so no, I don't know.
03:51:34  4      Q.  Well, I'm asking what did you presume?
03:51:36  5      A.  Okay.  What did I presume?  I presumed
03:51:39  6   that she was probably their grandmother.
03:51:40  7      Q.  Did you hear the words -- the letters
03:51:55  8   "CPS" mentioned at any time on September 7,
03:52:01  9   2010 [sic] at 207 Kingsboro Road?
03:52:04 10      A.  No.
03:52:04 11      Q.  Did you hear any one of the -- or did you
03:52:12 12   say or did the other -- or did the officers mention
03:52:16 13   that Ms. Cabisca might be going to jail or might be
03:52:20 14   arrested?
03:52:20 15      A.  Oh.  I'm certain that they did because, I
03:52:24 16   mean, technically she was under arrest and technically
03:52:26 17   she could go to jail.
03:52:29 18      Q.  Okay.  Do you know who said that, that she
03:52:37 19   could go to jail, if they said that?  If you know.
03:52:41 20      A.  At one point I explained to her that I was
03:52:45 21   giving her the courtesy of an appearance ticket.  I
03:52:48 22   explained to her that generally in these
03:52:52 23   circumstances, the person would be going to jail.  But
03:52:56 24   because of the unique circumstances of it, that I was
03:52:59 25   giving her the courtesy of giving her an appearance

94

                    NOLAN WENGERT - BY MR. FUSSELL

03:53:02  2   ticket, which, while it still counted as an arrest,
03:53:08  3   would enable her to leave and not go to jail tonight
03:53:09  4   and address the charges in court at a later date.
03:53:14  5      Q.  What were the charges that were filed
03:53:17  6   against her?
03:53:17  7      A.  Resisting arrest and harassment in the
03:53:20  8   second degree.
03:53:20  9      Q.  What did she do that consisted of
03:53:22 10   harassment in the second degree?
03:53:23 11      A.  Well, when she physically shoved Officer
03:53:27 12   Hogg in the chest causing him annoyance and alarm and
03:53:31 13   essentially in her tirades she referenced, you know,
03:53:39 14   offensive language and stuff that essentially would
03:53:42 15   border on a threat.  I don't recall the specific
03:53:46 16   words.  But the specific meat of the harassment second
03:53:48 17   charge was her, without any lawful reason to do so,
03:53:54 18   shoving Officer Hogg in the chest after calling him a
03:53:56 19   variety of names.
03:53:57 20      Q.  So who was the victim of that harassment?
03:54:03 21      A.  Generally it's reflected as the City of
03:54:05 22   Rochester, but technically the City of Rochester --
03:54:07 23   Officer Hogg would be the victim, but he's an employee
03:54:09 24   of the City of Rochester.  So Officer Hogg would have
03:54:12 25   been essentially the victim.

95

                    NOLAN WENGERT - BY MR. FUSSELL

03:54:20  2      Q.  What did she do that constituted resisting
03:54:23  3   arrest?
03:54:23  4      A.  Well, she failed to follow verbal commands
03:54:26  5   of Officer Hogg to do what Officer Hogg told her to do
03:54:29  6   after she was advised that she was under arrest.
03:54:31  7      Q.  What was that?
03:54:35  8      A.  Specifically, obviously I didn't have any
03:54:38  9   involvement in the actual arrest of harassment other
03:54:42 10   than to try to convince her to stop resisting.  So
03:54:44 11   what I specifically observed was I specifically
03:54:47 12   observed her on the ground, struggling, yelling and
03:54:51 13   screaming and swearing, and essentially trying to push
03:54:53 14   herself up and not cooperating with being handcuffed.
03:54:57 15   And then I also observed her pull away and pull her
03:55:00 16   arms away from Officer Hogg as he was reaching for her
03:55:03 17   to take her into custody.
03:55:38 18      Q.  How long after you shot the dog did it
03:55:41 19   die, if you know?
03:55:51 20      A.  I don't know.  Are you asking for my
03:55:54 21   opinion?
03:55:55 22      Q.  Yeah.  If you have it.
03:55:55 23      A.  My opinion is that it was more or less
03:55:59 24   dead immediately.
03:56:00 25      Q.  Whose vehicle was she placed into?

96

                    NOLAN WENGERT - BY MR. FUSSELL

03:56:08  2      A.  She was placed into, I believe, a female
03:56:16  3   officer's vehicle, which would have been Officer Kate
03:56:19  4   Turner, to my recollection.
03:56:26  5      Q.  Did anyone escort her to the vehicle, to
03:56:29  6   Officer Turner's vehicle?
03:56:31  7      A.  I would presume that either Officer Hogg
03:56:34  8   or Prinzi did.
03:56:35  9      Q.  Did you see that event take place or --
03:56:39 10      A.  I saw her being escorted to the vehicle,
03:56:41 11   but I don't recall who did.
03:56:44 12      Q.  Do you know if Officer Turner observed the
03:56:51 13   dog in the driveway?
03:56:53 14      A.  She wasn't physically present during any
03:56:56 15   of this.
03:56:56 16      Q.  Do you know if anyone told her not to go
03:57:01 17   down the driveway and observe the dog?
03:57:05 18      A.  I have no knowledge of that at all.
03:57:23 19      Q.  Did any officers other than Officer --
03:57:29 20   strike that.
03:57:29 21          Did Officer Turner arrive after
03:57:35 22   Ms. Cabisca was taken to the ground?
03:57:37 23      A.  Yes.
03:57:37 24      Q.  Did Investigator -- Sergeant Rivers arrive
03:57:47 25   after Ms. Cabisca was taken to the ground?

97

NOLAN WENGERT - BY MR. FUSSELL

03:57:50  2    A.  Yes.

03:57:50  3    Q.  Who arrived first, Officer -- Sergeant

03:57:56  4  Rivers or Investigator -- or Officer Turner?

03:58:00  5    A.  I believe Sergeant Rivers did.

03:58:04  6    Q.  Was an ambulance called?

03:58:13  7    A.  Yes.

03:58:13  8    Q.  Why?

03:58:15  9    A.  Because --

03:58:16  10    Q.  If you know.

03:58:17  11    A.  -- of the complaints of the asthma.

03:58:19  12    Q.  Do you know where Ms. Cabisca was when the

03:58:27  13  ambulance arrived?

03:58:28  14    A.  She was in the back of a police car.

03:58:30  15    Q.  Was she still handcuffed when the

03:58:40  16  ambulance arrived?

03:58:41  17    A.  I don't recall.

03:58:42  18    Q.  What happened to the dog that was shot?

03:58:48  19    A.  To my recollection, they decided to care

03:58:55  20  for it themselves, which is their right to do so.  So

03:58:59  21  they arranged for the dog to be transported or cared

03:59:02  22  for.

03:59:05  23    Q.  And Ms. Cabisca was charged with dog

03:59:08  24  violations; isn't that true?

03:59:09  25    A.  Yes.

98

NOLAN WENGERT - BY MR. FUSSELL

03:59:09  2    Q.  Did you go to any hearings with respect to

03:59:17  3  the dog violations?

03:59:19  4    A.  Yes.  I was called as a witness.

03:59:20  5    Q.  Did you testify?

03:59:21  6    A.  Yes.

03:59:21  7    Q.  Were you under oath?

03:59:23  8    A.  Yes.

03:59:23  9    Q.  Was everything you testified to true?

03:59:32  10    A.  Yes.

03:59:35  11    Q.  Do you know the final results of the dog

03:59:47  12  charges?

03:59:47  13    A.  No, I don't.

03:59:49  14    Q.  Do you know the final results of the

03:59:52  15  criminal charges?

03:59:52  16    A.  Yes.

03:59:52  17    Q.  What happened?

03:59:54  18    A.  She was offered an ACD, adjournment

03:59:58  19  contemplating dismissal.  And I would presume -- it

04:00:01  20  was a six-month ACD.  And I would presume that after

04:00:04  21  six months the charges were dismissed, as is common

04:00:08  22  practice in City Court in Rochester for misdemeanors

04:00:11  23  and violations.

04:00:12  24    Q.  Are you sure that's what happened?

04:00:14  25    A.  To my recollection of looking into it --

99

NOLAN WENGERT - BY MR. FUSSELL

04:00:17  2  well, I am sure that she was given an ACD and I'm sure

04:00:20  3  that it was six months because that was what was

04:00:23  4  reflected.  I don't know if she successfully completed

04:00:26  5  that six months and the charge was eventually

04:00:27  6  dismissed.

04:00:33  7    Q.  Were photos taken?

04:00:35  8    A.  Yes.

04:00:35  9    Q.  Who took the photos?

04:00:36  10    A.  I don't recall.

04:00:42  11    Q.  Did you prepare an incident report with

04:00:44  12  respect to the incidents that took place at 207

04:00:49  13  Kingsboro Road?

04:00:49  14    A.  No.  Because of the fact that obviously I

04:00:54  15  was the individual that shot the dog, the supervisor

04:00:57  16  prepares the incident report for me.

04:01:06  17    Q.  Why does the supervisor prepare the

04:01:13  18  incident report instead of the individual that

04:01:16  19  actually committed the act?

04:01:17  20    A.  Because in that particular situation, with

04:01:19  21  the discharge of a weapon, there's a perceived

04:01:22  22  conflict.  If I was to prepare an incident report and

04:01:26  23  document the entire thing and be the person who fired

04:01:28  24  the weapon and shot the dog, if I was to prepare the

04:01:30  25  incident report on that, I'm sure there would be a

100

NOLAN WENGERT - BY MR. FUSSELL

04:01:34  2  conflict on that.

04:01:35  3    Q.  I see.  So under those circumstances, the

04:01:38  4  sergeant -- strike that.

04:01:39  5        Was Rivers your sergeant?  Did you report

04:01:46  6  to him?

04:01:47  7    A.  Essentially -- I don't have a direct

04:01:51  8  sergeant.

04:01:51  9    Q.  Okay.

04:01:51  10    A.  So it would have been a sergeant that was

04:01:55  11  working that area at the time.  He was working that

04:01:56  12  area at the time.  I guess to answer your question, in

04:02:15  13  essence, the reason why I didn't prepare the incident

04:02:19  14  report is because Sergeant Rivers is tasked with his

04:02:21  15  own investigation into the circumstances that resulted

04:02:24  16  in the dog being shot.  So therefore, I'm essentially

04:02:29  17  reporting my involvement to him so he can conduct his

04:02:33  18  investigation into the circumstances of it.  So he

04:02:36  19  prepared an incident report on his investigation which

04:02:41  20  encompasses that.

04:02:41  21    Q.  Did you prepare a subject resistance

04:02:46  22  report as a result of shooting the dog?

04:02:47  23    A.  I was not involved in any sort of use of

04:02:50  24  force against a person, so no.

04:02:52  25    Q.  Okay.  So subject resistance reports are

# EXHIBIT C

13

TINA CABISCA - BY MR. ASH

01:31:59 2      A.   April 2014.

01:32:00 3      Q.   And during 2013 where were you working?

01:32:05 4      A.   At the time I was unemployed.

01:32:10 5           MR. FUSSELL:  At the time of what?

01:32:12 6      A.   At the time of the incident I was

01:32:14 7 unemployed.

01:32:14 8      Okay.  And how long had you been

01:32:19 9 unemployed at that point?

01:32:19 10     A.   A few months.

01:32:20 11     Q.   A few months.  Have you ever been

01:32:25 12 terminated from employment for cause?

01:32:27 13     A.   No.

01:32:27 14     Q.   Okay.  And in 2013 I think you indicated

01:32:33 15 that you owned some dogs?

01:32:36 16     A.   I did.

01:32:35 17     Q.   How many dogs did you own?

01:32:38 18     A.   I had three dogs.

01:32:38 19     Q.   Three dogs.  And can you describe the dogs

01:32:41 20 for me?

01:32:42 21     A.   Sure.  I had -- the first dog was a

01:32:49 22 13-year-old border collie.  I had rescued him when he

01:32:53 23 was 7.  The second dog was a boxer male.

01:33:01 24     Q.   When you describe these dogs, can you also

01:33:04 25 provide, like, general weight of the animal?

14

TINA CABISCA - BY MR. ASH

01:33:05 2      A.   All these are midsize dogs.

01:33:08 3      Q.   Midsize?

01:33:09 4      A.   Boxers are about 65 pounds.

01:33:11 5      Q.   Okay.  And a border collie would be --

01:33:14 6      A.   He was about the same.

01:33:16 7      Q.   About the same?  Okay.

01:33:17 8      A.   Just hairy.

01:33:18 9      Q.   Okay.  So you had the 13-year-old border

01:33:23 10 collie.  You had a male boxer.

01:33:24 11     A.   And at the time he was 7.  And a

01:33:31 12 4-year-old female boxer that I had rescued.

01:33:35 13     Q.   And how long had you owned -- I know you

01:33:40 14 said the owned the border collie for about 6 years.

01:33:43 15 How long had you owned the two boxers?

01:33:47 16     A.   The male boxer came to me when he was

01:33:50 17 14 weeks old, so I had him 7 years.  The female boxer,

01:33:53 18 shorter period of time than that because we rescued

01:33:59 19 her too.  So, you know, I'd have to go back and look.

01:34:02 20     Q.   Okay.  Have you ever had any official

01:34:08 21 problems with any of the dogs?  Have they ever been

01:34:10 22 fined or cited by any agency at all?

01:34:13 23     A.   Well, yes.

01:34:14 24     Q.   Yes?

01:34:16 25     A.   So not fined.  Not ever fined.  But

15

TINA CABISCA - BY MR. ASH

01:34:22 2 because I have dogs, I have a sign in front of my

01:34:26 3 house.

01:34:26 4      Q.   Uh-huh.

01:34:27 5      A.   And I had a sign at my house saying, you

01:34:32 6 know, I have an invisible fence.  And it's right where

01:34:34 7 the fence starts at the front of the house.  And I had

01:34:40 8 an issue with -- so I put my postal box outside of

01:34:48 9 that so even the postman didn't have to come into the

01:34:54 10 area where the dogs were.  And it was designed

01:34:54 11 purposefully that way.

01:34:55 12      So I had actually somebody, you know, walk

01:34:55 13 into where the dog was.  And at that point, you

01:35:06 14 know -- at that point, you know, no one was hurt.  No

01:35:09 15 one was bit.  But it was, "Tina" -- you know, I came

01:35:16 16 over and my battery on my dog needed to be changed.

01:35:18 17 So I changed it right away.  And that was that.

01:35:22 18      Q.   Was that --

01:35:23 19           MR. FUSSELL:  I'm sorry.  Were you cited?

01:35:27 20 He asked you if you were cited.

01:35:29 21           THE WITNESS:  They gave me a little

01:35:30 22 warning thing.

01:35:31 23           MR. FUSSELL:  Okay.

01:35:32 24           THE WITNESS:  So I don't know if that's

01:35:35 25 cited.  But I got a warning for that happening.  There

16

TINA CABISCA - BY MR. ASH

01:35:37 2 wasn't anyone injured.

01:35:38 3      Q.   Okay.  Who gave you that citation or

01:35:41 4 warning, for lack of a better term?

01:35:43 5      A.   It was someone from Animal Control.

01:35:47 6      Q.   Okay.

01:35:49 7      A.   It was a guy if that helps.

01:35:51 8      Q.   Do we know, when was this incident?

01:35:53 9      A.   Probably like within that year prior.

01:35:58 10 Honest, I don't know the date.

01:35:59 11     Q.   Do we know which dog it was?

01:36:00 12     A.   Bailey.

01:36:01 13     Q.   Bailey is the male?

01:36:03 14     A.   The female.

01:36:03 15     Q.   The female?

01:36:08 16     A.   Boxer.

01:36:08 17     Q.   Female boxer.  Okay.  Other than that one

01:36:11 18 incident, any other sort of citations or formal

01:36:15 19 complaints?

01:36:18 20     A.   You know what?  I can't think of any at

01:36:19 21 this minute.

01:36:19 22     Q.   Okay.  And prior to September 17, 2013,

01:36:30 23 had you had any encounters with police at your

01:36:33 24 residence, at the incident residence?

01:36:36 25     A.   You mean them coming on my property as

**21**

TINA CABISCA - BY MR. ASH

```
01:40:54  2  period of time.  So finally she went to sleep and Noah
01:40:59  3  was doing the doe-eye thing, like
01:41:01  4  half-awake/half-asleep.  Disney is on.  I said,
01:41:04  5  "Grandma is going to go upstairs."
01:41:05  6            I went upstairs to do the dishes that had
01:41:08  7  not yet been done from our meal.  And while I'm -- and
01:41:11  8  my window -- I have a huge window over my sink that
01:41:14  9  looks out into my backyard.  My garage is here, my
01:41:17 10  deck and my yard (indicating).  I can see the whole
01:41:20 11  thing from my kitchen window.  And I saw flashlights
01:41:24 12  on my garage.  And I'm like, what the heck is that?
01:41:30 13            So the house is designed with a door at
01:41:35 14  the front, a door on the side and a door in the back
01:41:37 15  off the deck.  So I went to the side door and I peeked
01:41:42 16  out.  And I see that there was a police light in front
01:41:47 17  of my house.  And I went -- I opened the door to step
01:41:54 18  out.  Bailey stepped out with me.  And she -- because
01:41:58 19  there has been accidents in front of my house multiple
01:42:01 20  times, right on my -- because I'm on a corner and the
01:42:04 21  street was changed years ago but people still don't
01:42:08 22  get it.  So people have run through my yard, you know,
01:42:11 23  across my yard the other way, missed it.  You know, a
01:42:14 24  list of things have transpired on that corner.
01:42:17 25            And I'm a nurse.  And honestly, in the
```

**22**

TINA CABISCA - BY MR. ASH

```
01:42:20  2  past, we've had to be helpful to people that are out
01:42:23  3  there particularly before anybody else shows up.  So I
01:42:27  4  went out to see what was going on.
01:42:30  5       Q.   So Bailey is the female dog or the male
01:42:33  6  dog?
01:42:33  7       A.   Bailey is the female boxer.
01:42:35  8       Q.   Okay.
01:42:35  9       A.   Bailey stepped out with me.
01:42:39 10       Q.   Did you have any reservations about
01:42:41 11  letting Bailey out of the house while --
01:42:44 12       A.   No, because the invisible fence doesn't
01:42:46 13  allow the dogs to go anywhere near the sidewalk.
01:42:50 14       Q.   Right.  But you just testified that
01:42:52 15  sometimes there are people who, you know, need
01:42:54 16  assistance and they're actually in your yard.  So did
01:42:59 17  you have any reservations about allowing a boxer, when
01:43:03 18  there could be potentially somebody on your
01:43:07 19  property --
01:43:07 20       A.   And the deal is, you would really
01:43:11 21  have to be -- I think you don't understand the way
01:43:15 22  things were laid out.  Because you really got to come
01:43:19 23  up my driveway a long ways before, you know, you would
01:43:23 24  ever even encounter a dog.  So you would need to
01:43:28 25  purposefully be at my house and you'd have to go past
```

**23**

TINA CABISCA - BY MR. ASH

```
01:43:33  2  my signs.
01:43:35  3       Q.   Has anyone -- let me ask you this:  Has
01:43:37  4  anyone -- prior to September 7, 2013, has anyone who
01:43:41  5  may have missed the curb or had an accident or there
01:43:45  6  has been some sort of incident in front of your home
01:43:47  7  or near the curb, has anyone had occasion to come up
01:43:49  8  to your house to ask you for assistance of any kind?
01:43:52  9       A.   I've offered and brought people into my
01:43:55 10  house with my dogs.  A woman and her baby who had a
01:43:58 11  car accident.  And I took them both into my house with
01:44:01 12  my dogs and there was no issue.
01:44:03 13       Q.   Okay.
01:44:04 14       A.   So if you want me to, I'd be happy to
01:44:07 15  continue with where I was.
01:44:08 16       Q.   Sure.  No.  Just, you know, every once in
01:44:11 17  a while I'll interrupt your narrative just to clarify
01:44:13 18  the record --
01:44:14 19       A.   Sure.
01:44:15 20       Q.   -- a little bit.  So Bailey steps out of
01:44:17 21  the house with you?
01:44:18 22       A.   Bailey steps out of the house with me.
01:44:20 23  And honest, I saw a light, but I didn't see any
01:44:25 24  policemen.  So my assumption is, there's nothing going
01:44:29 25  on at my house because there's no lights on.  I
```

**24**

TINA CABISCA - BY MR. ASH

```
01:44:37  2  haven't -- I've been doing the dishes.  I'm alone on
01:44:39  3  the first floor.  And I don't have a knock on the
01:44:46  4  door; I don't have a doorbell.  And I can say that --
01:44:49  5       MR. FUSSELL:  Do you mean you didn't hear
01:44:51  6  a knock on the door and you didn't hear a doorbell?
01:44:54  7       THE WITNESS:  No.
01:44:54  8       MR. FUSSELL:  Okay.
01:44:54  9       A.   And that's what I'm saying.  Because
01:44:56 10  honestly, when you have three dogs in the house and
01:44:58 11  somebody knocks on the door, it's just a bark fest.
01:45:00 12  You know, or if somebody rings the doorbell, it's a
01:45:03 13  bark fest.
01:45:03 14            So I had no reason to think that, opening
01:45:05 15  the door going out, there was anybody there.  So I
01:45:13 16  walked out.  And Bailey is with me, a couple feet
01:45:17 17  ahead of me.  I hear, "Pop, pop."  And I turn and
01:45:22 18  there's a man with a gun pointed down at me.  He
01:45:28 19  has -- and my first response was, oh, my God; this is
01:45:31 20  who they're looking for; they don't know he's here.
01:45:33 21  And I thought he was going to shoot me.  He had the
01:45:36 22  gun pointed right at me.  He had a striped shirt on
01:45:40 23  and regular pants.  And the first thing that came out
01:45:45 24  of my mouth was, "Who are you?"
01:45:50 25            At that point he yells out and says,
```

---

**29**

TINA CABISCA - BY MR. ASH

01:50:24  2  notice that your dog Bailey was down, what occurred
01:50:28  3  after that?
01:50:32  4      A.  The other two policemen were coming this
01:50:34  5  way with their guns out, pointed at me, yelling at me
01:50:37  6  to take care of my other dog (indicating). So my
01:50:41  7  oldest dog who was, like, 13 at the time that wanted
01:50:48  8  to go to the bathroom, I grabbed him, put him back in
01:50:49  9  the house, closed the door.  No dogs came out after
01:50:52 10  that.
01:50:52 11      Q.  Okay.
01:50:53 12      A.  So I have a dead dog at the bottom of the
01:50:57 13  steps and no dogs outside.
01:50:58 14      Q.  Where was your male boxer during this
01:51:02 15  entire time?
01:51:02 16      A.  He was in the house and never came out.
01:51:05 17      Q.  Okay.  Do you know where he was within the
01:51:09 18  house?
01:51:09 19      A.  How would I know that?  I'm outside.
01:51:13 20      Q.  I know.  But two dogs came out at some
01:51:16 21  point behind you, either with you or behind you.  So I
01:51:21 22  wanted to know if you knew generally where --
01:51:25 23      A.  In the house.
01:51:25 24      Q.  Just in the house somewhere.  Okay.
01:51:27 25          Did police officers ever say anything to

---

**30**

TINA CABISCA - BY MR. ASH

01:51:30  2  you after shots were fired besides "Get your dog in
01:51:34  3  the house"?
01:51:35  4      A.  What --
01:51:39  5      Q.  I mean, did they have any other
01:51:41  6  instructions for you?  Did they communicate anything
01:51:42  7  else to you, other than their concern about the older
01:51:45  8  border collie?
01:51:45  9      A.  The border collie, when I put him in the
01:51:48 10  house, I closed the door.  There was nothing else with
01:51:50 11  dogs, period.
01:51:51 12      Q.  Okay.  And what, if anything, might you
01:51:55 13  have been saying to police officers once your border
01:51:58 14  collie is put in the house?
01:51:59 15      A.  Oh.  I'm sure that I cussed at them.
01:52:02 16      Q.  Can you tell me what you were saying to
01:52:04 17  them and if they responded?
01:52:06 18      A.  I asked them, "What the fuck are you doing
01:52:09 19  here?"  And honestly, not my normal verbiage.
01:52:09 20      Q.  Uh-huh.
01:52:15 21      A.  Not in my professional being.  But you
01:52:20 22  have three men who are pointing guns at me at some
01:52:22 23  point.  My dog is dying.  I'm not getting any
01:52:26 24  assistance.  I asked for it.  "Help me with my dog.
01:52:29 25  Help me with my dog."

---

**31**

TINA CABISCA - BY MR. ASH

01:52:30  2      At this point now Teddy is in the house.
01:52:34  3  I came over.  I asked them to help me with Bailey.
01:52:37  4  And -- because she's not dead.  She's not dead.  They
01:52:41  5  just left her there to bleed out the bottom of the
01:52:43  6  steps.
01:52:44  7      So I looked up.  And now the two uniformed
01:52:47  8  officers are standing here.  The guy who shot her
01:52:50  9  stuck his head between the two of them and said, "We
01:52:53 10  called Animal Control."  And that was it.  There was
01:52:57 11  nothing mentioned about the dog again ever in
01:53:01 12  conversation with the police.
01:53:03 13      Q.  So you asked for assistance and at some
01:53:04 14  point one of the uniformed officers mentioned that
01:53:06 15  Animal Control had been called?
01:53:08 16      A.  No.  It wasn't a uniformed officer.  It
01:53:09 17  was the guy who shot the dog.
01:53:11 18      Q.  Okay.  Was he wearing any identifying
01:53:14 19  markers indicating that he was a police officer?
01:53:17 20      A.  Listen.  There was no light on.  There was
01:53:20 21  no light on in the front of the house.  He's on a dark
01:53:23 22  porch up from me with a gun pointed down at me.  I
01:53:28 23  wasn't -- and he did not have a uniform on.
01:53:33 24      Q.  Did he have anything displaying a shield
01:53:35 25  of the RPD?

---

**32**

TINA CABISCA - BY MR. ASH

01:53:36  2      A.  Not that I can recall.
01:53:37  3      Q.  Okay.  Did he have a duty belt on or a
01:53:42  4  sidearm or handcuffs or anything that would represent
01:53:45  5  that he was a police officer?
01:53:46  6      A.  You know what?  If he did, I don't recall
01:53:47  7  that.  I think at that point I was just terrified to
01:53:54  8  see that I had somebody on my porch pointing a gun at
01:53:58  9  me.  And I don't know who he is.  And he doesn't have
01:54:02 10  a uniform on.  He doesn't look like a cop.  And he
01:54:05 11  just shot my dog and now he has a gun on me.  So if he
01:54:09 12  was done shooting people, he never pulled his gun up.
01:54:12 13  We were that close, the dog and I.
01:54:14 14      Q.  At any time did the individual who shot
01:54:16 15  Bailey attempt to communicate with you?
01:54:19 16      A.  I'll tell you what he said.  When I asked
01:54:28 17  him who the fuck was he, he said -- yelled, "Rochester
01:54:28 18  City Police.  Get your dog under control."  He had
01:54:31 19  already shot the dog.  The dog was already down on the
01:54:36 20  ground bleeding.
01:54:36 21      And I -- my response to him is, "You shot
01:54:39 22  my dog."
01:54:40 23      Q.  Did he try to communicate anything else to
01:54:43 24  you?
01:54:43 25      A.  Not at that point.

---

33

TINA CABISCA - BY MR. ASH

```
01:54:44   2      Q.   Other than communication from the officers
01:54:48   3   about getting your dog under control, do you recall
01:54:51   4   anything else that may have been communicated to you
01:54:53   5   by those individuals?
01:54:54   6      A.   I asked them to communicate to me -- "Who
01:54:59   7   are you? I need your name. I need your badge number.
01:55:03   8   I need to know who you are." Never got it. Asked
01:55:08   9   multiple times.
01:55:10  10           I asked them, "What the fuck are you doing
01:55:12  11   here?"
01:55:12  12           They're like, "Well, we want you to come
01:55:14  13   here."
01:55:14  14           I said, "I'm not stepping off my property
01:55:16  15   with you. I'm not going to step off my property with
01:55:18  16   you. You came to my house and did this. You need to
01:55:21  17   tell me what you're here for." And they didn't.
01:55:23  18      Q.   Did they indicate to you why they wanted
01:55:25  19   you to step away from the property?
01:55:27  20      A.   No.
01:55:27  21      Q.   Once they had identified themselves as
01:55:34  22   Rochester Police Officers, were you satisfied with the
01:55:36  23   fact that they were, in fact, Rochester Police
01:55:40  24   Officers?
01:55:42  25           MR. FUSSELL: Object to the form.
```

34

TINA CABISCA - BY MR. ASH

```
01:55:43   2           You can answer. He said they identified
01:55:47   3   themselves as police officers. I think only one did
01:55:49   4   and the others had uniforms. That's my objection.
01:55:51   5      Q.   Well, let me --
01:55:52   6           MR. FUSSELL: That's why I raised that.
01:55:54   7      Q.   Let me pose this: The un-uniformed
01:55:58   8   officer identified himself as a Rochester Police
01:55:59   9   Officer.
01:55:59  10      A.   Uh-huh.
01:56:00  11      Q.   Then the other officers you testified
01:56:03  12   presented themselves in full uniform?
01:56:05  13      A.   Yes.
01:56:05  14      Q.   At that point were you satisfied that you
01:56:09  15   were dealing with the Rochester Police Department?
01:56:10  16      A.   Do you know what? I guess this is what I
01:56:14  17   have to respond to that. If you could imagine at that
01:56:19  18   moment, because this is all pretty surreal. And I'm
01:56:27  19   looking at it going -- when I ask someone "Who are you
01:56:33  20   and what are you doing here?" and you just had guns
01:56:38  21   pulled on me and you shot my animal, I'd expect a
01:56:42  22   response saying, "I'm Officer Joe Blow. We're here
01:56:47  23   because." That never transpired.
01:56:50  24      Q.   Do you recall what your tone or your
01:56:53  25   demeanor was while you were asking officers
```

35

TINA CABISCA - BY MR. ASH

```
01:56:56   2   information?
01:56:56   3      A.   I think that my tone was probably heavily
01:57:01   4   irritated. Because if I have to ask you multiple
01:57:05   5   times "Who are you? What did you come here for?" and
01:57:10   6   when I said "I'm not going anywhere with you," the
01:57:14   7   response from the uniformed officer -- and really I
01:57:18   8   don't know which one it was because nobody told me
01:57:21   9   their names -- was, "If you don't cooperate with us,
01:57:25  10   you're going to get arrested."
01:57:26  11      Q.   Did he tell you why you'd be arrested?
01:57:28  12      A.   He did not.
01:57:31  13           So as the conversation progresses, he says
01:57:33  14   to me --
01:57:36  15      Q.   Well, wait a minute. Wait a minute. You
01:57:37  16   said they wouldn't really communicate with you. So
01:57:39  17   what conversation was progressing?
01:57:41  18      A.   Progressing was, "What are you doing here
01:57:44  19   and I want your names." And on my behalf, I don't
01:57:48  20   feel like I had to say to them nicely. It's something
01:57:51  21   they should have presented to me willingly and very
01:57:54  22   forthrightly. And it did not occur. And so when I
01:57:57  23   said to them, you know, "You need to tell me," it
01:58:02  24   wasn't in a great tone. That's for sure. And it
01:58:05  25   probably had a couple of awful expletives with it.
```

36

TINA CABISCA - BY MR. ASH

```
01:58:09   2   But I really honestly don't have any idea why they
01:58:13   3   wouldn't want to tell me who they are. And I don't
01:58:16   4   have any idea why they wouldn't want to tell me what
01:58:18   5   they were doing there.
01:58:18   6      Q.   Okay.
01:58:19   7      A.   So my -- can I -- let me regroup with you.
01:58:22   8   Because honestly, they have -- you need to understand
01:58:29   9   where I'm sitting. I walked out of my house in my
01:58:32  10   bare feet, in a pair of shorts and a T-shirt. I
01:58:38  11   didn't come out there, you know, looking for bear. I
01:58:40  12   came into a situation that was created at my home not
01:58:45  13   by me. I feel that minimally I should have been given
01:58:51  14   basic information. And when they don't do that, my
01:58:54  15   tone became extremely different. And then instead of
01:59:00  16   proceeding to give me the information that was very
01:59:02  17   basic that I requested, they told me -- I put my hands
01:59:06  18   up and said -- just like this (indicating).
01:59:08  19      Q.   Well, let's not -- let's not go out of
01:59:13  20   sequence here. Let me ask you this: At what point
01:59:15  21   during your communication with the officers did they
01:59:18  22   ask you to step away from the property?
01:59:21  23      A.   While I was on the ground next to my dog
01:59:22  24   that was not dead yet.
01:59:23  25      Q.   Okay. So at that point shots had been
```

---

**37**

TINA CABISCA - BY MR. ASH

```
01:59:27   2   fired.
01:59:27   3        A.   Yep.
01:59:28   4        Q.   And the dog is on the ground bleeding.
01:59:31   5   And then after that point, the officers asked you to
01:59:35   6   step away from the property?
01:59:37   7        A.   They asked me to step away from the
01:59:39   8   property.  There was no way I was going with them.
01:59:41   9   They wouldn't address me who they were.  They wouldn't
01:59:44  10   tell me what they were doing there.  And I came out of
01:59:46  11   the house and turned the light on on the side of the
01:59:48  12   house.  That was the only light on.  I wasn't going to
01:59:51  13   leave that space not knowing what the hell was going
01:59:55  14   on because I'm the only adult there at this point in
01:59:58  15   the ball game.  There was nobody else that's an adult
02:00:01  16   in my home.
02:00:01  17        Q.   So they tell you to step away from the
02:00:04  18   property and you essentially refuse; is that correct?
02:00:08  19        A.   Yes.
02:00:08  20        Q.   And after you have refused to step away
02:00:10  21   from the property, what happens next?
02:00:12  22        A.   A uniformed officer told me if I didn't
02:00:15  23   cooperate with him, that I would be arrested.
02:00:20  24        Q.   Okay.  Did he mention what the charge
02:00:23  25   would be?
```

---

**38**

TINA CABISCA - BY MR. ASH

```
02:00:24   2        A.   No.
02:00:25   3        Q.   Did he ever say to you that -- explain to
02:00:30   4   you why he needed you to step away from the scene?
02:00:34   5        A.   No.
02:00:34   6        Q.   When he said you'd be arrested if you did
02:00:45   7   not cooperate, what, if anything, did you say or do?
02:00:47   8        A.   "I'm not coming anywhere with you.  You
02:00:49   9   came to my house and did this.  You need to tell me
02:00:53  10   what you're doing here and you need to tell me who you
02:00:55  11   are."
02:00:55  12        Q.   And at this point while you're saying
02:00:57  13   this, where are you physically located vis-à-vis the
02:00:59  14   dog that's been shot?
02:01:00  15        A.   Right next to the dog.
02:01:01  16        Q.   Okay.
02:01:01  17        A.   At the bottom of the steps at the front
02:01:03  18   porch of my house.
02:01:05  19        Q.   And what are you doing with the dog, if
02:01:08  20   anything?
02:01:08  21        A.   I'm not doing anything.  What can I do?
02:01:10  22   Nobody was going to help me.
02:01:12  23        Q.   Okay.  So does he respond to you saying
02:01:17  24   "I'm not going anywhere until you tell me who you are
02:01:20  25   and what you're doing"?  Did he say anything to you?
```

---

**39**

TINA CABISCA - BY MR. ASH

```
02:01:21   2        A.   I told -- no.
02:01:24   3        Q.   Okay.
02:01:25   4        A.   There was, like, nothing going on.  For
02:01:28   5   them -- there was no communication with me that was
02:01:31   6   any form of valid anything.
02:01:34   7             And then I like -- you know what?  It
02:01:38   8   was, "Are you here alone?"
02:01:40   9             And in my -- in my head I went --
02:01:44  10        MR. FUSSELL:  I'm sorry.  If you don't
02:01:45  11   want me to do this -- I'm confused.
02:01:46  12             Did you say "I'm here alone"?  Was that
02:01:51  13   you saying that?
02:01:53  14        THE WITNESS:  They asked me.
02:01:53  15        MR. FUSSELL:  Okay.
02:01:54  16        THE WITNESS:  They asked me was I here
02:01:56  17   alone.
02:01:56  18        MR. FUSSELL:  Okay.
02:01:57  19        A.   And I said, "Yes."  I'm like -- I was the
02:02:00  20   only adult there.
02:02:02  21        Q.   Uh-huh.
02:02:02  22        A.   And since they weren't being upfront with
02:02:07  23   me, I put my hands out straight and I said, "You need
02:02:12  24   to step back and get away from me."
02:02:15  25             And one of the uniformed officers said,
```

---

**40**

TINA CABISCA - BY MR. ASH

```
02:02:21   2   "That's it."  He came towards me and put his left
02:02:23   3   chest in my left hand and said, "You touched me.
02:02:25   4   That's illegal."  Grabbed me, threw me around like a
02:02:30   5   rag doll.  And we ended up in my lawn between my
02:02:34   6   driveway and the neighbor's driveway in front of my
02:02:38   7   hedges.
02:02:38   8        Q.   So you're saying the uniformed officer
02:02:44   9   intentionally placed his chest on your outstretched
02:02:48  10   palms?
02:02:48  11        A.   Left hand.  My left hand.
02:02:51  12        Q.   Because you indicated previously that both
02:02:53  13   of your hands were out.
02:02:54  14        A.   Both my hands were out.  He walked
02:02:56  15   toward me, put his chest on my hand and said, "You
02:03:03  16   touched me.  That's illegal.  You're going to jail."
02:03:05  17        Q.   Okay.
02:03:08  18        A.   When I tried to get away from him, he
02:03:10  19   grabbed me, threw me around and threw me to the
02:03:18  20   ground.  Two officers on top of me.  Two.  Two adult
02:03:22  21   men on top of me.  One with his elbow in my ribcage
02:03:27  22   and the other one on the other half of me.
02:03:30  23        Q.   At that point were you told you were under
02:03:33  24   arrest?
02:03:33  25        A.   At that point I said, "I'm asthmatic and I
```

41

TINA CABISCA - BY MR. ASH

02:03:37  2  can't breathe. You have to get off of me."
02:03:40  3         And he didn't.
02:03:41  4         I said, "Listen. I'm asthmatic. I'm not
02:03:43  5  going to be able to breathe. You got to get off me."
02:03:46  6         And he said, "Don't move. Stop moving."
02:03:50  7         So I stopped moving. I rolled over and I
02:03:53  8  said, "Get off me. You know, there's kids in the
02:03:54  9  house."
02:03:56  10        And he leaned into my face, this
02:03:58  11  close (indicating), and said, "That's too bad because
02:04:00  12  those kids are going to jail."
02:04:03  13        Q.   Okay. At some point after you're placed
02:04:09  14  in handcuffs and arrested, did somebody -- how were
02:04:14  15  the kids addressed?
02:04:15  16        A.   Well, you are a distance away from that.
02:04:18  17  Do you want to hear the whole thing or --
02:04:19  18        Q.   Let me just ask you. Because you
02:04:21  19  mentioned CPS, so I kind of want to get to whether or
02:04:24  20  not the children were addressed at some point during
02:04:26  21  the evening.
02:04:27  22        A.   The man who shot the dog came over and
02:04:30  23  asked -- told them to get off me.
02:04:33  24        Q.   Okay.
02:04:34  25        A.   They got off me. I got up. I ran into

42

TINA CABISCA - BY MR. ASH

02:04:37  2  the house. I checked on the kids. And I called my
02:04:42  3  family and told them what happened and said, "You have
02:04:45  4  to come here right" -- "come right back because this
02:04:47  5  is what's transpired and I'm here by myself."
02:04:51  6        Q.   So you were not placed in handcuffs. You
02:04:54  7  were brought to the ground after the contact and at
02:04:57  8  some point the un-uniformed officer asked that you be
02:05:05  9  let up?
02:05:05  10        A.   Yep.
02:05:05  11        Q.   At which point you entered the house and
02:05:08  12  made phone calls and looked after the kids?
02:05:11  13        A.   And then I left as soon as I did that and
02:05:13  14  went back out.
02:05:14  15        Q.   Okay. Now, why did you come back outside?
02:05:17  16        A.   Because I checked on the kids.
02:05:17  17        Q.   Uh-huh.
02:05:21  18        A.   The kids were okay.
02:05:23  19        Q.   Uh-huh.
02:05:23  20        A.   I called my family.
02:05:25  21        Q.   Uh-huh.
02:05:26  22        A.   And I have these people on my property
02:05:27  23  that are apparently untrustworthy at this point.
02:05:30  24        So when I came out, now there's six cop
02:05:33  25  cars; there's a fire truck. And now my anxiety is,

43

TINA CABISCA - BY MR. ASH

02:05:41  2  like, through the roof. I can't believe that all of
02:05:45  3  this is something necessary for -- because at this
02:05:50  4  point I still don't know who they are. They never
02:05:53  5  told me what they were doing at my place and now
02:05:56  6  there's six cop cars outside my house.
02:05:57  7        Q.   Let me ask you this: If you were worried
02:06:00  8  about who they were and you just mentioned they were
02:06:03  9  untrustworthy, wouldn't it have been safer for you to
02:06:08  10  stay in the house as opposed to going back out where
02:06:08  11  they were?
02:06:09  12        A.   Absolutely not. This is my house. This
02:06:12  13  is my house. This is where I live and pay exorbitant
02:06:16  14  taxes for these people to have a job. Are you kidding
02:06:19  15  me?
02:06:19  16        Q.   So I'm a little confused about what you're
02:06:22  17  saying. Initially you were saying -- you said that
02:06:24  18  when the dogs were shot your testimony was --
02:06:27  19        A.   Just for the record, it was one dog that
02:06:30  20  was shot.
02:06:30  21        Q.   Okay. When your dog was shot you were a
02:06:32  22  little bit taken aback at the fact that no one was
02:06:35  23  doing anything. Now there's --
02:06:37  24        MR. FUSSELL: Objection. Form.
02:06:41  25        MR. ASH: Okay. That's fine.

44

TINA CABISCA - BY MR. ASH

02:06:42  2        Q.   You were taken aback -- you expressed some
02:06:46  3  dismay at the fact that no one was helping.
02:06:48  4        MR. FUSSELL: Form. Form.
02:06:51  5        Q.   Now you find that there are more police
02:06:53  6  and fire there in response to apparently what
02:06:56  7  happened.
02:06:57  8        A.   So I think it should make perfectly good
02:07:00  9  sense to you to understand that I have three people
02:07:02  10  who have been unsuccessful at communicating to me what
02:07:05  11  they're there for, who they are and what they're there
02:07:09  12  for. Now you've added double that to my front yard.
02:07:13  13  People that were never there, don't know what the hell
02:07:16  14  happened. They're running around the place like -- it
02:07:21  15  was craziness. And it's my house and I still don't
02:07:24  16  know why they're there. I don't know which one is
02:07:27  17  which one. And in fairness, I have to say, if that
02:07:30  18  was your house, how would you respond?
02:07:32  19        Q.   Well, this is -- you've sued this case
02:07:36  20  out, so I don't have to answer those questions. I'm
02:07:38  21  asking questions in response to your lawsuit, so I'm
02:07:41  22  entitled to ask those questions.
02:07:42  23        A.   You can.
02:07:43  24        Q.   So let me ask you this: At the point you
02:07:46  25  see double the amount of emergency personnel in front

53

TINA CABISCA - BY MR. ASH

02:16:14  2   house the first time to check on the kids, what state
02:16:17  3   did you find the kids in?
02:16:18  4   A.   The baby was sleeping.
02:16:19  5   Q.   Okay.
02:16:20  6   A.   And Noah was nodding.
02:16:23  7   Q.   Okay.  So now you're in the squad car and
02:16:27  8   you're concerned about the children.  What, if
02:16:31  9   anything, happened to address those concerns about the
02:16:35  10  children?  Was anybody allowed to enter the house?
02:16:38  11  A.   No.
02:16:38  12  Q.   Was somebody called?
02:16:39  13  A.   No.  When I came out of the house and I
02:16:42  14  called my neighbor to come over, she came over.  And I
02:16:46  15  asked -- when they were carrying me off, I said,
02:16:49  16  "Gail, go in with the kids."
02:16:51  17  Q.   Okay.  So Gail was with the kids?
02:16:53  18  A.   No.  They wouldn't let Gail in the house.
02:16:56  19  Q.   Okay.
02:16:57  20  A.   So she stayed in the driveway, but she
02:17:02  21  wasn't allowed in the house.  And I don't know what
02:17:04  22  that was about.
02:17:05  23  Q.   Okay.  Did anybody -- was anybody
02:17:08  24  eventually allowed in the house?
02:17:09  25  A.   Lee went in the house.  My son went in.

54

TINA CABISCA - BY MR. ASH

02:17:11  2   They got the kids and took the kids to the neighbor's
02:17:15  3   house.
02:17:15  4   Q.   How long between the time you were put in
02:17:18  5   handcuffs and the kids were taken from the house by
02:17:23  6   your relatives?  What was the time span?
02:17:25  7   A.   I don't know.  How long it took me in the
02:17:28  8   car.
02:17:29  9   Q.   Do you have any -- can you give an
02:17:31  10  approximation?  I mean, more than an hour?  Less than
02:17:33  11  an hour?
02:17:34  12  A.   Less than an hour.
02:17:35  13  Q.   Less than an hour.  Okay.  So now you're
02:17:41  14  communicating with the female officer.  You've asked
02:17:43  15  for your inhaler.  Someone has brought your inhaler to
02:17:47  16  you; right?  What happens next?
02:17:47  17  A.   I can't use it.  My hands are tied behind
02:17:50  18  my back.
02:17:51  19  Q.   Okay.
02:17:52  20  A.   So I couldn't use it.
02:17:54  21  Q.   So did anybody help you with that?
02:17:58  22  A.   So she had called for 911 to have somebody
02:18:02  23  come.  I'm like, "You know what?  I'm going to need a
02:18:05  24  treatment.  I'm having trouble getting a breath."
02:18:08  25  And they came to the side of -- they came

55

TINA CABISCA - BY MR. ASH

02:18:11  2   right here to my window.  I was behind her.  She was
02:18:14  3   in the seat -- in the driver seat.  I was behind her.
02:18:17  4   They came to the window and she wouldn't let me out of
02:18:24  5   the car to get a treatment.  She told me that I needed
02:18:28  6   to complete the paperwork that she had first and then
02:18:30  7   she would let me out.
02:18:31  8   Q.   Okay.  And so did you complete that
02:18:34  9   paperwork?
02:18:35  10  A.   Yeah.  She didn't let me out till it was
02:18:38  11  done.
02:18:38  12  Q.   So how long between the completion of that
02:18:40  13  paperwork and the time you were let out for treatment?
02:18:44  14  What amount of time elapsed?
02:18:46  15  A.   I don't know.  It seemed like a really
02:18:50  16  long time when you can't take a breath.
02:18:52  17  Q.   So at some point did you actually receive
02:18:56  18  treatment from EMS?
02:18:56  19  A.   No, because the EMS people stepped back
02:19:02  20  away from the car, waited for me to get out.  And I
02:19:04  21  said, "Can you treat me right now?"
02:19:06  22  And the lady said, "We need you to come
02:19:08  23  over here."
02:19:10  24  And I'm like, you know, I'm not doing
02:19:13  25  that.  My daughter was standing right next to the car

56

TINA CABISCA - BY MR. ASH

02:19:15  2   waiting for me.  And I'm like, "Just take me right
02:19:19  3   now.  Take me right now.  I can't wait."  And it felt
02:19:22  4   like there was no -- not one single person that was
02:19:25  5   really paying attention to what I'm saying.  I can't
02:19:28  6   breathe.
02:19:28  7   Q.   So let me ask you this.  I just want to be
02:19:32  8   clear for the record.  So EMS -- you're let out of the
02:19:35  9   car at some point, out of the patrol car?
02:19:37  10  A.   At some point.
02:19:38  11  Q.   And were you released from handcuffs?
02:19:40  12  A.   Yes.
02:19:40  13  Q.   And after that EMS is asking you to come
02:19:46  14  to the truck?
02:19:47  15  A.   And they were like -- no.  I asked them,
02:19:51  16  "Are you going to take me right to the hospital?"
02:19:55  17  And they said, "We just want you to come
02:19:55  18  over here."
02:19:55  19  I'm like, "I can't just come over there.
02:19:58  20  I'm at a point" --
02:19:59  21  Q.   "Come over here" is where?
02:20:00  22  A.   I don't know where "over here" is because
02:20:02  23  they're wanting me to go away with these people again
02:20:05  24  without any explanation.
02:20:08  25  Q.   So you're saying they didn't offer you a

---

**57**

TINA CABISCA - BY MR. ASH

02:20:11  2  gurney or they didn't offer to transport you to their

02:20:13  3  vehicle?

02:20:13  4      A.  They said, "We need you to come over

02:20:15  5  here."

02:20:15  6      And I said, "Are you going to take me

02:20:17  7  right now to the hospital?"

02:20:18  8      And they said, "No.  We just want you to

02:20:20  9  come over here."

02:20:21  10     And I looked at my daughter and said,

02:20:22  11 "Just take me.  Just take me."  And they're familiar

02:20:29  12 obviously with my situation.

02:20:31  13     MR. FUSSELL:  Who's they?

02:20:32  14     THE WITNESS:  My children.

02:20:33  15     A.  And so my daughter was parked in a

02:20:36  16 place -- because the street was blocked off now.  And

02:20:40  17 my daughter was parked at a place that was beyond

02:20:43  18 everyone and she could get me out of there right away.

02:20:45  19     Q.  So how did you get to your daughter's car,

02:20:48  20 then?

02:20:48  21     A.  She walked me there.

02:20:51  22     Q.  So you would walk to the far end of the

02:20:55  23 street to get to your daughter's car but you wouldn't

02:20:57  24 walk over to EMS, the EMS van?

02:21:00  25     A.  My daughter's car was -- police car, car,

---

**58**

TINA CABISCA - BY MR. ASH

02:21:04  2  my daughter's car (indicating).  EMS was -- I don't

02:21:07  3  know where they were.  But if you're not going to take

02:21:09  4  me right away, I just went to the hospital

02:21:11  5  immediately.

02:21:12  6      Q.  Why did you believe that EMS wouldn't take

02:21:15  7  you, while you were short of breath, directly to the

02:21:17  8  hospital?

02:21:17  9      A.  I asked them.

02:21:18  10     Q.  And they told you that they would not take

02:21:22  11 you to the hospital?

02:21:22  12     A.  They said, "We need you to come over

02:21:22  13 here."

02:21:24  14     And I said, "Are you going to take me?"

02:21:28  15     And they said, "We just want you to come

02:21:28  16 over here."  And I had enough of that.

02:21:30  17     Q.  Okay.  So --

02:21:31  18     A.  Of no explanation.

02:21:34  19     Q.  So they didn't tell you they wouldn't take

02:21:36  20 you directly to the hospital.  They told you to come

02:21:38  21 over here and you didn't want to do that.

02:21:40  22     A.  I said, "Take me right away.  Are you

02:21:41  23 going to take me right away?"

02:21:43  24     The response was, "We need you to come

02:21:45  25 over here."  That wasn't a yes -- that was a yes or a

---

**59**

TINA CABISCA - BY MR. ASH

02:21:48  2  no and I wasn't getting it.  And I wasn't able to

02:21:51  3  breathe.  And I hadn't been able at that point to

02:21:54  4  still even use my inhaler because my hands were behind

02:21:57  5  my back.

02:21:57  6      And I looked at my daughter and said, "Can

02:22:00  7  you just take me?"

02:22:00  8      And she said, "Yes."

02:22:01  9      Q.  But were you upright and standing at the

02:22:05  10 time EMS told you to come to the car?

02:22:06  11     A.  I was standing when I got out of the car.

02:22:09  12     Q.  Okay.  And you did, in fact, walk

02:22:12  13 somewhere.  You just walked to your daughter's car and

02:22:14  14 not over to EMS?

02:22:15  15     A.  I walked one car ahead.  Cop car, car, my

02:22:20  16 daughter's car.

02:22:21  17     Q.  I understand.  I just need to make the

02:22:23  18 record clear.

02:22:24  19     A.  The record clearly should state that I

02:22:26  20 went to the fastest place I could to get me to the

02:22:30  21 hospital immediately.

02:22:32  22     Q.  So you thought that your daughter who was

02:22:34  23 not an emergency driver who cannot -- who has to

02:22:38  24 respect vehicle and traffic laws could get you to a

02:22:41  25 hospital quicker than an emergency vehicle?

---

**60**

TINA CABISCA - BY MR. ASH

02:22:43  2      A.  At that point the EMS people were so far

02:22:47  3  away from where -- were further away from where I was.

02:22:52  4      Q.  Uh-huh.

02:22:52  5      A.  And I used my inhaler on the way over.

02:22:55  6  And I got into the emergency room immediately when I

02:22:59  7  got there.

02:22:59  8      Q.  Other than your shortness of breath, what

02:23:02  9  were your other physical pains, if any?

02:23:09  10     A.  By the time I was in the car, I was having

02:23:16  11 incredible spasms in my back, in my neck and I could

02:23:23  12 not get a breath.

02:23:23  13     Q.  Have you ever had any previous back or

02:23:35  14 neck injuries?

02:23:35  15     A.  I have -- I'm arthritic.

02:23:38  16     Q.  Okay.

02:23:41  17     A.  And I'm spurred anteriorly and posteriorly

02:23:44  18 in my neck.

02:23:45  19     Q.  Okay.  Have you ever received any

02:23:48  20 treatment for either arthritis or your bone spurs?

02:23:51  21     A.  No surgery.

02:23:53  22     Q.  You said your cervical spine has the

02:23:58  23 spurs; right?

02:23:58  24     A.  (The witness indicated nonverbally.)

02:24:00  25     MR. FUSSELL:  You've got to answer yes or

---

# EXHIBIT D

21

JASON PRINZI - BY MR. FUSSELL

01:14:20  2      A.   He was looking at either larceny or the
01:14:22  3   kid doing burglaries in that area, and looking for
01:14:24  4   that address which I believe that Tyrone individual
01:14:27  5   said he had property from.  So he found whatever the
01:14:31  6   property was at that address, so Investigator Wengert
01:14:34  7   I believe was trying to verify that to make sure that
01:14:38  8   property was not stolen.
01:14:39  9      Q.   Okay.  And do you remember where the three
01:14:49 10   of you parked your cars as you went up to the
01:14:54 11   northern -- up to 207?
01:14:55 12      A.   I don't recall.  Just in front of 207
01:14:58 13   somewhere fairly close.  I don't remember
01:15:01 14   position-wise where.
01:15:01 15      Q.   Were you parking on the same side of the
01:15:04 16   street as 207 or across the street from 207, if you
01:15:09 17   remember?
01:15:09 18      A.   I don't recall.
01:15:12 19      Q.   Where was Mr. Flowers when you got to 207?
01:15:18 20      A.   I believe he was in the backseat of one of
01:15:21 21   the patrol cars.
01:15:21 22      Q.   When you said patrol car, that would be
01:15:24 23   either yours or Officer Hogg's; am I correct?
01:15:28 24      A.   Correct.
01:15:35 25      Q.   How close to 207 were those two patrol

22

JASON PRINZI - BY MR. FUSSELL

01:15:38  2   cars?
01:15:38  3      A.   I don't recall.
01:15:45  4      Q.   Were you wearing your uniform --
01:15:52  5      A.   Yes.
01:15:53  6      Q.   -- at that time?
01:15:57  7      A.   Yes.
01:15:57  8      Q.   Was Investigator Wengert in uniform?
01:16:00  9      A.   Investigators don't wear the blue
01:16:04 10   uniforms.  They wear dress attire and a neck badge
01:16:09 11   displaying that they're an investigator of the
01:16:10 12   Rochester Police Department.
01:16:11 13      Q.   How large is that badge?
01:16:12 14      A.   Approximately that big (indicating).  The
01:16:17 15   badge with the holder which is displayed on the
01:16:19 16   lanyard around the neck.
01:16:20 17      Q.   Now, I did not bring my ruler.  We went
01:16:25 18   through with this Mr. Ash before.  Approximately what
01:16:29 19   were the dimensions of the badge?  Because when you
01:16:32 20   put your hands out, that doesn't show up.
01:16:34 21      A.   The badge is the same size as --
01:16:36 22      Q.   I'll explain to you why I'm asking you
01:16:37 23   this.
01:16:38 24      A.   Okay.
01:16:38 25      Q.   Because that doesn't show up on the court

23

JASON PRINZI - BY MR. FUSSELL

01:16:40  2   reporter.  We all say "this big."  You could have said
01:16:42  3   this big or you could have said this big.
01:16:44  4      A.   The badge itself is the same size the
01:16:46  5   patrol wears on their shirt.  It's the exact same
01:16:48  6   badge only it's a bright gold color, easily visible.
01:16:52  7      Q.   Approximately how many inches wide and
01:16:55  8   high is it, approximately?
01:16:55  9      A.   Maybe 2 inches long by almost 2 inches
01:16:59 10   wide.
01:17:00 11      Q.   Okay.
01:17:00 12      A.   3 inches long by 2 wide.
01:17:03 13      Q.   Something like that?
01:17:03 14      A.   Yeah.
01:17:04 15      Q.   So other than the badge, did he wear --
01:17:11 16   what shirt was he wearing, if you know?
01:17:13 17      A.   Dress attire is what investigators
01:17:16 18   normally wear.
01:17:17 19      Q.   Does he wear a jacket?  Did it include a
01:17:19 20   jacket?
01:17:19 21      A.   I don't know if they do or not.  It
01:17:22 22   depends on the weather, I guess.
01:17:23 23      Q.   Slacks, I assume?
01:17:27 24      A.   Dress pants.  Yes.
01:17:28 25      Q.   What about Officer Hogg?  What was he

24

JASON PRINZI - BY MR. FUSSELL

01:17:32  2   wearing?
01:17:33  3      A.   Our issued uniform.  Blues.  It's referred
01:17:36  4   to as blues.
01:17:48  5      Q.   Do you remember Mr. Flowers saying
01:17:50  6   anything -- strike that.
01:17:52  7           Did Mr. Flowers say anything about dogs at
01:18:00  8   207 Kingsboro?
01:18:00  9      A.   I do not recall that.
01:18:05 10      Q.   Do you recall either Investigator Wengert
01:18:09 11   or Officer Hogg telling you that Mr. Flowers told them
01:18:15 12   that there were dogs at 207 Kingsboro?
01:18:18 13      A.   I don't recall any such conversation.
01:18:20 14      Q.   Did you, in fact, learn that there were
01:18:37 15   dogs at 207?
01:18:39 16      A.   I learned after the one came out and
01:18:42 17   charged Investigator Wengert.  Yes.
01:18:45 18      Q.   Do you know if you or Investigator Wengert
01:18:55 19   or Officer Hogg made any effort to make a phone call
01:19:04 20   or otherwise contact the resident of 207 Kingsboro
01:19:10 21   before one of you walked up to the door?
01:19:12 22      A.   I'm not -- I know I did not.  I'm not
01:19:15 23   aware if the other two did.  I know I didn't.
01:19:18 24      Q.   What time of day was this, if you recall,
01:19:21 25   approximately?

**25**

JASON PRINZI - BY MR. FUSSELL

2    A.    Approximately 10 o'clock at night,
3  roughly.
4        Q.    Did you -- once you arrived at the scene,
5  what did you -- at 207, once you parked your -- strike
6  that.
7             After you parked your -- I'll ask again.
8  How close was your car parked to 207?
9        A.    It was somewhere close to the front of the
10  house of 207, roadside. I couldn't tell you distance
11  in feet. I don't know.
12        Q.    Okay. Could you see 207 from your car?
13        A.    Absolutely.
14        Q.    Could Hogg see 207 from his car?
15        A.    I don't know what he could see. I can't
16  speculate on what he saw.
17        Q.    Could Wengert see 207 from his car?
18        A.    Well, Officer Wengert was knocking on the
19  door of 207, so...
20        Q.    I'm talking about when he was in his car.
21        A.    I'm not sure.
22        Q.    Do you know the order in which the cars
23  were parked?
24        A.    Not at all, no.
25        Q.    So what did you do after you parked your

**26**

JASON PRINZI - BY MR. FUSSELL

2  car near 207?
3        A.    I either stayed inside my car or I was
4  standing outside my car.
5        Q.    What happened after you got out of your
6  car? Did Wengert or Hogg or you say anything?
7        A.    I don't recall. I just know Investigator
8  Wengert was attempting to contact the homeowner there
9  at 207.
10        Q.    Did he tell you to stay by your car?
11        A.    I don't believe so.
12        Q.    Did he tell you he was going to go up and
13  make -- go up to the door?
14        A.    At some point either before we arrived in
15  front of the address or when we did, I do know he told
16  me he was going to go attempt to make contact with the
17  homeowner at 207. I did know that.
18        Q.    Did you see an invisible fence sign in the
19  yard, either while you were in your car or immediately
20  after you got out of the car?
21        A.    Not that I recall.
22        Q.    At any point before Investigator Wengert
23  went up to the house, did either he or Officer Hogg
24  mention that there was an invisible fence sign in
25  front of the house?

**27**

JASON PRINZI - BY MR. FUSSELL

2        A.    I don't recall any conversation about
3  fencing of any kind.
4        Q.    Did you hear the suspect tell anyone that
5  he had gotten a bicycle or bicycles at 207 -- in front
6  of 207 Kingsboro?
7        A.    I can't remember if I heard him tell
8  Investigator Wengert or not. When investigators talk
9  to somebody, I try to stay out of it.
10        Q.    Why?
11        A.    That's their individual investigation.
12  That's their job. You know, you never -- I don't step
13  on their job. That's kind of -- that's the way we do
14  things.
15        Q.    When you got out of your car, did you have
16  anything in your hands?
17        A.    I don't recall anything I would have had
18  in my hands.
19        Q.    Did you have a flashlight with you?
20        A.    I always have two flashlights on my
21  person.
22        Q.    Did you turn your flashlight on, one or
23  two of them on?
24        A.    I may have. I don't recall.
25        Q.    If you had turned them on, why would you

**28**

JASON PRINZI - BY MR. FUSSELL

2  have done that?
3        A.    To see better. I don't know -- I don't
4  recall that night if I had my flashlight on or in my
5  hand. But if I did, it would have been for obvious
6  reasons, to illuminate something, for better visual.
7        Q.    Can you describe what you saw when you
8  looked towards the house -- strike that.
9             Did you look towards the house?
10        A.    Sure.
11        Q.    Okay. What did you see?
12        A.    The house with a porch on the front.
13        Q.    Right.
14        A.    And the driveway I believe along the east
15  side of the house.
16        Q.    Would it have been to your left or to your
17  right, if you recall?
18        A.    I can't recall.
19        Q.    All right. Do you remember seeing a
20  garage?
21        A.    I don't recall a garage.
22        Q.    But you recall a driveway next to the
23  house?
24        A.    Yes.
25        Q.    Okay. Why did you not accompany

33

JASON PRINZI - BY MR. FUSSELL

01:29:26  1  before he began knocking?

01:29:28  3  A.  That, I don't recall.  I don't think it
01:29:31  4  was too long.  I mean, I don't think he was standing
01:29:33  5  on there for a long time.  I think he approached the
01:29:36  6  house and probably immediately started trying to make
01:29:40  7  contact.

01:29:40  8  Q.  Okay.  That would be the normal procedure,
01:29:42  9  I assume?

01:29:42 10  A.  I don't know if it's normal.  I think it's
01:29:46 11  subjective to what that individual wants to do.

01:29:48 12  Q.  Okay.  So what happened after you saw him
01:29:52 13  knock on the door?  What happened next?

01:29:54 14  A.  I saw dogs come out of the house.

01:29:57 15  Q.  Okay.  How long after the knocking started
01:29:59 16  did the dog come out of the house?

01:30:01 17  A.  I don't recall.

01:30:03 18  Q.  Okay.  And what did the dog do?

01:30:08 19  A.  Two dogs came out at first.  And they both
01:30:14 20  started running towards the front of the house.  One
01:30:16 21  of them stopped, turned up and went toward -- started
01:30:20 22  making its way towards the porch where Investigator
01:30:24 23  Wengert was standing.

01:30:24 24  Q.  Did you see any human beings at this time?

01:30:31 25  A.  Other than -- or including Investigator

34

JASON PRINZI - BY MR. FUSSELL

01:30:34  2  Wengert?

01:30:34  3  Q.  Yes.  I'm sorry.  Other than Investigator
01:30:36  4  Wengert.

01:30:36  5  A.  At that time I don't recall.

01:30:38  6  Q.  Did you see a woman come out of the door
01:30:43  7  when the dogs came out?

01:30:44  8  A.  I don't recall if she came out then or
01:30:49  9  just a few seconds after.  I don't recall.

01:30:50 10  Q.  Okay.  And the dog that did not -- the dog
01:30:57 11  that did not go up the steps, what did that dog do?

01:31:02 12  A.  I believe that dog stayed close by there.
01:31:06 13  But I'm not positive and I can't recall exactly what
01:31:09 14  that dog did.

01:31:10 15  Q.  What kind of a dog were those two dogs, if
16  you know?

01:31:16 17  A.  They looked like boxer breeds or close to
01:31:18 18  that breed.  But I don't know.  I'm by no means an
01:31:21 19  expert on dogs.

01:31:22 20  Q.  How far away from you -- how far away from
01:31:25 21  the porch were you when you observed the dogs?

01:31:27 22  A.  I couldn't say in feet-wise, but I was
01:31:31 23  fairly close.  Enough that I had a good visual, so...

01:31:34 24  Q.  Were you on the property of 207 when you
01:31:43 25  observed this, the dogs?

35

JASON PRINZI - BY MR. FUSSELL

01:31:45  2  A.  No.  I believe I was standing right by my
01:31:47  3  patrol car or Officer Hogg's patrol car, one or the
01:31:49  4  other.

01:31:51  5  Q.  And were those cars across the street from
01:31:55  6  207 or on the same side of the street?

01:31:57  7  A.  I can't remember where we parked them.

01:31:58  8  Q.  How long did it take -- the dog that ended
01:32:14  9  up getting shot, how long did it take the dog to come
01:32:17 10  from the door that it came out of till it got to the
01:32:23 11  part of the driveway that's just adjacent to the
01:32:26 12  porch?

01:32:28 13  A.  Time-wise, I don't know.  I believe it was
01:32:29 14  very quick.

01:32:29 15  Q.  Okay.  How would you describe the dog's
01:32:32 16  gait?

01:32:33 17  A.  I don't remember if it was a full sprint
01:32:37 18  or trotting along.  I don't know.  It happened pretty
01:32:42 19  quick.

01:32:44 20  Q.  Do you know how far -- I don't need to ask
01:32:48 21  you that.

01:32:50 22  Did the dog come to a full stop before it
01:32:54 23  went up the stairs?

01:32:55 24  A.  I don't recall.

01:32:56 25  Q.  Or turned towards-- okay.

36

JASON PRINZI - BY MR. FUSSELL

01:33:02  2  Well, describe the best you can how the
01:33:05  3  dog went from the time it came out of the door until
01:33:09  4  the shooting took place.

01:33:11  5  A.  When the dogs came out of the door, they
01:33:14  6  both proceeded to move towards the front of the house.
01:33:17  7  One of them stopped and started to go up towards --
01:33:20  8  onto the porch where Investigator Wengert was
01:33:23  9  standing.  It all happened fairly quick.

01:33:25 10  Q.  What's "fairly quick" mean?

01:33:30 11  A.  It wasn't 30 seconds from the time the
01:33:32 12  door opened that they came on the porch, no.  Fairly
01:33:35 13  quick.  I don't know.  It was quick.  I guess maybe 5,
01:33:39 14  10 seconds if that.  I'm just guessing there.  It was
01:33:42 15  quick.

01:33:45 16  Q.  What was the gait -- the dog's gait once
01:33:50 17  it turned towards the porch -- after it turned towards
01:33:53 18  the porch?

01:33:54 19  A.  After it turned towards the porch?

01:33:57 20  Q.  Right.  From the time it turned -- strike.
01:34:00 21  Did the dog turn to its left?

01:34:02 22  A.  At some point, sure.

23  Q.  Okay.

01:34:05 24  A.  It started to make its way up to the porch
01:34:07 25  or attempted to make it's way to the porch.

37

JASON PRINZI - BY MR. FUSSELL

01:34:09  2   Q.   How fast was it going?

01:34:11  3   A.   I don't know how I could measure that.

01:34:13  4   Q.   Well, was it ambling?  Was it walking?

01:34:16  5   Was it running?  Was it trotting?  Was it going full

01:34:21  6   speed?  That's what I want to know.

01:34:24  7   A.   I'm not sure, when it was going up the

01:34:27  8   porch, how fast it was going.  I couldn't tell you.  I

01:34:31  9   can't recall that.

01:34:32  10  Q.   So as far as you know, it might have been

01:34:34  11  just ambling very slowly?

01:34:37  12          MR. ASH:  Form.

01:34:37  13  A.   I wouldn't say slowly.  I mean, it was

01:34:41  14  barking and coming at him kind of aggressively.  It

01:34:44  15  wasn't taking its time.  I know that.  I don't know

01:34:46  16  how you want me to measure speed.  I don't know.

01:34:48  17  Q.   Well, the best you can.  I mean, you

01:34:54  18  are -- you are doing --

01:34:54  19  A.   In my opinion, I thought it was fairly

01:34:57  20  quick, you know.  But I don't know -- my opinion of

01:34:59  21  quick and yours of quick might be two different

01:35:02  22  things.  I don't know.

01:35:04  23  Q.   Would you describe it as running?

01:35:08  24  A.   Yeah.  I think so.  Running or a pretty

01:35:09  25  quick manner.  Sure.

38

JASON PRINZI - BY MR. FUSSELL

01:35:09  2   Q.   Was it flying up the stairs?  That's a

01:35:13  3   word of mine, but just -- how would you describe how

01:35:15  4   he was -- well, strike that.

01:35:18  5           Did he get up -- did the dog get to the

01:35:21  6   top of -- did it get on the porch?

01:35:21  7   A.   I'm trying to recall that.  And I don't

01:35:23  8   know if he even got up the steps.  I don't know.  I

01:35:26  9   don't recall.

01:35:26  10  Q.   Okay.  Do you know if the dog got up on

01:35:29  11  any step?

01:35:30  12  A.   I don't recall.  It happened so fast.

01:35:34  13  Q.   Okay.  Well, what happened from the time

01:35:44  14  the dog turned left until the dog was shot -- strike

01:35:44  15  that.

01:35:54  16          What did you see Officer Wengert do when

01:35:57  17  the dog turned in his direction?

01:35:59  18  A.   He attempted to back up, almost like if he

01:36:02  19  was looking to stand up on something or get away at

01:36:05  20  first.

01:36:08  21  Q.   Okay.  How far did he get?

01:36:08  22  A.   I don't know if he got any distance.  Just

01:36:10  23  looked like he started to -- his body started to

01:36:12  24  motion back.

01:36:13  25  Q.   Okay.  But he didn't -- did he take any

39

JASON PRINZI - BY MR. FUSSELL

01:36:16  2   steps back?

01:36:16  3   A.   I don't recall if he did or not.  I

01:36:18  4   couldn't tell you.

01:36:18  5   Q.   Okay.  And then what did he do?

01:36:21  6   A.   Then he used his duty weapon, discharged

01:36:26  7   and shot the dog.

01:36:26  8   Q.   Did he pull his weapon out of the holster

01:36:30  9   and then shoot the dog?

01:36:31  10  A.   That would be a logical order of events.

01:36:34  11  Yes.

01:36:35  12  Q.   But is that what happened?  Did you see

01:36:39  13  that happen?

01:36:39  14  A.   He didn't shoot the gun while it was in

01:36:41  15  his holster.  He did remove the gun from the holster.

01:36:44  16  Yes.

01:36:44  17  Q.   He did that?

01:36:45  18  A.   Yes.

01:36:46  19  Q.   Did he pull the gun out of his holster as

01:36:56  20  he was leaning back?

01:36:56  21  A.   It happened so -- I couldn't even begin to

01:37:01  22  speculate if that's how it happened.

01:37:02  23  Q.   Was it very, very quickly?

01:37:03  24  A.   My opinion, it was pretty quick.

01:37:05  25  Q.   As the dog turned to go towards the porch,

40

JASON PRINZI - BY MR. FUSSELL

01:37:27  2   did you see Ms. Cabisca?

01:37:33  3   A.   I don't recall if I had a visual of her at

01:37:36  4   that time or not.

01:37:36  5   Q.   So she may have been near the porch, she

01:37:41  6   may not have been out of the house.  You don't know?

01:37:43  7   A.   I simply do not recall.

01:37:50  8   Q.   What happened to the other dog after

01:37:54  9   the -- strike that.

01:37:58  10          What happened -- where was the dog when

01:38:00  11  the dog was shot?

01:38:01  12  A.   Relative to where Officer Wengert was or

01:38:08  13  the house?

01:38:08  14  Q.   Relative to the porch and the steps going

01:38:10  15  up to the porch and the porch and the driveway.

01:38:12  16  A.   I believe right in the vicinity of the

01:38:14  17  bottom of the steps right there --

01:38:16  18  Q.   Okay.

01:38:16  19  A.   -- if I recall correctly.

01:38:18  20  Q.   Okay.  When you say the "bottom of the

01:38:32  21  steps," are you indicating he was on one of the steps

01:38:35  22  or he was on the driveway?

01:38:37  23  A.   I don't recall.  Just somewhere in the

01:38:39  24  vicinity of the bottom of the step area right there.

01:38:42  25  Q.   Okay.  Do you know how many steps there

---

**49**

JASON PRINZI - BY MR. FUSSELL

01:48:24   2   there.

01:48:24   3       Q.   And after she expressed these vulgarities,

01:48:30   4   what happened next?

01:48:30   5       A.   I kept ordering her to put the other dogs

01:48:33   6   back inside, which she refused.

01:48:35   7       Q.   Then what happened? How many times did

01:48:37   8   you order her to put the dogs in the house?

01:48:39   9       A.   If I had to say, I would say at least ten.

01:48:41   10      Q.   Okay. And what was your tone when you

01:48:45   11   were talking to her?

01:48:46   12      A.   Loud and clear.

01:48:47   13      Q.   Okay. Did you say anything else to her

01:48:52   14   other than ordering her to put the dogs in the house?

01:48:56   15      A.   At that time I don't recall. I do

01:48:57   16   remember her saying she had one or two young children

01:48:59   17   in the house.

01:49:00   18      Q.   Okay.

01:49:01   19      A.   She was worried about them, so I said,

01:49:03   20   "Then go inside and attend to those children. We will

01:49:06   21   come in and explain everything and talk to you." And

01:49:08   22   I said that numerous times.

01:49:10   23      Q.   And what did she do after you told her to

01:49:14   24   go in the house and tend to her children?

01:49:15   25      A.   Continued to stay outside and yell at us,

---

**50**

JASON PRINZI - BY MR. FUSSELL

01:49:18   2   belittle us, swear at us.

01:49:20   3       Q.   The same type of vulgarities you've

01:49:23   4   already --

01:49:23   5       A.   Yes.

01:49:23   6       Q.   Okay. Then what happened?

01:49:24   7       A.   At some point I believe she did go in the

01:49:28   8   house and the dogs were put inside the house.

01:49:30   9       Q.   Okay. So at some point she followed your

01:49:36   10   directions and did what you had ordered her to do?

01:49:38   11      A.   Yes, but I believe she then came back

01:49:41   12   outside.

01:49:41   13      Q.   She then came back outside. And then what

01:49:43   14   happened?

01:49:43   15      A.   At one point she approached Officer Hogg

01:49:47   16   and with both hands pushed his chest. Got that close

01:49:51   17   to him and pushed him (indicating).

01:49:52   18      Q.   Okay. How did she -- describe the best

01:49:54   19   you can how she pushed him.

01:49:55   20      A.   Visual or audio for this? Both hands

01:49:59   21   towards his chest, upper chest, in a shoving or

01:50:02   22   pushing manner.

01:50:03   23      Q.   Okay. What did he do when she pushed her?

01:50:06   24      A.   He then used his training techniques and

01:50:08   25   placed her on the ground, what's commonly referred to

---

**51**

JASON PRINZI - BY MR. FUSSELL

01:50:12   2   as DT moves.

01:50:12   3       Q.   What's TT?

01:50:14   4       A.   Defensive tactics.

01:50:15   5       Q.   Oh. DT moves. I thought you said TT.

01:50:17   6       A.   DT. Defensive tactics.

01:50:20   7       Q.   What tactics --

01:50:21   8       A.   You'd have to either reference the report

01:50:23   9   or ask him on that. I just know he was trained in

01:50:27   10   defensive tactics.

01:50:27   11      Q.   And did she end up on the ground?

01:50:33   12      A.   I'm sorry?

01:50:33   13      Q.   Did he put her on the ground?

01:50:35   14      A.   He escorted her to the ground. Yes.

01:50:37   15      Q.   What's -- he escorted her?

01:50:38   16      A.   That's what it's --

01:50:39   17      Q.   Escorting means that usually the person is

01:50:42   18   intending to do something and you help them along. Is

01:50:45   19   that -- was she --

01:50:45   20      A.   We are trained in defensive techniques.

01:50:48   21   It's an escorting-to-the-ground technique.

01:50:50   22      Q.   Oh. As if you were escorting somebody to

01:50:55   23   a dance and they wanted to go and you went along with

01:50:58   24   them and helped them? Is that the idea?

01:50:59   25      A.   I've never -- I don't --

---

**52**

JASON PRINZI - BY MR. FUSSELL

    2       Q.   Okay.

01:51:00   3       A.   If you look at our training, defensive

01:51:03   4   tactics, it is an escort.

01:51:05   5       MR. FUSSELL: I'm asking Mr. Ash. I want

01:51:06   6   a copy of the defending tactics that involve escorting

01:51:12   7   individuals to the ground. I'm sorry. I apologize.

01:51:20   8       MR. ASH: Just to be clear for the record,

01:51:21   9   that's just a defensive tactic parlance. You're not

01:51:27   10   actually suggesting that it's like you're escorting

01:51:29   11   someone to the prom. That's the language that's

01:51:31   12   used --

01:51:31   13      THE WITNESS: Correct. Correct.

01:51:32   14      MR. ASH: -- in the manuals.

01:51:34   15      THE WITNESS: That's the verbiage.

01:51:39   16      Q.   Otherwise known as bowdlerizing?

01:51:44   17      A.   I'm not sure.

01:51:45   18      Q.   That's my editorial comment.

01:51:51   19      Okay. So describe specifically how he

01:51:55   20   escorted her to the ground.

01:52:01   21      A.   I couldn't do that. I don't know if it

01:52:03   22   was a bent-arm takedown or a three-point landing. I

01:52:05   23   don't know which technique he used, so...

01:52:08   24      Q.   Okay. Did you observe her on the ground?

01:52:10   25      A.   I did.

---

**57**

JASON PRINZI - BY MR. FUSSELL

2  Q.  Do you know why you would have let her go
3  back in a second time?
4  A.  Because there was young kids in the house.
5  She was saying she had little kids in the house
6  unattended.
7  Q.  Now, did she commit any crimes?  Well, did
8  you observe her committing any crimes?
9  A.  Pushing an officer is a crime.  Pushing
10  anybody is a crime.
11  Q.  What crime is that?
12  A.  Harassment second degree.
13  Q.  Okay.  Did you see her commit any other
14  crimes?
15  A.  I could definitely go with disorderly
16  contact if I wanted to, but we didn't charge that, I
17  don't believe.  I'm not positive.
18  Q.  Any other crimes?
19  A.  Not that I'm aware of.
20  Q.  Okay.  And after she put her hands on
21  Investigator Hogg --
22  A.  Officer Hogg.
23  Q.  Officer Hogg.  I'm sorry.  I apologize for
24  that.  Did he go backwards before he escorted her to
25  the ground?

**58**

JASON PRINZI - BY MR. FUSSELL

2  A.  I couldn't answer that.  I don't know.
3  Q.  How tall is -- I'll ask him anyway.  But
4  how tall is Officer Hogg?
5  A.  I don't know.  He's shorter than myself.
6  I know that.
7  Q.  How heavy is he?
8  A.  Lighter than me.  I don't know what he
9  weighs.
10  Q.  Okay.  After she pushed him or put her
11  hands on him and before he escorted her to the ground,
12  did he say anything to her?
13  A.  I don't recall.
14  Q.  So he may have or he may not; you don't
15  recall?
16  A.  Correct.  Yeah.  You'd have to ask him.  I
17  don't know.
18  Q.  After she touched -- how long after she
19  touched Officer Hogg did he escort her to the ground?
20  A.  I would assume immediately.  I mean,
21  that's...
22  Q.  Did any of the officers present, you or
23  Mr. Hogg or Investigator Wengert, mention CPS during
24  this incident?
25  A.  I don't recall.  May have.

**59**

JASON PRINZI - BY MR. FUSSELL

2  Q.  Do you know who may have said that?
3  A.  No.  I do not recall.  I don't recall
4  those words being said.  They may have, they may not
5  have.  I don't know.  I don't recall.
6  Q.  Pardon me?
7  A.  I don't even know if CPS was mentioned
8  that night.  I don't recall.
9  Q.  You don't recall?
10  A.  I do not.
11  Q.  Did anyone mention Ms. -- the possibility
12  of Ms. Cabisca going to jail?  Any one of the three of
13  you.
14  A.  I don't recall, but that's a jailable
15  offense.
16  Q.  So it may have been said, it may not have
17  been said.
18  A.  Yeah.  I would say that.
19  Q.  What's the jailable offense?
20  A.  It's a violation.
21  Q.  What's the violation?
22  A.  Harassment second.
23  Q.  The pushing or touching --
24  A.  Correct.
25  Q.  -- or whatever it was?

**60**

JASON PRINZI - BY MR. FUSSELL

2  A.  Correct.
3  Q.  When she touched Officer Hogg, was her
4  body moving?
5  A.  She was charging towards him, walking
6  towards him, so yes.
7  Q.  Okay.  What was her -- describe the
8  touching as best you can.  Was she leaning into him,
9  touching him?
10  A.  Both hands up towards his upper chest area
11  in a pushing or shoving manner.
12  Q.  Okay.  How hard was she pushing?  Could
13  you judge it in any way?
14  A.  I couldn't give you the foot-pounds.
15  Q.  I know that.  I didn't expect -- I was
16  hoping you could, but --
17  A.  I don't know how much force was exerted.
18  Q.  Okay.  So it could have been merely
19  touching?
20  A.  It was a shove.
21  Q.  It was a shove?
22  A.  It wasn't a pat on the arm or a pat on the
23  chest.  It was a push and shove.  No mistake about
24  that.
25  Q.  Okay.  And I think you indicated you

# EXHIBIT E

45

DARYL HOGG - BY MR. FUSSELL

2  Q.  Okay.

3  A.  I would say the two larger-breed dogs, the

4  larger of the three, the two of them, came out before

5  the other one.

6  Q.  Okay.  And did she come out before the

7  third dog?

8  A.  I don't recall.  But I believe all three

9  dogs came around the corner, so it could have been

10  simultaneously.  I know that all three dogs and her

11  ended up coming out.

12  Q.  At the same time, essentially?

13  A.  Essentially.  Yeah.

14  Q.  Okay.  And then after the three dogs and

15  Ms. Cabisca came out of the house, what happened next?

16  A.  Again we yelled at her many, many times,

17  "Put the dogs away.  Put the dogs away.  Put the dogs

18  away."

19  She was swearing at us.  "Why are you in

20  my house?  What the F do you want?"  You know, very

21  aggressive and very obstinate towards us.

22  Q.  With regard to the -- there was a dog that

23  ended up being shot; right?

24  A.  Correct.

25  Q.  Okay.  With regard to that dog, what did

46

DARYL HOGG - BY MR. FUSSELL

2  it do -- you said it ran out, I think, very fast or

3  extremely fast or something like that?

4  A.  Yes.

5  Q.  And what did it do after it came out of

6  the door, side door, going in that extremely fast

7  manner?

8  A.  The dog that was shot specifically came

9  towards the porch, down the driveway.  When it got to

10  roughly around the porch area, it stopped, it turned

11  and it went up the steps towards Officer -- I'm

12  sorry -- Investigator Wengert.

13  Q.  Was it a continuous movement or did he

14  actually stop before he went up the stairs?

15  A.  No, I don't believe it was a continuous

16  movement.  I believe it was -- he was -- well, I guess

17  it was still continuous.  He ran up towards us.

18  Q.  Correct.

19  A.  When he got to the porch, he turned and

20  went up the porch.

21  Q.  Okay.  Was he continuing at the same rate

22  of speed as he went up the porch?

23  A.  I guess I don't really know what speed

24  they were going.  They were both going fast.

25  Q.  Okay.

47

DARYL HOGG - BY MR. FUSSELL

2  A.  He was going up.

3  Q.  Did he change his speed -- as you recall,

4  did he change his speed at all from the speed he had

5  when he first came flying --

6  A.  No.

7  Q.  -- out the door until he went up towards

8  Investigator Wengert?

9  A.  No.

10  Q.  After that first dog came out of the

11  house, what did Investigator Wengert do?  What did you

12  see him do?

13  A.  As we were yelling for her to put the dogs

14  away?

15  Q.  Well, strike that.  Did you have time to

16  start yelling before the dog went up towards

17  Investigator Wengert?

18  A.  Yeah.  There was probably about 10 or

19  15 feet between the side door and the porch.  So the

20  minute I saw the dogs, we yelled, "Put the dogs away.

21  Put the dogs away."  I don't know how many times we

22  yelled it to her before the dog went up the porch, but

23  we did continuously yell that.

24  Q.  Okay.  How long after the first dog came

25  out of the door did you start yelling "Put the dogs

48

DARYL HOGG - BY MR. FUSSELL

2  away"?

3  A.  Immediately when we saw the dogs, we

4  started yelling "Put the dogs away."  The dogs were

5  also barking as they came out the door, so we could

6  hear them.

7  Q.  Can you quantify "immediately" in terms of

8  seconds, maybe?

9  A.  No.  Immediately.

10  Q.  Okay.  How much time transpired between

11  the first dog coming out the side door and the time

12  Investigator Wengert shot him?

13  A.  I don't know exactly.  It was very quick.

14  Q.  Can you give me an approximate idea of

15  what "very quick" is?

16  A.  Seconds.  Not 1 or 2.  I mean, it was 10,

17  15 seconds.  The whole thing happened very quickly.

18  Q.  Why don't you just tell us -- say go and

19  stop.

20  A.  I have no idea, sir.  This was two years

21  ago, so I cannot recall the exact time.  I know that

22  the dogs came out of the door.  They were very loud.

23  They were barking.  They were fast.  They were not put

24  away immediately.  The dog ran up on the porch towards

25  Investigator Wengert and Investigator Wengert shot the

61

DARYL HOGG - BY MR. FUSSELL

11:10:23   2    Q.    Like a cell phone that he may have had

11:10:25   3    with him?  Is that what you mean?

11:10:26   4    A.    Yeah.  Most likely it would be over the

11:10:29   5    air because other people may have heard the shots

11:10:33   6    being fired.

11:10:37   7    Q.    And then what happened?

11:10:38   8    A.    Again I asked your client to speak to me.

11:10:41   9          She did not want anything to do with me.

11:10:44  10    She continuously yelled at me and started charging

11:10:46  11    towards me.

11:10:47  12          We were now in the -- I would say the

11:10:51  13    front yard, close to the porch.  As she charged

11:10:54  14    towards me, I took a step, maybe two steps backwards.

11:10:58  15    She continued to charge towards me.  She put both of

11:11:01  16    her hands out flat and she pushed me in my chest area,

11:11:05  17    knocking me back at least one or two steps more.

11:11:10  18    Q.    And then what happened?

11:11:11  19    A.    At that point in time I used a defensive

11:11:15  20    tactic called a straight arm bar where I grabbed her

11:11:18  21    right wrist, pulled her arm straight -- with my right

11:11:22  22    wrist.  I'm sorry.  I took my left arm and put it in

11:11:26  23    between the crux of her arm and her shoulder blade and

11:11:29  24    I escorted her to the ground to where she would have

11:11:32  25    been laying flat on her stomach.

62

DARYL HOGG - BY MR. FUSSELL

11:11:34   2    Q.    Was she intending to go onto the ground?

11:11:38   3    A.    I don't understand what you mean.

11:11:40   4    Q.    Well, what does the word "escort" mean to

11:11:45   5    you?

11:11:45   6    A.    "Escort" means helping her from her feet

11:11:47   7    down to the ground without physically pushing her and

11:11:51   8    forcing her to the ground, slamming her into the

11:11:54   9    ground or anything like that.  I did it as easily as I

11:11:57  10    possible could so that she would not be injured, as

11:11:59  11    trained.

11:12:00  12    Q.    Explain exactly -- where were you trained

11:12:10  13    to do the escorting in such a way that it would be as

11:12:15  14    gentle a landing as possible?

11:12:15  15    A.    In the academy we're trained in many weeks

11:12:18  16    of defensive tactics.  So when you put your hand in

11:12:23  17    the crux of the arm and the shoulder blade, you're

11:12:26  18    applying pressure.  That pressure is guiding that

11:12:28  19    person to the ground.  So maybe "guiding" might be a

11:12:32  20    better word than "escorting."

11:12:34  21    Q.    Did she end up on the ground?

11:12:37  22    A.    She did.

11:12:38  23    Q.    Did anybody else end up on top of her?

11:12:40  24    A.    Not that I recall.

11:12:41  25    Q.    Could somebody have ended up on top of

63

DARYL HOGG - BY MR. FUSSELL

11:12:45   2    her?

11:12:45   3    A.    Probably not because nobody else wrote a

11:12:51   4    subject resistance report like me.  And I was more

11:12:54   5    than able to take her into custody by myself.

11:12:58   6    Q.    And once she got on the ground, what part

11:13:06   7    of her body was on the ground?

11:13:07   8    A.    She was laying on her front side.

11:13:08   9    Q.    What do you mean, "her front side"?  Left?

11:13:15  10    Right?

11:13:15  11    A.    The front side of her body was on the

11:13:17  12    ground.

11:13:18  13    Q.    Okay.

11:13:18  14    A.    She was laying flat, like prone down.

11:13:20  15    Q.    She was laying on her chest?

11:13:22  16    A.    On her stomach, her chest.  Yes.

11:13:25  17    Q.    Do you know if she was injured?

11:13:31  18    A.    At that point I did not know whether she

11:13:34  19    was injured or not.  I continued to take her into

11:13:36  20    custody.

11:13:36  21    Q.    Pardon me?

11:13:38  22    A.    I continued to take her into custody.

11:13:40  23    Q.    What do you mean by that?

11:13:41  24    A.    At that point I performed another tactic

11:13:43  25    that we use in defensive tactics called a two-point

64

DARYL HOGG - BY MR. FUSSELL

11:13:48   2    landing where I restrained her arm and then slowly

11:13:51   3    moved it around behind her back where I placed

11:13:53   4    handcuffs on her.

11:13:54   5    Q.    Describe a two-point landing.

11:13:57   6    A.    A two-point landing.  As I had her right

11:14:00   7    arm, it was more so -- it wasn't flat with the rest of

11:14:03   8    her body.  It was proned up a little bit.  I put my

14:14:08   9    two knees, one by her shoulder, the top of her

11:14:11  10    shoulder blade, the other one on the other side of her

11:14:13  11    arm to keep her from standing up.  And then I

11:14:15  12    maneuvered her arm in the bend of her arm behind her

11:14:19  13    back and I placed the handcuffs on her; grabbed her

11:14:21  14    left arm and pulled that behind her back and put the

11:14:24  15    handcuff on there.

11:14:24  16    Q.    So you had your knees in her back?

11:14:27  17    A.    I had my knees on the top of her shoulder

11:14:30  18    and I had the knee on the side of her body.  Not in

11:14:33  19    her back.

11:14:35  20    Q.    Which of your knees was on her shoulder?

11:14:41  21    A.    It would have been my right knee because I

11:14:42  22    was on her right side.

11:14:49  23    Q.    Which knee would have been in her back?

11:14:50  24    A.    Again, I did not have a knee in her back.

11:14:53  25    I had it on her side.  And that would have been my

77

DARYL HOGG - BY MR. FUSSELL

11:26:38 2 that there was a dead dog in the driveway?

11:26:41 3    A.   I don't know who told her, but at one

11:26:44 4 point she was informed that there was a dog shot in

11:26:47 5 the driveway.

11:26:52 6    Q.   Did anybody encourage her not to go up and

11:26:55 7 look at the dog?

11:26:55 8    A.   I did not.  But one of the other two may

11:26:58 9 have, knowing that she does like dogs a lot and that

11:27:02 10 may have, you know, upset her too.

11:27:03 11    Q.   Do you know if Investigator Turner did

11:27:12 12 a -- I think the word was search?

11:27:13 13    A.   Officer Turner?  Yes.

14    Q.   Officer.

11:27:16 15    A.   She, I believe, did a search incident to

11:27:18 16 arrest.

11:27:18 17    Q.   Did you see that take place?

11:27:19 18    A.   I don't think I did, no.

11:27:22 19    Q.   How do you know she did that?

11:27:24 20    A.   She's trained just like the rest of us.

11:27:27 21 We all do a search incident to arrest before you put

11:27:30 22 them in the car.

11:27:30 23    Q.   What would that involve?

11:27:31 24    A.   That would be just checking pockets,

11:27:35 25 making sure there was nothing sharp in the pockets,

78

DARYL HOGG - BY MR. FUSSELL

11:27:37 2 nothing illegal in the pockets; checking out pant

11:27:40 3 legs, shoes if they have them sometimes.  When it

11:27:43 4 comes to females, sometimes females hide things in

11:27:48 5 their bras, so sometimes female officers will check

11:27:50 6 inside bras.  Again, that's an intimate area.  That's

11:27:53 7 why we wouldn't do the search and Officer Turner

11:27:56 8 would.

11:27:56 9    Q.   When you say "we," you mean the male

11:27:58 10 officers?

11:27:58 11    A.   The male officers, yes.

11:28:10 12    Q.   How long was Ms. Cabisca on the ground

11:28:12 13 before she got off the ground?

11:28:17 14    A.   I would say it was within minutes.  I

11:28:19 15 don't think she was on the ground overly long.  I had

11:28:21 16 no intention of leaving her there.

11:28:23 17    Q.   Do you have an approximate idea of how

11:28:26 18 many minutes?

11:28:28 19    A.   No.

11:28:35 20    Q.   While on the ground did she say

11:28:40 21 anything -- strike that.

11:28:42 22       You may have already talked about that she

11:28:43 23 mentioned children.  When did she mention children?

11:28:45 24    A.   I believe she mentioned it when she was on

11:28:47 25 the ground.

79

DARYL HOGG - BY MR. FUSSELL

11:28:47 2 .   Q.   Okay.

11:28:48 3    A.   That there was a child in the house, that

11:28:51 4 she had nobody else to watch that child.

11:28:52 5    Q.   Did you ever hear her state that she has

11:28:59 6 asthma?

11:29:02 7    A.   I don't recall if she stated it to us.  I

11:29:04 8 know at one point or another -- and, again, I

11:29:07 9 apologize.  I don't know if she came out with her

11:29:09 10 asthma pump when she came back out of the house or if

11:29:12 11 somebody had to go retrieve it.  But I do know at one

11:29:16 12 point or another she was given her asthma pump so that

11:29:19 13 she could take it because she was stating that she was

11:29:21 14 having an anxiety attack.

11:29:24 15    Q.   Did she ever say that she couldn't

11:29:26 16 breathe?  Did you ever hear her say "I can't breathe"?

11:29:27 17    A.   I believe that's when I determined that

11:29:29 18 she had an asthma pump and needed it.

11:29:31 19    Q.   When was that?

11:29:32 20    A.   I don't recall when that was.

11:29:33 21    Q.   Could it have been while she was on the

11:29:35 22 ground?

11:29:35 23    A.   Could have been.

11:29:37 24    Q.   Do you know who obtained the breathing

11:29:58 25 device?

80

DARYL HOGG - BY MR. FUSSELL

11:29:59 2    A.   I don't.  Like I said, she may have

11:30:01 3 brought it back out with her when she came back out

11:30:04 4 the second time or we may have had to send somebody to

11:30:08 5 go get it.  I don't recall.

11:30:08 6    Q.   Could it have been her boyfriend as far as

11:30:11 7 you know?

11:30:12 8    A.   It could have been.  He did arrive on

11:30:15 9 scene.

11:30:15 10    Q.   Did anyone mention the words "CPS" during

11:30:43 11 this incident at all?

11:30:44 12    A.   No.  I don't see why we would.

11:30:48 13    Q.   Do you remember anybody using the term?

11:30:51 14    A.   No.

11:30:53 15    Q.   Did anyone tell Ms. Cabisca she was going

11:30:56 16 to go to jail or be arrested at any particular time?

11:30:58 17    A.   Yes, I did.

11:30:59 18    Q.   When did you first say that?

11:31:02 19    A.   When she shoved me, I told her she was

11:31:02 20 under arrest.

11:31:02 21    Q.   How many times did you tell her she was

11:31:10 22 under arrest?

11:31:10 23    A.   I think I told her when she shoved me that

11:31:14 24 she was under arrest, and then I told her as I was

11:31:15 25 handcuffing her that she was under arrest.