# WILLIAMS ASSOCIATES, LLC
## International Consultants

1175 MARLKRESS ROAD, BOX 2633
CHERRY HILL, NJ 08034
Telephone: 609-280-9787
Secure Fax: 856-428-8649
Web: www.jawilliamsassociates.com
Email: jaw@jawilliamsassociates.com

• Civil & Criminal Case Litigation Support
• Police Policy, Practices & Procedures
• Executive Security

27 February 2016

JAWA 15 – 175 – 3

Re:  Tina Cabisca

Vs

City of Rochester, New York, Et Al.

Dear Attorney Fussell:

This report, with supporting source referenced and based opinions, is drawn upon the materials provided and reviewed to this date.  I reserve the right to amend and supplement this report as additional information and documents become available to me.

The report is being submitted pursuant to Discovery Rule 26 , and Rules of Evidence 702: which states, " a witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in a form of an opinion or otherwise if :

(A)  The expert's scientific or technical or other specialized knowledge will help

    1.  the trier of fact to understand the evidence or to determine a fact in issue;

(B)  The testimony is based on sufficient facts or data;

(C)  The testimony is the product of reliable principles and methods to the facts of the case.

As an Adjunct Professor for Law and Justice Studies at Rowan University, Glassboro, New Jersey, I continue to teach Criminal Justice Courses such as Police In America;  Minorities, Crime and Criminal Justice; Criminal Investigations; American Corrections; Law Enforcement and The Constitution; Criminal Justice and Social Conflicts, and other assigned Criminal Justice courses.



As an Associate Member of the American Bar Association, I serve on the ABA Criminal Justice Section Committee and consult on matters of Police Operations and Training, and have been Court Certified under the Daubert Challenges.

I continue membership and participation in the training programs of the American College of Forensic Examiners, Springfield, Missouri, while serving on the ACFEI Board of Forensic Examiners, and as a Faculty Fellow and Certification Course Presenter at ACFE National Conferences held annually.

I previously held membership and participated in administrative and training programs of the American Society of Industrial Security International, while serving on the ASIS, International Crime and Loss Prevention Council.


Identification and Qualifications of Expert Witness:

My name is James Aaron Williams.  I am self-employed as a Consultant in Law Enforcement Policy, Practice, Procedure, and Training.  I have also been accepted as a Consultant in Security, Policy, Practice, Procedure, and Training.  I attach my curriculum vitae and will incorporate it into my report relative to the above referenced.  My vitae sets forth my training and  professional law enforcement and security experience and expertise, professional associations, and a summary of courses taken,  authored,  and instructed , over the previous thirty (30) years at Municipal, County, State, Federal, and International settings, and the past ten (10) years as a law enforcement and security consultant nationwide.

In addition to my training and expertise credentials, I was a New Jersey State Highway Patrolman, NJ Division of Motor Vehicles.  I served as a full time certified police officer in Burlington County (NJ) municipalities of Burlington Township, New Hanover Township, and Beverly City.  I served in progressing grades of Patrolman, Detective, Detective Sergeant, in Burlington Township, Lieutenant, in New Hanover Township, Captain, and Chief of Police in

Beverly City.  Collateral duties as the Deputy Director and Chief Police Training Instructor at the Burlington County Regional  Police Academy, involved teaching all police operations, firearms, and self defense courses.

As a Certified Chief Police Training Instructor, I was called upon to assist in the development of the New Jersey Police Training Commission's Police Training Curricula, and the certification of police officers and police trainers.  As an expert, I was called upon to initiate, train, develop and administer a Certified Police Department for the Richard Stockton College at Pomona, New Jersey and served as the initial Director of Public Safety and Security.

I was recruited by the Burlington County (NJ) Sheriff's Department at the rank of Sheriff's Department Commander.   In this position I initiated and directed the Departmental Investigations and Training Units.

I was recruited by the United States Department of Justice Drug Enforcement Administration as a Special Agent and assigned to the Organized Crime Strike Force.  I retired, after twenty years service, as Deputy Associate Special Agent In Charge, and Chief of Organized Crime Drug Enforcement Task Forces on world wide assignments.  Additionally, I was assigned Diplomatic duties by the United States Department of State and the Drug Enforcement Administration, with oversight duties for Law Enforcement and Training of Police Officers and Military Officers throughout Africa, Asia the Caribbean, Europe, and South America.

Seven (7) years of my federal law enforcement career were spent developing and teaching law enforcement and security operations courses both domestically and internationally.

One (1) year was spent on a liaison assignment as Senior Drug Policy Advisor to the Central Intelligence Agency, (CIA), with offices at Langley, Virginia

Three (3) years as a United States Diplomat serving as US Country Attache' to the Caribbean.

**Methodology Utilized In Developing Preliminary and Concluding Opinion (s):**

In developing opinions in this case incident I reviewed materials, documents, and reports sent to me by the case attorney. The materials reviewed were those typically relied upon by consultants and experts when conducting an analysis of law enforcement matters. After an audit of the materials submitted to my office by counsel, I developed a set of material facts and analyzed those facts against standard and accepted professional police policy, practices, procedures and training. An analysis was made between what police officers are trained and mandated to do as opposed to what was actually done during this case incident.

The methodology I used in this case incident is the same that I have utilized during the past fifteen (15) years and has been accepted by presiding trial judges in previous trials in which I have testified as an expert in both plaintiff and defense cases. The methodology I have used is consistent with that utilized by other law enforcement experts.

**Documents and Discovery Materials submitted and reviewed to this date:**
1. Complaint by Plaintiff. Nine pages.
2. Complaint Answer by Defendant. Five pages.
3. Mediation Memorandum. Ten pages.
4. Letter from the City Attorney to the Mediator. One page.
5. Psychotherapy Report. Eight pages.
6. Hospital Records from Verisma Highland Hospital. Thirteen pages.
7. Alexander Medical Records. Two Pages.
8. Property photographs of the Cabisca house and grounds. Nine photographs.

09. Photographs of the Cabisca dog (deceased).  Three photographs.

10. Photographs of Ms. Tina Cabisca.  Six photographs.

11. Kingsboro Road calls for Police Services.  Six pages.

12. Police Incident Reports. Officer Daryl Hogg, 2 pages  -  Officer Jon Rivers, 3 pages.

13. Court Appearance Tickets.  Four pages.

14. Rochester City response letter.  Four pages.

15. Hearing Transcript.  Thirty five pages.

16. Statement of Tyrone Flowers.  Three pages.

17. Statement of Rachel Wickman.  One page.

18. Statement of Jared and Jamie Hillegeer.  One handwritten page.

19. Report of Thomas Mullamney relative to the deceased dog Bailey.  One page.

20. Letter to Mr. and Mrs. Brantly from Attorney Fussell.  Two pages.

21. Officer of the Year Award to Noland Wengert for year 2011.  One page.

At the outset of this case incident review, it is important to note that the report is based upon the facts as presented by the materials and documents submitted, and specifically avoids drawing conclusions based upon creditability issues of the parties or their positions within the legal, law enforcement, security, or social communities represented.

I have been requested to opine as to the appropriate or inappropriate actions, and appropriate or inappropriate application of standard and accepted police policy and procedures in and during the arrest of Ms. Tina Cabisca by Rochester, NY Police Officers.

My opinions are based upon my specialized training, experience, expertise, knowledge, domestic and international criminal investigations, international police training administration, police training administered at police settings,  and  international  police services while on Diplomatic assignments.

Case Synopsis  According to Documents and Materials Reviewed to Date :

Referencing the above submitted documents, on or about 9:50 pm on 07 September 2013, Rochester New York Police Department officers, were investigating a possible larceny near the property of 207 Kingsboro Road.  The officers were Investigator Nolan Wengert, Officer Daryl Hogg, and Officer Jason Prinzi.

Tyrone Flowers, who was returning to his home, noticed two (2) discarded bicycles laying on the curbside at or near the streets of Genesee Boulevard and Kingsboro Road. Believing the bicycles to be abandoned, Mr. Flowers picked them up and continued to proceed to his residence, under the observance of an elderly man who was sitting on a nearby porch.  As Mr. Flowers was walking toward his residence, he noticed a gray Chevrolet Impala drive slowly past him.  When Mr. Flowers reached his residence, he was arrested by Investigator Nolan Wengert who explained, " I saw you with the two bikes." Officers Daryl Hogg and Jason Prinzi arrived, and the bicycles were loaded into the trunk of one of the police vehicles.  The officers then returned to the location where Mr. Flowers had picked up the bicycles.  Mr. Flowers, in his statement to police, states, " I told the Policeman where we were going, the lady who lives there has dogs."

Upon arrival at 207 Kingsboro Road, the two Uniformed Patrol Officers remained near their patrol cars while the Investigator,  in plain clothes,  approached the porch of the above address.  As Investigator Wengert announced his presence, a side door of the residence opened and Ms. Tina Cabisca and two dogs emerged.  As one of the dogs approached the porch on which Investigator Wengert was standing, he (Wengert) drew his service weapon and shot the dog.

According to Ms. Cabisca, Investigator never announced his presence at the front door. Had he (Wengert) rang the doorbell or knocked, it would have alerted her dogs, she would have answered the door and communicated with the investigator, and the dogs would have

remained inside the house.

Subsequently, Ms. Cabisca became highly upset when the dog was shot, and a verbal confrontation between she and the officers ensued. Ms. Cabisca was physically forced to the ground. After getting up, according to Ms. Cabisca, she reentered her house and then requested the police leave her property as several other officers had arrived. As she held her hands out in front of her, one of the uniformed officers placed his chest on her hands and told her that she was now going to jail because she had touched him. The officer then placed a set of handcuffs on her wrists, and according to Ms. Cabisca, picked her up by her hands. She was handcuffed, carried to a patrol car, placed in the rear seat of the car, and initially denied access to an Inhaler used for a breathing condition caused by a case of Asthma, according Ms. Cabisca. Ms. Cabisca was kept at the hospital from 10:45 pm until approximately 4:00 am the following day after being examined and treated for body bruises.

Findings Leading to Opinions:

1.  Rochester New York Police Department is accredited through the NY State Law Enforcement Program and was last accredited in 2010. The Special Operations Division of the Department oversees the Animal Services Unit.

2.  According to Tyrone Flowers, " I told the policeman the house where we were going, the lady who lives there has dogs," as they proceeded to 207 Kingsboro Road, the home of Tina Cabisca. (Source, Tyrone Flowers statement).

3.  Once at 207 Kingsboro Road, the Plain Clothed Investigator approached the residence while the two uniformed officers remained some distance away in the driveway of the subject residence. (Source, Officer Daryl Hogg statement).

Statement Conflicts:

4. From his seat in the patrol car near the Cabisca driveway, Tyone Flowers stated, that " the dog was not barking or growling looked at the light on the porch which the detective was holding. The detective then shot the dog twice."

5. From his position standing at the end of the Cabisca driveway, Dayrl Hogg stated that " Inv. Wengert yelled "hello" as the side door opened. Two large breed dogs began to bark and ran out of the door and then down the driveway. As the dogs were coming out of the house (A1) Cabisca followed behind them. RO's began to yell to (A1) to put the dogs away but (A1) did not. As the dogs passed the stairs of the porch where Inv. Wengert was standing, one dog stopped, turned and ran up the steps charging at Inv. Wengert, still barking loudly. As the aggressive dog charged Inv. Wengert, he shot 2 rounds into the dog from his duty weapon."

6. Nolan Wengert states, " the dog is charging right at me , growling and barking, it got to within four feet of me, and I fired on it."

7. Adam Pierce and Rachel Wickman state, " Bailey, their Boxer not once did she growl or show signs of aggression towards us."

8. Jared and Jamie Hillegeer state, " we have never had an issue approaching the house nor leaving our baby to play on the floor with all three dogs present."

9. Dr. Thomas P. Mullaney, DVM, states, " under the normal duress of the veterinary visit and the blood draw she was not aggressive at anytime. I have no reason to believe Bailey is aggressive or vicious."

**Opinion 1:**

In my opinion, Investigator Wengert was procedurally in error when he approached the residence, in plain clothes, after receiving knowledge that the occupant kept a number of dogs inside the home. Police Officers are trained to assure that persons approached have full

knowledge that they are law enforcement officials. The service uniform provides official identification and prevents persons from mistaking a plain clothed officer from a person intent on causing harm to the home owner. The fact that the officers were forewarned of "the lady who lives there has dogs," would have cautioned a prudent thinking, well trained police officer, to use trained procedures to assure the home occupant knew that the persons approaching the home were police officers and to restrain any activity by dogs in the house or on the property.

( Source ). 1. New Jersey Attorney General's Office Division of Criminal Justice Police Training
Commission Basic Course for Police officers, chapter 6, Unit Title: Verarbal and Non
Verbal Communications, paragraph 6.4.1 .

2. Empirical Expertise as Deputy Director and Chief Police Instructor, Burlington
County Regional Police Academy, Drug Enforcement Administration Regional State
and Local Training Supervisor, United States DEA Chief of International Mobil
Police Training Units.

Opinion 2:

In my opinion, Investigator Noland Wengert, Officer Daryl Hogg and Officer Jason Prince conducted actions that were grossly inappropriate and disregarded the application of trained techniques for effectively controlling a person who is Hostile, or Angry, or Hysterical / Scared, or Intoxicated, Deranged, Very Young, Very Old, Racist, Knows Little or No English, or is Speech and Hearing Impaired. By not initiating the trained techniques to calm and control the hysterical Ms. Cabisca, due to the shooting of her pet dog, the named officers chose to handcuff her, carry her to the patrol car, and without exercising ministerial {duty of care}, temporarily depriving her of her inhaler she normally used to control an expressed medical problem of breathing.

( Source ). New Jersey Attorney General's Office Division of Criminal Justice Police Training

WILLIAMS ASSOCIATES, LLC

Commission, Training Manual Chapter 6, Unit Title: Verbal and Non Verbal

Communications, Paragraph 6.4.6.

Empirical Experiences as a Patrolman and Police Sergeant at the Burlington

Township (NJ) Police Department.  Deputy Academy Director and Chief Police

Training Instructor.

Opinion 3:

In my opinion, opinion, Investigator Nolan Wengert, and Officers Daryl Hogg and

Jason Prince blatantly and without the due process of reasonableness, inappropriately chose

to arrest Ms. Tina Cabisca when she exhibited verbal anger and hysteria over the shooting of

her pet dog  by a police officer.  Despite the on scene presence of three (3) trained and

experienced police officers, Ms. Cabisca was  handcuffed, placed on the ground, picked up and

locked in the rear seat of the police car.

Concluding Opinion :

Referencing all of the above, in my opinion, based upon a reasonable degree of

professional certainty, Rochester New York Police Department Investigator Nolan Wengert,

Officer Daryl Hogg, and Officer Jason Prinzi, grossly, and without provocation, at some point

threw Ms. Tina Cabisca to the ground.   After a subsequent argument, rather than exercising

the aforementioned trained police methods of deescalating  a non physical police and civilian

confrontation, the named police officers immediately placed Ms. Cabisco under arrest.

These actions, in my opinion, were without reasonable probable cause to do so in light

of there were no physical abuse actions directed at the officer (s), no actions by Ms. Cabisca

that would place the officer (s) in fear of bodily injury, there were no actions by Ms. Cabisca

that would place others in fear of bodily injury, and there were no actions by Ms. Cabisca that

would place her in danger to herself.  As outlined above, the standard and accepted police