UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

TINA CABISCA,

              Plaintiff,

     v.

CITY OF ROCHESTER et al.,
              Defendants.

_____

**DECISION & ORDER**
14-CV-6485

## Factual Summary

At approximately 9:50 p.m. on the evening of September 7, 2013, Investigator Nolan Wengert with the Rochester Police Department saw an individual later identified as Tyrone Flowers pushing two bicycles down the sidewalk in the area of Kingsboro Road. See Def.'s Mot. for Summ. J. (Docket # 18-1) at 9. Investigator Wengert was not in uniform, but was in plainclothes. Id. Suspecting that the bicycles may have been stolen, Wengert questioned Flowers, who said that he had found the bikes on the front lawn of 207 Kingsboro Road. Id. Investigator Wengert called for back-up, and Officers Hogg and Prinzi responded to assist in uniform. The officers detained Flowers in a police vehicle.

Investigator Wengert decided to investigate further by asking the homeowner of 207 Kingsboro, plaintiff Tina Cabisca (hereinafter "plaintiff" or "Cabisca"), about the bikes. Wengert walked up plaintiff's driveway and up the steps leading to the open front porch. Id. Officers Hogg and Prinzi stood at the end

of the driveway near the sidewalk, observing Wengert. Id. According to Wengert and Hogg, Wengert rang the doorbell and knocked on the front door. Id. at 9, 16. Plaintiff claims that she did not hear a doorbell ring or any knocks on the door, and that she would have, because with three dogs in the house, "if somebody knocks on the door, it's just a bark fest." Id. at 31.

According to the officers, Wengert heard a door open on the side of the house. Id. at 23. He went down the steps and around the side of the house saying "hello," at which time two "large breed" dogs began to bark and run aggressively down the driveway. Id. at 16, 23. One dog continued running to the end of the driveway while the other, Bailey, turned and "charged" at Wengert. Id. at 9, 16. Wengert backed up onto the front porch, and then, as the dog continued to approach, shot the dog twice. Id. at 9, 16, 23-24.

According to Cabisca, she opened her side door because she saw flashlights on her garage. Her dogs stepped out with her, and a man shot Bailey. Id. at 31. Plaintiff denies that the dogs were aggressive, barking, or charging. She claims that Investigator Wengert had the gun pointed right at her, and she did not know that he was an officer because he was not in a uniform. Id. at 31-32.

2

The parties agree that Cabisca, after witnessing her dog shot by the police, became angry and visibly upset, cursed at the officers and refused to follow their instructions to step away from the dying dog. Id. at 16, 25-26, 32-34. Plaintiff had two small children unattended to inside the house. Id. at 12, 16, 35, 43. According to the officers, plaintiff confronted Officer Hogg and pushed him backwards using both of her hands, causing him to step back. Id. at 11, 16, 26, 47. Plaintiff states that she had her hands out in front of her and Hogg took her arm and put his left chest in her left hand and said "you touched me. That's illegal." Id. at 34.

Officer Hogg then forced Cabisca to the ground. Id. at 47. Hogg employed two different "defensive techniques" on plaintiff, including a straight arm bar and a two-point landing, causing her to fall to the ground. Id. at 11. Plaintiff then had her hands cuffed behind her back. Id. at 34-35, 47. Plaintiff claims that she told Officer Hogg that she could not breathe, and that Hogg said "those kids are going to CPS and you're going to jail." Id. at 35.

Plaintiff was placed in the back seat of a police car. Id. at 12. After being served with appearance tickets charging her with harassment in the second degree in violation of New York Penal Law § 240.26(1), and resisting arrest in violation of New York

3

Penal Law § 205.30, she was released by the police.[1] Id.; see
Attorney Aff. (Docket # 36-1). Plaintiff refused medical help,
choosing instead to go to the hospital herself. Id. at 10, 16,
36-37. Cabisca appeared as directed in Rochester City Court on
September 18, 2013. All charges were dismissed on October 22,
2013 by Rochester City Court Judge Ellen M. Yacknin. See Attorney
Aff. (Docket # 36-1).

Based on this incident, Cabisca filed this federal action on
August 22, 2014, alleging eight causes of action against the
defendants for (1) trespass; (2) battery; (3) false arrest; (4)
malicious prosecution; (5) abuse of legal process; (6) injury to
property; (7) § 1983 violation of plaintiff's 4th, 5th, and 14th
amendments; and (8) a Monell claim against the City of Rochester.
See Complaint (Docket # 1).

## Motions Before the Court

On January 29, 2017, one day before the deadline to file
dispositive motions, plaintiff filed a motion to compel discovery
(Docket # 15). See Amended Scheduling Order (Docket # 14) ("All
motions to Compel Discovery to be filed on or before 7-30-16.").

---

[1] Plaintiff was also served with six citations asserting Animal
Control violations.

4

Defendants opposed that motion as untimely (Docket # 19), and filed for summary judgment the following day, January 30, 2017. Docket # 18. Plaintiff filed a reply to the motion to compel on February 18, 2017. Docket # 21.

The Court set a briefing deadline for defendants' summary judgment motion, giving plaintiff until February 27, 2017 to respond. Docket # 20. On February 27, 2017, Plaintiff filed a cross-motion for summary judgment. Docket ## 22-24. Defendants responded in opposition on March 10, 2017, noting that plaintiff's summary judgment motion was filed after the Court's dispositive motion deadline. Docket # 27. Plaintiff filed a reply on March 6, 2017. Docket # 31.

The Court heard argument on the motion to compel and the two summary judgment motions on June 1, 2017. Docket # 32. During the hearing, the Court denied plaintiff's motion to compel (Docket # 15) and plaintiff's motion for summary judgment (Docket # 22). As to defendants' motion for summary judgment, the Court requested further briefing from both parties on a number of issues, and reserved decision. See Docket # 32. Thereafter, counsel for the defense submitted additional briefing on June 2 and 15, 2017. Docket ## 33-34. Plaintiff responded on June 18, 2017. Docket # 36. On that same date, plaintiff filed a motion for the Court to reconsider its decision on her motion to compel. Docket # 35.

5

The defendants responded to this new motion on June 20, 2017. Docket # 38. Plaintiff filed an additional affirmation on July 1, and an additional motion for discovery on July 31, 2017. Docket ## 39, 40. This Decision and Order is intended to resolve all pending motions before the Court.

## Discussion

A. Defendants' Motion for Summary Judgment (Docket # 18): The defendants have moved for summary judgment on many of the state and federal claims alleged in the complaint. The Court notes at the outset that there are a number of factual disputes in this case, suggesting the difficulty of resolving plaintiff's claims at the summary judgment stage. Because the elements and facts pertaining to each claim are, for the most past, unique, the Court will address each cause of action separately.

However, before turning to the merits of the defendants' motion, it is important to recognize the role of the Court in resolving a dispositive motion. The general principles used to evaluate the merits of summary judgment motions are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is warranted where "there is no genuine issue as to any material fact and [] the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists "if the

6

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). While the burden of showing that no genuine factual dispute exists is on the defendants, when faced with a properly supported summary judgment motion, plaintiff "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). "Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants." United States v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir. 1982)(internal citations omitted). With this standard established, the Court will now turn to the merits of the motion.

False Arrest: Federal claims of false arrest implicate the Fourth Amendment right to be free from unreasonable seizures. See Posr v. Doherty, 944 F.2d 91, 97 (2d Cir. 1991). A § 1983 claim alleging false arrest is "substantially the same" as the tort under New York state law, and thus the Court analyzes both state and federal claims together. Id. at 96. "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the

7

defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (citing Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) (quoting Broughton v. State, 37 N.Y.2d 451, 456-57, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975) (additional internal quotation omitted)).

Defendants contend that there was probable cause to arrest plaintiff for harassment and resisting arrest. "Probable cause exists when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" Curley v. Village of Suffern, 268 F.3d 65, 69-70 (2d Cir. 2001) (quoting Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (additional internal quotation omitted)). Harassment in the second degree occurs when, "with intent to harass, annoy or alarm another person," someone "strikes, shoves, kicks or otherwise subjects such other person to physical contact,

8

or attempts or threatens to do the same." N.Y. Penal Law § 240.26 (McKinney). Resisting arrest requires "intentionally prevent[ing] or attempt[ing] to prevent a police officer or peace officer from effecting an authorized arrest." N.Y. Penal Law § 205.30 (McKinney).

In seeking summary judgment, defendants rely on the deposition testimony of Officers Wengert, Hogg and Prinzi. Wengert described plaintiff as being "completely uncooperative, yelling, screaming, flailing her arms around and just yelling a variety of insults towards the officers." Wengert Dep., Ex. "B" attached to Def.'s Mot. for Summ. J. (Docket # 18-1) at 25. According to Wengert, plaintiff was irate and yelling, and "physically shoved Officer Hogg in the chest causing him annoyance and alarm." Id. at 26-27. After Officer Hogg "escorted her to the ground," plaintiff was "struggling, yelling and screaming and swearing, and essentially trying to push herself up and not cooperating with being handcuffed." Id. at 27. Officer Hogg testified that plaintiff "charged towards me" and then "pushed me in my chest area" whereupon he "escorted her to the ground." Hogg Dep., Ex. "E" attached to Def.'s Mot. for Summ. J. (Docket # 18-1) at 47. Officer Prinzi testified that plaintiff "approached Officer Hogg and with both hands pushed his chest." Prinzi Dep., Ex. "D" attached to Def.'s Mot. for Summ. J. (Docket # 18-1) at 43.

9

Plaintiff's recollection of the physical contact between her and Officer Hogg was different. According to plaintiff, she had come out of her house and witnessed her dog shot by a man who was not dressed like a police officer. Her pet was still alive and bleeding on her driveway, while the man who shot her dog continued to point his weapon at her.

> I think at that point I was just terrified to see that I had somebody on my porch pointing a gun at me. And I don't know who he is. And he doesn't have a uniform on. He doesn't look like a cop. And he just shot my dog and now he has a gun on me.

Cabisca Dep., Ex. "C" attached to Def.'s Mot. for Summ. J. (Docket # 18-1) at 32. Plaintiff testified that she also observed two uniformed police officers with weapons also pointed at her, and she repeatedly asked them to "help me with my dog." Id. The officers then directed her to "come here" and she responded: "I'm not going to step off my property with you. You came to my house and did this. You need to tell me what you're here for." Id. at 33. According to plaintiff, the officers refused to explain to her why they were on her property and why they had shot her dog.

Plaintiff acknowledged that she became "heavily irritated." "I didn't come out there, you know, looking for bear. I came into a situation that was created at my home not by me. I feel that minimally I should have been given basic information. And when they don't do that, my tone became extremely different." Id. at

10

33. At this point one of the uniformed officers told plaintiff that if she "didn't cooperate with him, that I would be arrested." Id. at 34. Plaintiff told the officers that she was not leaving her property: "You came to my house and did this. You need to tell me what you're doing here and you need to tell me who you are." Id. After receiving no response, plaintiff put her hands straight out and said to the officers, "[y]ou need to step back and get away from me." According to plaintiff, one of the uniformed officers then said "that's it," and came towards her. Id. The approaching officer "put his left chest in my left hand and said, 'You touched me. That's illegal. You're going to jail.'" Id. Plaintiff testified that when she tried to get away from the officer, he "grabbed me, threw me around, and threw me to the ground. Two officers on top of me. Two. Two adult men on top of me. One with his elbow in my ribcage and the other one on the other half of me." Id. Plaintiff testified that the "man who shot the dog" then "told them to get off of me" and they did. Id. at 35. At that point, plaintiff went into her house to check on her children and call her family. Id.

"The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). Clearly, this is not one

11

of those situations. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). Viewing the record in a light most favorable to plaintiff, as I must, I find that there are issues of fact as to whether the defendants had probable cause to arrest plaintiff for harassment and resisting arrest. For this reason, defendants' motion for summary judgment as to plaintiff's claim of false arrest is **denied.**

Malicious Prosecution: In order to prevail on a claim of malicious prosecution under § 1983, plaintiff must establish the elements of malicious prosecution under state law. Thus, in New York, "a plaintiff is required to demonstrate: (i) the commencement or continuation of a criminal proceeding against her; (ii) the termination of the proceeding in her favor; (iii) that there was no probable cause for the proceeding; and (iv) that the proceeding was instituted with malice." Mitchell v. City of New York, 841 F.3d 72, 79 (2d Cir. 2016) (internal quotations omitted).

Plaintiff has satisfied the first two elements by providing proof of the dismissal of both charges against her. See Docket # 36-1; Mitchell v. New York, 841 F.3d at 79 (proceeding terminated in plaintiff's favor where District Attorney declined to prosecute her). As discussed above, there are issues of fact as to the

12

existence of probable cause for plaintiff's arrest. Thus, the defendants' motion for summary judgment necessarily hinges on whether plaintiff can show that the defendants acted with malice.

To demonstrate malice, "a plaintiff must show that the defendant acted in bad faith, i.e., on the basis of 'a wrong or improper motive, something other than a desire to see the ends of justice served.'" Watson v. United States, 865 F.3d 123, 134 (2d Cir. 2017) (quoting Torres v. Jones, 26 N.Y.3d 742, 761, 47 N.E. 3d 747 (2016) (additional citations omitted)). "In most cases, the lack of probable cause — while not dispositive — 'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (citation omitted); see also Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003)("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well. A lack of probable cause generally creates an inference of malice.").

Having found an issue of fact as to probable cause, I find that the existence of malice is also an issue of material fact. Plaintiff has testified that she did not resist arrest, but that Officer Hogg purposely caused her hand to touch his chest. Once that contact took place, plaintiff claims that Hogg threatened

13

that her "kids are going to CPS and you're going to jail," and then tackled her to the ground. Construing all inferences in a light most favorable to plaintiff, a jury could reasonably find that the defendants were annoyed or angry with her attitude and objections to their conduct, and that there was a malicious prosecution of plaintiff. See Lowth v. Cheektowaga, 82 F.3d at 573 (plaintiff had suggested malice on the part of the police officer who may have been angry for what plaintiff "had put him through"). For this reason, defendants' motion for summary judgment as to plaintiff's claim of malicious prosecution is **denied.**

Abuse of Legal Process: Under New York law, "'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" Savino v. City of New York, 331 F.3d 63, 76-77 (2d Cir. 2003) (quoting Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994)). Abuse of process by state actors is also a violation of the procedural due process rights guaranteed by the Fourteenth Amendment, and the same factors are used to evaluate the merits of a federal civil rights claim.

14

See Hoyos v. City of New York, 999 F. Supp. 2d 375, 391 (E.D.N.Y. 2013).

As with claims of malicious prosecution, "[w]hile there is no showing of actual malice, malice may be inferred from the lack of probable cause." Berman v. Silver, Forrester & Schisano, 156 A.D.2d 624, 625 (2d Dept. 1989); see also Sforza v. City of New York, No. 07CIV6122DLC, 2009 WL 857496, at *17 (S.D.N.Y. Mar. 31, 2009) ("lack of probable cause gives rise to an inference of malice" in abuse of process claim). However, more than simply a malicious motive is needed to prove abuse of legal process. "In order to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper *purpose* in instigating the action." Savino, 331 F.3d at 77 (emphasis in original). Here, plaintiff alleges that defendants filed charges against her

> to provide some lame excuse for committing their outrageous actions – coming onto her property at night, needlessly shooting her dog, refusing to cooperate with their improper orders, and refusing to respond to her questions as to why they had entered her property, needlessly throwing her to the ground – actions the defendant police knew they could not defend in any manner without concocting an offense and crime with which to charge the plaintiff.

Pl.'s Br. (Docket # 23-1) at 17. While this may constitute an improper motive for the officers' actions – creating a "lame excuse" for their abuse of authority in entering plaintiff's

15

property and charging her with "concocted" criminal offenses –
plaintiff has failed to offer proof that defendants "had a
collateral purpose beyond pursuing, and prevailing in, plaintiffs'
criminal prosecution." Hoffman v. Town of Southampton, 893 F.
Supp. 2d 438, 448 (E.D.N.Y. 2012), aff'd sub nom Peter L. Hoffman,
Lotte, LLC v. Town of Southampton, 523 F. App'x 770 (2d Cir. Apr.
29, 2013); see also McKnight v. Vasile, 11-CV-6328P, 2017 WL
1176051, at *30 (W.D.N.Y. Mar. 30, 2017) (Payson, M.J.) (argument
that officer commenced criminal prosecution to justify use of force
against plaintiff is "insufficient to suggest a collateral
objective, as opposed to an improper motive"); Gilliard v. City
of New York, No. 10-CV-5187, 2013 WL 521529, *14 (E.D.N.Y. 2013)
("[a]t most, [d]efendants issued the summons with the improper
motive of covering up their abuse of authority in arresting
plaintiff ...[,][b]ut an improper motive does not equate to an
improper purpose; the [d]efendants used the process of the court
for the purposes for which the law created") (internal quotations
and brackets omitted); Dotson v. Farrugia, No. 11 Civ. 1126, 2012
WL 996997, *8 (S.D.N.Y. 2012) (plaintiff's contention that the
summons was issued to him in retaliation "for his perceived
affront, and to attempt to cover up the wrongdoing of the Court
Officers in having arrested plaintiff" was insufficient to state
a claim for abuse of process; "[t]hese allegations, however, even

16

if taken as true, do not support a claim for abuse of process, because they allege only an improper motive, which is not actionable, rather than an ulterior collateral purpose or objective, which may be.") (internal quotations omitted); Crews v. County of Nassau, No. 06-CV-2610, 2007 WL 4591325, *12 (E.D.N.Y. 2007) ("Because plaintiffs have merely alleged that defendants were motivated by their desire to cover up their misdeeds, but not that defendants had a purpose other than to prosecute [plaintiff], the abuse of process claim fails."). For this reason, defendants are entitled to summary judgment on plaintiff's malicious abuse of process claims, and this motion is **granted**.

Municipal Liability: Plaintiff's eighth cause of action sets forth a claim against defendant City of Rochester for negligently failing "to properly investigate the defendant officers involved in the mistreatment of the plaintiff," and for negligently instructing, training and supervising the officers. Complaint (Docket # 1) at 8. This is the only cause of action alleged against the City of Rochester. The City moves for summary judgment, arguing that plaintiff has asserted no facts to support a Monell claim in this matter. See Def.'s Mot (Docket # 18-2) at 4-5. I agree.

To plead a § 1983 claim against a municipality, a plaintiff is required to assert a violation of a federally protected right

17

that was caused by the municipality's official policy or custom, or by a decision of a policymaker with final policymaking authority. Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 694 (1978). "The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact.'" Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). A claim against a municipality is "at its most tenuous where a claim turns on failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011) (citation omitted).

Here, plaintiff has provided nothing by way of facts, policies, or other admissible evidence that raises a plausible assertion of a policy or custom that could be the basis of municipal liability. "[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." Jones v. Town of East Haven, 691 F.3d 72, 81 (2d Cir. 2012) (citations omitted). Further, even if plaintiff could link some type of decision-making to the municipality, the Supreme Court has stated that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through

18

its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Board of County Com'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original). Plaintiff has not even provided any municipal policies, not to mention any evidence that hints at municipal liability. I therefore **grant** the City of Rochester's motion for summary judgment and direct the Clerk of Court to terminate the City as a defendant in this lawsuit.

Trespass: Plaintiff's first cause of action asserts a state law claim for trespass against the individual defendants. See Complaint (Docket # 1) at 3. Plaintiff also pleads Fourth Amendment violations in her seventh cause of action. Id. at 8. Defendants move for summary judgment against both plaintiff's federal and state law claims. See Def.'s Mem. of Law (Docket # 18-2) at 5-8; Def.'s Supp. Mem. of Law (Docket # 33) at 1-2. For the reasons stated below, the Court concurs with defendants that plaintiff has not established facts that could lead a reasonable factfinder to find liability for trespass, and **grants** defendants' motion for summary judgment for both of plaintiff's trespass claims.

The facts as related to the alleged trespass are not really in dispute. Both parties agree that on the evening of September 7, 2013, between 9:30 and 10:00 p.m., defendants Wengert, Prinzi

and Hogg entered plaintiff's property including her driveway. Investigator Wengert, dressed in plain clothes went onto plaintiff's porch. None of the officers had plaintiff's permission to enter her property. As Investigator Wengert testified, the purpose of the nonconsensual entry was to investigate a potential burglary of two bicycles from plaintiff's home. See Wengert Dep., Ex. "B" attached to Def.'s Mot. for Summ. J. (Docket # 18-1) at 18-24.

The Second Circuit has held that there is "no Fourth Amendment violation based on a law enforcement officer's presence on an individual's driveway when that officer was in pursuit of legitimate law enforcement business." United States v. Reyes, 283 F.3d 446, 465 (2d Cir. 2002) (finding that several other circuits have reached similar conclusions regarding the accessible, semi-private nature of driveways). Further, a "police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Florida v. Jardines, 569 U.S. 1, 8 (2013) (quoting Kentucky v. King, 563 U.S. 452, 470 (2011)). Similarly, under New York state law, "law-enforcement officials have a privilege to enter private property to perform their legal duties." Reynolds v. United States, 927 F. Supp. 91, 96 (W.D.N.Y. 1996) (dismissing a claim of trespass

20

because the agent "was on the property precisely because he was a police officer acting within the scope of his employment").

The law protecting police officers from claims of trespass when investigating possible criminal conduct is clear, and there is no dispute in this case that defendants entered plaintiff's property in order to ring her doorbell for the purpose of inquiring about the bikes. Their initial foray onto plaintiff's property was indisputably in furtherance of a legitimate law enforcement duty. Although plaintiff disagrees with the way in which the officers conducted their investigation, that alone does not convert their presence on her property into a trespass. Accordingly, defendants' motion for summary judgment on plaintiff's trespass claims are **granted**.[2]

---

[2] Plaintiff also alleges trespass in that after the dog was shot, a police officer insisted on accompanying Lee Windsor, plaintiff's partner, when he entered the home to retrieve plaintiff's inhaler. See Pl.'s Atty Aff. (Docket # 36) at ¶ 4. This "trespass" is not alleged in the complaint and is made only in an attorney affidavit. Absent any facts from someone with first-hand knowledge suggesting that Windsor objected to being accompanied into the home, this claim fails. See Matthews v. Malkus, 377 F. Supp. 2d 350, 359 (S.D.N.Y. 2005) (trespass is "the intentional entry of defendants on to plaintiff's land and the wrongful use without justification or consent"); cf. Green v. City of Mount Vernon, 96 F. Supp. 3d 263, 293 (S.D.N.Y. 2015) (plaintiff adequately pleaded a claim of trespass by asserting that defendant police officers knew they were in the wrong location but did not leave).

21

The Shooting of Plaintiff's Dog: Plaintiff's complaint alleges two separate causes of action arising from the shooting of her dog by the police. First, plaintiff alleges that the killing of her pet dog violated the Fourth Amendment. The Second Circuit, along with "a number of our sister circuits," has concluded that "the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." Carroll v. County of Monroe, 712 F.3d 649, 651 (2d Cir. 2013) (citations omitted). As the court stated in Carroll,

> To determine whether a seizure is unreasonable, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion" and determine whether "the totality of the circumstances justified [the] particular sort of . . . seizure." Tennessee v. Garner, 471 U.S. 1, 8-9 (1985) (internal quotation marks omitted). We have long held that the plaintiff has the burden to prove that a seizure was unreasonable. See Ruggiero v. Krzeminski, 928 F.2d 558, 562-63 (2d Cir. 1991).

Id. In Carroll, the court found that shooting a family dog is "a severe intrusion given the emotional attachment between a dog and an owner." Id. However, the court also noted that "in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." Id. (citing Altman v. City of High Point, N.C., 330 F.3d 194, 205-06 (4th Cir. 2003); Brown v. Muhlenberg Tp., 269 F.3d 205, 210-11 (3d Cir. 2001)). Ultimately the court in Carroll

22

did not disrupt the jury's verdict that the defendant-officer was reasonable in shooting the plaintiff's dog while executing a search warrant.

Because there are critical facts in dispute here, it is for the jury and not this Court to decide whether Investigator Wengert's conduct in shooting the dog was reasonable. For example, the parties' accounts differ substantially over the point at which plaintiff's dogs came outside. Wengert testified that as he was waiting on the front porch after ringing the doorbell and knocking, he heard a door open on the side of the house. He walked off the porch to come around the corner, and "was shocked to see multiple dogs, no people, and then the dogs charging up the driveway." Wengert Dep., Ex. "B" attached to Def.'s Mot for Summ. J. (Docket # 18-1) at 23. Plaintiff's recollection is considerably different. She testified that she observed police lights outside of her house and then she saw a flashlight in the back of her house. She opened the side door to see if anybody was outside, and Bailey, the dog, "stepped out" "a couple feet ahead of" her. Cabisca Dep, Ex. "C" attached to Def.'s Mot for Summ. J. (Docket # 18-1) at 31. The parties' accounts also diverge on the circumstances leading up to the shooting of the dog. Investigator Wengert described that two large dogs were running aggressively at him, "charging up." One of the dogs continued towards Wengert, he took steps backwards,

23

backed into something, and fired his handgun at the dog twice. Wengert Dep. at 24. Plaintiff disagrees that the animal posed any danger to Wengert, stating that the dog was just a few feet ahead of her when Wengert shot it. Cabisca Dep. at 31.

Specific facts matter in determining reasonableness under the Fourth Amendment. In Brown v. Muhlenberg Township, the court held that police may not be justified in "destroy[ing] a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody." 269 F.3d at 211. In Altman v. City of High Point, the court concluded "that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance." 330 F.3d at 206. A jury could reasonably determine that plaintiff's pet dog presented no immediate danger to the officers and that the animal was not uncontrolled and unsupervised when it was shot by Wengert. Viewing the facts in the light most favorable to plaintiff, I find the current record creates an issue of fact on whether "the totality of the circumstances" justified the Fourth Amendment seizure of Bailey the dog. Because of these disputed facts surrounding the shooting, summary judgment is **denied** on this Fourth Amendment claim.

New York General Construction Law § 25-b: Plaintiff's complaint also includes a state law claim under New York General Construction Law § 25-b for "injury to property" totaling $800. See Complaint (Docket # 1). Section 25-b provides that "'injury to property' is an actionable act, whereby the estate of another is lessened, other than a personal injury, or the breach of a contract." N.Y. General Construction Law § 25-b (McKinney's). Plaintiff's complaint alleges that her pet had a property value of $800 and "the defendant Wengert willfully and maliciously destroyed the dog by shooting it and whereupon Wengert, Hogg, and Prinzi allowed it to bleed to death." Complaint (Docket # 1) at 7. Defendants move for summary judgment on this claim, arguing generally that Investigator Wengert perceived an "imminent threat from Plaintiff's unleashed and approaching dog," and was therefore justified in shooting. See Def.'s Mot. for Summ. J. (Docket # 18-2) at 6. Defendants urge that "[t]he Court may not substitute its judgment for the judgment of Officers surprised by a large dog approaching them in the dark of night." Def.'s Supp. Mem. of Law (Docket # 33) at 4.

At first blush, it would appear that this claim, like plaintiff's Fourth Amendment claim, presents questions of fact that can only be resolved by a jury. However, neither plaintiff's nor defendants' moving papers set forth the required elements of

25

a claim under § 25-b or provide any supporting case law for their positions. Disturbed by this lack of law and analysis, the Court, during the motion hearing, directed both counsel to further brief the viability of a § 25-b claim under the facts and circumstances presented here. Both counsel filed post-hearing briefs (Docket ## 33, 36) and both are remarkable in their failure to mention — let alone address — the Court's concern and directions. Indeed, neither counsel mention the General Construction Law statute, the elements of a § 25-b cause of action or its availability for the loss of a pet, or any case law supporting or contesting such a position.

"[T]here is a limit to how much a court may be called upon to divine in assessing the sufficiency of the complaint before it, particularly when the plaintiff is represented by counsel." Heart Disease Research Found. v. Gen. Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972); see also Duncan v. AT & T Commc'ns, Inc., 668 F. Supp. 232, 234 (S.D.N.Y. 1987) ("the court's responsibilities do not include cryptography, especially when the plaintiff is represented by counsel"); Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988) (the "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory"). While both sides' briefings are equally non-responsive to the Court's

26

concerns, the defendants have moved for summary judgment on this cause of action and it is plaintiff's responsibility to demonstrate the existence of a valid cause of action *and* issues of fact so as to preclude summary judgment. Plaintiff simply has not done so. Counsel's briefing is not only bereft of any citation to relevant legal authority but also fails to even address the concerns expressed by the Court. It is not the job of this Court to construct a reasonable analysis of how § 25-b of New York's Construction Law applies to the police shooting of a pet dog. Plaintiff now unfortunately faces the consequences of ignoring the Court's direction to provide legal support for her § 25-b cause of action. Accordingly, summary judgment is **granted** to defendants on this cause of action.

Excessive Force: Plaintiff's seventh causes of action alleges that defendants used excessive force in violation of the Fourth Amendment while executing their arrest.[3] See Complaint (Docket # 1). The elements of such a claim are well established:

The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest. Because the Fourth Amendment test of reasonableness is one of objective reasonableness, the inquiry is necessarily case and fact

---

[3] Plaintiff's fourth cause of action includes a battery action against the officers, but defendants do not move for summary judgment on that cause of action and thus the Court will not analyze the merits of it here.

27

> specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. In conducting that balancing, we are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (internal quotations and citations omitted).

Defendants move for summary judgment on the excessive force claim, stating that "Plaintiff was taken to the ground with minimal force after she admitted ignoring lawful orders, and 'trying to get away' after she was told she was under arrest." Def.'s Supp. Mem. of Law (Docket # 33) at 5; see also Def.'s Rep. (Docket # 27) at ¶ 23. Defendants also argue that the officers have qualified immunity as a matter of law against plaintiff's excessive force claim. See Def.'s Mot for Summ. J. (Docket # 18-2) at 7-8.

Like plaintiff's other claims, the evidence at this summary judgment stage of litigation must be viewed in the light most favorable to plaintiff. According to plaintiff, after her dog was shot, the officers told her to come towards them and to step away from the dead dog. See Cabisca Dep., Ex. "C" attached to Def.'s Mot. for Summ. J. (Docket # 18-1) at 33-34. Plaintiff claims she asked the officers what they were doing and what was going on.

28

The officers then told plaintiff that if she did not comply with them, she would be arrested. Id. Plaintiff had her two small grandchildren asleep inside, and did not want to leave them alone. The officers again told plaintiff that she needed to step away from the dog and come with them, and she told them to "step back and get away from" her, putting her hands straight out in front of her. Id. at 34. According to plaintiff, one of the uniformed officers said "that's it," and came up to plaintiff and "put his left chest in [her] left hand and said 'you touched me. That's illegal.'" Id. Plaintiff says the officer then "grabbed" her, "threw" her "around like a rag doll," and the two ended up in her lawn. Plaintiff testified that she "tried to get away from him," and he "grabbed" her, "threw" her around, and "threw" her to the ground. She stated that then there were two officers on top of her, "one with his elbow in [her] ribcage and the other on the other half" of her. Id. Plaintiff said that she told the officers that she was asthmatic and could not breathe. In response, the officers told to her to stop moving, which she did, and then they got off of her. Id. at 35.

The fact that the defendants recall the encounter differently than plaintiff only pays tribute to why issues of fact often permeate excessive force claims. See, e.g., Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999) ("The issue of excessive force

29

also was for the jury, whose unique task it was to determine the amount of force used, the injuries suffered and the objective reasonableness of the officer's conduct."). For the same reason, summary judgment on the basis of qualified immunity is also inappropriate at this juncture of the dispute. "[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness" of a police officer's use of force under the Fourth Amendment. Kerman v. City of New York, 261 F.3d 229, 240 (2d Cir. 2001) (internal quotation and citation omitted). For these reasons, defendants' motion for summary judgment as to plaintiff's claim of excessive force is **denied.**

B. Plaintiff's Discovery Motions (Docket ## 15, 35, 40): On January 29, 2017, plaintiff filed a motion to compel certain discovery documents. See Docket # 15. Defendants objected to the filing of this motion, noting that the motion was made one day before the dispositive motion deadline, and that plaintiff's counsel had not discussed outstanding discovery prior to filing the motion to compel. See Docket # 17. At oral argument, the Court **denied** plaintiff's motion as untimely because the reigning Scheduling Order called for motions to compel to be filed on or before July 30, 2016. See Docket # 14. Plaintiff thereafter filed a motion to reconsider pursuant to Federal Rule of Civil Procedure

30

60(a), arguing that counsel's delay was due to a clerical error. See Docket # 35. Plaintiff's motion papers contain no law or legal arguments in support of the relief requested.

> In determining what constitutes a clerical error, our analysis is informed by the corrections permitted under Fed.R.Civ.P. 60(a), which provides "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders."

Rezzonico v. H & R Block, Inc., 182 F.3d 144, 150 (2d Cir. 1999). A motion under Rule 60(a) is available only to correct a judgment "for the purpose of reflecting accurately a decision that the court actually made." Truskoski v. ESPN, Inc., 60 F.3d 74, 77 (2d Cir. 1995). Such a motion may be made so long as the relief sought does not affect substantive rights but "merely correct[s] a judicial oversight." Dudley ex rel. Estate of Patton v. Penn-America Ins. Co., 313 F.3d 662, 665 (2d Cir. 2002); see, e.g., Robert Lewis Rosen Associates, Ltd v. Webb, 473 F.3d 498 (2d Cir. 2007) (finding the court properly corrected a clerical error related to arbitration); Hodge ex rel. Skiff v. Hodge, 269 F.3d 155, 158 (2d Cir. 2001) (finding a clerical mistake where the clerk of court used the parties' wrong name in the judgment); Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525 (1990) (district

31

court had power to amend judgment to clarify intended disposition of a case).

Here, plaintiff does not argue that the Court made a clerical error, but that counsel made an error by not reading the totality of the Court's January 15, 2016 Scheduling Order. The Court's Scheduling Order was a one-page letter facsimile which contained scheduling deadlines proposed by the parties and signed by both counsel, on which the Court stamped "So Ordered." See Docket # 14. The Court altered nothing on the document, and filed it "as is" on the ECF system. Plaintiff's counsel has no excuse for not abiding by those deadlines, which he himself proposed. The motion to compel was untimely, and was properly denied by the Court. Plaintiff's motion to reconsider (Docket # 35) is **denied**.

Plaintiff has also asked the Court for leave to depose a critical witness, Mr. Tyrone Flowers, even though the discovery deadline has passed. See Docket ## 40, 42. The defendants oppose a deposition of Flowers and ask the court to preclude his testimony at trial because plaintiff did not list Mr. Flowers as a witness in her Rule 26 disclosures. See Docket # 43.

Mr. Flowers appears to be a critical witness in this case. According to plaintiff, Flowers was an eyewitness to the events that occurred on the evening of September 7, 2013. Mr. Flowers was the individual who was walking two bikes down the street and

pointed to plaintiff's house as being the location where he obtained the bikes. According to Flowers, he was placed in the back of a police vehicle while the officers entered plaintiff's property to inquire about the bicycles, and Flowers alleges that he told the officers that plaintiff had dogs before they walked onto her property. See Pl.'s Reply (Docket # 30) at 9-11. Plaintiff submitted an affidavit from Mr. Flowers in support of her motion for summary judgment, a motion which the Court summarily denied as untimely. Irrespective of the fact that plaintiff did not disclose Flowers as a witness in initial disclosures, there is no question that defendants have been aware of Mr. Flowers' involvement in the events of September 7, 2013 since this lawsuit was commenced. Given these facts, there is no demonstrated prejudice to defendants in allowing both sides to question Mr. Flowers and preserve his testimony.

For the above reason, plaintiff's motion to permit the deposition of Mr. Flowers outside of the Scheduling Order (Docket # 40) is **granted.** See Outley v. City of New York, 837 F.2d 587, 591 (2d Cir. 1988) ("only extreme misconduct on the part of plaintiff or extreme prejudice suffered by the defendants would justify the extraordinary sanction of preclusion"). Unless extended by agreement of the parties, the Flowers deposition shall be conducted no later than **November 10, 2017.**

33

## Conclusion

For the reasons stated above, (1) the defendants' motion for summary judgment (Docket # 18) is **denied in part and granted in part**; (2) Plaintiff's motion for summary judgment (Docket # 22) is **denied** as untimely; (3) Plaintiff's motion to compel discovery (docket # 15) is **denied** as untimely; (4) Plaintiff's motion to reconsider (Docket # 35) is **denied**; and (5) plaintiff's motion for discovery (Docket # 40) is **granted**.

This case has been referred to mediation during the Court's concentrated Settlement Week between November 13 and 22, 2017, pursuant to Section 2.1(B) and 4.1(A)(5) of the Court's Alternative Dispute Resolution Plan. See Docket # 41. Should the parties not reach settlement during this period, they are directed to contact the Court in order to schedule a status conference.

**SO ORDERED.**

JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

Dated: September 20, 2017
       Rochester, New York

34