UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

TINA CABISCA

                           Plaintiff

                                                       PLAINTIFF'S
PROPOSED FINDINGS
OF FACT, WITH
ARGUMENTS,
AND CONCLUSIONS
OF LAW

                                                       14-CV-6485

                       V

CITY OF ROCHESTER, NEW YORK,

DARYL HOGG, JASON PRINZI, MARYROSE

AND EARL WENGERT COEXECUTORS OF

THE ESTATE OF NOLAN WENGERT,

CARRIE BERKSTRESSER and K TURNER

                         Defendants

1

# FINDINGS OF FACT

## INTRODUCTION

This Findings of Fact cites trial testimony with "tt" before  the page and line numbers of the trial testimony page cited. This document is also interspersed with comments and arguments relating to cited facts.

## CELL PHONE INVESTIGATION

1.      Defendant investigator Wengert knew Tyrone Flowers lived at 35 Kingsboro Road, see trial Exhibit 17 *Wengert's EBT page 6 line 9-25*, where Wengert explains he was on Kinsgboro Road when he first saw Tyrone Flowers because Wengert was then in the process of investigating the theft of a cell phone from a relative of a retired RPD officer and as part of that investigation, Wengert had already learned that  the suspect "S" of the commission of that theft was Tyrone Williams, and that Tyrone Flowers was a person with knowledge of that theft "PK", trial Exhibit 14 page 1. ( At Hogg's EBT, trial Exhibit 18, page 112, lines 4-8, Hogg provides the definition of "PK", as a person with knowledge of the crime, that is a "witness" to be questioned about the crime), not a "suspect" of

committing the crime, as was Tyrone Williams). It was mere coincidences that both Tyrones lived on Kingsboro Road, and both worked at the same banquet facility, and those facts were noted on the paper Wengert carried with him as he drove down Kingsboro Road on 9-7-13 as part of his investigation of the cell phone theft, before he came upon Tyrone Flowers. Wengert was on his way to interview Flowers about the cell phone theft, as he encountered Flowers pushing two bikes down the street, trial Exhibit 14 pg. 1.

2.      In fact Wengert first saw Flowers when Flowers was, "several houses away" from Flowers' home "pushing two bikes down the sidewalk," as Wengert was on his way to interview Flowers about the cell phone theft. Wengert, while conducting the cell phone theft investigation, had already determined that Tyrone Williams, who was 6' 4" and 220 pounds (about a foot taller than Flowers) had an extensive pawning history, and a history of burglary, and **that Tyrone Flowers had <u>no</u> such history**. Trial Exhibit 14 page 1, first paragraph. (If Flowers had committed any larcenies, Wengert would certainly have noted that fact in trial Exhibit 14, especially because he was investigating a "larceny", of a cell phone, the same kind of crime, "larceny", he claimed he "reasonably believed" Flowers had committed with two used kids bikes.

3

## FLOWERS' ARREST

3.      Despite Flower's denial of stealing the used kid's bikes, and that

Wengert's knowing that Flowers had no history of committing larcenies, Wengert

arrested Flowers for stealing the bikes anyway.  Flowers credibly told Wengert

he'd picked them up for his young children after they had been abandoned by the

curb up his street and that the next door neighbors had observed him doing so

and the neighbors had made no response or reaction to Flowers' doing so.

According to Flowers, Wengert threw Flowers to the ground and then

handcuffed Flowers (Flowers' trial testimony, tt page 357 line 22-25.) Wengert

admitted he handcuffed Flowers claiming he "reasonably believed" that Flowers

had committed the crime of either "burglary or larceny." (Trial Exhibit 17,

Wengert EBT testimony, pg.  9 lines 15-21.)

After handcuffing Flowers, Wengert called for backup on his radio. The two

who responded were not only Wengert's fellow officers, but Wengert's "precious

friends," defendant officers Daryl Hogg and Jason Prinzi, who arrived at Flowers'

home in separate cars, where they put Flowers in the back seat of Wengert's car,

and the bikes in one of the uniformed officer's car. (Wengert EBT, trial Exhibit 17,

4

page 48 lines 7-19, tt Flowers trial testimony page 360 line 9-13), Please note that both Wengert and Flowers claim Flowers was placed in **Wengert's** car, not in Prinzi's car, contradicting Hogg and Prinzi's testimonies at trial. We contend Hogg and Prinzi testified falsely on this matter, almost certainly to try to protect their fellow officer and precious friend, Wengert, from the responsibility imposed upon Wengert by his hearing the warnings and other statements Flowers claims he gave Wengert in the car going from Flowers' house to Plaintiff's house.

4.      On the way to the Cabisca house, in the back seat of Wengert's car, Flowers told Wengert that the lady who lives in that house had dogs, that after the dog was shot the officers ducked, "took shield" and that the next door neighbors, while sitting on their porch had observed Flowers take the bikes and did not object, or otherwise, react do his doing so, tt Flowers page 361 lines 3-17.

Wengert's purported (we contend false) justification for conducting the arrest of Tyrone Flowers was because (Wengert claimed) he "reasonably believed" Flowers had committed a larceny or felony burglary of the bikes, the latter, according to Wengert, would be a class C violent Felony, one Wengert claimed, "is about as serious as it gets" and could spiral out of control to "murder" as he stated on page 43 line 13 to page 45 line 14 of his EBT, trial Exhibit 17. We

5

contend that this conclusion was preposterous, as, of course, thousands of

innocent people frequently legally walk kids bikes down their own street, near

their own homes. This claim is made even more outrageous because, as noted in

trial in the first written paragraph of trial Exhibit 14, EBT Exhibit 4, Wengert had

just performed a background check on Flowers and found no evidence of his ever

committing larceny or burglary.

5.     Please note that while in trial Exhibit 14, Wengert's report of the cell

phone investigation, it claims Flowers had some marijuana and latex gloves when

Wengert first saw him, Wengert himself treated those findings as so insignificant,

that he turned the marijuana in for destruction, and accepted Flower's claim that

he used latex gloves in his catering business, trial Exhibit 14 page 1, second

paragraph. (In any event Flowers flatly denies having Marijuana and believes he

did not have latex gloves with him at that time. Flowers trial testimony, tt page

378 lines 11-19.)

This behavior on the part of Wengert was even more indicative of a

malfunctioning or defective mind (at about 9:30 pm on 9-7-13) because,

according to Flowers trial testimony, tt page 357 line 22-25, Wengert needlessly

6

threw Flowers to the ground, and handcuffed him. (Wengert admitted he

handcuffed Flowers. Exhibit 17 page 21 line 22 to page 22 line 3.)

As a police investigator Wengert must have known the law, and that his

primary duty was to serve and protect citizens (whose taxes paid his salary) not to

needlessly assault them. There was no reason for Wengert to either (a) push

Flowers to the ground, (b) handcuff him, or (c) place him in a police car and drive

him away from his home. (Criminal assaults, and kidnapping, we contend, under

the circumstances).

6.      As noted above Wengert admitted at his EBT, trial Exhibit 17,  on

page 9 lines 17-21, that he handcuffed Flowers because he "**reasonably believed**"

(not just "suspected" or "speculated") that Tyrone Flowers, "had just committed a

crime … of either burglary or larceny." He went on to say that a reason he

**"believed"** Flowers had committed a **"violent felony"**, (Trial Exhibit 17, Wengert

EBT page 22 lines 15-16 of his EBT) was because, **"Generally most people aren't**

**honest and truthful,"** page 24 lines 11-12. This statement is clearly indicative of a

paranoid, frightening, irrational nature, especially troubling, for a police officer.

It's also very likely that Wengert was committing the common psychological

practice of projecting his own character, (in this case his own lack of honesty and

7

truthfulness) upon members of the general public. Wengert could not, under all these circumstances have "**reasonably believed**" that Flowers had committed crimes with respect to the bikes, unless his mind was somehow warped, for a reason, or reasons, that remain a mystery. It's very significant too, that Wengert was 28 years old, page 29 trial Exhibit 17 lines 13-14, 6 feet 1 inch tall and weighing 185 pounds, trial Exhibit 17 page 39 lines 7-12, while Flowers testified he was only 5 foot 4" and weighed about 140 pounds, tt page 353 line 1-3**.**

7.      Wengert's needless call for back up also indicated a disturbed mind, as he was perfectly capable of handling tiny Mr. Flowers by himself, so there was no reason for Wengert to call, for one extra officer, let alone **two** large officers each 6' tall and weighing 195 and 200 pounds respectively, Hogg and Prinzi. (See Trial Exhibit 19, Prinzi EBT page 8 lines 4-7, and page 6 lines 12-13, which claims he graduated from High School in 1993, when he was presumably either 17 or 18 years old, meaning he was born in about 1974, which made him about 39 years old on 9-7-13.  Trial Exhibit 18, Hogg's EBT testimony page 6 line 7-9, shows Hogg was 41 years old on 9-7-13, and the second to the last page of trial Exhibit 10, EBT

8

Exhibit 3, at the top line, , shows Hogg to have been 6' tall and weighed 195 pounds on 9-7-13.

Those two officers, described as Wengert's "precious friends" in his obituary in the Utica New York Observer Dispatch, tt Prinzi page 469 line 7 to page 470 line 13, were needlessly taken away from their appointed police duties to serve and protect the public, to needlessly accompany Wengert take Tyrone Flowers from 35 Kingsboro Road, less than two blocks away, to Plaintiff's house at 207 Kingsbury Road. Using those two officers for this chore, constituted an unnecessary, overzealous waste of police services. (Surely Wengert could have easily taken Flowers and the bikes to Plaintiff' home without the assistance of either Hogg or Prinzi, especially because he had tiny, Flowers -who Wengert knew, through his background check, was not a larcenist, let alone a, criminal - in handcuffs, assuming he had a valid reason to take Flowers to the Plaintiff's house, which he did **not**.)

8.    Based on the respective sizes of Wengert and Flowers there was no need for Wengert to call for any assistance to transport Flowers to Plaintiff's home, let alone two large officers. Yet, Wengert needlessly asked for their assistance, Trial Exhibit 17, *Wengert EBT page 42 Lines 4-17*.

9

In summary Wengert had no legitimate reason to arrest Flowers, let alone go to Plaintiff's house, or to take Flowers to Plaintiff's house.

## TRIP TO MS. CABISCA' HOUSE

9.     Wengert should have called the Plaintiff that evening, or called her the next morning,, especially after Wengert was told by Flowers that the lady who lived at that house had dogs. Flowers also told Wengert that the neighbors next door saw Flowers take the bikes, and did not object to Flowers taking them**.**

Certainly, Wengert could, and should, have gone to the neighbors' house, as they were still sitting on their porch when Wengert and Flowers arrived at Cabisca house, tt Flowers page 361 line 3 to page 362 line 8. As noted above, Wengert admitted, at his 4-28-16 deposition, given, in April 2016, almost three years before trial,), that Flowers was in the back seat of **Wengert's car**, Trial Exhibit 17 page 48 lines 7-19. Please also note that Wengert was not aware of anything that could have blocked Flowers' view of Plaintiff's house or driveway, trial Exhibit 17, Wengert EBT page 48 lines 20-22. Also please note that Wengert

10

claimed at his EBT page 51 lines 22-24, trial Exhibit 17, that he didn't see the

invisible fence sign that was **clearly visible** to him as he walked up the driveway

towards Plaintiff's porch. He probably missed seeing it (if in fact he really missed

seeing it) because his mind was impaired, or he was acting with reckless

irresponsibility, which is especially troubling for a police officer who was certainly

trained to be extremely observant. The reason he didn't see the sign remains a

mystery. See trial Exhibit 2, photos showing the blue and white electric fence sign

(see especially the top photo on the first page, the bottom photo on the second

page, the bottom photo on the third page, and the top photo on the last page

which shows the sign is located to the immediate right of the mail box next to the

front porch.)

10.     The sign was surely more visible to Wengert as he walked down the

driveway at 10 pm than it is in these photos, Exhibit 2, because, there was a street

light behind him illuminating the sign that night, while at the time these photos

were taken the sun was behind the house putting the sign in the shade, tt page

478 Hogg trial testimony line 9-14. (Also the dog hearing examiner found the

electric fence existed and provided his reason for dismissing all charges against

the Plaintiff for having unleashed dogs, trial Exhibit 16 page 29 lines 1-9. This

11

finding, unlike his finding that Plaintiff had two dangerous dogs, was not

appealed, and stands as a finding that is binding (pursuant to the reasoning

proposed by Mr. Ash in his Rule 50 motion) on this Court, that plaintiff **did not**

own unleashed dogs.)

In summary Wengert should not have: (a) gone to Plaintiff's house, (b)

gone down her driveway after being advised she had dogs, and (c) should not

have crossed the Invisible Fence sign and gone upon to her porch.

### WENGERT ON DRIVEWAY AND PORCH

11.     Also the trial testimony of Plaintiff's police expert Dr. James Williams

claimed that Wengert violated proper police procedures when he went down

Plaintiff's driveway, onto her porch in plain clothes, and especially because

Wengert ignored both the warning from Flowers, who told Wengert that Ms.

Cabisca had dogs, and the obvious existence of the "Invisible Fence" sign, that

conveyed the same message to Wengert, tt Williams page 136 line 8 to page 138

line 19.

Wengert was, of course, dressed in street clothes. He wore a shirt and tie

and dress pants and a lanyard he claimed was identical to the one he wore at

plaintiff's house, which he testified was about 8" tall and 6" wide, but was proven,

instead, at his deposition, to be only 4.5" tall and 3" wide (Trial Exhibit 17,

Wengert EBT page 48 line 23 to page 50 line 11)

12.     Because Wengert knew Plaintiff had dogs, that could prove to be

dangerous, Wengert clearly should have tried to contact the plaintiff by phone or

waited until the next day, or at least knocked on, or wrung, the doorbell, so that

Plaintiff could have come to the front door, where Wengert could have asked her

if the bikes had been left by the curb to be taken by anyone, or gone next door to

speak with the neighbors on their porch. But, despite his assertions to the

contrary, Wengert didn't do any of that. (Plaintiff claims that she didn't hear a

knock or ring and neither did any of her three dogs, because, had the dogs heard

a knock or ring, according to Plaintiff and common sense, there would have been

a bark fest, and there wasn't one.) Trial Exhibit 408 Cabisca EBT page 23 lines 22-

through page 24 line 24.

13.     And Wengert's excuse for trying to fully investigate the presumed

bike theft immediately, instead of waiting until the next day, was indicative of

13

paranoia, for reasons that were not explained at trial. Also note trial exhibit 17,

Wengert EBT page 43 line 13 through page 44 line 25 where he makes the claim,

noted previously in this document, (One we contend to be preposterous on its

face) that there was a real possibility that Flowers had committed a violent class C

Felony, which he described as, "about as serious as it gets." He went on to make

the even more preposterous claim that the potential bike theft could have

spiraled out of control into "murders." Trial Exhibit 17, Wengert EBT page 45 line

6 (Paranoia in the extreme, existing for reasons not disclosed at this trial.)

   In summary Wengert's reasons for going down the Plaintiff's driveway,

wearing plain clothes, and crossing the Electric Fence sign to climb onto her

porch, all to investigate a patently bogus bike theft, merely compounded the

bogus nature of his behavior.


### TINA CABISCA

   14.     Tina Cabisca was 52 years old on 9-7-13. She is a 5' 2" blue eyed,

blond Caucasian. Trial Exhibit 10, 9th page near bottom, Rochester Police Incident

Report.  As of that date she was a registered nurse and had a Master's Degree in

14

Business from the Simon School of Business at the University of Rochester. tt Cabisca page 184 lines 8-12.   On that date she was home with her three peaceful dogs, two boxers and an old border collie and two infant grandchildren (9 months and 4 years old). tt 191 line 17-21 and page 192 line 13- 193 line 16. That home is located at 207 Kingsboro Road, Rochester, a peaceful neighborhood, and she had lived there since she bought her house in 2002. tt Cabisca page 185 lines 5-18.

As noted heretofore in this document, the defendants went to

Plaintiff's house to find out if a suspect they had in custody, Tyrone Flowers, had stolen two bikes Plaintiff and Flowers claim were abandoned by the side of her street. Flowers, handcuffed and placed in the back seat of Wengert's police car, observed the incidents that are the subject of this lawsuit. (tt page 385 line 20- page 386 line 1, and Wengert EBT trial exhibit 17 page 48 line 7-19) Flowers, Hogg, and Wengert all agreed that Flowers had a clear view of Cabisca's House, drive way and front yard, Flowers testimony as to his view of Cabisca yard and driveway tt page 385 line 16 through page 386 line 15, Hogg EBT trail Exhibit 18, page 33 lines 15-25, Wengert EBT Trial Exhibit 17 page 48 line 11-22. Flowers' version of those events are consistent with the Plaintiff's version, but inconsistent with much of the defendants' versions of these same events.

15

In summary, the Plaintiff was a very responsible, peaceful, intelligent, productive member of the Rochester community.

## MS. CABISCA EXITING HER HOUSE

15.     Ms. Cabisca claims that at about 9:50 pm. she heard no knocks on her door and heard no doorbell ring, and none of her three dogs barked, as they always did when someone knocked on the door or rang the doorbell. She was in her kitchen washing dishes facing the back of her house when she observed light reflecting of her garage, which was located behind her home (tt page 197 line 17- page 199 line 21). Being a nurse, (tt page 184 line 8-9) and living on a sharply curved part of the street that had been the location of car accidents, she assumed the flashing lights were from a first responder, such as an ambulance or police vehicle, responding to an accident, and thinking her medical assistance might be needed, as it had been in the past, tt page 208 line 20- page 210 line 11, she walked out of her kitchen, unarmed, barefoot, with one of her dogs, Bailey, walking immediately in front of her, tt page 215 line 6-18, trial exhibit 419, a photo of Plaintiff.

16

In summary Plaintiff was acting as a kind, reasonable manner, as a responsible citizen when she exited her house at 9:50 pm to find out if her nursing skills could help with a problem taking place in front of her home.

## WEGERT SHOOTS BAILEY

16.     As Bailey, a four year old female boxer, walked past Plaintiff's front porch, Plaintiff heard two gun shots. Bailey fell immediately, and Ms. Cabisca looked up onto the porch and saw a man in plain clothes pointing a gun at her. She immediately feared he was a criminal attempting to invade her home, who was about to shoot her, as he had shot her dog. Tt page 212 line 2 to page 13 line 10.

She was then advised by the man on the porch, Nolan Wengert, that he was a police officer, tt page 213 lines 22-25. She then saw two uniformed police officers coming down her driveway, guns drawn pointing them at her. She begged the officers (Defendants Wengert, Hogg and Prinzi) to help her bleeding, dying dog. But they refused, saying they called animal control, tt page 213 line 23 to page to page 215 line 1. (As if Animal Control could arrive in time to help the dog!) She watched helplessly as her beloved, peaceful, gentle dog bled to death.

17

She was frantic with shock, fear, and anger, tt page 220 lines 10 to page 221 line 2.

17.     The police claim that the three dogs charged at Wengert, running fast, growling and barking, and that Wengert shot the dog to protect himself. Plaintiff's conflicting version is described in Plaintiff's trial testimony beginning at tt page 191 line 17, and continuing, with interruptions, to tt page 217 line 8. Flowers version of the events leading to the shooting and including the shooting are at, tt Flowers page 362 line 16 to page 365 line 25, and page 370 line 1 to page 371 line 4.  They differ greatly from the defendants' versions.

18.   We contend the facts before the Court, in light of all the circumstances, are that if Bailey did charge at Wengert, as the Defendants claim, that the only way Wengert could have shot Bailey, would be if he'd already drawn his gun in preparation of shooting any dog from his position on the porch before any dog came out the side door of the house.

         This is because It would have been impossible for him to draw the weapon from its holster and shoot the dog pursuant to the RPD's 21 foot Tueller rule, trial Exhibit 15, and the reasoning supporting it, and the testimonies of RPD Sergeant Snow, page 85 lines 12-18, and investigator Swain, page 24 line 4 to

18

page 25 line 2, included as part of  trial Exhibit 15, and Defendant Prinzi's

testimony, trial Exhibit 19, at page 79 lines 14-16, where Prinzi said, "Dogs are

fast. Dogs cover a lot of territory fast. And reaction is always slower than action."

      The second page of Exhibit 15, shows that it takes an aware officer 1.5 seconds to

respond to a threat by shooting the person constituting that threat, but it takes an

unaware officer more time than that. And that page also notes it takes a standing, armed

man 1.5 seconds to: (a) begin his charge at an officer and (b) get to, and attack, that

officer if the distance between the two men is 21 feet, see page 1 of Exhibit 15.  (Please

note that Defendants Wengert, Hogg and Prinzi all claim that Wengert was not aware of

the existence of the dog, until the dog was actually charging Wengert.)  Furthermore our

Police Expert witness in this case, Dr. James Williams explained that the Tueller rule states

that during the time it takes the average officer to, (1) recognize a charging threat, (2)

draw his/her sidearm, and (3) fire two rounds at center mass, at an attacker charging the

officer with a knife, the attacker can successfully get to and attack the officer, before the

officer can shoot him, if the attacker starts from a distance of 21 feet or less. tt Williams

Page 140 Line 22 to page 143 line 1, and trial Exhibit 15, the Tueller Drill.

      19.    Also, the testimony of Plaintiff's police expert Dr. James Williams

states at tt page 140, line 22 – page 143 line 1, that, in his opinion, Wengert would **not**

**have had time to shoot Bailey before Bailey attacked Wengert, if Bailey had charged at**

**Wengert as Wengert claimed the dog was charging him**. Dr. Williams specifically noted

that, "A four footed canine would cover that distance much faster than any human on

this earth." tt 142 lines 4-5.

　　While this fact isn't in the record, it is common knowledge, that a speed of

60 mph, is the same as 88 feet per second. (See Kyle's Converter on line).

Therefore if a dog were running at 30 mph, it would cover 44 feet per second. At

that rate it could cover 20 feet, the distance from Plaintiff's side door to her front

door, in less than half a second, a third of the time it would take the officer to pull

his gun from his holster and shoot the dog. (Please note, that at Hogg's EBT trial

Exhibit 18, pg. 45 line 22, he testified that the dog was extremely fast, and

maintained its speed while turning on to porch, pg. 46 line 20**,** and, as noted

above, Prinzi at his EBT Exhibit 19 page 79 lines 9-16 said that dogs are fast, and

that reaction is always slower than action.  Wengert, Hogg and Prinzi claim the

dog was charging initially, not starting from a standing position, as would a man

holding a knife in the Tueller Rule example, and therefore the dog could cover the

maximum distance of 20 feet, at an even faster rate than would a hypothetical

man in the Tueller example.)

20

20.     If Wengert had actually been the subject of an attack by a charging, running dog by either:

(a) The description Wengert gave at his EBT – the, **down and up** the porch steps version, Trial Exhibit 17, Wengert EBT page 53 line 6 to page 58 line 19, see specifically pgs. 54 line 4 to pg. 58 line 19, or

(b) The version he originally gave to Sergeant Rivers, on the night of the event, trial Exhibit 10, EBT Exhibit 3, page 3 of 4 of Rivers' incident report (7th page of exhibit 10) and described also at trial exhibit 17, Wengert EBT page 30 line 4 to page 33 line 9, see especially page 32 line 9 to page 33 line 9), Wengert's version that claimed Wengert **stayed** on the porch from the time he first got upon it until the time the running dog appeared.

(Please note again, that version, (b), was agreed to by everyone else present at the shooting, including Plaintiff, tt Cabisca Testimony page 211 line 13 - 213 line 10, Flowers, tt page 363 line 4- 365 line 25, Hogg EBT, trial Exhibit 18, pages 46 line 5-12 and 49 lines 3-24, and Prinzi, EBT, trial Exhibit 19, page 36 line 2-9, which specifically notes that Wengert was **"standing"** on the porch.**)**

And because of the short distances from the side door to the porch, (12 feet), and from the bottom of the porch to the porch door, (8 feet), Cabisca trial

21

testimony, tt page 200 line 2- page 201 line 13, and the speed of a charging,

running dog, that would run much faster than the fastest human on earth, tt Dr.

Williams page 141 line 16 –page 142 line 11, it would have been **impossible** for

Wengert to observe the threat, recognize it as a threat, react by moving the

device on his holster that allows him to remove the gun from its holster, lift his

gun from its holster, release the safety on the trigger, aim accurately at the dog

and shoot it before the dog reached and attacked him. (Drawing a police pistol

from its holster and shooting it are very different from the use of actor- cowboy

pistols depicted in movies.) Please note tt Hogg page 497 line 14- 498 line 5, in

which Hogg, demonstrates everything that Wengert had to do between the time

he recognized the threat of the charging dog and the time he could actually shoot

it.

21.    Please note, Plaintiff claims that when she looked out the door she

saw a bubble light and knew there was a first responder but did not know if that

first responder was an ambulance. Specifically, she did **not**, as claimed by

defendants, admit she saw police officers at that time, tt page 211 line 21- page

212 line 12.

22

In summary, Wengert's assertion that he shot a running, charging dog is nonsense.

## A CLOSER LOOK AT

## WENGERT'S DIFFERENT DOG SHOOTING VERSIONS

22.     In any event the, "Wengert stayed on the porch until he saw the dog version" is much more credible than the, "Wengert went down the porch steps, saw the dog and retreated up the porch steps" version for two reasons:

(A) As noted above, it was contradicted by **all** of the other witnesses to the event, including the two uniformed Defendant officers, and

(B) In Wengert's EBT, trial Exhibit 17, page 60 lines 19-23, he claims that he saw **nothing** in the River's report that's inaccurate. Wengert told Sergeant Rivers that, "The **two** boxers ran down the driveway past Wengert who was **still standing on the front porch**" Exhibit 17 Wengert EBT page 32 lines 25 to page 33 line 3 that, "one boxer ran up the front steps aggressively charging" at Wengert, trial Exhibit 17, Wengert EBT page 33 lines 4-5, and that "Wengert attempted to retreat backwards on the porch up onto the porch towards him. Wengert then

23

removed his  …. Glock …. And fired two rounds striking the dog in the face and shoulder area."  Trial Exhibit 17 Wengert EBT page 33 line 11-17. (Please note this version is incredible in light of the Tueller 21 foot rule as the dog was charging fast and only **8 feet** from Wengert when Wengert first saw Bailey charging him.)

23.     This version is made even more incredible by Wengert's statement to Rivers that Wengert shot the dog as the dog, "was coming up brick steps onto a wooden porch." Trial exhibit 17, Wengert EBT page 34 lines 15-16. If this were true, Wengert would have reacted to the charge instantly, a matter of nanoseconds, as it would have traversed only **2 or 3 feet** (not 8 feet) before Wengert saw the dog, realized he was being attacked, completed the maneuvers he had to complete before he could pull his gun from its holster, extract the gun, release the safety, aim competently and shoot the dog.

Furthermore, the description Wengert gave of drawing his gun from its holster, and preparing to shoot the dog, constitutes his admission that his shooting the dog would have been too time consuming, to have been accomplished in that method. (When we are addressing fractions of a second, Trial Exhibit 17, Wengert EBT page 61 line 22 to page 63 line 18.)

24.     But Wengert also testified:

24

(c) That Wengert came down off the porch on to the driveway, to see **three** (not **two,** as he told Rivers) dogs charging at Wengert, causing Wengert to escape the charge by going back up the stairs onto the porch and then pulled his gun from its holster and shot the dog as it followed him up the stairs running. Exhibit 17, Wengert EBT page 54 line 5 to page 58 line 3, and at the dog hearing Exhibit 16 page 9 lines 9-16, where he insists in response to several, seemingly dubious questions posed by the hearing examiner, that **"three"** dogs were charging him.

Please note at Exhibit 17 page 55 line 17 through page 58 line 19, Wengert indicates he may have been drawing his pistol from his holster as he was running sideways up the porch steps. Clearly if this scenario were accurate, it would take significantly longer for Wengert to shoot the dog, (as he pulled his gun from its holster while running sideways up the porch steps) than if he were standing in a stable position when drawing his pistol. We contend that this version described an event that could not have taken place - A physical impossibility, as described previously in this document due to principles set forth in the Tueller 21 foot rule trial Exhibit 15, and by testimony of Dr. Williams, because the very short distance the dog would have traversed, made it impossible for Wengert to have gone up the stairs, while simultaneously drawing his gun and then shooting the dog,

25

before the dog would have reached and attacked him, (If the dog had been running as Wengert claims it was doing.) Also note the photos of the house, trial Exhibit 2, and testimony, mentioned previously, that it was 12 feet from the side door to the bottom of the porch steps and 8 feet from there to the front door. tt Cabisca page 200 line 9 to page 201 line 13.  Also note Hogg agreed with this assessment, saying there was about 10-15 feet between the side door and the porch, Trial Exhibit 18, Hogg EBT page 47 lines 18-19, when Plaintiff claimed that distance was measured at 12 feet.

 

      25.    The evidence before the court demonstrates conclusively that the only way Wengert could have shot the dog, (if it was in fact charging at him) was if he had already draw his weapon, awaiting a dog as he stood on the porch, as he would have done after hearing from Flowers that the plaintiff had dogs and seeing the Invisible Fence sign as he walked up the driveway. Upon hearing Flower's warning and seeing the Invisible Fence sign, a reasonably attentive person, let alone a reasonable officer, would have walked away from Plaintiff's home, and tried to contact her later.

Or a reasonable officer could have decided to walk over to the neighbors'
home, who, according to Flowers, were still on their porch and spoken to them,
because Flowers had already told Wengert, the neighbors had witnessed Flowers
take the bikes, tt page 358 lines 18-25, and tt 361 line 14-17. Also note that at tt
page 362 line 1 – 8,  Flowers explained that the neighbors were still on their porch
when he and the three officers arrived at Plaintiff's house and that Flowers hoped
Wengert would go talk to the neighbors, but that Wengert instead insisted on
going down the Plaintiff's driveway and upon Plaintiff's porch.  (Please note, as
addressed later in this document, that Wengert, instead, waited to approach and
speak to the male neighbor, Mr. Teddy Brantley, only **after** he shot Bailey and
**after** the Plaintiff was manhandled by Wengert's subordinates, Hogg and Prinzi, tt
Cabisca page 240 lines 9-24)

Also Wengert refused to estimate the time it took from the time he took
getting to the top of the stairs after first seeing the dogs, but admits it was, "a
very short period of time. It's a short distance" Trial Exhibit 17, Wengert EBT page
64 lines 13-20.  Wengert claimed the front door was to his immediate right, or he
was immediately behind the door, when he shot the dog. Wengert EBT page 65
lines 14-22, Trial Exhibit 17.

27

26.     We contend that the most likely reason Wengert decided to testify to

the false - down and up the stairs version - at his EBT, was almost certainly

because, between the night of the incident when he truthfully told Rivers he had

stayed on the porch from the time he climbed up on the porch until he shot the

dog, and the time of his EBT, he realized the version he gave Rivers, was

completely incredible, because he would not have even know about the dog

approaching him until it was charging no more than 8 feet from him, and it would

have been utterly impossible for him to pull his gun from its holster, aim and

shoot the dog, as it chased, very fast, only 2 or 3 feet, up the stairs after him,

before he shot the dog. (Wengert's EBT version – the down and up the stairs

version - was also impossible to accomplish, but, slightly less so, than his

reformed version, as it gave him a few more nanoseconds.)


And, of course, had the dog been shot as it raced towards Wengert, the

bullets would have gone from the front of the dog's body towards the back of its

body, contradicting the third photo in trial Exhibit 3 which demonstrates clearly,

that the bullet directly entered the dog's left elbow, not grazing it, and therefore

Wengert faced the dog's left side when he shot it, and did not face the front of

28

the dog at that time. Dr. Williams' testimony supports this contention, tt Williams page 138 line 20 to page 140 line 11, and Dr. Kutrybala's dog autopsy report, as relied upon by Dr. Ewing to help explain the Plaintiff's extreme emotional reaction to observing the shooting of her innocent dog, as the autopsy showed the bullet entered the dog's left elbow and crossed over to its right side, Trial Exhibit 3, third photo. Ewing testimony tt page 18 line 11 to page 19 line 17. Clearly had the Plaintiff seen her dog charge up at Wengert, and realizing the shooting was justified, her emotional reaction to the shooting would have been far less serious than it was, and remains.

Taking in to account all the above, the Defendants' version that Bailey ran, charging up the stairs at Wengert, causing him to shoot her is utter nonsense.


**THREE YOUNG LARGE, MALE, ARMED OFFICERS VS. ONE SMALL,**

**OLDER, UNARMED FEMALE**

27.    The record clearly shows (as noted previously) that Defendant Hogg was 41 years old, 6' tall and 195 pounds, trial Exhibit 10, EBT Exhibit 3, in the second to the last page, at the top of the page. ), Prinzi was 37 or 38 years old, 6'

29

tall and 200 pounds, trial exhibit 19, Prinzi EBT page 6 lines 12-13 and page 8 lines 4-12, and Wengert was then 28 years old, 6' 1' tall and 185 pounds; Wengert EBT, trial exhibit 17, page 29 lines 13-14 and page 39 lines 7-12, and all three were armed with weapons. The record also shows they requested Ms. Cabisca, a 5' 2" blue eyed blond, 52 years old, unarmed, grandmother, wearing only a T-Shirt, and shorts, and bare footed (Cabisca EBT, trial Exhibit 408, page 36 lines 9-10, trial exhibit 10, ninth page, lower left hand corner, a police report, and photo Exhibit 419) to move from one area of her drive way to another. Ms. Cabisca claims that she refused to move without an explanation from the police telling her why they were on her property and why they had shot her dog. Cabisca EBT trial Exhibit 408 page line 2 to 20. She then claimed that one officer notified her that she would "go to jail" if she did not cooperate. (tt Prinzi page 463 lines 1-7, tt Cabisca page 234 line 20 to page 235 line 3 and tt Hogg page 487 line 16-20)

In summary the Defendants' both individually, and collectively, had a huge advantage over the Plaintiff, with respect to physical power, and their extreme ability to exercise physical control over any situation involving confrontation between any one of them, on the one hand, and her on the other hand, which advantage was multiplied by three, when involving all of them and just her.

30

**DEFENDANTS' REFUSAL TO COMMUNICATE WITH PLAINTIFF**

28.     Neither Wengert, Hogg nor Prinzi told Plaintiff (**immediately** after shooting her dog), why they were at her house, even though she specifically asked them to tell her why they were there. This failure is inexcusable. (Hogg admitted Plaintiff had asked them why they were at her house, and that the police "couldn't" give her an answer, tt Hogg page 484 line 24-25), a ridiculous response.  Furthermore Defendant's excuse that they couldn't talk to her is absurd, as any of the three could have said in a **"loud and clear"** tone, that they were there to find out if she had abandoned two bikes by her curb, for any passer- bye to take. Please note the officers admitted they could speak loudly to her when yelling at her to put her dog(s) inside the house, and Prinzi admitted at his EBT, trial Exhibit 19, at page 49 lines 7-12, that he Ordered Plaintiff to put her dogs away in a "**loud and clear**" tone at least **ten times**. Therefore he could have spoken in a similar tone to ask her if she had left the bikes by her driveway for a stranger like Flowers to take, **(The sole purpose of the Defendants' visit to Plaintiff's house)** to ascertain as soon as possible if Flowers had her permission to

31

take the bikes, instead of causing conditions to get grossly out of hand, resulting in a needless angry confrontations, assaults, handcuffing, false arrests etc.  This failure is made even more egregious because the two remaining dogs did not attack the police officers. As Wengert stated, "After the gunshots were fired the dogs became scared and they ran away, running in circles back towards the door area, along the side of the house **for 4 to 5 minutes."** Trial exhibit 17 Wengert EBT page 71 line 11 to page 72 line 12, giving all three defendants far, far more time, than they needed to ask Plaintiff if she'd left the two bikes out front for anyone to take. (Four to five minutes is a very lengthy amount of time, under these circumstances. For example many athletic men can run an entire mile in less than five minutes, and a few can do it in less than four.)

There is, of course, no reason why at least one of the three officer, let alone all of them, could not have spoken firmly, clearly and authoritatively in language similar to the following, **"We're sorry about your dog, but tell us – Did you leave two bikes by your curb, for anyone to take?"**

29.     Despite the defendants' assertions, the Plaintiff did nothing to prevent them from making such a simple, clear statement, immediately after the

32

dog was shot. Such a question would be asked by any rational adult, let alone by trained police officers.

Instead, we suggest, they behaved more like a guilty trio of irresponsible 10 year old boys who had mistakenly shot their teacher's dog, and were intimidated by the teacher's fury, to the point where they became tongue tied, and froze, and were unable to react in a reasonable manner, and answer her question, or ask her any reasonable questions; (prior to, of course, over-reacting by exploding in angry assaults, that are described later in this document.) After all, Plaintiff did nothing to prevent them from speaking to her. For example, she did not point a gun at them and order them not to speak, or stick socks in their mouths to prevent them from communicating.

The three large defendants refused to respond to her questions, as noted above, they refused to give her their badge numbers or names, and most importantly did not tell her why they were at her home, and, also as noted above, Hogg admitted at his EBT, that she did ask them why they were at her house, and Prinzi admitted at his EBT, Exhibit 19, page 58 lines 22-25 that the acronym "CPS" may have been uttered by one of the Defendants during the incident. Such a reference under these circumstances is absurd, and surely Prinzi would not have

33

testified that those letters "may" have been said unless the letters "CPS" were actually uttered, as Plaintiff claimed. (This fact is addressed later in this document)

30. As for the fact that Wengert did not testify at the trial, if the Defendant's counsel notes that he could not defend himself at the trial because he was deceased, we contend that such an assertion should be ignored by the court because the Defendants and Mr. Ash never told the Court, or Plaintiff, the cause of Wengert's death, despite numerous requests therefore by Plaintiff's counsel, and without such an explanation, the court cannot conclude that the death was not self-inflicted, intentional or otherwise, and therefore Wengert's failure to defend himself in court, no matter how tragic, may have been his own fault, and therefore doesn't constitute a valid excuse, for his failure to come to court and defend himself.

In summary the Defendants' failure to immediately ask Plaintiff is she had abandoned bikes by her curb, is inexcusable and outrageous.

34

**PLAINTIFF WHITE/FLOWERS BLACK**

31.     Furthermore the fact that the Plaintiff is white, is, we contend,

relevant, as the police misconduct would be more shocking, and seem more

"surreal" (tt Cabisca page 228 line 4) to her than it would for a black person who

would be more likely to consider such behavior conducted by police, as to be

expected. For example Tyrone Flowers admitted that his mistreatment by the

defendants (he was not only assaulted, and kidnapped, as the defendants had no

grounds to "reasonably believe"  he had stolen the bikes and therefore had no

justification to touch him, let alone handcuff him, and force him into a police car,

and drive him away with it, than would any non-officer), claimed he was angry for

a couple of days, but understood the realities involved and that he would get

nowhere if he attempted to pursue any justice or reparations for his own

mistreatment.  tt page 366 Flowers Testimony lines 1- 20.

To summarize the activities on 9-7-13, are consistent with the common

views of police on the part of whites, more trusting, than blacks, less trusting.


**HOGG THREW PLAINTIFF TO GROUND AND PRINZI PILED ON**

35

32.     But instead of simply asking Plaintiff, if she'd abandoned the bikes,

Hogg admitted he instead threw Ms. Cabisca to the ground in the grass in front of

her home, trial exhibit 18, Hogg EBT page 63 line 17 to pg. 65 line 12, and placed

his body on top of hers. According to the Plaintiff and Flowers, Prinzi got on top of

her with Hogg. (tt Cabisca page 236 line 3- 21, and tt Flowers page 374 line 6- 19.)

Hogg admitted he handcuffed Plaintiff behind her back while she was on the

ground trial exhibit 18, Hogg EBT page 63 line 17 to page 65 line 12.

Plaintiff testified that, before she was attacked, she had put her hands up

to signal to the defendants that they were not to get any closer to her, but that

Hogg then put his left chest on her left hand and threw her to the ground, that

Hogg and Prinzi placed their bodies onto hers and that while plaintiff was on the

ground, plaintiff told the officers that she is asthmatic and to get off of her, as she

could not breathe. She explained that after she made that comment they pushed

her harder. She stated, a second time, that she is asthmatic and couldn't breathe.

They responded by continuing to push down upon her. She then told them, there

were kids in her house, and that one of the uniformed officers responded saying,

"That's too bad because you're going to jail and those kids are going to CPS." Trial

exhibit 408, Plaintiff's EBT page 39 line 22 to page 41 line 12*, and tt Cabisca page 232 line 4 to page 237 line 24.

In light of the above it is clear that Defendants Hogg and Prinzi were motivated by evil motives or intents, and/or acted with reckless or callous indifference to plaintiff's federally protected rights and therefore Plaintiff is entitled to punitive damages for their violation of her section 1983 rights.

Furthermore the batteries they performed upon her were clearly committed with actual malice or so recklessly and wantonly as to permit the inference of malice, and thereby also entitling the plaintiff to punitive damages against Hogg and Prinzi.

In summary, Hogg had no grounds to attack Plaintiff and take her to the ground and lie upon her and Prinzi had no right to pile on, as he observed the situation and therefore knew (a) Hogg had no grounds to attack the Plaintiff, (b) that Hogg had the ability to control her without Prinzi's assistance, and ( c) therefore Prinzi knew he had no right to pile on the Plaintiff's body. This behavior is an example of a common understanding in our society, which is that police are often more concerned with improperly assisting fellow officers acting improperly than serving and protecting members of the public.

In summary neither Hogg nor Prinzi had the right to attack Plaintiff, let alone to injure her.


**DEFENDANTS GET OFF PLAINTIFF'S BODY, SHE ENTERS**

**AND RETURNS FROM HER HOUSE**

33.     Plaintiff testified that then Wengert told the two plain clothes officers to get off plaintiff and let her get up off the ground. Plaintiff then ran into the house, checked on her grandchildren, then called her family by phone, and told them to come home immediately. Trial exhibit 408 plaintiff's EBT page 41 lines 22 to page 42 line 5, and tt Cabisca page 238 lines 2-10. Plaintiff testified she then went back outside and saw six additional police cars and a fire truck on the street in front of her home, (tt Cabisca page 239 lines 3- 21) Plaintiff then realized that two of her next- door neighbors were in their yard. She asked them to come to plaintiff's home, because she was afraid to be left alone with the officers, including the three individual defendants, and the officers who'd arrived in the additional police vehicles that had recently arrived.  Trial exhibit 408 page 47 lines 2-9.

In summary, please note that if the Defendants' really had reason to fear Plaintiff they would not have allowed her to go into her house alone.

## WENGERT ASKS MR. BRANTLY ABOUT BIKES

34.     When the neighbors came onto plaintiff's yard, Investigator Wengert, approached Plaintiff's neighbor Teddy Brantley and asked him what Teddy knew about the bikes. Plaintiff responded to over-hearing this question, by speaking angrily to the police, saying they had to be kidding and asked if this event resulted merely from her abandoning kid's bikes by the curb, as this was the first time she was given an inkling as to why the police had come to her house. tt Cabisca 239 line 15 to 240 line 24. **(**Please note the reason Wengert approached Mr. Brantley about the bikes, is because Wengert already knew that Teddy Brantley saw Flowers take the bikes as Flowers had told Wengert while he was being driven to Plaintiff's house that the neighbor on the porch, Mr. Brantley, saw Flowers take the bikes. Flowers said this to Wengert during the same conversation when Flowers told Wengert that the Plaintiff had dogs,  tt Flowers page 361 lines 3-17)

In summary, this proves Wengert knew the neighbors, the Brantleys,  had seen Flowers take the bikes, before he got to Plaintiff's house, and supports our

39

obvious contention that Wengert should have gone next door and spoken to Mr.

Brantley before going down the Plaintiff's porch and passed the electric fence

sign, to learn about Flower's taking the bikes, to avoid a confrontation with any

dogs.

### PLAINTIFF IS HANDCUFFED, LIFTED AND PUT IN CAR

35.    Plaintiff claims that Hogg then responded to Plaintiff's angry

statements by handcuffing plaintiff behind her back, and lifting her off the ground

from behind, using the handcuffs, and carrying off her property and putting her in

the back of a police a police car, (tt page 242 line 7 to page 243 line 6.)

In light of the facts set forth above the false arrest and false imprisonment

described in this Proposed Findings of Fact demonstrate repeated reckless, willful,

wanton and malicious behavior, entitling Plaintiff to punitive damages.

In summary, Hogg's arrest of Plaintiff was illegal. Merely because Plaintiff

expressed anger at the police for their stupid, ridiculous behavior, her angry

comments do not provide a valid, legal excuse to arrest her. (Surely, she was

40

arrested, because she had the audacity to openly criticize the police for their

outrageous behavior, not because she had committed a crime.)


## GRANDCHILDREN

36.    Plaintiff was further traumatized by the fact that her grandchildren

were not being attended to, and she feared the 4 year old  might come outside

and be traumatized by the scene of the bleeding/ dying dog and the other events

taking place involving plaintiff. tt Cabisca page 231 line 13 to page 232 line 3,

Cabisca EBT, trial Exhibit 408 page 52 lines 4-20, and tt Cabisca page 246 line 18 to

page 247 line 2.


## SPASMS/ASTHMA

37.    After plaintiff was forced into the police car, she experienced huge

spasms in her chest, which increased her inability to breathe due to her asthma.

Being handcuffed behind her back also impeded her ability to breathe. After her

significant other, Lee, arrived at her home, Plaintiff asked him to go into her

house to get her inhaler. After a while he returned with the inhaler, but she

41

couldn't use it because her hands were cuffed behind her back, and the officer in the car, Turner, would not let her leave the car or remove the handcuffs until Turner completed the paperwork on Plaintiff's arrest.  Turner called 911. Tt page 244 line 2 to page 246 line 14.

When the ambulance arrived its two attendants went to the police car.

38.     But, Turner refused to allow the plaintiff to leave the police car and refused to remove the handcuffs, preventing plaintiff from obtaining medical attention from the ambulance attendants. Sometime after the ambulance attendants arrived at the police car, Turner allowed the plaintiff to leave the police car, and un-cuffed plaintiff, tt Cabisca page 253 line 17 to page 254 line 12. But because the attendants would not tell Plaintiff, if they would take her to a hospital, "immediately", and she desperately needed to go to an E. R. "immediately", and her daughter offered to take her there "immediately," Plaintiff accepted her daughter's offer and went in her daughter's car to the hospital.

In summary, the Defendants were told by Plaintiff that she suffered from asthma, and couldn't breathe. (The inability to breathe being one of the most frightening events a human can experience - the reason water-boarding is

42

torture). But the fact that Plaintiff was suffering from this condition, meant little

to Defendants, as matters such as "paper work" were treated with more respect,

than immediately getting her inhaler, and allowing her to use it immediately.

## HIGHLAND

39.      Plaintiff was then transported to Highland hospital, where she

received injections of tordol, for pain, and valium, for muscle spasms. (The trauma

from the assaults on plaintiff initiated the spasms to her neck and back that would

not allow her to take a deep breath.)

Plaintiff arrived at Highland E. R. at approximately 10:45 pm, and was kept at

the hospital until about 4 am the next day. tt Cabisca page 254 line 13 to page 256

line 15. She was suffering from an inability to breathe, an asthma attack, and

major spasms in her chest.  Prior to 9-7-13 plaintiff had been prescribed 60

mgs/day of Cymbalta, for treatment of fibromyalgia. However, due to the

batteries descried in this Complaint she was prescribed 90 mgs/day of Cymbalta,

and she continues on that increased prescription today. The extra 30 mgs are to

43

treat plaintiff's increased pain and anxiety due to the defendants' mistreatment of her on 9-7-13.

40.      Plaintiff's physician prescribed valium on the Monday after Saturday 9-7-13. Her initial prescription was for 2mg /day, but the amount was raised to 10 mg/day, several weeks later. Due to that pain, she can't sleep without a sleep aid or muscle relaxant, tt Cabisca page 256 line 16 to page 259 line 2.

In summary, Plaintiff suffered from the batteries she endured, and received treatment for them, immediately after she was battered, and received more treatment with her general practitioner two days later.

**PLAINTIFF CHARGED WITH PENAL LAW AND DOG VIOLATIONS**

41.      The defendants thereafter, on 9-7-13 intentionally and maliciously falsely arrested the plaintiff by falsely charging her with Harassment in the Second Degree, a violation of Penal Law § 240.26 (1) and Resisting Arrest, a Class A Misdemeanor in violation of Penal Law § 205.30. Trial Exhibit 6, first page, and tt Cabisca page 264 line 24 to page 265 line 22.

44

Plaintiff was also falsely charged with possessing three unleashed dogs in violation of Rochester Chapter 31 section 4 of the Rochester City Code and three dangerous dogs in violation of Rochester Chapter 31 section 7 (A) of the Rochester City Code, trial Exhibit 6. (Two citations were issued for each of plaintiff's three dogs) These charges were filed even though plaintiff's property was surrounded by an electric fence to keep the dogs on her property.

42.     The two Penal Law charges listed above, were dismissed on about 10-22-13, by City Court Judge Ellen Yacknin, tt Cabisca page 267 line 10 to page 268 line 13 and Trial Exhibit 5. A hearing took place on the six dog charges before a City of Rochester Hearing Examiner on 10-30-13. Plaintiff claims, she went twice to the dog hearing because Wengert failed to appear at the first scheduled date. She also claims Wengert made many false statements during that hearing, tt Cabisca page 270 line 20 to page 279 line 23, also see trial Exhibit 16, a transcript of the dog hearing. Also, as noted previously, Exhibit 16 at page 29 lines 1-9 it shows that Plaintiff was found **not guilty** of having any unleashed dogs because *she had the electric fence,* and at pages 30 line 13 to page 31 line 13 Plaintiff was found guilty of having 2 dangerous dogs and fined a total of $400, despite the fact that the hearing examiner admitted he did not allow the plaintiff to present proof

45

that the dog was shot in the side and not in its front as claimed by Wengert. But those convictions were thereafter dismissed and the fines were dismissed as well, by the City of Rochester, after plaintiff brought an appeal, tt Cabisca page 281 line 18 to page 282 line 12, and Trial Exhibit 8. (The finding that she was not guilty of the unleashed dogs was not appealed by the City.)

In summary, it is clear that the police issued these charges in an effort to blame Plaintiff for her injuries, and protect them from accepting responsibility for causing them. The fact that the criminal charges were dismissed and the dog charges were as well, demonstrates that City employees understood she was guilty of nothing.

## SOUTH CAROLINA

43.     When Plaintiff applied for a license to practice nursing in South Carolina shortly after 9-7-13, her application was held up because a background check by that state discovered she'd been arrested in Rochester for Resisting Arrest and Harassment. Before Plaintiff was able to prove to those authorities that those charges had been dismissed she had to return to New York to find work in order to support herself, tt Cabisca page 261 line 14 to page 265 line 8.

46

In summary this demonstrates damages Plaintiff suffered as a result of the false arrest she endured at the hands of the Defendants. Her life may have been altered dramatically if she had not suffered the charges imposed upon her by the false arrest.

### PLAINTIFF'S DESCRIPTIONS OF EMOTIONAL TRAUMA

44.     According to the plaintiff she suffers from depression, anxiety and post- traumatic stress disorder, including intense fear, helplessness, and horror. Her experience is persistently re-experienced with recurrent and intrusive distressing recollections of the event including images, thoughts or perceptions, intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event, (seeing policemen, having a police car pull alongside her while driving, seeing dead animals along the road, or at other locations, trigger very severe and disabling panic attacks), tt Cabisca page 220 line 10 to page 221 line 2; page 227 line 15 to page 228 line 16; page 250 line 6 to page 252 line 17 (this demonstrated plaintiff's reaction to receiving the Kutrybala report) tt cabisca page 260 line 7- 24. (Plaintiff's inability

47

to sleep) tt Cabisca page 283 line 11 to page 290 line 21, (Plaintiff's fear, lack of

trust, lack of social activities, no social relationship of any kind with men, her

break up with her significant other, no visits to Rochester, only works or stays

home, lack of concentration, reduction of job responsibility and positions,

attending psychological therapy) tt Ewing page 32 line 12 to page 37 line 19; page

38 line 2 to page 39 line 7. (We did not sue for lost income as that would have

been extremely difficult to do, because she does work, and it would have been

almost impossible to show the difference between what she now makes, and

projections as to what she would have made had the 9-7-13 incident not

occurred.)

     In summary, misbehavior by police can create extreme damages, in this

case extreme psychological damages.

## MALICIOUS PROSECUTIION

    45.    The defendants maliciously prosecuted the plaintiff for the improper

purpose of attempting to hide, and justify, their improper treatment of plaintiff

when they went onto on plaintiff's property, and battered her, falsely arrested her,

48

falsely imprisoned her, killed her dog, and violated her civil rights for no legitimate law enforcement purposes.

Furthermore the evidence is overwhelming that the defendants were annoyed and/or angry with the plaintiff's angry attitude and objections to her conduct resulting in their malicious prosecution of her.

Also Plaintiff is requesting punitive damages against Hogg and Prinzi, but not against Wengert because Wengert is deceased and punitive damages can't be brought against one who has died.

In summary, as noted above the needless, malicious prosecution may have altered her future as it forced her to return from South Carolina to New York.


**DOG HEARING**

46.    The defendant Investigator Nolan Wengert pursued the abuse of the legal process when he testified falsely at a hearing on 10-30-13 before David Harradine, Hearing Officer, Trial Exhibit 16, and the testimony from Plaintiff regarding said testimony (Cited above), which false testimony resulted in plaintiff's improper convictions of violating two charges of "Dangerous Dog", one

49

charge for each of her two Boxer dogs, in violation of Chapter 31, Section 7A of

the Code of the City of Rochester. The false testimony included the Investigator's

statement, under oath, that all **three** of Ms. Cabisca's dogs charged him, (see

above, an assertion contradicted by other witnesses – including  Prinzi, at his EBT

Exhibit 19, page 33 lines 12-19, where Prinzi claimed **two** dogs came out, Flowers'

tt page 364 line 23 to page 365 line 9; Flowers' tt page 370 lines 8 to page 371 line

4, showing **one** dog going to the front of the house and one to the back, and no

third dog, and Plaintiff Cabisca EBT, Exhibit 408 page 25 lines 15-19 and page 30

lines 5-11; and tt Cabisca page 212 line 13 to page 214 line 16, showing **one** dog

going to the front and one to the back, with Wengert killing the one that went to

the front. And, as noted previously, Wengert told Sergeant Rivers that **two** dogs

charged him, but he testified at the dog hearing that **three** did so.

In summary, the dog hearing showed that Wengert was capable of

frequently giving false testimony under oath, as much of his testimony was

contradicted, not only by the Plaintiff, but by other statements made by Wengert

himself, at other times, on this record. It also shows the extent the police were

willing to pursue the plaintiff to protect themselves from facing liability for their

mistreatment of her.

50

**EXHIBIT 3, PHOTO GUN WOUND**

47.     Wengert's testimony about the dog shooting incident is refuted by

the testimony of both Plaintiff and Mr. Flowers as to how the shooting took place,

by the Plaintiff's reaction to the shooting, and by Dr Ewing's trial testimony

showing she would **not** have been furious and terrified by the episode had she

seen the dog charging at Wengert, which (had that happened) would have

provided justification in her mind for the shooting, tt Ewing page 18 line 11 to

page 19 line 17, and by trial Exhibit 3 especially the 3rd photo which shows a clean

direct hit into the dog's left elbow, not a scrapping  wound, that would have been

evident had the dog been facing Wengert when the dog was shot, as noted by Dr.

Williams. As noted previously, this photo shows the dog's left side was facing

Wengert when Wengert fired the shot dog in its side, not in the face, or in the

front of its body. tt Williams page 138 line 20 to page 140 line 11. Furthermore

Wengert did not shoot at two dogs. The dog that was shot was the only one of

plaintiff's dogs that was in the vicinity of Wengert when he discharged his

weapon. Plaintiff owned three dogs at the time. According to Plaintiff and Tyrone

Flowers, the one that was shot had walked towards the front of the house, a

51

second, after exiting the side door, never came to the front of the house, but

instead went into the backyard, away from the police before Plaintiff put him

back in the house, and the third dog never came out of the house. (Also note as

previously stated in this finding of fact, the Plaintiff testified at tt pages 273 line 5

to page 279 line 25 describing the false statements made by Wengert at the

10/30/13 dog hearing.)

Plaintiff's conviction of the dog violations resulted in the imposition of two

fines, each in the amount of $200, for a total of $400. However, after appeal,

those convictions were dismissed and plaintiff was not required to pay either of

those fines, trial Exhibit 8.

48.    Wengert shot the dog twice along its side, with a 45 caliber model

30SF semi- automatic Glock, Trial Exhibit 17, Wengert EBT page 33 lines 13-17, as

the dog was facing the street, perpendicular to the officer, not facing the officer.

Furthermore, according to the Plaintiff and Mr. Flowers, the dog was not barking,

growling or in any other manner demonstrating a threat to the officer, tt Cabisca

page 216 lines 11 to page 217 line 1; and tt Flowers page 364 lines 8- 20.

In summary, the third photo of Exhibit 3, as noted by Plaintiff's expert

police expert, and as is obvious to a non-expert observer, contradicts the

52

Defendants' contention that Bailey was charging at Wengert when he shot her;

that instead, Wengert was facing her side when the shooting took place, meaning

she was not charging him, and he had no reason to shoot her. It also

demonstrates her emotional injuries were much greater than they would have

been had the dog been charging Wengert, instead of walking past him.

## DR. CHARLES EWING- EMOTONAL DAMAGES

49.        As noted previously in this finding of facts, according to Dr. Charles

Ewing, the Plaintiff's psychologist expert, plaintiff suffers from severe post-

traumatic stress disorder, including intense fear, helplessness, and horror. Her

experiences are persistently re-experienced with recurrent and intrusive

distressing recollections of the event including images, thoughts or perceptions,

intense psychological distress at exposure to internal or external cues that

symbolize or resemble an aspect of the traumatic event, (seeing policemen,

having a police car pull alongside her while driving and viewing dead animals

along the roadway or otherwise, trigger very severe and disabling panic attacks),

and other effects set forth more completely in the testimony of Dr. Ewing. These

damages are permanent and extremely disabling, tt Ewing page 32 line 12 to page

37 line 19; and page 38 line 2 to page 39 line 7.

50.    Dr. Ewing testified that the costs for her treatment, medication

diagnoses, and medications will be great throughout Plaintiff's life. He claimed at

tt 39 lines 8-25 that she will require both intensive and extensive psychotherapy

(twice a week) and be treated by a full psychiatric examination and be seen by a

psychopharmacologist, to learn what medications she should take. At tt 40 line 3

to page 41 line 14  he testified that her emotional conditions are permanent, and

her prognosis is guarded at best – that she will never recover from her PTSD, but

can learn to function, but never to the level at which she functioned before 9-7-

13.

On tt page 41 line 15 to page 43 lined 6 Dr. Ewing described the cost of the

treatment, examinations and medications, Plaintiff needs during the rest of her

lifetime. He claims her psychotherapy will cost between $200 and $300 per week,

her initial psychiatric work up will cost $250 that each medication management

session will cost about $150. He claimed that the cost of her medications may be

cheap if generic, but very expensive, if not generic. He testified the psychotherapy

will last the rest of her life. The life expectancy table, Exhibit 26 was placed in

54

evidence at tt 43 lines 5-6, and they show Plaintiff is expected to live another 26.4

years after the date of the trial, tt page 42 line 12. Therefore the cost of her

psychotherapy alone will (at the estimated average of $250 per week) cost

Plaintiff $343,200.

In summary it's proven conclusively that Plaintiff has suffered, is suffering

and will permanently suffer extreme psychological disturbances including PTSD

for the rest of her life, and that the testimony of Plaintiff's eminent psychologist

was not rebutted or disputed by the Defendants and it accurate, and her

emotional damages have a very high financial value.


## WENGERTS CONFLICTING TESTIMONY

51.    We contend that some of Wengert's testimony (in addition to his

differing versions of the dog shooting event, previously discussed in this paper) is

contradicted other testimony he gave, and not only by the plaintiff and Tyrone

Flowers, but from other police officers as well.

For example, Wengert testified that Kingsboro Road was dangerous and

that many thefts took place upon it, which, he claimed, justified his arrest of

Flowers. We contend this testimony is patently false because it was made despite:

(a) both Plaintiff and Flowers, long term residents of Kingsboro Road, Plaintiff's

EBT Exhibit 408, page 11 lines 10-14, showing Plaintiff purchased her Kingsboro

Road home in 2002; claiming it wasn't a dangerous area, nor the location of many

thefts, (Trial Exhibit 408, Cabisca EBT page 28 lines 11-15, and trial Exhibit 1,

showing a lack of criminal activity during the year before 9-7-13), which Plaintiff

looked up on a public Rochester City Police site on line**,** after one of the

Defendants told her she lived in a dangerous area. Trial Exhibit 1, instead supports

her belief that she lived in a safe area.

52.     Please note that Flowers has been a resident of 35 Kingsboro Road

since 2004, tt Flowers page 351 line 16 through 25; Flowers has lived with his wife

and their children since 2003 and Flowers has worked at Glendoveers Party House

from at least September 7, 2013 until the trial date of February 2019,  tt Flowers

352 lines 9- 25; Flowers testified that Kingsboro Road was a peaceful, nonviolent

area on 9/7/13 tt 353 lines 17- 23.; and Cabisca agreed at tt Cabisca page 185 line

5 to page 189 line 6; that testimony describes trial Exhibit 1, a criminal history at

Kingsboro Road for the year prior to 9/7/13. It's very important, we contend, to

note that defendants **did not present <u>any documentary evidence</u> to refute**

**Plaintiff's and Flowers' testimonies, or Exhibit 1, that Kingsboro Road was a safe, peaceful neighborhood on 9-7-13.**

53.    Wengert's allowing Hogg to arrest Plaintiff for the violation of harassment and the misdemeanor of Resisting Arrest, when Plaintiff had committed neither violation, trial exhibit 18, Hogg EBT page 81 lines 16-23. (Please note that Wengert stated in his EBT, trial Exhibit 17, page 58 lines 20-23, that as an investigator he was higher in the RPD hierarchy than were officers Hogg and Prinzi, and therefore Wengert could, and should, have prevented Hogg from having Plaintiff charged with any crime or violation, as Wengert could, and should, have prevented Hogg and Prinzi from battering Plaintiff.)

**In summary the evidence before the Court demonstrates that Wengert's testimony was frequently incredible and should be given little if any credence, as it is often self-serving.**

**NO DEFENDANT CUSHIONED HOGG'S TAKING PLAINTIFF TO GROUND**

54.     In addition Wengert did nothing to cushion Plaintiff's fall to the

ground, trial exhibit 17, Wengert EBT page 91 lines 2-6. Certainly Wengert knew

that Hogg was not injured in any possible way, even if Plaintiff had reached out to

shove his chest. Also Hogg could have reached out his longer arms and easily

prevented her from touching, let alone shoving, him. (Of course Plaintiff denies

she touched Hogg, but even if she did touch him, her behavior did not reasonably

justify the placement of any charges against her, and Wengert, Hogg's superior,

had to know that). Please note that pursuant to New York Penal Law section

240.26 one can't be convicted of the mere violation of simple harassment without

proving the person who shoved another did so, "with intent to harass, annoy or

alarm another person" The evidence here, on the other hand, clearly shows the

hysterical Plaintiff put her hand out to protect herself from having contact with

Hogg, certainly not to harass, annoy or alarm him. Furthermore, had Wengert's

mind been operating rationally, he would not have allowed Hogg to take Plaintiff

to the ground, handcuff her, and keep her there for any amount of time, let alone

1.5 minutes, Wengert EBT, trial exhibit 17, Wengert EBT page 83 lines 12-14.

Cabisca describes the immediate lead up to and subsequent assault upon her by

Hogg and Prinzi at tt Cabisca page 231 line 13 to page 238 line 10. Please note

58

that after her dog was shot, and the defendants screamed at her, Hogg stated

**"She was clearly upset and rightfully so. She was clearly angry and she did not**

**want to have anything to do with us."** tt Hogg page 486 lines 4- 9. This is a clear

admission by Hogg that the Defendants mistreated Plaintiff, justifiably upsetting

and angering her, and that Hogg was aware of that fact.

**In summary, the defendants mistreated Plaintiff by battering her and**

**otherwise mistreating her, and they know they did so.**


### FORCING PLAINTIFF INTO POLICE CAR

55.   Forcing Plaintiff to go to, and enter, the police car. (If Hogg had

harbored the bizarre, belief that Plaintiff had committed a violation or crime, all

he had to do was to give her an appearance ticket**.)**  And while Wengert didn't

place Plaintiff in the car, he was responsible for its accomplishment, as Wengert

was the leader of both Hogg and Prinzi, and that act, had it been performed by

either of them, demonstrates the actor(s) were operating under malicious

mind(s) as well.

And, as Defendant officer Kaitlyn Turner noted, Plaintiff was irate until Turner herself took control of this disastrous situation and calmed Plaintiff down by simply, humanely and rationally being kind and respectful to her, trial exhibit 20, Turner EBT pages 44 line 1 to page 46 line 23, in a manner Wengert, Hogg and Prinzi were required to employ as members of the RPD, but failed to do, possibly because the minds of these three "precious friends" were somehow controlled by malice. Turner was the only one of the four who followed proper police procedures as described by Dr. Williams, and whose behavior was consistent with common decency and common sense.

Also note, in this regard Plaintiff's police expert Dr. Williams trial testimony, claims the Defendants' improperly took the Plaintiff to the ground and after failing to use proper de- escalation techniques to calm her while she was hysterical, tt Williams page 143 line 6 to page 147 line 23.

In summary, Hogg had to know he had no rational or legal reason to handcuff plaintiff and force her into a police car, and he did so only because she had the, (to him), audacity to express her anger at the Defendants' for their idiotic behavior on 9-7-16, including battering Plaintiff and shooting Bailey.

60

**USE OF ONLY AMOUNT OF FORCE NEEDED TO**

**OFFSET FORCE USED AGAINST OFFICER**

56.     Also at trial exhibit 18, Hogg's EBT he admitted at page 122 lines 19-22, that, "police procedures require officers to use only the amount of force needed to offset the amount of force used against them." (A statement that agrees with that of Dr. Williams' testimony at tt Williams page 143 lines 14-20.) When Hogg admitted he used of a straight arm bar and a two point landing he, of course, exerted far greater force on Ms. Cabisca than she had imposed against Hogg, even if she had pushed Hogg, which she, of course, denies doing.  Hogg, at tt page 488 line 19 to page 489 line 2, described the straight arm bar he used to get Ms. Cabisca to the ground, as a "defensive tactic." (But clearly, he did not need to use a "defensive tactic" against her as she was not "attacking" him, even if she touched his chest. Defensive tactics, by definition, are to be employed to protect oneself against an attack, and she did not **"attack"** Hogg.)

In addition, at trial exhibit 18,  Hogg admitted at his EBT page 122 line 23 to page 123 line 5,  that officers are trained to talk people down no matter how irate or belligerent they may be, as a first step. As noted above, clearly Wengert, Hogg and Prinzi failed to even try to talk Plaintiff down before Hogg physically took her

down. (We repeat, they didn't even ask Plaintiff if she'd left bikes on the curb for anyone to take, and defendants gave no reason for their failure to do so, the very reason they went to her house.)

In summary Hogg knew he was allowed to use only the amount of force against Plaintiff, that she had used against him, and he clearly violated this rule, as he exerted far greater force on her than she did on him.

`                        "**CRAZY NIGHT**"

57.    During his testimony at trial Mr. Flowers explained that after Ms. Cabisca was placed in the police car detective Wengert, came over to Flowers, who was still in the back of Wengert' s car, and immediately told Flowers, "It's a crazy night." And Flowers agreed with that assessment. Tt 376 lines line 6- 10, and then Wengert asked Flowers about a cell phone.

It was not until that moment that Flowers realized the cell phone theft was the real reason Wengert stopped Flowers (not the concocted stolen bike excuse). This adds proof to the fact that Wengert's "bike theft" excuse for assaulting

62

Flowers was nonsense, and that Wengert admitted that the bizarre events of that

evening were "crazy", tt page 376 lines 11-25.

Clearly the "crazy" behavior that took place that evening did not result

from actions taken by the Plaintiff, her dog or Flowers, but was instead the

"crazy" behavior created by the Defendants Wengert, Hogg and Prinzi. (A

craziness that had a cause, a cause that was probably due to maliciousness that

infected all three of the "precious friends" from about 9:30 to 10:30 pm on 9-7-

13, tt Flowers page 375 line 17 to page 377 line 8.)

In summary, we agree with Wengert's statement that it was a "Crazy

Night", but treat the statement he made to that effect as an admission that he,

Hogg and Prinzi were completely responsible for the fact that it was a "Crazy

Night."


### DEFENDANTS' OPENING

58.    Because the parties' Findings of Fact and Conclusions of Law are

required to be supplied contemporaneously, the Plaintiff does not have the

advantage she would have if her closing statement were made after that of the

63

defendant's closing argument, if oral argument had taken place. Therefore,

assuming the Defendants' Closing will be similar to their Opening, we will

comment on various statements made during that opening by Mr. Ash at this

time. His opening is found at tt 109-116.

59.    While Wengert was noted as being an officer on the rise, (tt 109 lines

11-15) there is proof set forth In this case that he made efforts to do so that may

have been beyond the pale. For example, he had no rational reason to believe

Flowers (Trial exhibit 14) has committed larceny or robbery when walking used

kids' bikes down his street.

But, that observation, could well have played into Wengert's desire to solve

the cell phone theft, of a relative of a former RPD member, a case that therefore

was a cause of special concern to members of the RPD, and whose solution

would, of course, provide an especially attractive jewel for Wengert in the eyes of

his fellow RPD officers and superiors. These circumstances gave Wengert an

excellent reason to terrify tiny Flowers into giving Wengert a statement

implicating Flowers' huge  - 6'4",  220 pound,  co-worker, neighbor and namesake

Tyrone Williams, Exhibit 14 page 1, in the commission of the cell phone crime.

Such a method of attempting to terrify and coerce Flowers into making such a

64

statement, (One Wengert may have believed Flowers would have been reluctant to make, i.e. be reluctant to squeal on Williams, under all the relevant circumstances) is almost certainly the reason Wengert concocted the silly bike robbery idea, and tried to terrorize Flowers.

60.     Mr. Ash's claim at tt 109 line 17 that Wengert actually was checking on the Plaintiff "to make sure she was okay" and that she hadn't been robbed is absurd for reasons described in this document, which need not be repeated here.

Mr. Ash's assertion (tt 109 line 23) that he grew up in the City and that "You don't see people walking two bikes unless they stole one" is grossly improper, as it's not evidence, and he conflates the area in the City where he grew up (wherever that may have been) with Kingsboro Road. I expect that assertion by Ash was unethical. See NYSBA Lawyer's Code of Responsibility DR 7-106 (C) (1) as of 2003, and current Rule 8.4 (e) (1).

61.     Mr. Ash's statement at tt 109 that Wengert's belief that Flowers stole the bikes is a "reasonable **assumption**" (tt 109 line 25) is meaningless because Wengert had to have a "reasonable **belief**" that Flowers stole the bikes to justify

his arrest of Flowers, (not just an "assumption") and, as described heretofore in this document, Wengert certainly had no grounds for such a "belief"

Mr. Ash's statement at tt 110 lines 7-9 that Kingsboro Road was known for burglaries and larcenies was not supported with documentary proof. His failure to provide such proof, demonstrates the City had no such proof, and, of course, couldn't provide it because Kingsboro Road was not an area where burglaries and larcenies were common occurrences.

Mr. Ash's assertion (tt 110 lines 13-15) that Wengert called Hogg and Prinzi to "verify" Ms. Cabisca's story has no support in the record. (In fact Wengert testified at his EBT Exhibit 17 page 42 lines 4—17 that he, instead, called for the assistance of Hogg and Wengert to assist him in transporting Flowers to the location where Flowers obtained the bikes.)

62.    Mr. Ash's assertion (tt 110 line 22 to page 11 line 2) that Wengert went down and up the porch stairs before shooting Bailey, ignores Wengert's statement to Sergeant Rivers that he did not do so, and it conflicts with the versions of the other witnesses to the shooting event.

Mr. Ash's assertion at tt 111 lines 3-8, that plaintiff told a person at the hospital that her dogs were running is hearsay, and not protected by any

exception, because it is not a medically related comment. Hospital workers have

no incentive to be accurate about facts that are not directly relevant to treatment

of a patient and such assumptions – like the fact that the dogs were "running"

made by medical personnel can often be incorrect. (The author of that report may

have just assumed the dog was "running.")

63.     Mr. Ash's statement at tt 111 lines 17-18, that the bullet was lodged

in the top of the stairs, makes little logical sense, if Wengert's version of the

events were true. Certainly if Wengert shot the dog in its front as it came up the

stairs, the bullet would have gone through the dog and into the driveway or into

the next door neighbor's house, not into the top of Plaintiff's porch. And without

anyone to lay a foundation as to the accuracy of the photos, as to where, and

when they were taken, those photos have no meaning or relevance at this trial.

We repeat the assertion about lack of foundation to Ash's statements at tt page

111.  For example, we don't know if the dog was moved after it was shot, if the

substance shown on the stairs, (which may, or may not, be blood); was carried up

the steps by people walking up the stairs before the photos were taken, or many

other facts that would make the Defendants' photos meaningful or relevant. (The

only photo defendants placed in evidence that was supported with a factual

67

foundation is the photo of the Plaintiff in the police car, which Plaintiff herself

identified, Exhibit 419.)

At tt 112 lines 6-11 Mr. Ash claims records will be shown about a postal

carrier and one of the Plaintiff's dogs. But no such records were produced at trial,

indicating no such records exist, or that if they do exist, they contradict Mr. Ash's

assertion about their relevance, and therefore he did not try to admit them.

64.     Mr. Ash's comments at tt 112 lines 16-22, noting that the most

egregious and outrageous part of this case was that Plaintiff actually saw officers

and opened her door and let a 100 pound terrier run towards the officers. This is

nonsense for several reasons. There was no "terrier," and no dog weighed 100

pounds. (Plaintiff claimed they each weighed about 65 pounds, and were two

boxers and a border collie.) Also the record, as noted above, shows that Plaintiff

saw, not police officers, but lights emitted by first responders, and because of her

electric fence, she knew none of her dogs would go more than a foot, or so,

beyond her porch, therefore none would reach any first responders, standing in,

or near, the street. (She was acting responsibly, as a nurse, trying to help anyone

who might have been injured, and responsibly as a dog owner by containing her

dogs with the electric fence.)

68

(Please note my comments above about the size of the dogs when reading

Mr. Ash's comment at tt 113 lines 9-10, that Plaintiff had 300 pounds of animal

running around.)

65.    Mr. Ash's statement that the police needed to secure the scene after

an officer shot the dog, (tt 113 line 13) makes no sense. Had a criminal done the

shooting, securing the scene would have made sense, but the shooting was

committed by officer Wengert. Furthermore securing a scene requires placing

yellow crime scene tape around the crime scene area, and Defendant's own

photo, Exhibit 415, (assuming it is accurate) shows that no such tape was used to

secure the crime scene. The crime scene was not secured.

As stated repeatedly in this document, and contrary to Ash's statement at

tt page 114 line 16, even if Plaintiff did everything Ash claims she did, Hogg had

no right to assault her, by using defensive tactics, such as a straight arm bar and

two point landing, as he did not need to do anything to address her approaching

him, except place his stronger hands (attached to his longer, stronger arms) on

Plaintiff's shoulders to prevent her from pushing him.

66.    Also at tt page 115 lines 3-5 Ash speaks of Hogg allowing Plaintiff to

enter her home alone, without police accompaniment. Certainly Hogg would not

69

have allowed her to do that if Hogg wasn't convinced that she posed no danger to anyone, including the police themselves.

### DEFENDANT'S EVIDENCE

We will address only selected parts of the Defendants' evidence.

67.    With respect to the photos Exhibits 415-417, 419 and 420, please note they were not authenticated by anyone, except that 419 was authenticated by the Plaintiff as a photo of herself, barefoot, wearing a T–shirt, and shorts and handcuffed in a Police car, tt page 215 lines 2-24 and page 308 lines 15-17.

The defendants did not address any of those photos, let alone identify them. Mr. Ash specifically did not ask his two witnesses, Hogg or Prinzi, to look at or identify them, and he called no other witness to do so either.

68.    Instead these exhibits were used almost exclusively by Mr. Ash, and on cross examination of Dr. Ewing at pages 52, 53, 54, 56 57, 58, 59, and on cross examination of Dr. Williams at pages 153,154,161,164, 165,167,176, and 177. But

neither Dr. Ewing nor Dr. Williams saw the Plaintiff's property at any time, let alone on 9-7-13, and therefore did not, and could not, authenticate the Defendants' photos.

Plaintiff addressed one or more of those photos at redirect of Ewing at page 71, and on direct of Williams at page 149. Defendant addressed Exhibit 415 to Flowers on cross, tt page 388 line 8 to page 389 line 21, where Flowers noted the dog was about 5 feet from the porch when the dog was shot, but the dog was only about 2 feet from the porch in Exhibit 415. This discrepancy demonstrates that the photos did not accurately depict the scene as of the time of the event, and, we contend, should be ignored by the Court even though they were admitted in evidence. Our point here is that none of these photographs were identified by any witness in a manner to qualify then as admissible evidence – Specifically no one testified when they were taken, or where they were taken, or if they accurately depicted the scenes they were meant to depict, and therefore have no probative value.

69.    Also please note that none of the Plaintiff's expert witnesses were rebutted in any way. No one took the stand as an expert psychologist, or psychiatrist, to dispute the testimony of eminently qualified Dr. Ewing. And no

71

one testified as an expert in police procedures to refute the testimony of

eminently qualified Dr. Williams. Certainly none of the Defendants qualified as

experts in police practices, or in any other field.

70.    Furthermore, as noted above, the defendants produced a great deal

of evidence that contradicted both testimony given by each other, such as: (a)

The number of charging dogs –Prinzi said two, others said three; (b) Wengert's

remaining on, or going off, the porch - Wengert himself gave two completely

different version of that issue; ( c) The identity of the police car that carried

Flowers from 35 to 207 Kinsgsboro Road, (Flowers and Wengert said it was

Wengert's, while Prinzi and Hogg said it was Prinzi's.) The record contains many

such examples of conflicts between the testimonies of the Defendants.

71.    And the defendants provided evidence that contradicts reality, such

as the fact that their version of the dog shooting violates the Tueller 21 foot rule,

as no one, including no police officer, had the time to recognize the threat of the

a charging dog, extract his weapon from its holster, unleash the safety lock, and

aim and shoot a running, attacking dog before being attacked by such a dog over

such a small distance.

And the Defendants alleged inability to tell the Plaintiff why they went to her home, even though at least one of them admitted she'd asked them why they came to her house.

**CONCLUSIONS OF LAW**

**POINT I**

**THE EVIDENCE IS OVERWHELMING THAT PLANTIFF SHOULD BE AWARDED**

**JUDGMENT ON HER THIRD CAUSE OF ACTION IN**

**FALSE ARREST/FALSE IMPRISONMENT**

We will rely heavily during portions of this Conclusions of Law on the Court's decision on the Summary Judgment Motion brought by the Defendants, on causes of action that survived that Motion, Docket 45. Those portions cited from Docket 45 are italicized, to separate them from arguments prepared by Plaintiff's counsel for this document. At times I don't italicize the citations, because I changed them from the citations of the Exhibit numbers relied upon by the Court in its decision on the Summary Judgment motion, and replaced them with the trial Exhibits numbers. I believe it is appropriate to do this because the deposition testimony of the parties relied upon by the court are in the record of this trial.

The following italicized language is from Document 45.

*FROM Summary Judgment JUDGE'S ORDER DOC 45 False Arrest: Federal claims of false arrest implicate the Fourth Amendment right to be free from unreasonable seizures. See Posr v. Doherty, 944 F.2d 91, 97 (2d Cir. 1991). A§ 1983 claim*

73

alleging **false arrest** is "substantially the same" as the tort under New York state law, and thus the Court analyzes both state and federal claims together. Id. at 96. "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (citing Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). "The existence of probable cause to arrest Constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under§ 1983." Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) (quoting Broughton v. State, 37 N.Y.2d 451, 456-57, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975) (additional internal quotation omitted).

Defendants contend that there was probable cause to arrest plaintiff for harassment and resisting arrest. "Probable cause exists when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" Curley v. Village of Suffern, 268 F.3d 65, 69-70 (2d Cir. 2001) (quoting Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (additional

74

*internal quotation omitted) Harassment in the second degree occurs when, "with*

*intent to harass, annoy or alarm another person," someone "strikes, shoves,*

*kicks or otherwise subjects such other person to physical contact, or at tempts or*

*threatens to do the same." N. Y. Penal Law § 24 0. 26 (McKinney). Resisting arrest*

*requires "intentionally prevent[ing]or attempt[ing] to prevent a police officer or*

*peace officer from effecting an authorized arrest." (McKinney)*

*In seeking summary judgment, N.Y. Penal Law § 205.30 defendants rely on*

*the deposition testimony of Officers Wengert, Hogg and Prinzi. Wengert described*

*plaintiff as being "completely uncooperative, yelling, screaming, flailing her arms*

*around and just yelling a variety of insults towards the officers." Wengert Dep.,*

*Ex. "B" attached to Def.'s Mot. for Summ. J. (Docket# 18-1) at 25. According to*

*Wengert, plaintiff was irate and yelling, and "physically shoved Officer Hogg in*

*the chest causing him annoyance and alarm." Id. at 26-27. After Officer Hogg*

*"escorted her to the ground," plaintiff was "struggling, yelling and screaming and*

*swearing, and essentially trying to push herself up and not cooperating with*

*being handcuffed." Id. at 27. Officer Hogg testified that plaintiff "charged towards*

*me" and then "pushed me in my chest area" whereupon he "escorted her to the*

*ground." Hogg Deposition trial Exhibit 18 at 47. Officer Prinzi testified that*

*plaintiff "approached Officer Hogg and with both hands pushed his chest." **Prinzi***

75

***Dep.,*** *trial Exhibit 19, page 60 Plaintiff's recollection of the physical contact between her and Officer Hogg was different. According to plaintiff, she had come out of her house and witnessed her dog shot by a man who was not dressed like a police officer. Her pet was still alive and bleeding on her driveway, while the man who shot her dog continued* **to point his weapon at her.** *I think at that point I was just terrified to see that I had somebody on my porch pointing a gun at me. And I don't know who he is. And he doesn't have a uniform on. He doesn't look like a cop. And he just shot my dog and now he has a gun on me.* Cabisca EBT, Exhibit *408 at 32. Plaintiff testified that she also observed two uniformed police officers with weapons also pointed at her, and she repeatedly asked them to "help me with my dog." The officers then directed her to "come here" and she responded: "I'm not going to step off my property with you. You came to my house and did this. You need to tell me what you're here for."  At 33. According to plaintiff, the officers refused to explain to her why they were on her property and why they had shot her dog.*

*Plaintiff acknowledged that she became "heavily irritated."*

*"I didn't come out there, you know, looking for bear. I came into a situation that was created at my home not by me. I feel that minimally I should have been given basic information. They don't do that, my tone became extremely different."* Exhibit *408 page 36.  At this point one of the uniformed officers told plaintiff that if she*

*"didn't cooperate with him, that I would be arrested."* Exhibit 408 page 35.*Plaintiff told the officers that she was not leaving her property: "You came to my house and did this. You need to tell me what you're doing here and you need to tell me who you **are**.* Exhibit 408 page 33. *After receiving no response, plaintiff put her hands straight out and said to the officers, "[y]ou need to step back and get away from me."* Exhibit 408 page 39 lines 22-24 *According to plaintiff, one of the uniformed officers then said "that's it," and came towards her. The approaching officer "put his left chest in my left hand and said, 'You touched me. That's illegal. You're going to jail.* Exhibit 408 pages 39-40.*Plaintiff testified that when she tried to get away from the officer, he "grabbed me, threw me around, and threw me to the ground. Two officers on top of me. Two. Two adult men on top of me. One with his elbow in my ribcage and the other one on the other half of me." Id. Plaintiff testified that the "man who shot the dog" then "told them to get off of me" and they did. Id. at 35. At that point, plaintiff went into her house to check on her children and call her family.*

**PLAINTIFF'S PREPARED ARGUMENTS IN FALSE ARREST**

The following is written by Plaintiff's counsel in support of her contention that a verdict should be granted pursuant to Plaintiff's Third Cause of action in False Arrest.

New York State Pattern Jury Instructions, the 2005 version, are used throughout these arguments, and are described simply as PJI, with the appropriate section number.

With respect to False Arrest and False Imprisonment PJI 3:5 states in the third paragraph of the Charge that the, "Burden is upon the defendant to prove by a fair preponderance of the evidence that he had reasonable cause for believing that the crime" – in this case Harassment, a violation, and Resisting Arrest, a misdemeanor – "had been committed and that plaintiff was the person who committed it" – in this case, "them")

Clearly based on this record, the defendants cannot, as a matter of law, meet that burden, as it is clear that the defendants did not have any evidence, let alone, "a fair preponderance of the evidence" to provide any of the individual

defendants with "reasonable cause for believing" Ms. Cabisca had committed any violation or crime.

Clearly the evidence now before the Court demonstrates conclusively that the criteria described in the second paragraph of the Commentary of PJI 3:5 are met. They are "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged" (She was taken to the ground, and later handcuffed, and carried to and placed in a police car)

This Cause of Action includes False Imprisonment as well. Those causes of action are treated as one in the title of PJI 3:5. The False Imprisonment took place when the defendants followed up their False Arrest, by handcuffing plaintiff, and carrying her to a police car where she was kept in handcuffs until released sometime later.

Under New York law, "because a cause of action for false arrest is Essentially the same tort as false imprisonment"; they can be analyzed as one Cause of Action. See *Mitchell v Home*, 377 F. Supp. 2d 361 at 376 (S.D.N.Y. 2005) and *Mejia* v *City of New York*, 119 F. Supp. 2d 232 E.D.N.Y. 2000  at

252, "Under New York law, false arrest is considered to be a species of false

Imprisonment."

Also please note that the Comment section of the PJI 3:5 (at page 51 of

Volume 2 of the Second Edition 2005) states that punitive damages in a False

Arrest action can be awarded against the individual defendants upon a showing

that the defendant, "acted recklessly, willfully, wantonly or maliciously." We

contend the evidence is clear that the individual defendants met all four of those

standards, even though only one of them need be met to award punitive

damages.

Plaintiff has the right to obtain Punitive damages against the individual

defendants in their individual capacity. *New Windsor Volunteer Ambulance Corps*

*Inc. v Meyers*, 442 F. 3d 101 (2d Cir.2006) at 122.

In conclusion we contend the Plaintiff's version of these events when

combined with the corroboration of trial testimony of Tyrone Flowers, and the

bizarre, frequently incredible testimony, produced at both the depositions and

trial of the defendants clearly show Plaintiff has succeeded in sufficiently proving

her Cause of Action in False Arrest and/or False Imprisonment against the

Defendants, especially against Hogg and Prinzi.

## POINT II

## THE EVIDNECE IS OVERWHELMING THAT PLANTIFF SHOULD BE AWARDED

## JUDGMENT OF HER FOURTH CAUSE OF ACTION IN

## MALICIOUS PROSECUTION

The following is based on the Court's language in Docket 45 on the

Malicious Prosecution Cause of Action.

*Malicious Prosecution: In order to prevail on a claim of malicious*

*prosecution under§ 1983, plaintiff must establish the elements of malicious*

*prosecution under state law. Thus, in New York, "a plaintiff is required to*

*demonstrate: (i) the commencement or continuation of a criminal proceeding*

*against her; (ii) the termination of the proceeding in her favor; (iii) that there was no probable cause for the proceeding; and (iv) that the proceeding was instituted with malice." Mitchell v. City of New York, 841F.3d 72, 79 (2d Cir. 2016) (internal quotations omitted).*

*Plaintiff has satisfied the first two elements by providing proof of the dismissal of both charges against her. See Docket# 36-1; Mitchell v. New York, 841 F.3d at 79 (proceeding terminated in plaintiff's favor where District Attorney declined to prosecute her). As discussed above, there are issues of fact as to the existence of probable cause for plaintiff's arrest. Thus, the defendants' motion for summary judgment necessarily hinges on whether plaintiff can show that the defendants acted with malice.*

*To demonstrate malice, "a plaintiff must show that the defendant acted in bad faith, i.e., on the basis of 'a wrong or improper motive, something other than a desire to see the ends of justice served."' Watson v. United States, 865 F.3d 123, 134 (2d Cir. 2017) (quoting Torres v. Jones, 26 N.Y.3d 742, 761, 47 N.E. 3d 747 (2016) (additional citations omitted)). **"In most cases,** the lack of probable cause - while not dispositive - 'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause. '" Lowth v. Town of Cheektowaga, 82 F. 3d 563, 573 ( 2d Cir. 1996) (citation omitted); see also Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003)*

82

*("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well. <u>A lack of probable cause generally creates an inference of malice.</u>").*

Having found an issue of fact as to probable cause, I find that the existence of malice is also an issue of material fact. Plaintiff has testified that she did not resist arrest, but that Officer Hogg purposely caused her hand to touch his chest. Once that contact took place, plaintiff claims that Hogg threatened that her "kids are going to CPS and you're going to jail," and then tackled her to the ground. Construing all inferences in a light most favorable to plaintiff, **a jury could reasonably find that the defendants were annoyed or angry with her attitude and objections to their conduct, and that there was a malicious prosecution of plaintiff.** See Lowth v. Cheektowaga, 82 F.3d at 573 (plaintiff had suggested malice on the part of the police officer who may have been angry for what plaintiff "had put him through")

The following was written by Plaintiff's counsel in support of Plaintiff's contention that a verdict should be granted pursuant to Plaintiff's Fourth Cause of action in Malicious Prosecution.

PJI 3:50 sets forth the criteria for a cause of action in Malicious Prosecution, beginning at page 436 of Volume 2 the Second Edition of the PJI 2005.

The charges against the plaintiff were dismissed by the Court after the plaintiff's criminal counsel asked the Court to dismiss the matter. (The case was not adjourned in contemplation of dismissal.)

The evidence described in the record before this Court demonstrates that the prosecution was initiated by the defendants without probable cause for the violation of Harassment Second Degree, and therefore there was no probable cause for arresting plaintiff for the crime of Resisting Arrest. (As noted previously in this document), even if plaintiff "shoved" Hogg, the police had no grounds under the circumstances to believe plaintiff did so "with intent to harass, annoy, or alarm" Hogg, as is required for a conviction of PL 240.26, Harassment 2nd degree. After all, the plaintiff was 52 years old, barefoot, wearing shorts and a T-shirt, unarmed, 5' 2" 160 pound and female, while Hogg was 41 years old, male, carrying a gun, wearing shoes or boots, whose his 6' 1" tall partner had just killed

84

plaintiff's dog, and the three individual defendants had shocked plaintiff to her core by their unexplained presence. Each of the other two uniformed officers were armed with guns, male, younger than Hogg, and at least six feet tall. The evidence is conclusive that the arrest for Harassment was done for malicious purposes by the defendants, almost certainly in a frantic attempt to provide some excuse, no matter how lame as cover, for their gross mistreatment of plaintiff. Even if every fact the defendants assert were to be considered true for the purpose of this motion, the proof demonstrates no reasonable grounds exited to make a reasonably prudent person believe the plaintiff was guilty of Harassment Second Degree, and therefore defendants clearly committed Malicious Prosecution of the plaintiff. Clearly, if plaintiff "shoved" Hogg, she did so in a desperate effort to keep these men, she reasonably viewed, at the time as killers and trespassers, who had no justifiable reason to be on her property, who'd shot her dog and pointed guns at her, at 10 pm, and refused to tell her why they were at her home and acting in such an outrageous manner.


    We contend the Plaintiff's version of these events when combined with the corroboration of trial testimony of Tyrone Flowers, and the bizarre, frequently

85

incredible testimony, at the depositions and trial of the defendants, clearly show

Plaintiff has succeeded in proving to a sufficient extent her Cause of Action in

False arrest against the Defendants, especially against Hogg and Wengert.


**POINT III**

**THE EVIDENCE IS OVERWHELMING THAT PLANTIFF SHOULD BE AWARDED**

**JUDGMENT OF HER CAUSE OF ACTION FOR THE SHOOTING**

**OF HER DOG PURSUANT TO SECTION 1983**


The following, in italics, is from the Court's Decision, Docket 45:

*The Plaintiff alleges a cause of action arising from the shooting of*

*her dog by the police, due to the Defendants' violation the Fourth Amendment. The*

*Second Circuit, along with "a number of our sister circuits," has concluded that*

*"the unreasonable killing of a companion animal constitutes an unconstitutional*

*'seizure' of personal property under the Fourth Amendment." Carroll v. County of*

*Monroe, 712 F.3d 649, 651 (2d Cir. 2013) (citations omitted). As the court stated*

*in Carroll, To determine whether a seizure is unreasonable, a court must "balance*

*the nature and quality of the intrusion on the individual's Fourth Amendment*

*interests against the importance of the governmental interest alleged to*

*justify the intrusion" and determine whether "the totality of the circumstances*

*justified [the] particular sort of ... seizure." Tennessee v. Garner, 471 U.S. 1,*

*8-9 (1985) (internal quotation marks omitted). We have long held that the plaintiff*

*has the burden to prove that a seizure was unreasonable. See Ruggiero v.*

*Krzeminski, 928 F.2d 558, 562-63 (2d Cir. 1991).Id. In Carroll, the court found*

*that shooting a family dog is "a severe intrusion given the emotional attachment*

*between a dog and an owner. 11 Id. However, the court al so noted that "in some*

*circumstances, it is reasonable for an officer to shoot a dog that*

*he believes poses a threat to his safety or the safety of the community." Id. (citing*

*Altman v. City of High Point, N.C., 330 F.3d 194, 205-06 (4th Cir. 2003); Brown*

*v. Muhlenberg Tp., 269 F.3d 205, 210-11 (3d Cir. 2001)). Ultimately the court in*

*Carroll 22 did not disrupt the jury's verdict that the defendant-officer was*

*reasonable in shooting the plaintiff's dog while executing a search*

*warrant.*

*Because there are critical facts in dispute here, it is for the jury and not this*

*Court to decide whether Investigator Wengert's conduct in shooting the dog was*

*reasonable. For example, the parties' accounts differ substantially over the point at*

*which plaintiff's dogs came outside. Wengert testified that as he was waiting on the*

87

*front porch after ringing the doorbell and knocking, he heard a door open on the side of the house. He walked off the porch to come around the corner, and "was shocked to see multiple dogs, no people, and then the dogs charging up the driveway." Wengert Dep*, Exhibit 17, Wengert EBT page 54. ".

(However, Plaintiff contends that this is only one of Wengert's versions of the event. Another version was given by Wengert to Sergeant Rivers on the night of the event. That version did not claim Wengert went down and up the porch stairs before he shot the dog, Trial Exhibit 17. Instead it claims Wengert was still standing on the porch when the dog charged at Wengert and when Wengert shot it. Wengert EBT Pages 32-33.)

*Plaintiff's recollection is considerably different. She testified that she observed police lights outside other house and then she saw a flashlight in the back of her house. She opened the side door to see if anybody was outside, and Bailey, the dog, "stepped out"* page 23 line 22,*"a couple feet ahead of"* her. *Cabisca* deposition trial Exhibit 408. *The parties' accounts also diverge on the circumstances leading up to the shooting of the dog. Investigator Wengert described that* **two** *large dogs were running down the driveway towards Wengert, but one of them turned aggressively up the porch stairs at him, "charging up."* **One** of the dogs continued towards Wengert, Trial Exhibit 17**,** at page 32 line 24 to page 33 line 5 before Wengert took steps backwards, (This version is from Sgt.

Rivers' account of the event as it was described to Rivers by Wengert on the night of the event, and notes at page 33 line 1-2 that Wengert was "**still standing** on the front porch"). Then Wengert *backed into something, and fired his handgun at the dog twice. Plaintiff disagrees that the animal posed any danger to Wengert, stating that the dog was just a few feet ahead of her when Wengert shot it. Specific facts matter in determining reasonableness under the Fourth Amendment. In Brown v. Muhlenberg Township, the court held that police may not be justified in "destroy [ing] a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody." 269 F.3d at 211. In Altman v. City of High Point, the court concluded "that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance." 330 F.3d at 206. A jury could reasonably determine that plaintiff's pet dog presented no immediate danger to the officers and that the animal was not uncontrolled and unsupervised when it was shot by Wengert.*

We contend the Plaintiff's version of these events when combined with the corroboration of trial testimony of Tyrone Flowers, and the bizarre, frequently incredible testimony, of the depositions and trial of the defendants clearly show

89

Plaintiff has succeeded in proving her section 1983 Cause of Action for shooting Plaintiff's dog, especially against the Estate of Wengert**.**

## POINT IV

## THE EVIDENCE IS OVERWHELMING THAT PLANTIFF SHOULD BE AWARDED JUDGMENT OF HER CAUSE OF ACTION FOR EXCESSIVE FORCE USED UPON PLAINTIFF HERSELF PURSUANT TO SECTION 1983

Again, the italicized version below is from the Court's Docket 45:

*Excessive Force: Plaintiff's seventh causes of action alleges that defendants used excessive force in violation of the Fourth Amendment while executing their arrest. The elements of such a claim are well established: The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest. Because the Fourth Amendment test of reasonableness is one of objective reasonableness, the inquiry is necessarily case*

*and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. In conducting that balancing, we are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3 whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (internal quotations and citations omitted)* Defendants asks for Judgment in her favor on the excessive force *claim, stating that "Plaintiff was taken to the ground with minimal force after she admitted ignoring lawful orders, and 'trying to get away' after she was told she was under arrest."  Defendants also argue that the officers have* **qualified immunity** *as a matter of law against plaintiff's excessive force claim.*

*According to plaintiff, after her dog was shot, the officers told her to come towards them and to step away from the dead dog. Plaintiff claims she asked the officers what they were doing and what was going on. The officers then told plaintiff that if she did not comply with them, she would be arrested. Id. Plaintiff had her two small grandchildren asleep inside, and did not want to leave them alone. The officers again told plaintiff that she needed to step away from the dog and come with them, and she told them to "step back and get away from" her,*

91

*putting her hands straight out in front of her. Id. at 34. According to plaintiff, one of the uniformed officers said "that's it," and came up to plaintiff and "put his left chest in [her] left hand and said 'you touched me. That's illegal.'" Id. Plaintiff says the officer then "grabbed" her, "threw" her "around like a rag doll," and the two ended up in her lawn. Plaintiff testified that she "tried to get away from him," and he "grabbed" her, "threw" her around, and "threw" her to the ground. She stated that then there were two officers on top of her, "one with his elbow in [her] ribcage and the other on the other half" of her. Id. Plaintiff said that she told the officers that she was asthmatic and could not breathe. In response, the officers told to her to stop moving, which she did, and then they got off of her. Id. at 35. The fact that the defendants recall the encounter differently than plaintiff only pays tribute to why issues of fact often permeate excessive force claims. See, e.g., Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999) ("The issue of excessive force also was for the jury, whose unique task it was to determine the amount of force used, the injuries suffered and the objective reasonableness of the officer's conduct.").*

The following constitute Plaintiff's counsel's argument in favor of Plaintiff's claim that excessive force was used upon her.

The criteria set forth in New York PJI 3:60 to constitute a cause of action pursuant to 42 U. S. C. § 1983 are all met in the facts set forth before the Court. Criteria (1) is – Were the defendants acting under the color of law? The answer is undoubtedly "Yes". They were acting as Police Officers of the City of Rochester. Criteria (2) is - Did the defendants' conduct violate a right protected by the United States Constitution? The answer to that question is also clearly "Yes". In fact the defendants violated two of the Plaintiff's rights under the Constitution - The right not to be subjected to excessive force pursuant to the 14th Amendment to the Constitution, PJI 3:60 (3), and the right to exercise free speech pursuant to the 1st Amendment (2).

It would be a natural reaction for a shocked, irate, terrified plaintiff, like Ms. Cabisca, to yell at the officers after they shot her dog, pointed guns at her, and refused to explain to her why they were on her property and why they had shot her dog.

There is no reason why the officers did not treat the plaintiff with proper, accepted police techniques (let alone basic human decency and common sense) to address her anger, and fears, and to reduce her fury. Instead these much younger, stronger, and larger men physical attacked her, violating her civil rights to be free from excessive force.

93

The third criteria set forth in PJI 3:60 to establish a cause of action pursuant to 42 USC § 1983 is proof of damage. The plaintiff suffered significant damages, including, but not limited to, severe physical pain, requiring hospitalization at a hospital Emergency room, treatment by her primary care physician, and intense, permanent psychological pain, including post -traumatic stress disorder.

It is clear that all the defendants are liable to the plaintiff for compensatory damages.

The Comment of PJI 3:60 at page 580 of the 2005 edition demonstrates that the individual defendants, Hogg and Prinzi are subject to punitive damages as well, as they clearly were motivated by either (a) evil motives or intents, and/or (b) acted with reckless or callous indifference to plaintiff's federally protected rights. The PJI cites Smith v Wade 461 US 30, 103 S Ct 1625, 75 L. Ed 2d 632. (Page 580 of Volume 2 of the Second Edition, 2005) (We acknowledge Wengert's Estate is not subject to pay punitive damages.)

Furthermore the Comment to PJI 3:60 claims that **attorney's fees** may be awarded to the prevailing party (Page 581 of the Second Edition 2005).

In fact the evidence before the Court demonstrated in this trial  show that the defendants batteries were excessive, based only upon the evidence submitted by the  defendants themselves, (even if plaintiff had "shoved" Hogg) with respect to

94

batteries Hogg and Prinzi performed upon the plaintiff herself , are patently grossly excessive.  Please note they were excessive even if plaintiff had committed the violation (not crime) of Harassment, PL 240.26. (But, in any event she didn't commit that violation because a "shove" doesn't constitute a violation of PL 240.26 unless the "shove" was performed to, "harass, annoy or alarm" Hogg. Certainly under the circumstances of this case, after plaintiff's dog was shot and killed, any shoving she may have committed was to keep these police from further terrorizing her, and to protect her from their committing any more injures to her, her other dogs, or her property, and not performed to "harass, annoy or alarm" Hogg or anyone else.)

Also there is no reason why any of the officers should be protected by qualified immunity. Mr. Ash has argued that Prinzi should receive that protection because he was assisting Hogg when he got on top of Plaintiff's lower body, and claims the case of McKnight v Vasile 2017 WL 1176051 is support thereof. However, as noted in Plaintiff's Objection to Plaintiff's Rule 50 motion, the cases are distinguishable, and the McKnight rule does not apply here. In McKnight the officer who went to help Vasile arrest that Plaintiff, did so assuming Vasile was making a proper arrest, and had no reason to suspect otherwise. In this case, on the other hand, Prinzi was present and saw the entire engagement between Hogg and

95

the Plaintiff, and had to know Hogg's actions violated section 1983, and should not
be protected from his piling on to Plaintiff's small body with his large body.

We ask the court to review the testimony of Dr. James Williams specifically
those portions addressed in the accompanying Findings of Fact, including his
statement (Agreed to by Hogg at his EBT, Exhibit 18 page 122 lines 19-22) that,

**"Police officers are trained to use that amount of force that is**

**necessary to offset the amount of force being used against him.",**

and Dr. Williams' contention that the three large, armed, trained, young officers
were clearly able to easily control  the 52 year old , 5' 2", unarmed, barefoot
Plaintiff.

"Under the law, police are not permitted to use any degree of force in all
instances – in some circumstances, no use of force is reasonable because none is
required." *Weather v City of Mount Vernon 2011 WL 1046165,aff'd.  474 F. App
821 (2nd Cir, 2012.at page 11.* Accordingly, the actions of the officers must be
judged against the purported justification for the use of force under the
circumstances and a defendant may be liable if, "The force used exceeded the force
needed for the factual circumstances." *Graham v City of New York, 928 F.Supp.2d*

96

*610 (E.D.N.Y. 2013)* at 618, this is particularly true where the circumstances of the encounter suggest that the officer, "gratuitously inflicts pain in a manner that is not a reasonable response to the circumstances." *Phelan v Sullivan*, 541 F. App 21 (2nd. Cir 2d 2013) at 25; and *Lemmo v Mc Koy,* 2011 WL 843974 (E.D.N.Y. 2011) at page 6. "Although the Graham test does not consider the subjective intent of the officer's per se, ….. the intentional, gratuitous uses of force that are not required to subdue an individual likely fail the *Graham* objectionable, unreasonable test."

Further, although the "absence of any injury, however slight of fleeting," is an indication that the force used was de minimis, *Jennejahn v Village of Avon* 575 F. Supp 2d 473 (W.D.N.Y. 2008) at 480 to 481, the absence of a serious injury is not dispositive of the claim. See *Davenport v County of Suffolk* 2007 WL 608125 (E.D.N.Y.) at page 10. "A plaintiff need not sustain severe injury to maintain a claim that the use of force was objectively unreasonable." *Yang Feng Zhao v City of New York* 656 F. Supp. 2d 375 (S.D. N.Y., 2009) "The Second Circuit has indicated that a very minimal injury is sufficient to trigger a potential liability for excessive force"

Surely all Hogg had to do, if plaintiff did shove him, was to place his arms on her shoulders and move her gently away from him. Certainly his arms are longer and stronger than hers, and had he made this simple, reasonable effort, she

97

would not have been injured, or arrested. And, of course, he was **required** to treat

her with same type of respect and kindness his fellow officer Kaitlin Turner did,

which de-escalated the situation by calming plaintiff down.

Also please note the Harassment and Resisting Arrest charges placed against her

were not Adjourned In Contemplation of Dismissal. They were fully dismissed by the court

When plaintiff appeared before the City Judge with her attorney.

We contend the Plaintiff's version of these events when combined with the

corroboration of trial testimony of Tyrone Flowers, and the bizarre, frequently

incredible testimony, of the depositions and trial of the defendants clearly show

Plaintiff has succeeded in proving her section 1983 Cause of Action for their

mistreatment of Plaintiff herself.

**POINT V**

**SUMMARY JUDGMENT SHOULD BE GRANTED PURSUANT TO**

**PLAINTIFF'S SECOND CAUSE OF ACTION IN BATTERY**

The Court did not address the Battery cause of action in Document 45, because the Defendants did not make a motion to dismiss this cause of action. The following is Plaintiff's argument solely.

PJI 3:4 describes the criteria for a cause of action in Battery Committed in Performance of Public Duty or Authority. We contend that as a matter of law it was not reasonable for either defendant to believe plaintiff had committed the **violation** of Harassment, (as noted heretofore in this Memorandum) and they therefore had no right to attempt to arrest her, and therefore they had no basis upon which to determine she was Resisting Arrest. Furthermore, the use of the amount of force applied upon her was grossly excessive and unreasonable, even if there had been a reasonable basis to conclude she, (a 52 year old female, 5' 2" tall weighing 160 pounds, possessing no weapon and barefoot, vs Hogg, a 41 years old armed, shoe or boot wearing, male, 6 feet tall and weighing 195 pounds) had committed the **violation** (not even a crime) of Harassment second degree 240.26 of the New York Penal Law. Certainly the officers could have, and as police almost always do, should have, (if she had committed a violation – which she hadn't) issued an appearance ticket to her, under these circumstances for this violation, and not wasted their time battering, handcuffing, and placing plaintiff in a police car.)

99

Certainly the physical attacks upon the plaintiff under all these circumstances were motivated by malice.

Please note again the last paragraph in the section preceding this paragraph, addressing the report and testimony of Dr. Williams.

**POINT VI**

**A JUDGMENT SHOULD BE GRANTED TO PLAINTIFF IN GROSS NEGLIGENCE PJI 2:10 A, OR IN THE ALTERNATIVE, IN STANDARD NEGLIGENCE PJI 2:10.**

While the Complaint does not specifically set out a cause of action in either Gross Negligence PJI 2:10A, or in the alternative in Standard Negligence, PJI 2:10, the facts set forth in the record in the EBTs which took place in April 2016 and in the trial clearly set forth a cause of action in Gross Negligence, or in the alternative in Standard Negligence, and we ask the court, pursuant to FRCP 15 (b) (2) to make a finding against Wengert for Gross Negligence, or in the alternative in Standard Negligence against Plaintiff for pointing a gun at her and terrifying her. In order to prove a cause of action in Gross Negligence, or in the alternative

in Standard Negligence plaintiff must prove the following, all of which were proven in this lawsuit.

PJI 2:10A provided two alternate definitions of Gross Negligence. While Plaintiff need prove only one of those two, we contend plaintiff proved both, and we ask the Court to find Defendant Wengert to have committed one or both of them. The first definition is, "Gross Negligence means a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others."

The second is, "Willful misconduct occurs when a person intentionally acts or fails to act knowing that his conduct will probably result in injury of damage. Willful misconduct also occurs when a person acts in so reckless a manner or fails to act in circumstances where and act is clearly required, so as to indicate disregard of the consequences of his action or inaction."

Wengert was Grossly Negligent by assuming Tyrone Flowers, - who, when Wengert first encountered Flowers, knew Flowers had no record for any crime such as larceny, because Wengert had already obtained that information when researching the cell phone theft, and therefore Wengert had no grounds to believe Flowers had stolen the bikes he was walking down his own street.

101

Therefore Wengert had no legal grounds to go to the Plaintiff's home to investigate a purported crime he had to know was bogus. Wengert followed up this foolishness by ignoring Flowers' comment that Plaintiff had dogs, and by not going to the Brantly home to discuss this matter with that couple, who were on their porch when Wengert arrived at Plaintiff's home, and Wengert followed up this foolishness by ignoring the Invisible Fence sign, and walking upon Plaintiff's porch, failing to ring her door bell or knock, and pulling his gun from its holster to shoot any dog that might appear. These failures caused Wengert to have his gun in a position to point at anyone who might be right behind her dog, and, of course, to terrify such a person - in this case the Plaintiff. His Gross misconduct was enhanced because he wore only street cloths, (instead of directing one of the two uniformed officers to go on the porch, whose appearance as police officers would have ameliorated Plaintiff's terror.)

If the Court refuses to find Gross Negligence, we ask it to find in the alternative, standard Negligence, PJI 2:10. Certainly Wengert's behavior met the definition of that Cause of Action, which is, "Negligence is lack of ordinary care. It is a failure to use that degree of care that a reasonably prudent person would have used under the same circumstances. Negligence may arise from doing an act

102

that a reasonably prudent person would not have done under the same

circumstances, or, on the other hand, from failing to do an act that a reasonably

prudent person would have done under the same circumstances."

(We are not asking for a Judgment in Assault because we can't prove

Wengert pointed the gun intentionally at the Plaintiff)

**DAMAGES**

I checked on line the Inflation Schedules comparing the inflation that has

occurred between some of the earlier cases and 2019, to demonstrate the fact

that the verdicts and settlements given in earlier dates should be viewed as their

equivalent amounts for 2019

Please note that Plaintiff has endured great damages, not just for the

physical pain from the physical batteries, false arrest, and false imprisonment,

but, more importantly, she has suffered severe, crushing emotional problems as

well, problems that are permanent and very serious. These problems produce

many negative affects upon various aspects of Plaintiff's life including – the

103

destruction of her relationship with her significant other, persistent fear, including fear of living and working in Rochester, fear of living alone, her impaired social, and personal life; hypervigilance, panic attacks, intrusive thoughts, inability to sleep, and terrifying nightmares, exhaustion during the day because of her inability to sleep at night, loss of her ability to focus, loss of interest in travel, in sex, and in work, among other damages. Furthermore, she needs very expensive, extensive intensive psychotherapy at least twice a week, and an expensive medication regimen under the direction of a psychopharmacologist.

In summary Plaintiff's former positive view of herself and her former Highly competent, positive, joyful life has been replaced by misery, fear, PTSD, grief and isolation.

Dr. Ewing's trial testimony claimed that Plaintiff suffers from intrusive thoughts which he defined as – "Out of nowhere comes a thought about what happened to you about the traumatic event; bad dreams, nightmares, repeated bad dreams and nightmares about the traumatic event, efforts to avoid stimuli that remind you of the incident,"  such as, in the plaintiff's case, staying away from the police. He includes other examples, of PTSD symptoms, such as: "alienation from other people, hypervigilance, sometimes bordering on paranoia." Tt page 34 line 11 to page 37 line 11. As previously noted in this document.

104

As noted in the Plaintiff's Findings of Fact her costs for treatment, pharmapsychological analyses, and medication will be extremely high – the cost of needed psychotherapy alone being $343,200 for the balance of her life.

## PJI 3:3 BATTERY COMPENSATORY AND PUNITIVE

18.     The Comment section on Compensatory Damages from 2005 Vol 2, PJI 3:3 page 16 states that the damages recoverable for battery include compensation for the injury, pain and suffering. It notes that Plaintiff's subjective testimony of pain from the battery is sufficient to establish entitlement to some compensation, and cites Laurie Marie M v Jeffrey T. M. 159 AD 2d 52. It also states that damages for humiliation, fright, and mental anguish are also recoverable whether or not the victim sustained physical injury Williams v Underhill 63 AD 223

When addressing Punitive Damages for battery the 2005 volume of the PJI Vol 2 page 17 notes that Defendant's acts must be shown to have been committed with actual malice or so recklessly and wantonly as to permit the inference of malice. Guion v Associated Dry Goods Corp 43 NY 2d 876. It states that punitive damages can be awarded upon a showing of gross, wanton and willful conduct. Smith v Erie 295 AD 2d 1010 from 2005 PJI Vol 2 page 17-18*. And

105

it claims that on the issue of malice, all of the immediately connected circumstances tending to explain defendant's motive, including the words spoken by the defendant are admissible. <u>Voltz v Blackmar</u> 64 NY 440

On page 17 of the Second Edition of the PJI in the Comment section of PJI 3:3, the Battery section, it states that, "Punitive damages may be awarded" in a battery cause of action, upon a showing of, "actual malice or so recklessly and wantonly as to permit the inference of malice", or "upon a showing of gross, wanton and willful conduct."  It also notes, on page 18, that while punitive damages are not recoverable against the state or its political subdivision, "the immunity of the municipality does not extend to individual police officers."

The evidence on this record clearly shows that Hogg and Prinzi both met the standards to award punitive damages against them for battering Plaintiff.

## PJI 3:5 FALSE ARREST/FALSE IMPRISONMENT

## COMPENSATORY DAMAGES

19.     The Comment on Compensatory Damages for false arrest, 2005 PJI 3:5 Commentary, Vol 2 page 50, states that a Plaintiff can be awarded for mental anguish, shame, humiliation, injury to reputation, physical suffering or bodily injuries

The comment on punitive Damages 2005 PJI 3:5 Commentary Vol 2 page 51 states that a Plaintiff can get punitive damages if Defendant acted "recklessly, willfully, wantonly or maliciously" (Please note the word "or" is used here, not the word "and")

106

It also refers the reader at page 51 to read the Comments to PJI 2:278 and PJI 3:3.

As noted in PJI charge 2:278, the standard charge on punitive damages, "the purpose of punitive damages is to punish the defendant …. And thereby discourage the defendant and other people from acting in a similar way in the future" In the comment section of 2:278 at page 1443 it states, "Courts should determine the reprehensibility of a defendant's conduct by considering whether the harm caused was physical as opposed to economic, the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others."  As noted in commentary of 2:278 at page 1446 it states, "To warrant an award of punitive damages, there must be proof of recklessness, or a conscious disregard of the rights of others." At page 1454 it states, "The Court of Appeals has held that the evidentiary standard for proving entitlement to punitive damages is preponderance of the evidence"

In the Comment section of PJI 3:5 it notes that Plaintiff is entitled to punitive damages against defendants in a false imprisonment case, "upon a showing that the defendant acted recklessly, willfully, wantonly or maliciously" (Please note the word "or" is used here, not the word "and") Page 51 Vol. 2 Of PJI Second Edition.

The evidence on this record clearly shows that Hogg met the standards to award punitive damages against him for the false arrest and false imprisonment of Plaintiff.

107

**CASES CITED FOR COMPENSATORY DAMAGES AWARDS**

20.      Please note that while the reasons why the various plaintiffs cited below endured their injuries differ, the following cases are not cited in this Memorandum for the ways in which the injuries occurred, but instead, for the nature of the injuries themselves and their similarities to the injuries suffered by Ms. Cabisca. For example, some of these plaintiffs were attacked by police, others by intruders, others by a spouse; some were raped, or were victims of attempted rapes. But the injuries, sometimes the physical injuries, but principally the emotional ones, are very similar to those suffered by Ms. Cabisca and that is why they are cited in this Memorandum written to address the damages Plaintiff endures. Also note the word "rape" as defined in Webster's 1996 Unabridged Dictionary includes not only, "the unlawful compelling of a woman through physical force or duress to have sexual intercourse", but also, "an act of plunder, violent seizure, or abuse, despoliation, violation" It is apparent from reading various cases cited in this Memorandum that the violations, and violent seizure Ms. Cabisca suffered at the hands of the defendants when they battered, falsely arrested and falsely  imprisoned her, are very similar, if not virtually identical, to the damages victims of rape, attempted rape and other brutal assaults, endure.

21.    The following cases are cited, in this portion of this Memorandum, for their awards of Compensatory Damages.

108

<u>Doyle v City of Buffalo</u>   2006 WL 7071514

The Plaintiff, a 47 year old female school principal, told police they could not speak to a student without the student's parent's consent. Police responded by arresting the principal, handcuffing her behind her back, and taking her forcibly away from school in front of students and staff, causing her severe humiliation . She suffered three cervical herniations at C 4-5, C 5-6, and C 6-7, with spinal cord compression, from the handcuffing. The criminal charges filed against her were dropped a short time later. The plaintiff's treating psychiatrist testified that plaintiff suffered from permanent PTSD, with anxiety, depression, nightmares and flashbacks. He testified she will suffer these effects permanently.

A jury awarded her $200,000 for past pain and suffering and $1.2 million for future pain and suffering, a total for pain and suffering of **$1.4 million**, plus more for lost earnings.

**Inflation calculator on line - $100 in 2006 is equal to $126.20 in 2019.**

Therefore the award in 2019 dollars for compensatory damages would be **<u>$1.764 million.)</u>**

<u>Abreu v 1551 S. Nicholas Ave. Corp.</u> 1996 WL 34616289

The plaintiff a tenant in her 20's claimed her landlord did not supply her door with a chain or peephole, and as a result she allowed two men to enter her

109

apartment who both raped her. Although the physical injuries essentially resolved, she suffered severe post-traumatic stress disorder. The plaintiff's psychiatrist testified that she suffered from severe PTSD, manifesting in anxiety, depression, nightmares, flashbacks of the event, and an inability to enjoy life. Despite getting therapy the psychiatrist contended that she will suffer the affects for the rest of her life.

The jury awarded her $1 million for past pain and suffering, and $250,000 for future pain and suffering, a total for pain and suffering of **$1.250 million.**

**Inflation calculator on line shows that $100 in 1996 is equal to $ 162.15 in 2019.**

Therefore the award in 2019 dollars for compensatory damages would be **<u>$2.03438 million.</u>**

<u>Kaplan from NYC, Newell v 525 Park Ave Assoc. et al</u> 1992 WL 12711678

The Plaintiff sued her landlord for leaving a ladder in place that allowed an intruder to get into her apartment and attack her. She was not sexually assaulted. She was choked, suffered ruptures of both eardrums resulting in temporary hearing loss and unconsciousness, and she suffered from severe PTSD.  Her psychiatrist testified to her PTSD. She described her withdrawn personality, and hyper-alertness, stating she no longer has an active social life and rarely leaves her apartment. Furthermore she suffered a loss of appetite, sleep disorders,

difficulties concentrating, fear of being alone, and fear of being in crowds. Her psychiatrist testified her symptoms are permanent in nature.

A jury awarded her $200,000 for past pain and suffering, and $350,000 for future pain and suffering, for a total pain and suffering award of **$550,000**, plus an award for loss of income.

**Inflation calculator on line $100 in 1992 equal to $181.53 in 2019.**

Therefore the award in 2019 dollars for compensatory damages would be **$998,415.**

Cardoza v City of New York 2012 WL 7985032

The Plaintiff, William Cardoza, was charged with resisting arrest and disorderly conduct. Thereafter, officers testified falsely about William and withheld vital information before a Court. William sued for false arrest, battery, and malicious prosecution. All charges filed against William were dismissed.

A jury awarded William $500,000 for violating his civil rights, $500,000 for past pain and suffering, $2 million for future pain and suffering for a total of non-punitive damages of **$3 million**, and $1.5 million for punitive damages.

111

The verdict form, 2012 WL 3134131, shows the Jury found that the police had committed battery, false arrest, malicious prosecution, and constitutional excessive force

McLaughlin v New York 2000 WL 35896965

In 1989 the plaintiff was asking an officer about the officer's issuance of Parking tickets. The officer then repeatedly punched plaintiff in the body and took him into custody.

A jury awarded plaintiff $430,000 for pain and suffering, $5,000 for medical expenses, $1 million for federal civil rights violations and $100,000 for punitive damages. The total verdict minus the medical and punitive damages was **$1.430 million.**

The verdict form, 2000 WL 35634785, shows the jury found defendant had committed excessive force, false arrest, false imprisonment, malicious prosecution, violated plaintiff's § 1983 right, and found that each one of these violations constituted a substantial factor in causing the plaintiff's injury.

**Inflation calculator on line shows that $100 in 2000 is equal to $147.74 in 2019.**

Therefore the total award, minus medical and punitive damages, in 2019 dollars would be **$2.11168 million.**

112

## CASES CITED FOR PUNITIVE DAMAGES AWARDS

22.    The following cases are cited, in this portion of this Memorandum, for their awards of Punitive Damages.


Ronessa Hollingsworth v City of New York 2010 WL 9448206 An off duty officer went into the home of a 17 year old girl, removed her clothes, fondled her and fled when he saw her mother arrive. The plaintiff's treating social worker testified that the plaintiff suffers from Post –Traumatic syndrome.

A jury awarded plaintiff $650,000 for past pain and suffering and $90,000 for future pain and suffering, for a total of $740,000 for pain and suffering and **$175,000 for punitive damages**. Plaintiff suffers from constant flash backs, was terrified during the incident, and is now afraid to go anywhere without her mother.



Cardoza v City of New York    2012 WL 7985032 (This case is described above.)

Note: Punitive Damages awarded was **$1.5 million.** The inflation calculator shows $100 in 2012 is the same as $110.81 in 2019. Therefore the punitive damages would be equal to **$1.662** million in 2019.

<u>Martire v City of New York</u> 2011 WL 7054293

The Plaintiff was assaulted, battered, and falsely arrested by officers. The Plaintiff was charged with Obstructing Governmental Administration and Disorderly Conduct. The Plaintiff was awarded by a Jury $100,000 for pain and suffering, and **$150,000 in punitive damages** for violation of his civil rights.

**The inflation calculator shows $100 in 2011 is the same as $113.10 in 2019** Therefore, the punitive damages would be equal to **$169,650** in 2019.

23.     We conclude our argument for punitive damages by noting that if this court does not award substantial damages against defendants for their mistreatment of Plaintiff, defendants and their fellow RPD officers will continue to harbor the terrifying belief (terrifying to citizens) that they operate above the law, (or are the law) and will be encouraged to continue to engage in similar tortious treatment of members of the public.

A strong signal that such behavior will not be tolerated by the Courts is, we suggest, very important, especially in light of today's social climate.

## CONCLUSION

The evidence on this record demonstrates that all the disputed factual issues can only be decided in Plaintiff's favor. The defendants' versions of the disputed facts contain no evidentiary value, for reasons set forth in this document

and described in the record. Specifically significant portions of the defendants' versions are contrary to valid testimony provided by the plaintiffs' witnesses, and/or, are frequently inconsistent with other testimony provided by the defendants themselves, and/or are at odds with reality. And, of course, they are self-serving. They contain no evidentiary weight.

The Plaintiff's evidence, on the other hand, is consistent with other testimony presented by the Plaintiff, with reality.

Furthermore the Plaintiff has proven all the causes of action with an amount and quality of evidence that greatly exceeds the amount needed to prove each cause of action.

Also it is crucial that the Plaintiff presented two excellent expert witnesses, whose testimony was clear, and unrebutted. The defendants did not present any expert witnesses to rebut or otherwise diminish the testimony of Plaintiff's extraordinarily qualified experts, and furthermore, there is no evidence presented to the court to diminish, or discredit Plaintiff's expert testimony.

Also the defendants did not rebut other damaging testimony presented against them, or explain away other negative evidence or reasonable inferences based on that evidence.

Please discount any similarities to damages incurred in an accident, such as an automobile accident, for example. Such accidents are not accompanied by the emotional damage associated with abuses performed by those we hire and rely upon to protect us from danger; but who instead physically abuse us.

115

Finally, the Plaintiff is also entitled to Attorney's fees for her personal 1983 cause of action, Point IV.

August 6, 2019

s/_____

E. Robert Fussell Esq.

Attorney for Plaintiff

46 Wolcott Street, Suite One

Le Roy, New York 14482

585 768 2240

gasholic@rochester.rr.com

To: Spencer L. Ash Esq.

City of Rochester Department of Law

30 Church Street, Room 400-A

Rochester, New York 14614

585 428 6699

spencer.ash@cityofrochester.gov

116

117