**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

TINA CABISCA,

         Plaintiff,

        v.

CITY OF ROCHESTER, et al.,
         Defendants.

_____

**DECISION AND ORDER**
14-cv-6485-JWF

## Preliminary Statement

Tina Cabisca ("plaintiff" or "Cabisca") brought this action pursuant to 42 U.S.C. § 1983 against the City of Rochester, several Rochester Police Department ("RPD") officers, and one Animal Control officer asserting constitutional violations as well as various state law causes of action arising from her arrest on September 7, 2013. See Compl. (Docket # 1). The parties consented to the disposition of this case by the undersigned pursuant to 28 U.S.C. § 636(c). Docket # 6.

On September 21, 2017, the Court granted defendants' motion for summary judgment with respect to plaintiff's claims for trespass, abuse of legal process, injury to property, and municipal liability against the City of Rochester. Docket # 45. The City of Rochester was subsequently terminated as a defendant, as all claims pending against it were dismissed. See Docket # 45.

Prior to trial, defendant Investigator Nolan Wengert ("Investigator Wengert" or "Wengert") passed away. His parents,

1

Maryrose and Earl Wengert, as co-executors of his estate, were substituted as parties. Docket # 85.

After the close of plaintiff's proof at trial, defense counsel made a motion for a directed verdict[1] seeking to dismiss the claims against Animal Control Officer Carrie Berkstresser ("Officer Berkstresser" or "Berkstresser") and RPD Officer Kaitlyn Turner ("Officer Turner" or "Turner"). The Court granted that motion and dismissed Berkstresser and Turner as defendants from the case.[2] See Min. Entry (Docket # 103); February 21, 2019 Trial Transcript ("Tr. 3"), Docket # 108, at 438-39. The parties also made several motions in limine which were either decided on the record or will necessarily be resolved by the Court's verdict. See February 19, 2019 Trial Transcript ("Tr. 1"), Docket # 106, at 77-89; Docket # 115.

Thus, the causes of action remaining in the case are plaintiff's 42 U.S.C. § 1983 claims for the fatal shooting of plaintiff's dog under the Fourth Amendment, excessive force, and

---

[1] Defense counsel brought his motion for a directed verdict under Federal Rule of Civil Procedure ("Rule") 50 rather than Rule 52(c). Moreover, "[w]here a party mistakenly moves for judgment under Rule 50(a) in a bench trial, the court will construe the motion as one under Rule 52(c) and employ the appropriate standard." Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary Rule 52 (Feb. 2019) (citing Federal Ins. Co. v. HPSC, Inc., 480 F.3d 26, 32 (1st Cir. 2007)).

[2] However, as the Court previously ruled in its decision on the motion for a directed verdict, the complaint does not make clear against whom the malicious prosecution claim is asserted. Docket # 115. Therefore, the Court will address the merits of plaintiff's malicious prosecution cause of action in this Decision and Order.

malicious prosecution, and plaintiff's state law claims of battery and false arrest against Officer Jason Prinzi ("Officer Prinzi" or "Prinzi"), Officer Daryl Hogg ("Officer Hogg" or "Hogg"), and Maryrose and Earl Wengert as the co-executors of Wengert's estate. Plaintiff seeks compensatory and punitive damages. Docket # 1. A bench trial was held from February 19, 2019 to February 21, 2019. The parties submitted their post-trial proposed findings of fact and conclusions of law on August 6, 2019. Docket ## 110, 111.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

For purposes of this Decision and Order, familiarity with the pre-trial record in this case is assumed. That familiarity is important because it pays tribute to the difficulties encountered by this Court - largely unnecessary and attributable to the distrust between counsel - in resolving discovery disputes and pre-trial motions in an effort to set the parameters of the issues to be tried.

The non-jury trial itself confirmed the conflicting versions of what occurred on the evening of September 7, 2013. Many of the factual conflicts between the parties are so divergent that they cannot both be true. This Court is not required by Federal Rule of Civil Procedure 52(a) to reconcile the irreconcilable. See Krieger v. Gold Bond Bld. Prods., A Div. of Nat'l Gypsum Co., 863 F.2d 1091, 1097 (2d Cir. 1988) (in meeting the requirements of Rule 52(a) the court must only "make sufficiently detailed findings

3

to inform the appellate court of the basis of the decision and to permit intelligent appellate review"). To the extent the Court credits testimony that is inconsistent with, or different than, other testimony, it is because the Court has found the facts adopted, when considered with all the other facts and circumstances, more credible and believable than the testimony or facts not adopted.

Accordingly, the following constitute the Court's findings of fact and conclusions of law.

# I. FINDINGS OF FACT

## A. THE FATAL SHOOTING OF PLAINTIFF'S DOG

1. On September 7, 2013, plaintiff's family was cleaning out her garage at 207 Kingsboro Road of items they had stored there. At some point during their cleaning they placed two children's bikes on the curb between Cabisca's sidewalk and the street for anyone to take. February 20, 2019 Trial Transcript ("Tr. 2"), Docket # 107, at 189-91.

2. Later that evening, Tyrone Flowers ("Flowers"), who also lived on Kingsboro Road, took the two bikes and began walking them down the road to his house. Tr. 3, at 352, 355. Flowers had a six-year-old child at the time. According to Flowers, the bikes appeared to be for children between the ages of six and eight years old, and looked "abandoned," so he took them. Tr. 3, at 355.

4

3. As Flowers walked to his home with the bikes, he saw a gray Impala driving up the street. Tr. 3, at 356. Flowers testified that the man who was driving the gray Impala came into his front yard and demanded that Flowers get on the ground. The man refused to identify himself (Tr. 3, at 357) but was later identified as Investigator Wengert. See Tr. 3, at 391.

4. Not only was Wengert driving an unmarked car, but he was not wearing a police uniform. Tr. 3, at 357.

5. Although he was directed to get on the ground, Flowers did not comply because Wengert would not identify himself. Tr. 3, at 357. Flowers testified that "[t]hen he grabbed me and threw me to the ground and that's when he appeared to put the handcuffs on me. When he pulled out his radio, that's when I found out that, yeah, he's a cop." Tr. 3, at 357-58.

6. Wengert called for backup. Tr. 3, at 358. He told Flowers he had been stopped because Wengert saw Flowers with the bikes and there was "a lot of theft going on in this area." Tr. 3, at 358.

7. Two uniformed officers, whom Flowers identified as Officers Hogg and Prinzi, appeared on the scene. See Tr. 3, at 359. The officers did not accept Flowers's explanations for where he got the bikes and the handcuffed Flowers was placed in the back

seat of one of the police vehicles present at the scene.[3] See Tr. 3, at 360.

8. The officers put the two bikes into one of the police vehicles and drove to plaintiff's home at 207 Kingsboro Road. Tr. 3, at 360. As they approached 207 Kingsboro Road, Flowers told the officers that "she got dogs," referring to Cabisca. Tr. 3, at 361.

9. The driveway of 207 Kingsboro Road runs up along the left side of plaintiff's house, past a side door, and ends at a detached garage behind the home. See Pl.'s Exs. 2C, 2G.[4] The residence has a covered front porch through which the front door is accessed. See Pl.'s Ex. 2G. The covered front porch is accessible from its left side by a set of stairs that descends perpendicular to the driveway. Pl.'s Exs. 2B, 2D, 2E; Defs.' Ex. 415. There does not appear to be any other way to access the front door other than stepping onto the porch. Thus, visitors would access the front

---

[3] The witnesses dispute whether Flowers was placed in Wengert's, Prinzi's, or Hogg's vehicle; Hogg's vehicle would have had a "cage" in the back. See Pl.'s Ex. 17, at 48; Tr. 3, at 360, 445, 448, 476-77. They also dispute whether the window had been rolled down while Flowers sat in the car and observed the scene. Tr. 3, at 364, 448. Irrespective of whose car Flowers was placed in and whether his window had been rolled down once they arrived at Cabisca's home, it does not affect the Court's view of Flowers's testimony. Flowers testified on cross examination that he "could see the whole yard. I could see the whole driveway." Tr. 3, at 386. The Court found Flowers's testimony to be forthright and credible in all material respects.

[4] Plaintiff's Exhibit 2 consists of copies of nine color photographs printed on five pages stapled together. The original photographs were substituted for the copies. Tr. 3, at 404. For ease of reference, each of the original photographs has been given a letter, so that the first photograph as it appears in plaintiff's trial exhibit book is Exhibit 2A and so on to 2I.

6

door by entering the rectangular porch via the porch's short left side that faces the driveway.

10. In front of a row of bushes just below the porch is a small blue, rectangular "Invisible Fence" sign. Pl.'s Exs. 2A, 2D, 2F. A faint groove extends horizontally across the driveway from the Invisible Fence sign, marking the boundary of the Invisible Fence. See Pl.'s Exs. 2A, 2D; Tr. 2, at 203. The covered porch is behind the Invisible Fence line and hence plaintiff's dogs would be free to roam on or near the porch area. See Pl.'s Ex. 2A.

11. At around 10:00 p.m. that evening, Cabisca was home in her kitchen doing the dishes while her four-year-old grandson and nine-month-old granddaughter were sleeping. Tr. 2, at 191-92.

12. Cabisca had three dogs in her home: A 13-year-old border collie, Teddy; a seven-year-old boxer, Rocco; and a four-year-old boxer, Bailey. Tr. 2, at 192-93, 207. Each dog was "about 60, 65 pounds." Tr. 2, at 194. Cabisca described Bailey as a "lover. She was just the dog that would come up, put her head on your lap and need to be loved." Tr. 2, at 307.

13. Cabisca testified that each of her dogs wore an Invisible Fence "collar [that] lets them know that they're close [to the fence] and if they proceed, they're going to get zapped . . . if the dogs come up like within 2 feet of that, they're going to get

7

an indicator on their collar that they shouldn't go any further."
Tr. 2, at 203-05.

14. Cabisca further testified that "[e]ach dog had to go through a training period and you stay with them until they clearly understand how far they can go and then - and then I can open my door and let my dog out and I know that they're not going to go anywhere." Tr. 2, at 206. Bailey "wore her collar always" and was wearing it on September 7, 2013. Tr. 2, at 203.

15. When Wengert, Prinzi, and Hogg arrived at Cabisca's home, Wengert walked up onto Cabisca's covered front porch, rang the doorbell, and knocked on the door. Pl.'s Ex. 17, at 51, 53.[5] He did not see the Invisible Fence sign. Pl.'s Ex. 17, at 51. He heard some movement in the house but did not hear any barking or growling. Pl.'s Ex. 17, at 53-54. He heard, but did not see, the side door open, and "walked off the porch to come around the corner and said hello." Pl.'s Ex. 17, at 54.

16. Not expecting visitors, Cabisca exited through her side door to see what was happening outside her home and Bailey exited the side door with her. Tr. 2, at 212. Bailey was trotting a little bit ahead of Cabisca by "about 3 feet." Tr. 2, at 216.

---

[5] Investigator Wengert is the only defendant charged with a Fourth Amendment seizure of plaintiff's dog, Bailey. Because Wengert passed away prior to trial, the Court relies on his deposition testimony taken on April 28, 2016, which was admitted into evidence as Plaintiff's Exhibit 17. See Fed. R. Civ. P. 32(a)(4)(A); Kierce v. Cent. Vermont Ry., Inc., 79 F.2d 198, 200 (2d Cir. 1935) (testimony by deposition is the equivalent to testimony at trial).

8

The witnesses dispute whether Bailey was barking or growling. Tr. 2, at 216-17; Tr. 3, at 364, 452. Upon review of the evidence, the Court finds that Bailey was barking as she came down the driveway.

17. Wengert, perceiving that Bailey was charging at him, backed up quickly onto the porch and drew his pistol. Pl.'s Ex. 17, at 57-58. The witnesses also dispute whether Bailey ever advanced up the front porch stairs. Pl.'s Ex. 17, at 54; Tr. 3, at 452-53, 481. Upon review of the evidence, the Court finds that Bailey was advancing onto the porch at the time she was fatally shot.

18. Wengert fired his gun twice, hitting Bailey. Pl.'s Ex. 17, at 57-58. Officer Prinzi heard the shots and saw Bailey collapse. Tr. 3, at 453.

19. The shot that killed Bailey entered on the side of her left front leg. Pl.'s Ex. 3C.[6] The parties do not dispute that Bailey died of her gunshot wound. It appears that only one of the bullets Wengert fired struck Bailey. Pl.'s Exs. 3A, 3C; see Defs.' Ex. 416; Tr. 2, at 148-49.

---

[6] Plaintiff's Exhibit 3 consists of copies of three color photographs, one on each page. The original photographs were substituted for the copies. Tr. 3, at 404. For ease of reference, each of the original photographs has been given a letter, so that the first photograph as it appears in plaintiff's trial exhibit book is Exhibit 3A and so on to 3C.

20. James Williams, Ph.D. testified for plaintiff and was qualified as an expert in the field of police behavior. Tr. 1, at 132; see Pl.'s Ex. 13.

21. Dr. Williams opined that Bailey could not have been charging at Wengert when she was shot because the Tueller 21 Foot Rule would have made it so that Wengert "would not have had time to release the catch on his holster, unholster his weapon, draw it, point it, and fire at an oncoming dog." Tr. 2, at 141.

22. As Dr. Williams explained,

[t]his [rule] was brought about in one of our western states by a Sergeant Tueller who was an on-duty police officer to train officers on how to get away from a man who would be charging at them with a weapon, a bladed weapon within a distance of 21 feet. That's where we get the 21 foot rule. In my opinion, based on empirical experiences, a man cannot cover this distance in the same amount of time as a canine. A four-footed canine would cover that distance much faster than any human being on this earth.

Tr. 2, at 141-42; Pl.'s Ex. 15. Dr. Williams believed that the distance between the side door and the front door on the porch was less than 21 feet. Tr. 2, at 141.

23. Defense Exhibit 415 depicts the porch stairs with a deceased Bailey lying covered by a blanket at the bottom of the stairs. Defs.' Ex. 415. Three evidence markers are visible on the porch itself. There appears to be a small amount of a colored substance on the second step from the bottom. Defs.' Ex. 415. Dr. Williams testified that "on the stairs there's nothing that

can be defined definitively. There may be tracks or marks on the steps but you can't tell what they are." Tr. 2, at 149. The marks on the steps, in Dr. Williams' opinion, "could be anything." Tr. 2, at 150.

24. On cross examination, Dr. Williams opined that, while a red coloration would be consistent with blood, all he could see on the steps depicted in Defense Exhibit 415 was some coloration or spotting, but he could not definitively say whether or not it was red. Tr. 2, at 153-54.

25. When Cabisca heard the shots that killed Bailey, she looked to her left to see a man pointing a gun in her direction and Bailey lying at the bottom of the steps in a pool of blood. Tr. 2, at 212, 214.

26. Cabisca did not have any reason to believe that Wengert was a law enforcement officer because he was not wearing a uniform. Tr. 2, at 212. It was Dr. Williams's opinion that Wengert did not follow proper police procedure when he went up onto Cabisca's porch to investigate the potential larceny, because Wengert was in plainclothes when he approached Cabisca's front door, not in a police uniform. See Tr. 2, at 136-37.

## B. PLAINTIFF'S ARREST AND THE USE OF FORCE

27. Cabisca bent down to tend to her dog and she "hear[d] a voice from over here telling [her] to get [her] dog under control." Tr. 2, at 214. She looked up to see whom she later identified as

11

Officers Hogg and Prinzi "coming down [her] driveway and they also
have their guns out pointed in [her] direction." Tr. 2, at 214.

28. At this point in her encounter with the police, Cabisca
"still [didn't] even know why these people are here." Tr. 2, at
227-28. She testified that

> it was, you know, anxiety beyond – if you ever can
> imagine having something like that happen to you. It was
> surreal. It was just like a movie that happened to
> somebody else, you know, but never happened to me and I
> never would have expected it to happen to me . . . the
> amount of everything going on at that time – and this is
> all very short, you know, this isn't like this is a long
> drawn out period. It was like boom boom boom. And when
> you're not even telling me what, what's going on, like
> who's what, the anxiety that I had was incredible. And
> was I angry? Oh, completely angry. And did I cuss at
> them? Yes, I cussed at them because when I have to say
> what the hell are you doing here, you know, I think
> that's so inappropriate. It would have been nice for
> somebody just to say I'm officer Joe Blow and this is
> what we're doing here.

Tr. 2, at 228.

29. Officer Prinzi testified that Cabisca "called us all
fucking assholes" and he was not able to communicate with her as
"[s]he would just speak over [him] and yell." Tr. 3, at 454.

30. Cabisca asked the officers for their identification and
badge numbers and what they were doing at her house but the
officers did not provide her with that information. Tr. 2, at
229. The officers asked her to step off her property with them,
but Cabisca declined to do so because they would not tell her who
they were or why they were there. Tr. 2, at 230.

12

31. One of the uniformed officers said to Cabisca "if you don't cooperate with us, we're going to arrest you." Tr. 2, at 230-31.

32. Cabisca stayed near Bailey at the bottom of the porch steps. Tr. 2, at 231. She "told them to step back away from me" putting her palms up and her arms forward. Tr. 2, at 232.

33. Officer Prinzi testified that Cabisca "with both hands, came and shoved" Officer Hogg: "Both palms out she walked up to Officer Hogg, put her hands on his chest and shoved him." Tr. 3, at 459-60. According to Prinzi, the shove "[k]nocked [Hogg] back at least a step or two." Tr. 3, at 460. According to plaintiff, she did not shove Hogg. Cabisca testified that Hogg walked directly into her outstretched arms. Tr. 2, at 234. Based on my consideration of the trial testimony, I find that plaintiff did push Hogg away from her, although it was probably not a push that would cause Hogg to fear for his safety, particularly given the size and weight differences between Officer Hogg and plaintiff.

34. Once Cabisca touched him, Officer Hogg said "that's it, you're going to jail." Tr. 3, at 463, 487-88; see Tr. 2, at 234-35.

35. Officer Hogg decided to arrest Cabisca on a charge of Harassment in the Second Degree and approached her to effectuate the arrest. Tr. 3, at 487. Cabisca tried to pull away from Officer Hogg. Tr. 2, at 318.

13

36. Officer Hogg considered Cabisca to be resisting arrest and decided to perform a straight arm bar technique to subdue her. Tr. 3, at 488. To do so, Officer Hogg testified that he "guided [Cabisca] to the ground" by "grabb[ing] [Cabisca's] right wrist with my right hand and then I put my hand on her shoulder which would have been her right side." Tr. 3, at 487-88.[7]

37. In performing the straight arm bar technique, both Cabisca and Flowers testified that Hogg "threw [Cabisca] on the ground" and got on the top half of her body. Tr. 2, at 235; Tr. 3, at 374, 393-94. The Court found this testimony to be credible. Hogg had his elbow in plaintiff's chest area. Tr. 2, at 235-36.

38. Officer Prinzi put his elbows and knees onto the lower half of Cabisca's body, "leaning on [her] holding [the] bottom half of [her] body." Tr. 2, at 236, 319; Tr. 3, at 374, 394.[8]

_____

[7] Officer Prinzi gave the Court a demonstration of the straight arm bar takedown technique. Tr. 3, at 461-62. While Officer Hogg described the procedure as an effective means of "guiding" a civilian to the ground, it appeared to this Court as a procedure also capable, especially during the heat of an arrest, of forcibly slamming someone to the ground.

[8] Although Officer Prinzi testified that he did not touch plaintiff, Tr. 3, at 463, and Officer Hogg said that Officer Prinzi did not assist him with Cabisca's takedown, Tr. 3, at 489, there were inconsistencies in the record regarding who did what. Repeatedly throughout Officer Hogg's testimony he described events that occurred using the "we" pronoun: "We can roll her over so that she would be sitting on her butt"; "Eventually after the seating position, we raised her - I raised her up, I apologize."; "[A]nd eventually we did put handcuffs back on her - I'm sorry - eventually I put handcuffs back on her." Tr. 3, at 491-93 (emphasis added). The same is true during Officer Hogg's deposition in 2016: "When she was onto her side, we escorted her - I'm sorry - we helped her to her butt and then we stood her up - I'm sorry. I helped her to her butt and then I stood her up from there to get back on her feet." Pl.'s Ex. 18, at 66 (emphasis added). Moreover, despite Prinzi's unequivocal assertion that he did not touch plaintiff, at his deposition in 2016, much nearer to the incident than his testimony at trial, Officer Prinzi said "I don't recall" when asked whether he had touched Cabisca. Pl.'s Ex. 19, at 20. There were other facts Officer

14

While Hogg and Prinzi were on top of her, Cabisca said "I can't breathe, I'm asthmatic." Tr. 2, at 237.

39. Cabisca was 52 years old, 5 feet, 2 inches tall, and 160 pounds at the time of her arrest. See Tr. 2, at 147, 216. Officer Hogg was 6 feet tall, weighed around 190 pounds, and was 41 years old at the time of the arrest. Pl.'s Ex. 18, at 6, 10. Officer Prinzi was 6 feet tall and 200 pounds at the time of Cabisca's arrest. Pl.'s Ex. 19, at 8.

40. While Cabisca was on the ground, Officer Hogg held Cabisca's arm behind her back and placed handcuffs on her. Tr. 3, at 489.

41. Once Cabisca was under the control of the officers, Officer Hogg put Cabisca on her side and asked her to bend into a "fetal position" to make it easier for him to roll her into a seated position for a "sit-up type of technique." Tr. 3, at 491.

42. Officer Hogg brought Cabisca to her feet. Tr. 3, at 492. He "tried to explain to her what was going on." Plaintiff told Hogg that she had children in the house. Hogg said he felt he "had to do something. We had to figure something out because I . . . didn't trust those dogs." Tr. 3, at 492.

---

Prinzi could not recall at his deposition. Id. at 61-67. For example, Officer Prinzi could not recall whether Cabisca had been handcuffed at any point. Id. at 20, 62. These inconsistencies in the officers' testimony when considered in light of the testimony of the plaintiff herself and the eyewitness Flowers, causes the Court to find that plaintiff met her burden of proof in showing that Officer Prinzi did make contact with Cabisca during her arrest.

43. Hogg spoke with Wengert and Prinzi and decided to take off Cabisca's handcuffs to "allow her to go back in the house, maintain whatever she has to do with the children, make sure all the dogs are locked up and then make some phone calls because she's going to need an adult" so that the children were not left alone. Tr. 3, at 492.

44. When Cabisca came back out of her house, Officer Hogg placed her back into handcuffs and asked Officer Prinzi to escort her to a police vehicle on scene. Tr. 3, at 493.

## C. POST-ARREST EVENTS

45. Officer Turner, who was sitting in the police vehicle to which Cabisca was escorted, issued an appearance ticket charging Cabisca with Harassment in the Second Degree pursuant to New York State Penal Law section 240.26(1) and Resisting Arrest pursuant to New York State Penal Law section 205.30. Pl.'s Ex. 6; Docket # 1, at 5.

46. Animal Control Officer Berkstresser, who had been summoned to the scene following Bailey's shooting, issued three tickets, one for each dog Cabisca owned, for having unleashed dogs in violation of Rochester City Code section 31-4. Docket # 1, at 5; Pl.'s Ex. 6. In addition, Officer Berkstresser issued three more tickets to Cabisca, one for each dog Cabisca owned, for having dangerous dogs in violation of Rochester City Code section 31-7(A). Docket # 1, at 5; Pl.'s Ex. 6.

16

47. On October 22, 2013, the penal law charges were dismissed by City Court Judge Ellen Yacknin. See Pl.'s Ex. 5.[9] Pl.'s Ex. 5.

48. A hearing was held on October 30, 2013 regarding the dog-related tickets. Pl.'s Ex. 16. Although Cabisca was found guilty on two of the dog-related violations, she appealed and the tickets were dismissed on appeal on March 5, 2014. Pl.'s Ex. 8; Docket # 1, at 5-6.

## D. PLAINTIFF'S EVIDENCE OF DAMAGES

49. When Cabisca was placed into the police vehicle after being handcuffed, she was "struggling to breathe." Tr. 2, at 243.

50. Cabisca's family arrived at the scene and she asked them to get her inhaler for her. Tr. 2, at 244. When her partner, Lee, finally brought the inhaler to her, her hands were still handcuffed behind her back so she could not use it. Tr. 2, at 245. She was having "major spasms in [her] chest wall." Tr. 2, at 255.

51. An ambulance was called to the scene. Tr. 3, at 466. Cabisca asked if the police were "going to take [her] right away

---

[9] Defense counsel contends that the penal law charges were dismissed "in the interest of justice." Tr. 3, at 426. In support of this contention, defense counsel cited to Plaintiff's Exhibit 16 which is the transcript of the hearing held on the six dog-related violations tickets. Pl.'s Ex. 16. During the hearing, plaintiff's then-attorney stated on the record that "the Court did dismiss both of those cases in the interest of justice," referring to the two penal law charges. Id. at 12. The Court relies on the actual certificate of disposition submitted into evidence in finding that the grounds for the penal law charges' dismissal remain unclear.

17

to the hospital" but they said she had "to wait until [her] paperwork is done." Tr. 2, at 252-53.

52. Cabisca then asked her daughter if she could take her to Highland Hospital and her daughter drove her there. Tr. 2, at 254. Highland Hospital administered Toradol, an anti-inflammatory drug "[t]o decrease the swelling that was going on related to injuries and inability that were keeping [Cabisca] from getting a deep breath." Tr. 2, at 256. Cabisca was also given Valium "to relax those muscles so that [she] could get a breath." Tr. 2, at 256.

53. When Cabisca saw her primary care doctor on September 9, 2013, her doctor increased Cabisca's existing dosage of Cymbalta from 60 milligrams to 90 milligrams a day. Tr. 2, at 256-57. Cabisca had been taking Cymbalta to manage her fibromyalgia. Tr. 2, at 257. Cabisca testified that the medication "helps my anxiety and if I take that 30 milligrams away, then, you know, my anxiety is not controlled and so I, I tried not to take it and it didn't work." Tr. 2, at 257. Her primary care doctor also prescribed 2 milligrams of Valium which has since been increased to her current dosage of 10 milligrams. Tr. 2, at 258.

54. Cabisca had visible bruising on her left arm and scratches on her back stemming from the incident. Pl.'s Ex. 9. She admitted that "physically I think I've healed." Tr. 2, at 261.

18

55. Cabisca testified that her hospital visit cost her $1,100 and each visit to her primary care doctor cost her $90. Tr. 2, at 259-60. She estimated that she saw her primary care doctor at least ten times for injuries related to this lawsuit. Tr. 2, at 259-60.

56. Cabisca also began seeing a mental health therapist after the incident and she paid $88 out of pocket each appointment for at least 20 appointments. Tr. 2, at 289. Cabisca later switched to a new therapist whom she had seen every two weeks for three months at the time of trial. The new therapist charged her a $25 co-pay per visit. Tr. 2, at 290.

57. Cabisca testified that she decided to move to South Carolina as a result of the incident "[b]ecause it wasn't safe for [her] to live in [her] home." Tr. 2, at 262. She decided to move "within two weeks" of the incident. Tr. 2, at 264. Cabisca is a nurse and "[n]urses can't work in a state without a license." Tr. 2, at 262. Her license in South Carolina was "held up" because her "background check showed that [she] had been arrested for harassing the police and they wouldn't provide [her] a license until [she] provide[d] them with something that says, you know, it's dismissed." Tr. 2, at 262.

58. Cabisca testified that the events of September 7, 2013 have had a lasting impact on her personal life:

19

> If I know there's some event and the police are going to
> have a presence there, I don't go. And I don't go because
> you can't - I don't trust them. I'm frightened of them
> and I don't think that there's any reason for me to put
> myself in a place where I have to be even more
> uncomfortable just because they're there . . . . [M]y
> partner had been my partner for seven years and I think
> that we had a very strong relationship. And his response
> to me is, you know, you've changed, and by that, you
> know . . . we weren't social any more - or I wasn't
> social any more and he was. And, you know, sexually,
> uninterested. I didn't sleep well.

Tr. 2, at 284-85. Cabisca and her partner Lee are no longer together. Tr. 2, at 285.

59. Cabisca still owns her home at 207 Kingsboro Road and collects rental income from the property. Tr. 2, at 337-38. She testified that she does not live there or work in the City of Rochester because of the events of September 7, 2013. Tr. 2, at 288.

60. Charles Ewing, J.D., Ph.D. was qualified as plaintiff's expert witness to testify in the field of psychology and mental health. Tr. 1, at 7; Pl.'s Ex. 11.

61. Dr. Ewing reviewed Cabisca's mental health records, among other documents, and examined Cabisca in August 2015 for "three and a quarter hours" for purposes of rendering an expert opinion on plaintiff's psychological damages. Tr. 1, at 11-14; see Tr. 1, at 64.

62. Dr. Ewing testified that Cabisca developed post-traumatic stress disorder ("PTSD"), manifesting in plaintiff as depression,

20

anxiety, and panic disorder, attributable to the events that transpired on September 7, 2013. Tr. 1, at 32-33.

63. Dr. Ewing found that plaintiff exhibited "subjective feelings of sadness on a regular basis, sleep difficulties, withdrawing from social contacts with other people, [and] isolating herself." Tr. 1, at 33. She also had "[f]eelings of tightness in the chest, difficulty breathing, feeling like she's going to die and [is] triggered by stimuli that reminded her of the incident." Tr. 1, at 33.

64. These feelings led Cabisca to exhibit "avoidance symptoms" where

> she felt she could no longer live in her house because the attack had taken place there. She felt that she could no longer live in the city or the county because she had to avoid contact with the police. She did her best to avoid any contact with the police. But even just driving down the road, she could see a police car and then start to develop these physiological symptoms that I mentioned. She also at one point was stopped by a police officer and became so ill that she could barely get to work and barely do her job at work because of the panic, anxiety symptoms.

Tr. 1, at 34-35.

65. Dr. Ewing also observed plaintiff's PTSD manifest through "hypervigilance": "She reported that wherever she was, she was constantly on the alert to make sure that nobody was there following her and there were no police officers near by." Tr. 1, at 36.

21

66. Dr. Ewing further noted that Cabisca's PTSD affected other parts of her life besides her work:

> She just didn't want to be out. She wanted to be either at home or at work and she wouldn't even, on many occasions, go to a grocery store . . . . She lost interest in things that previously held interest for her: Travel, sex, other activities that she shared with her significant other. And she reported that her significant other and she drifted apart because of these issues that stemmed from the incident.

Tr. 1, at 36-37.

67. It was Dr. Ewing's opinion that Cabisca could eventually "function" with her symptoms if given the right medications and psychotherapy treatments, but that "[m]ost people who have post-traumatic stress disorder to this extent, they never really get over it. The symptoms can be treated and they can be made more comfortable and made to have a bit better life, but they don't outgrow or outlive these symptoms." Tr. 1, at 40.

## II. CONCLUSIONS OF LAW

### A. SEIZURE OF PLAINTIFF'S DOG

1. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

2. "[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." Carroll v. Cty. of Monroe, 712 F.3d

22

649, 651 (2d Cir. 2013) (shooting a family dog is "a severe intrusion given the emotional attachment between a dog and an owner"). Pursuant to Carroll:

> To determine whether a seizure is unreasonable, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion" and determine whether "the totality of the circumstances justified [the] particular sort of . . . seizure." Tennessee v. Garner, 471 U.S. 1, 8-9 (1985) (internal quotation marks omitted). We have long held that the plaintiff has the burden to prove that a seizure was unreasonable. See Ruggiero v. Krzeminski, 928 F.2d 558, 562-63 (2d Cir. 1991).

Id. at 651. The reasonableness inquiry is an objective one based on the totality of the circumstances and not an officer's subjective intent. Graham v. Connor, 490 U.S. 386, 397 (1989) (finding that the reasonableness inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"); see Dziekan v. Gaynor, 376 F. Supp. 2d 267, 270-71 (D. Conn. 2005).

3. Importantly, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. As one court recently explained:

23

In the context of the fatal shooting of a pet, there are several specific considerations that the court must keep in mind. First, it is well-established that the killing of a pet dog constitutes "a severe intrusion given the emotional attachment between a dog and an owner." Carroll, 712 F.3d at 651; see also Kendall v. Olsen, 237 F. Supp. 3d 1156, 1167 (D. Utah 2017) ("[C]ourts have recognized that most dog owners think of dogs solely in terms of an emotional relationship, rather than a property relationship." (internal quotation marks and citation omitted)); Altman v. City of High Point, 330 F.3d 194, 205 (4th Cir. 2003) ("Dogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring."). On the other side of the balance, however, the governmental interest is "significant": dogs may represent a serious risk to the safety of officers and the general public, and in some circumstances, it may be "reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." Carroll, 712 F.3d at 651. In particular, "the state's interest in protecting life and property may be implicated when there is reason to believe [a] pet poses an imminent danger." Brown v. Muhlenberg Twp., 269 F.3d 205, 210 (3d Cir. 2001). As long as it was reasonable for the officer to believe that danger was imminent, a fatal seizure may be justified even if the dog did not actually pose a danger to the officer. "[T]he law does not require the officer to wait until the approaching animal is within biting distance or is leaping at him before taking protective action." Dziekan v. Gaynor, 376 F.Supp.2d 267, 272 (D. Conn. 2005) (citing Warboys v. Proulx, 303 F. Supp. 2d 111, 118 (D. Conn. 2004)).

Azurdia v. City of New York, 18-CV-04189-ARR-PK, 2019 WL 1406647, at *7 (E.D.N.Y. Mar. 28, 2019).

4. Application of the required calculus is often difficult and this case is no exception. On the one hand, the conduct of plaintiff in responding to an unannounced and unexpected stranger approaching her home was perfectly reasonable. She went outside

24

to see who was at her home and one of her dogs, Bailey, accompanied her. Plaintiff's installation of an electric fence ensured that Bailey would be deterred from going off of plaintiff's property and, indeed, the front porch area where Bailey was shot was clearly within the boundary she was trained to remain within. On the other hand, it was reasonable for Officer Wengert to approach plaintiff's house to determine whether Flowers's explanation about finding the bikes abandoned on the curb in front of Cabisca's residence was accurate and this was within his responsibilities as a police officer. I find that Cabisca was outside, with Bailey just in front of her, when Officer Wengert encountered Bailey. It was dark out and Bailey was not a small dog. Bailey was also barking - a reasonable canine response to the presence of a stranger near her home - but also a noise that would justify some alarm and apprehension from Officer Wengert given the circumstances.

5. As the Second Circuit recognized in Carroll, in some circumstances it is reasonable for a police officer to shoot a dog that "he believes poses a threat to his safety or the safety of the community." Carroll, 712 F.3d at 651. This case presents the perfect storm of events where both plaintiff, Bailey, and law enforcement were reasonable in their response to what each perceived to be danger. Be that as it may, as to the decisive issue on this cause of action, whether, given the totality of circumstances it was objectively unreasonable for Officer Wengert

to believe that Bailey posed a threat to his safety, I find that plaintiff has not met her burden of proof. Id. at 651. ("[P]laintiff has the burden to prove that a seizure was unreasonable."). Given the unusual confluence of circumstances, it was reasonable for Officer Wengert to believe that a large unrestrained dog, barking and quickly approaching him at night by ascending stairs leading onto a small porch that provided no way to retreat safely (see Pl.'s Ex. 2), presented a threat to his safety. Accordingly, it was unfortunate, but not unreasonable for Wengert to draw his weapon and shoot Bailey. As Dr. Williams testified - it is proper police procedure for an officer to shoot a dog if he believes the dog poses a threat to his safety, and the officer may shoot with the intent to eliminate the threat, and not merely wound the animal, if he felt so threatened. Tr. 2, at 164.

6. For these reasons, as to this cause of action, I find for defendants. Although no consolation to plaintiff, it was a "perfect storm" of unforeseen events and reactions to those events that led to the tragic loss of plaintiff's dog. While plaintiff and Bailey did nothing wrong, under the facts found here, the Fourth Amendment does not afford her a remedy. Accordingly, the Court turns next to the conduct of defendants after Bailey was shot and killed.

## B. EXCESSIVE FORCE AND BATTERY

7. The analysis required for determination of a claim alleging

the use of excessive force during an arrest is well established:

In order to establish that the use of force to effect an arrest was unreasonable and therefore a violation of the Fourth Amendment, plaintiffs must establish that the government interests at stake were outweighed by "the nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests." Graham v. Connor, 490 U.S. 386, 396 (1989). In other words, the factfinder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time. Id. at 397 . . . . The inquiry therefore "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

Amnesty America v. Town of West Hartford, 361 F.3d 113, 123 (2d

Cir. 2004) (emphasis supplied).[10]  "Application of physical force

is  excessive  when  it  is  more  than  is  necessary  under  the

---

[10] Plaintiff appears to have also asserted a state law battery claim. Compl., Docket # 1, at ¶¶ 12-19.  Under New York State law, "[b]attery occurs when a person intentionally touches another person without the person's consent and causes an offensive bodily contact." Yan Zhao v. United States, 273 F. Supp. 3d 372, 398 (W.D.N.Y. 2017) (citing Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001)). "'[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical.'"  Humphrey v. Landers, 344 F. App'x 686, 688 (2d Cir. 2009) (quoting Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991)) (internal brackets omitted). Thus, "'[t]he test for whether a plaintiff can maintain a supplemental cause of action for assault and battery is the exact same test as the one used to analyze a Fourth Amendment excessive force claim.'" Graham v. City of New York, 928 F. Supp. 2d. 610, 624 (E.D.N.Y. 2013) (quoting Pierre–Antoine v. City of New York, No. 04-CV-6987, 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006)).

27

circumstances." Brown v. City of New York, 11 CIV. 1068 AJN, 2013 WL 491926, at \*10 (S.D.N.Y. Feb. 8, 2013) (emphasis supplied).

8. Having set forth the applicable legal analysis, the Court turns to applying the law to the conduct of each relevant defendant.

### i. Officer Hogg

9. As stated above, the severity of the crime is an important factor in the excessive force analysis. Officer Hogg determined that plaintiff had committed the offense of Harassment in the Second Degree. Harassment in the Second Degree is a violation under New York State law "for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed." N.Y. Penal Law §§ 10.00(3), 240.26. The severity of a crime of arrest is "unquestionably slight" for purposes of an excessive force claim when it is subject to a maximum penalty of fifteen days' imprisonment. Brown v. City of New York, 798 F.3d 94, 102 (2d Cir. 2015). Thus, the severity of the crime for which Hogg intended to arrest Cabisca was unquestionably minor.

10. A police officer's right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. However, "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer."

28

Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir. 2000). Here, despite the fact that Cabisca straightened her arms and pushed Hogg back in an attempt to keep him away from her, plaintiff posed no real threat to the safety of Hogg or the other officers present. Plaintiff was not trying to flee the scene or trying to physically attack law enforcement. Her family pet had just been shot and killed by an unknown individual in plain clothes and lay bleeding at the foot of her porch. She was unquestionably upset and enraged by what just happened. She had done nothing wrong except go outside her house to investigate a strange man on her porch at night. Her efforts to find out what was going on were not being adequately addressed by the officers present and she was being asked to walk away from the body of her pet and accompany the officers who had just shot her dog. Her "resistance" in allowing Officer Hogg to approach her was, given the unique circumstances, hardly unexpected and not conduct that a reasonable police officer could "reasonably interpret as threatening an attack." Brown, 798 F.3d at 102.

11. On the issue of whether the force used on Cabisca was reasonable or excessive, I found the expert testimony of Dr. Williams to be credible and compelling. Dr. Williams testified that a reasonably well-trained police officer is "authorized to use that amount of force necessary to offset the force being used against him." Tr. 2, at 143. In Dr. Williams's expert opinion,

when officers are confronted with a citizen who is irate or hysterical, the "first step" is always to "deescalate the situation." Tr. 2, at 144. Dr. Williams defined the de-escalation process as follows:

To calmly without any threatening or overt actions try and talk a person down or, at the very least, let that person talk himself out. There is no need for immediate action if a person is simply arguing with a policeman or even using profanity and using curse words to describe that policeman. You use that process instantly to avoid a process where you're arresting a person and placing them in handcuffs.

Tr. 2, at 144.

12.    Hogg failed to employ the process of de-escalation. Instead, he escalated the encounter by directing plaintiff to leave her front lawn and abandon her fatally wounded pet.    When she balked by placing her hands in front of her and pushing him away, Hogg apparently lost his temper and abruptly announced to plaintiff: "[n]ow you're going to jail." Tr. 3, at 487.

13. Having decided to arrest plaintiff, Officer Hogg decided to employ a "straight arm bar technique" to forcibly bring Cabisca to the ground. The technique was demonstrated to the Court during the trial.    Based on the trial testimony and the technique's demonstration, it is of little surprise to this Court that "[t]he plethora of excessive force cases show that the use of arm bar techniques to gain control of an arrestee often result in injury to the arrestee." Fischer v. Hoven, No. 1:16-CV-01056-CBK, 2018 WL

2012908, at *6 (D.S.D. Apr. 30, 2018). I agree with Dr. Williams's testimony that under the facts presented here, use of this particular technique to effectuate plaintiff's arrest "was unreasonable and unnecessary." Tr. 2, at 144-45. Cabisca was unarmed, outnumbered, and made no attempt to flee. "[T]he need for force, if any, was minimal at best." Meredith v. Erath, 342 F.3d 1057, 1061 (9th Cir. 2003).

14. Even assuming for the sake of argument that use of the straight arm bar technique by Officer Hogg was reasonable, his conduct after he threw plaintiff to the ground was unreasonable, unnecessary, and involved the excessive use of force. Given the (1) chain of events leading up to the arrest, (2) nature of the offense plaintiff allegedly committed, (3) height and weight discrepancies between Officer Hogg and Cabisca, and (4) manpower advantage law enforcement had over plaintiff, it was unreasonable and excessive for Hogg to place his 190 pounds of weight on top of Cabisca, place his elbow in her chest, and then lean on her even harder when she said she could not breathe and had asthma.

15. As to whether Officer Hogg utilized more force than was necessary to effectuate the arrest of plaintiff for Harassment in the Second Degree, I find that plaintiff has met her burden of proof.

31

## ii. Officer Prinzi

16. Although Officer Prinzi did not participate in forcibly taking plaintiff to the ground, for the reasons stated earlier I find that Prinzi did assist Hogg once plaintiff was face down on the ground. This assistance consisted of applying his body weight to plaintiff's lower body after Officer Hogg had forcibly put plaintiff on the ground. Tr. 2, at 319, 329-30.

17. Officer Prinzi, who weighed 200 pounds at the time of the arrest used his body weight and his elbows and knees to assist Officer Hogg in arresting plaintiff. As a result of the actions of both officers, plaintiff had close to 400 pounds of weight on top of her. This weight caused plaintiff to suffer bruises, breathing issues, and chest spasms severe enough that she required medical intervention. The Court, having already found that Officer Hogg's use of his bodyweight constituted excessive force, also concludes that Officer Prinzi's use of similar force was excessive in that it was more force than was reasonably necessary to be applied under the circumstances presented.

18. In making the above findings, the Court has taken into consideration the indisputable fact that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397. But unlike many other arrests, the Court is convinced

32

by the testimony adduced, including the expert opinion of Dr. Williams,[11] that the choices made by Officers Hogg and Prinzi were not prompted by a "rapidly evolving" crime scene. Rather, they were considered decisions that were inconsistent with trying to de-escalate the tragic shooting of a beloved pet by law enforcement. Indeed, by the time the force was applied, law enforcement knew or should have known that neither the homeowner nor the pet did anything wrong and that plaintiff, although justifiably upset, presented no real threat to them. See Love v. Town of Granby, No. 03-CV-1960, 2004 WL 1683159, at *5 (D. Conn. July 12, 2004) ("Where there is no need for force, any force used is constitutionally unreasonable." (alterations omitted)). In sum, under the specific facts of this record, the Court determines that plaintiff has proven that both Officers Hogg and Prinzi battered Cabisca and utilized excessive force in effectuating her arrest.

## C. FALSE ARREST

19. Federal claims of false arrest implicate the Fourth Amendment right to be free from unreasonable seizures. See Posr v. Doherty, 944 F.2d 91, 97 (2d Cir. 1991). A § 1983 claim alleging false arrest is "substantially the same" as the tort under New York state law, and thus the Court analyzes both state and federal

---

[11] Although under no obligation to do so, defendants presented no expert evidence to contradict the opinions of Dr. Williams.

claims together. Id. at 96. "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (citing Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)).

20. "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation omitted)). "Probable cause exists when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" Curley v. Village of Suffern, 268 F.3d 65, 69-70 (2d Cir. 2001) (quoting Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (additional internal quotation omitted)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 152 (2004); Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) ("'When determining whether

probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it.'" (quoting Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) (emphasis in original))).

21. Plaintiff was arrested for, inter alia, Harassment in the Second Degree in violation of New York Penal Law section 240.26(1) for shoving Officer Hogg. See Pl.'s Ex. 6; see Docket # 1, at ¶ 21. Harassment in the Second Degree occurs when, "with intent to harass, annoy or alarm another person," someone "strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." N.Y. Penal Law § 240.26 (McKinney).

22. I find that Cabisca's actions in shoving Officer Hogg by pushing her arms and hands forward as Officer Hogg approached her provided Hogg with probable cause to believe that plaintiff had committed the offense of Harassment in the Second Degree under New York State Law. See, e.g., People v. John-Connor, 71 N.Y.S.3d 923 (N.Y. App. Term 2017) (plaintiff's sworn allegation that she "'use[d] her hands' to 'push and shove' a police officer" authorized her arrest for second degree harassment).

23. Because probable cause existed to arrest Cabisca for Harassment in the Second Degree, plaintiff's confinement was otherwise privileged. Savino, 331 F.3d at 75. Having found that probable cause existed for at least one of the offenses for which

35

Cabisca was charged, the Court need not consider whether probable cause existed as to any other charged crimes. Allen v. City of New York, 480 F. Supp. 2d 689, 711 (S.D.N.Y. 2007).

## D. MALICIOUS PROSECUTION

24. "'In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" Dowd v. DeMarco, 314 F. Supp. 3d 576, 583 (S.D.N.Y. 2018) (citing Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010)). To establish a malicious prosecution claim, plaintiff bears the burden of proving "(i) the commencement or continuation of a criminal proceeding against her; (ii) the termination of the proceeding in her favor; (iii) 'that there was no probable cause for the proceeding'; and (iv) 'that the proceeding was instituted with malice.'" Mitchell v. City of New York, 841 F.3d 72, 79 (2d Cir. 2016) (quoting Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003)). "In addition to these elements, a plaintiff proceeding under § 1983 must also 'show a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" Daniels v. Gladstone, No. 16-CV-190 (PKC) (JO), 2019 WL 3502924, at *9 (E.D.N.Y. July 31, 2019) (quoting Mitchell, 841 F.3d at 79).

36

25. Based on plaintiff's arguments and submissions, the Court construes plaintiff's Fourth Cause of Action as one for malicious prosecution under § 1983. Nowhere does plaintiff indicate that this malicious prosecution claim arises under state law.

### i. Unleashed and Dangerous Dogs Violations

26. It is unclear from the complaint whether the plaintiff is claiming she was maliciously prosecuted on the dog-related violations tickets.[12] Regardless, plaintiff cannot establish that a Fourth Amendment seizure occurred.

27. Defendants argue that plaintiff failed to sustain a malicious prosecution claim in light of Burg v. Gosselin, 591 F.3d 95, 101 (2d Cir. 2010) which held that "a pre-arraignment, non-felony summons requiring no more than a later court appearance does not constitute a Fourth Amendment seizure." Thus, defendants now argue that plaintiff did not meet her burden of proving a Fourth Amendment seizure for purposes of her malicious prosecution claim.

28. In Burg, the plaintiff brought a § 1983 action against a canine control officer because she was issued a summons for her dog creating a nuisance. Burg, 591 F.3d at 96 n.1. Under Connecticut law, the dog nuisance constituted an infraction punishable by a "fine[] not more than one hundred dollars or

---

[12] Indeed, Animal Control Officer Berkstresser, who issued the tickets, was dismissed from the case during trial. Tr. 3, at 438-39.

imprison[ment] not more than thirty days." Id. The court in Burg
stated that while the case did not involve a federal malicious
prosecution claim, "the district court characterized Burg's sole
claim as an 'unreasonable seizure.'" Id. at 96 n.3. Indeed, "[a]
plaintiff asserting a Fourth Amendment malicious prosecution claim
under § 1983 must . . . show some deprivation of liberty consistent
with the concept of 'seizure.'" Singer v. Fulton County Sheriff,
63 F.3d 110, 116 (2d Cir. 1995).

29. The dog-related tickets required plaintiff to make a
single appearance at the Municipal Code Violations Bureau on
October 6, 2013. See Pl.'s Ex. 6. The violations for which
Cabisca was ticketed are all punishable only by fines and are
therefore not felonies. See Rochester City Code § 31-17; N.Y.
Penal Law § 10.00(5) ("'Felony' means an offense for which a
sentence to a term of imprisonment in excess of one year may be
imposed."). As in Burg, "a pre-arraignment, non-felony summons"
for a dog-related violation "requiring no more than a later court
appearance does not constitute a Fourth Amendment seizure." Burg,
591 F.3d at 101.

30. Moreover, plaintiff was not even required to make a
"court" appearance but rather attend a civil administrative
hearing. Pl.'s Ex. 16, at 12:10-20 ("No, this isn't a court. This
is an administrative hearing. . . . Those [the Penal Law charges]
are criminal matters. This is dogs."). The hearing held on

38

October 30, 2013 was nothing more than a civil administrative proceeding of the type the Second Circuit has ruled likely cannot support a claim for malicious prosecution under § 1983:

> As we have noted, our case law does not forbid a § 1983 malicious prosecution claim premised on a civil or administrative proceeding; however, because such claims must, under Albright and Singer, be premised on a violation of Fourth Amendment rights, it is unlikely that a civil proceeding of the kind at issue here would implicate constitutional rights in a manner that would warrant redress under § 1983.

Washington v. County of Rockland, 373 F.3d 310, 317 (2d Cir. 2004) (section 1983 action for malicious prosecution for subjecting plaintiff-officers to a civil administrative disciplinary proceeding). This is particularly so where, as here, plaintiff was "never taken into custody, imprisoned, physically detained, or seized" for the dog-related violations. Id. at 316. The Court specifically asked plaintiff's counsel if Cabisca was "arrested on the dog violations or was [Cabisca] arrested on the resisting arrest?" Tr. 3, at 419. Plaintiff's counsel only responded that plaintiff was charged with dog-related violations. Tr. 3, at 420. As defense counsel correctly noted, the dog violations are not arrestable offenses. Tr. 3, at 419-420; Rochester City Code § 31-17.

31. Plaintiff cannot establish that a criminal proceeding was commenced against her and hence the proof at trial cannot sustain

a claim of malicious prosecution by virtue of being issued the six dog-related violations tickets.

## ii. Penal Law Charges

32. Again, although it is unclear whether plaintiff intends to assert a malicious prosecution claim for plaintiff's Penal Law charges, any such claim fails under both state and federal law.[13]

33. In ruling on defendant's motion for summary judgment, this Court determined that plaintiff "satisfied the first two elements" of a malicious prosecution claim for the Penal Law charges "by providing proof of the dismissal of both charges against her." Docket # 45, at 12 (citing Mitchell, 841 F.3d at 79). However, the Court ruled that there remained issues of fact as to whether probable cause existed for the proceeding and whether the proceeding had been instituted with malice. Docket # 45, at 13-14.

34. Based on the evidence adduced at trial, the Court is satisfied that there was probable cause to initiate the proceeding on the Penal Law charges, foreclosing a malicious prosecution claim. Plaintiff argues that there was no probable cause for the Resisting Arrest charge because there was no probable cause to

---

[13] Defendants appear to argue that Burg also bars plaintiff's § 1983 malicious prosecution claim on the Penal Law charges. Because the Court finds that there was probable cause to initiate criminal proceedings for these charges, it declines to address whether the appearance tickets and subsequent court appearances amount to a Fourth Amendment seizure, as required for a malicious prosecution claim under § 1983.

40

arrest her for the underlying Harassment in the Second Degree charge. Docket # 111, at 84. However, that argument fails because the Court previously determined in Part C, supra, that there was probable cause for the Harassment in the Second Degree charge.[14] The testimony adduced at trial also establishes that plaintiff was in fact resisting arrest. Plaintiff herself admits that she "pulled away" from Hogg, Tr. 2, at 318, and Hogg maintains that he interpreted plaintiff's actions as her resisting arrest, Tr. 3, at 488-89. See Johnson v. City of Troy, No. 114CV0817GTSTWD, 2016 WL 5107124, at *14 (N.D.N.Y. Sept. 20, 2016) (finding there was probable cause to arrest and prosecute plaintiff for resisting arrest where it was undisputed that plaintiff acted in a way that the police reasonably believed interfered with the arrest). Therefore, there was probable cause for the Harassment in the Second Degree and Resisting Arrest charges.

35. Accordingly, plaintiff has not sustained her burden of proof on her malicious prosecution claims.

## E. QUALIFIED IMMUNITY

36. Defendants assert that even if they are found liable under any of the above causes of action, they are entitled to qualified immunity. Accordingly, the Court will address the qualified

---

[14] Although "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," the Court is satisfied for the same reasons set forth in Part C, supra, that there was probable cause for the Harassment in the Second Degree proceedings. Accord Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013).

immunity defense as it pertains to excessive force, the only claim
that the Court has found for plaintiff.

37. "Qualified immunity protects public officials from civil
liability only 'if (a) the defendant's action did not violate
clearly established law, or (b) it was objectively reasonable for
the defendant to believe that his action did not violate such
law.'" Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015)
(quoting Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)). Here,
defendants do not dispute that the right to be free from the use
of excessive force wasord "clearly established" at the time they
arrested Cabisca. See Mickle v. Morin, 297 F.3d 114, 122 (2d Cir.
2002) (it is "well established that the use of excessive force in
the course of an arrest is constitutionally prohibited").

38. "'[I]n the context of excessive force, the Fourth
Amendment reasonableness inquiry tends to converge with the
qualified immunity reasonableness inquiry.'" Jackson v.
Mastrangelo, 6:17-CV-06448 EAW, 2019 WL 4686456, at *4 (W.D.N.Y.
Sept. 26, 2019) (quoting Spencer v. Sullivan County, 18-cv-365,
2019 WL 4514011, at *7 n.5 (W.D.N.Y. Sept. 19, 2019); see Saucier
v. Katz, 533 U.S. 194, 210 (2001) (Ginsburg, J., concurring in the
judgment) (stating that "paradigmatically, the determination of
police misconduct in excessive force cases and the availability of
qualified immunity both hinge on the same question: Taking into
account the particular circumstances confronting the defendant

42

officer, could a reasonable officer, identically situated, have believed the force employed was lawful?").

39. As Magistrate Judge Payson recently explained:

Certainly, as established caselaw makes clear, the extent to which, if at all, an arrestee presents a danger to the officers and the nature and degree of the arrestee's resistance to the arrest are important considerations in the context of analyzing whether qualified immunity applies to a challenged use of force. See Betts v. Rodriquez, 2017 WL 2124443, *4 (S.D.N.Y. 2017) ("the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances[,]  .  .  . [including] whether the suspect poses an immediate threat to the safety of the officers or others  .  .  . [and] whether he is actively resisting arrest or attempting to evade arrest by flight") (internal quotations omitted); Ahern v. City of Syracuse, 411 F. Supp. 2d 132, 152 (N.D.N.Y. 2006) ("[i]n the context of qualified immunity, 'reasonable' requires the court to balance the same factors it considers in determining reasonable force under the Fourth Amendment: the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest."); Bantum v. City of New York, 2001 WL 705889, *2 (S.D.N.Y. 2001) (whether a defendant is entitled to immunity for the force used during an arrest "requires an analysis of a variety of factors including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest") (internal quotations omitted).

Warr v. Liberatore, 13-CV-6508P, 2019 WL 4072662, at *5 (W.D.N.Y. Aug. 29, 2019).

40. Having already engaged in the reasonableness analysis in finding excessive force was used during plaintiff's arrest, the Court need not repeat itself. Suffice it to say that given the

particular circumstances confronting defendants Hogg and Prinzi, their actions were not "objectively reasonable." Cf. Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1062 (9th Cir. 2003) ("We need no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case.").

41. Accordingly, Officers Hogg and Prinzi are not entitled to qualified immunity on plaintiff's excessive force claims.

## F. DAMAGES

42. Having found for plaintiff on her battery and excessive force claims against Officer Hogg and Officer Prinzi, the Court must determine the damages proximately caused by their actions. "Courts are not required to provide lengthy analyses in support of their damages findings but they are required under Fed. R. Civ. P. 52(a) to adequately explain the subsidiary facts and methodology underlying the ultimate finding." Henry v. Champlain Enters., Inc., 445 F.3d 610, 622 (2d Cir. 2006) (internal quotation omitted).

43. "[A] plaintiff may recover money damages against an officer acting under color of federal law for using excessive force in violation of the Fourth Amendment in

44

effecting his arrest." Torres-Cuesta v. Berberich, No. 08-CV-1382 (ARR)(LB), 2011 WL 3298448, at *12 (E.D.N.Y. Aug. 1, 2011) (citing Graham, 490 U.S. at 394 n.9); Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995)). Plaintiff here seeks compensatory and punitive damages.

### i. Compensatory Damages

44. "To recover compensatory damages plaintiff must prove that his injuries were proximately caused by the constitutional violation." Atkins v. New York City, 143 F.3d 100, 103 (2d Cir. 1998).

> "Generally, a plaintiff may recover for loss of earnings, medical expenses, and mental and physical pain and suffering attributable to the defendant's [tortious conduct]." Robinson v. United States, 330 F. Supp. 2d 261, 290 (W.D.N.Y. 2004). Monetary awards for pain and suffering are "inherently subjective . . . , not subject to precise quantification, and generally present[ ] a question of fact." Leto v. Amrex Chem. Co., 85 A.D.3d 1509, 1511 (3d Dep't 2011) (internal quotations omitted)" . . . . . "'Factors to be considered in evaluating such awards include the nature, extent and permanency of the injuries, the extent of past, present, and future pain and the long-term effects of the injury,' including the effect on the capacity to enjoy life, engage in daily tasks and/or activities that once brought pleasure, as well as any loss of self-esteem." Cody v. State of New York, 59 Misc. 3d 302, 314 (N.Y. Ct. Cl. 2017) (quoting Nolan v. Union Coll. Trust of Schenectady, N.Y., 51 A.D.3d 1253, 1256 (3d Dep't), lv. denied, 11 N.Y.3d 705 (N.Y. 2008)).

McKnight v. Vasile, No. 11-CV-6328P, 2018 WL 4625549, at *1 (W.D.N.Y. Sept. 27, 2018) (citations omitted).

45. After careful review of the evidence presented and after considering damages awarded in other excessive force cases, the Court concludes that an award of $50,000 in compensatory damages is justified and appropriate in this case. $40,000 is attributable to Officer Hogg and $10,000 is attributable to Officer Prinzi.

46. In making this decision as to damages, the Court notes that it has considered and credited the opinions of Dr. Ewing as to the nature, extent, severity, and permanency of plaintiff's injuries and mental suffering proximately caused by excessive force used by defendants. The Court has also relied on the testimony of the plaintiff which it found to be generally credible on her physical injuries and mental suffering. The Court finds that damages in the amount of $50,000 is sufficient to reasonably compensate plaintiff for her injuries.[15]

## ii. Punitive Damages

47. "'Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Edwards v. Cornell, No. 3:13-cv-878(WIG), 2017 WL 5719144, at *8 (D. Conn. Nov. 28, 2017) (quoting Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996)).

---

[15] Plaintiff requests an award of $343,200 for plaintiff's mental health treatment. Docket # 111, at 55, 105. Plaintiff did not address or request an amount for plaintiff's physical injuries. Nor did plaintiff submit any actual medical bills as proof of the cost of her psychotherapy treatment.

46

48. The Court finds no evidence that Officers Hogg or Prinzi's actions were "motivated by evil motive or intent" or that either acted with "callous indifference" to plaintiff's rights. Accordingly, the Court declines to award punitive damages.

### iii. Attorney's Fees

49. Plaintiff's attorney also makes a request for an award of attorney's fees but has not submitted any documentation sufficient for the Court to determine what fees plaintiff's counsel claims. Accordingly, plaintiff's request for attorney's fees is denied without prejudice to renew. Any application for attorney's fees must comply with the law in the Second Circuit and be supported by contemporaneous time records. Such motion must be filed within 21 days from entry of this Decision and Order. Because the undersigned will be retiring as a Magistrate Judge on November 5, 2019, such application for attorney's fees shall be made to and determined by my successor, Magistrate Judge Mark Pedersen.

### Conclusion

Based on the foregoing, the Court finds in plaintiff's favor on her state law claim for battery and her claim for excessive force under 42 U.S.C. § 1983. The Court finds in favor of defendants on all other causes of action. The Court awards plaintiff $50,000 in compensatory damages, $40,000 of which is attributable to Officer Hogg and $10,000 of which is attributable to Officer Prinzi.

47

IT IS SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     November 4, 2019
           Rochester, New York