UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TINA CABISCA,

Plaintiff,

-vs-                                          DECISION AND ORDER

DARYL HOGG and JAYSON PRINZI.,                14-CV-6485-MJP

Defendants.

**Pedersen, M.J.** On November 4, 2019, the Honorable Jonathan W. Feldman issued a thorough, well-written Decision and Order (ECF No. 116) in the bench trial he conducted in this case. Judge Feldman found in favor of Plaintiff Tina Cabisca ("Plaintiff) on her state law claim for battery and her claim for excessive force under 42 U.S.C. § 1983. He found in favor of Defendants on all other causes of action. Judge Feldman awarded Plaintiff $50,000 in compensatory damages, $40,000 of which is attributable to Officer Hogg and $10,000 of which is attributable to Officer Prinzi. The Clerk filed a Judgment (ECF No. 117) on November 11, 2019.

On November 15, 2019, Counsel for the Defendants filed a motion for reconsideration of both the Judgment and the Decision and Order. (ECF No. 120.) On January 31, 2020, Plaintiff filed a response in opposition. (ECF No. 129.) For the reasons stated below, the Court denies Defendants' application.

## BACKGROUND

On September 7, 2013, Plaintiff's family was cleaning out her garage at 207 Kingsboro Road, Rochester, New York, of items they had stored there. At some point during their cleaning they placed two children's bikes on the curb between Plaintiff's

sidewalk and the street for anyone to take. (Trial Tr. vol. 2, 189:7–91:13, Feb. 20, 2019, ECF No. 107.) Tyrone Flowers ("Flowers"), having a six-year-old at the time and noticing the bikes were left out for anyone to take them, took the bikes and began walking them down the road to his house. (Trial Tr. vol. 3, 352:14–19, 355:2–356:17, Feb. 20, 2019, ECF No 108.) An individual, later found to be Investigator Nolan Wengert ("Inv. Wengert"), drove his unmarked grey Impala "up the street looking for something like he was lost…" as Flowers walked to his house. (Trial Tr. vol. 3, 356:19–20.) As Flowers got to his house, he saw the driver of the Impala walking up his driveway. Inv. Wengert, who had not been driving a marked police car and was not wearing a uniform, demanded that Flowers get on the ground, but did not disclose he was an officer. (*Id*. 357:2–7) After Flowers refused to get on the ground, Inv. Wengert "threw [him] to the ground and that's when he appeared to put the handcuffs on [Flowers]." (Trial Tr. vol. 3, 357:16–25.) Inv. Wengert called for backup on a radio, which is the first time Flowers realized he was a police officer. (Trial Tr. vol. 3, 357:25–58:2.)

Two uniformed officers, Daryl Hogg ("Officer Hogg") and Jason Prinzi ("Officer Prinzi"), arrived and loaded the bikes into a police vehicle. The officers went to Plaintiff's residence with Flowers. (Trial Tr. vol. 3, 360:20–25.) Flowers testified that: "due to I know the area so I was letting them know like who's sitting where, where I got the bikes from, she got dogs because I lived over there for years but they didn't want to hear none of that. So they decided to take it into they own hands." (Trial Tr. vol. 3, 361:5–9.)

The officers arrived at the residence at about 10:00 p.m. (Trial Tr. vol. 2, 191:22–23.) Plaintiff had three dogs in her home: a 13-year-old border collie named Teddy; a seven-year-old boxer named Rocco; and a four-year-old boxer named Bailey. (Trial Tr. vol. 2, 192:18–93:11–13.) Each dog was "about 60, 65 pounds." (Trial Tr. vol. 2, 94:18.) Plaintiff described Bailey as a "lover. She was just the dog that would come up, put her head on your lap and need to be loved." (Trial Tr. vol. 2, 307:15–17.)

When Inv. Wengert, Officer Prinzi, and Officer Hogg arrived at Plaintiff's home, Inv. Wengert walked up onto Plaintiff's covered front porch, rang the doorbell, and knocked on the door. (Wengert Dep. 51, 53, Pl.'s Trial Ex. 17. Copy on file in Chambers.)[1] He did not see the Invisible Fence sign. (Wengert Dep. 51.) He heard some movement in the house but did not hear any barking or growling. (Wengert Dep. 53–54.) He heard, but did not see, the side door open, and "walked off the porch to come around the corner and said hello." (Wengert Dep. 54, 16.) Not expecting visitors, Plaintiff exited through her side door to see what was happening outside her home and her dog, Bailey, exited the side door with her. (Trial Tr. vol. 2, 212.) Bailey was trotting a little bit ahead of [Plaintiff] by "about 3 feet." (Trial Tr. vol. 2, 216.) The witnesses dispute whether Bailey was barking or growling. (Trial Tr. vol. 2, 216–17; Trial Tr. vol. 3, 364, 452.)

Inv. Wengert, in plainclothes, perceiving that Bailey was charging at him, backed up quickly onto the porch and drew his pistol. (Wengert Dep. 57–58.) The

---

[1] Nolan Wengert passed away before he could testify at the trial; as a result, his deposition was used in deciding both the case and this motion to reconsider.

witnesses dispute whether Bailey ever advanced up the front porch stairs. (Wengert Dep. 54; Trial Tr. vol. 3, 452–53, 481.) Wengert fired his gun twice, hitting Bailey. (Wengert Dep. 57–58.) Officer Prinzi heard the shots and saw Bailey collapse. (Trial Tr. vol. 3, 453.)

When Plaintiff heard the shots that killed Bailey, she looked to her left to see a man pointing a gun in her direction and Bailey lying at the bottom of the steps in a pool of blood. (Trial Tr. vol. 2, 212, 214.) Plaintiff did not have any reason to believe that Inv. Wengert was a law enforcement officer because he was not wearing a uniform. (Trial Tr. vol. 2, 212.) Plaintiff's witness, James Williams, Ph.D., an expert in the field of police behavior, opined that Inv. Wengert did not follow proper police procedure when he went up onto Plaintiff's porch to investigate the potential larceny, because Wengert was in plainclothes when he approached Plaintiff's front door, not in a police uniform. (Trial Tr. vol. 2, 136–37.) Plaintiff bent down to tend to her dog and she "hear[d] a voice from over here telling [her] to get [her] dog under control." (Trial Tr. vol. 2, 214.) She looked up to see whom she later identified as Officers Hogg and Prinzi "coming down [her] driveway and they also have their guns out pointed in [her] direction." (Trial Tr. vol. 2, 214.) She testified that:

> it was, you know, anxiety beyond—if you ever can imagine having something like that happen to you. It was surreal. It was just like a movie that happened to somebody else, you know, but never happened to me and I never would have expected it to happen to me … the amount of everything going on at that time—and this is all very short, you know, this isn't like this is a long drawn out period. It was like boom, boom, boom. And when you're not even telling me what, what's going on, like who's what, the anxiety that I had was incredible. And was I angry? Oh, completely angry. And did I cuss at them? Yes, I cussed at them because when I have to say what the hell are you doing here, you know, I think

that's so inappropriate. It would have been nice for somebody just to say
I'm officer Joe Blow and this is what we're doing here.

(Trial Tr. vol. 2, 228:2–16.) Plaintiff asked the officers for their identification and
badge numbers and what they were doing at her house, but the officers did not answer
her. (Trial Tr. vol. 2, 229.) The officers asked her to step off her property with them,
but Plaintiff declined to do so because they would not tell her who they were or why
they were there. (Trial Tr. vol. 2, 230.)

Plaintiff stayed near Bailey at the bottom of the porch steps. (Trial Tr. vol. 2,
231.) She "told them to step back away from me" putting her palms up and her arms
forward. (Trial Tr. vol. 2, 232.) Officer Prinzi testified that Plaintiff "with both hands,
came and shoved" Officer Hogg: "Both palms out she walked up to Officer Hogg, put
her hands on his chest and shoved him." (Trial Tr. vol. 3, 459–60.) According to Officer
Prinzi, the shove "[k]nocked [Officer Hogg] back at least a step or two." (Trial Tr. vol.
3, 460.) According to Plaintiff, she did not shove Officer Hogg. Plaintiff testified that
Officer Hogg walked directly into her outstretched arms. (Trial Tr. vol. 2, 234.) Based
on Judge Feldman's consideration of the trial testimony, he found that plaintiff did
push Officer Hogg away from her, although it was probably not a push that would
cause Officer Hogg to fear for his safety, particularly given the size and weight
differences between Officer Hogg and Plaintiff. (Decision and Order 13, November 11,
2019, ECF No. 116.) Once Plaintiff touched him, Officer Hogg told Plaintiff she was
going to jail. (Trial Tr. vol. 3, 463, 487–88; Trial Tr. vol. 2, 234.) Officer Hogg decided
to arrest Plaintiff on a charge of harassment in the second degree and approached

her to take her into custody. (Trial Tr. vol. 3, 487.) Plaintiff tried to pull away from Officer Hogg. (Trial Tr. vol. 2, 318.)

Officer Hogg considered Plaintiff to be resisting arrest and decided to perform a straight arm bar technique to subdue her. (Trial Tr. vol. 3, 488.) To do so, Officer Hogg testified that he "guided [Plaintiff] to the ground" by "grabb[ing] [Plaintiff's] right wrist with my right hand and then I put my hand on her shoulder which would have been her right side." (Trial Tr. vol. 3, 487–88.) In performing the straight arm bar technique, both Plaintiff and Flowers testified that Officer Hogg "threw [Plaintiff] on the ground" and got on the top half of her body. (Trial Tr. vol. 2, 235; Trial Tr. vol. 3, 374, 393–94.) Judge Feldman found Plaintiff's and Flowers' testimony to be credible. Officer Hogg had his elbow in plaintiff's chest area. (Trial Tr. vol. 2, 235–36.) Officer Prinzi put his elbows and knees onto the lower half of Plaintiff's body, "leaning on [her] holding [the] bottom half of [her] body." (Trial Tr. vol. 2, 236, 319; Trial Tr. vol. 3, 374, 394.)

Plaintiff was issued an appearance ticket charging her with harassment in the second degree pursuant to New York State Penal Law section 240.26(1) and resisting arrest pursuant to New York State Penal Law section 205.30. (Decision and Order ¶ 45, ECF No. 116.) She was also issued numerous animal control tickets; both the animal control tickets, and the penal law charges, were dismissed. (*Id.* ¶¶ 47–48.)

On November 4, 2020, Judge Feldman issued a decision and order, granting Plaintiff's claim for battery and excessive force, awarding her $50,000 in compensatory damages. (Decision and Order 2, ECF No 116.) On November 15, 2019,

Defendants filed the pending motion for reconsideration. (Def.s' Mot. for

Reconsideration, Nov. 15, 2019, ECF No. 120.)

## STANDARD OF LAW

Federal Rule of Civil Procedure 52 has already been addressed by this Court

in Judge Feldman's Decision and Order. Rule 52 pertains to appellate review, rather

than reconsideration by the trial court. Arguments under Rule 52 should be made to

the appellate court.

> Rule 52(b), however, does permit a trial court to "amend its findings—
> or make additional findings" as well as "amend the judgment." Fed. R.
> Civ. P. 52(b). The underlying purpose of Rule 52(b) "is to permit the
> correction of any manifest errors of law or fact that are discovered, upon
> reconsideration, by the trial court." *Nat'l Metal Finishing Co. v.
> BarclaysAmerican / Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990).
> It is "not intended to allow parties to rehash old arguments already
> considered and rejected by the trial court." *Id.* (citing *American Train
> Dispatchers Ass'n v. Norfolk & Western Ry. Co.,* 627 F.Supp. 941, 947
> (N.D. Ind. 1985)).

*Zell v. Klingelhafer*, No. 13-CV-458, 2018 WL 334386, at *3 (S.D. Ohio Jan. 8, 2018),

*aff'd,* 751 F. App'x 641 (6th Cir. 2018), *cert. denied,* 139 S. Ct. 1299, 203 L. Ed. 2d 416

(2019), *reh'g denied,* 139 S. Ct. 1649, 203 L. Ed. 2d 920 (2019).

Federal Rule of Civil Procedure 60(b) provides a means to obtain relief from a

judgment. It states:

> On motion and just terms, the court may relieve a party or its legal
> representative from a final judgment, order, or proceeding for the
> following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not
> have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

"Under both Rules 59(e) and 60(b), the decision to grant or deny a motion for reconsideration is within 'the sound discretion of a district court judge.'" *Lichtenstein v. Reassure Am. Life Ins. Co.*, No. 07-CV-1653 DLI LB, 2011 WL 1527787, at *1 (E.D.N.Y. Apr. 20, 2011) (citations omitted). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked . . . ." *Shrader v. CSX Transp., Inc.,* 70 F3d 255, 257 (2d Cir. 1995). "Reconsideration is not a proper tool to repackage and re-litigate arguments and issues already considered by the court in deciding the original motion. Nor is it proper to raise new arguments and issues." *Lichtenstein,* 2011 U.S. Dist. LEXIS 42765, 2011 WL 1527787, at 1 (citations omitted). *Sabeniano v Citibank, N.A.,* 2013 US Dist LEXIS 200242, at 3-5 [SDNY Oct. 25, 2013]. Although Rule 60(b) "strikes a balance between serving the ends of justice and preserving the finality of judgments[,] ... final judgments should not be lightly reopened." *Tapper v. Hearn*, 833 F.3d 166, 170 (2d Cir. 2016) (quoting *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)).

## ANALYSIS

### Points I and II

Defendants assert that Judge Feldman's Decision and Order contains manifest errors of both fact and law, claiming that his decision is in conflict with the holding in *McKnight v. Vasile,* No. 11-CV-6328P, 2018 WL 4625549 (W.D.N.Y. Sept. 27, 2018)*,* and *Digennaro v. Town of Gates Police Dep't,* 2013 US Dist LEXIS 8557 (W.D.N.Y. 2013).

As stated above, the Defendants must show the decision was clearly erroneous, or show that there are additional facts unknown at the time of the decision that would change the outcome, or show that the trial court overlooked facts or controlling law Defendants raised at the time of the decision. Here, Defendants fail to identify controlling decisions or facts Judge Feldman overlooked that might reasonably be expected to alter the conclusion he reached. *Shrader* v. *CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (articulating the standard in context of reviewing a motion under Fed. R. Civ. P. 59(e)). Defendants do not offer any proposed amended or additional facts, do not cite any facts in the record that they contend the Court overlooked, and do not cite even one Second Circuit or Supreme Court decision to support their argument that the "subject Decision and Order contains manifest errors of both fact and law." (Def.s' Mem. of Law 3, Nov. 15, 2019, ECF No 120-5.)

### Rule 52

Findings of fact cannot be set aside unless the movant shows they are "clearly erroneous." Fed. R. Civ. P. 52(a)(5). Judge Feldman held a three-day bench trial from February 19 to 21, 2019. (Minute entries, Feb. 19, 20 & 21, 2019, ECF Nos. 101–03.)

Following the bench trial, Defendants filed their Proposed Findings of Fact and Conclusions of Law on August 6, 2019 (ECF No. 110). Judge Feldman presided at the bench trial and was able to personally observe the demeanor of testifying witnesses. As such, he was in a much better position to examine the facts of the case than the undersigned, to whom this case was transferred upon Judge Feldman's retirement. While there was a transcript of the entire trial, there is no video recording of the proceedings that would allow the undersigned to have a better or equal view of the case as a whole as compared to Judge Feldman. Simply put, the trial judge, by virtue of being present at the trial and witnessing the testimony and especially the demonstrative evidence in person, had a more complete picture of the case as a whole. Nuance in testimony and, in this case the performance of an in-court demonstration of the hotly contested arm-bar maneuver, is not recorded except in words on paper.

In his Decision and Order, Judge Feldman explained that "[m]any of the factual conflicts between the parties are so divergent that they cannot both be true," and explained that Rule 52(a) did not require him to "reconcile the irreconcilable." (Decision and Order at 2, November 11, 2019, ECF No 116. (citing *Krieger* v. *Gold Bond Bld. Prods., A Div. of Nat'l Gypsum Co.*, 863 F.2d 1091, 1097 (2d Cir. 1988) (in meeting the requirements of Rule 52(a) the court must only "make sufficiently detailed findings to inform the appellate court of the basis of the decision and to permit intelligent appellate review")). He explained that "[t]o the extent the Court credits testimony that is inconsistent with, or different than, other testimony, it is because the Court has found the facts adopted, when considered with all the other

facts and circumstances, more credible and believable than the testimony or facts not adopted." (*Id.*) Judge Feldman determined that Inv. Wengert had no way to retreat, perceived the dog as a threat, and properly shot it. (Decision and Order at 26, November 11, 2019, ECF No 116.) Officer Hogg had probable cause to arrest Plaintiff for harassment in the second degree and resisting arrest. (*Id.* at 35.) Judge Feldman found no evidence that Officers Hogg or Prinzi's actions were "motivated by evil motive or intent" or that either acted with "callous indifference" to Plaintiff's rights. Accordingly, the Court declined to award punitive damages. (*Id* 47–48). Further, he found that when Officer Hogg arrested Plaintiff, he "threw" her on the ground "and got on the top half of her body" with his elbows in her chest area. (*Id* at 14.) Judge Feldman credited the testimony of Plaintiff and the witness, Tyrone Flowers, in reaching this finding. (*Id.*) He found that after Plaintiff was on the ground, "Officer Prinzi put his elbows and knees onto the lower half of [Plaintiff's] body, 'leaning on [her] holding [the] bottom half of [her] body." (*Id.* at 14.) In making this determination, he credited Plaintiff's testimony over the testimony of Officers Prinzi and Hogg, explaining that the "inconsistencies in the officers' testimony when considered in light of the testimony of the plaintiff herself and the eyewitness Flowers, causes the Court to find that plaintiff met her burden of proof in showing that Officer Prinzi did make contact with Plaintiff during her arrest." (*Id.* at 14–15.) All of these findings are were made by witnessing the full trial and observing the witnesses testify, which is not possible for the undersigned by reading the transcripts.

All of these determinations were made by reviewing the evidence as it was presented at trial, something which cannot be readily recreated.

Nothing the defense has raised is "clearly erroneous," Fed. R. Civ. P. 52(a)(5). Defendants reargue the Court's credibility determinations. Issues of credibility and those arising out of contradictory testimony are primarily to be disposed of by the trial judge in a non-jury case and not by a reviewing court. *M. W. Zack Metal Co.* v. *S. S. Birmingham City*, 311 F.2d 334 (2d Cir. 1962). Where a credibility determination is inextricably dependent on first-hand observation of the witnesses, that determination should not be disturbed by a reviewing court. *See Klein* v. *Smith*, 559 F.2d 189, 192 (2d Cir. 1977). Where findings of federal district court are dependent on oral testimony and candor and credibility of witnesses, a reviewing court should only disturb the findings in the "most unusual circumstances." *Rosenthal* v. *Hildebrand*, 242 F.2d 607, 608 (7th Cir. 1957). Rule 52(b) permits the party to propose amended or additional fact findings based on facts in the record that it contends the Court overlooked in reaching its own fact findings. If the party demonstrates that a fact finding should be amended or that additional findings should be made, the party may request that the judgement be amended accordingly.

The defense lists five factual conclusions Judge Feldman made which it claims are erroneous:

1. "Indeed, by the time the force was applied, law enforcement knew or should have known that neither the homeowner nor the pet did anything wrong

and that plaintiff, although justifiably upset, presented no real threat to them." (Decision and Order at 33.)

2.  "Here, despite the fact that [Plaintiff] straightened her arms and pushed [Officer Hogg] back in an attempt to keep him away from her, plaintiff posed no real threat to the safety of [Officer Hogg] or the other officers present…." (*Id* at 29.)

3.  "Based on my consideration of the trial testimony, I find that plaintiff did push [Officer Hogg] away from her, although it was probably not a push that would cause [Officer Hogg] to fear for his safety, particularly given the size and weight differences between Officer Hogg and plaintiff." (*Id* at 13.)

4.  "[Plaintiff] was unarmed, outnumbered, and made no attempt to flee. "[T]he need for force, if any, was minimal at best." (*Id* at 31.)

5.  "Based on the trial testimony *and the technique's demonstration*, it is of little surprise to this Court that '[t]he plethora of excessive force cases show that the use of arm bar techniques to gain control of an arrestee often result in injury to the arrestee.' I agree with Dr. Williams's testimony that under the facts presented here, use of this particular technique to effectuate plaintiff's arrest "was unreasonable and unnecessary." (*Id*. 30–31.)

(Def.s' Mem. of Law 6–7, Nov. 15, 2019, ECF No 120-5, citing Decision and Order November 11, 2019, ECF No 116.)

***Issue Three***

As issues one, two, four, and five are related, the Court will discuss issue three first. Defendants assert that the Court substituted its judgment for the reasonable judgment of police officers. (Def.s' Mem. of Law 8.) Specifically, Defendants argue that because Plaintiff refused to leave the scene where the police had just shot and killed her dog, and pushed Officer Hogg in the chest, "there is no basis for Judge Feldman's conclusion that [Plaintiff] was not a flight risk or posed no threat from a reasonable officer's perspective." (*Id* at 8.) Defendants' contention raises no new facts, and does not rise to the level of "clearly erroneous." Defendants do not cite to any evidence in the record to demonstrate that the Court's inference that "it was probably not a push that would cause [Officer Hogg] to fear for his safety," was unreasonable. The analysis required for determination of a claim alleging the use of excessive force requires,

> "the factfinder [to] determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time…. The inquiry therefore 'requires careful attention to the facts and circumstances of each particular case, including … whether the suspect poses an immediate threat to the safety of the officers or others."

(Decision and Order at 27, ECF No 116 (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir 2004), and *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The trial judge was required to consider the age, size and weight differences between Plaintiff and Officer Hogg, in determining if Plaintiff was an "immediate threat to the safety of" Officer Hogg. As such, there is nothing to suggest his ruling was "clearly erroneous."

***Issues One, Two, Four, and Five***

The remaining issues fall within the claim that "[t]here is no basis for Judge Feldman's conclusion that [Plaintiff] was not a flight risk or posed no threat from a reasonable officer's perspective," and that "it was improper for Judge Feldman to supplant Defendants' judgment with 20/20 calculus of the parties' relative height, weight and age." Defendants seem to be claiming that in considering the totality of the circumstances to determine whether the force used by Officers Hogg and Prinzi against Plaintiff in this case was excessive and unreasonable, it was improper for the the judge to make credibility determinations and draw inferences from the trial testimony. Judge Feldman specifically cited to evidence in the record to support his position for each finding of fact. As stated above, Judge Feldman followed what was required under *Graham* v. *Connor*, 490 U.S. 386 (1989). These findings were based on the record and Defendants do not provide any new information to suggest that the findings should be changed. Therefore, because Defendants have failed to request that the Court make amended or additional findings, and have not argued that the findings or conclusions of law are unsupported by facts in the record, the Court denies their Rule 52(b) motion. *United States* v. *Local 1804-1, Int'l Longshoremen's Ass'n*, 831 F. Supp. at 169 ("to succeed under Rule 52(b), the defendants must show that the Court's findings of fact or conclusions of law are not supported by the evidence in the record.").

***Point III: Per Se Excessive Force***

Defendants' claim that "Judge Feldman's Decision ... declares trained, well-established police takedown procedures as *per se* excessive force based on hindsight

analysis of the threat to an officer during real-time, active resistance." (Def.s' Mem. of Law 3.) It is unclear to the Court where Defendants believe the "straight arm bar" technique was found by Judge Feldman to be *per se* excessive force. Judge Feldman held that Officer Hogg did not properly *employ* the "straight arm bar" technique, as he testified it was taught at the police academy, because he "threw" Plaintiff on the ground instead of "guiding" or "escorting" her to the ground, as trained. A police officer's right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. However, "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). Judge Feldman explains that:

> despite the fact that [Plaintiff] straightened her arms and pushed Hogg back in an attempt to keep him away from her, plaintiff posed no real threat to the safety of Hogg or the other officers present. Plaintiff was not trying to flee the scene or trying to physically attack law enforcement. Her family pet had just been shot and killed by an unknown individual in plain clothes and lay bleeding at the foot of her porch. She was unquestionably upset and enraged by what just happened. She had done nothing wrong except go outside her house to investigate a strange man on her porch at night. Her efforts to find out what was going on were not being adequately addressed by the officers present and she was being asked to walk away from the body of her pet and accompany the officers who had just shot her dog. Her "resistance" in allowing Officer Hogg to approach her was, given the unique circumstances, hardly unexpected and not conduct that a reasonable police officer could "reasonably interpret as threatening an attack." *Brown*, 798 F.3d at 102.

(Decision and Order 29, ECF No 116.) On the issue of whether the force used on Plaintiff was reasonable or excessive, Judge Feldman found the expert testimony of

Dr. Williams to be credible and compelling. (*Id*. at 29.) In Dr. Williams's expert opinion, when officers are confronted with a citizen who is irate or hysterical, the "first step" is always to "deescalate the situation." (Trial Tr. vol. 2, at 144.) Dr. Williams defined the de-escalation process as follows:

> To calmly without any threatening or overt actions try and talk a person down or, at the very least, let that person talk himself out. There is no need for immediate action if a person is simply arguing with a policeman or even using profanity and using curse words to describe that policeman. You use that process instantly to avoid a process where you're arresting a person and placing them in handcuffs.

(Trial Tr. vol. 2, at 144.) Officer Hogg failed to employ the process of de-escalation. Instead, he escalated the encounter by directing Plaintiff to leave her front lawn and abandon her fatally-wounded pet. When she balked by placing her hands in front of her and pushing him away, Officer Hogg apparently lost his temper and the following took place (according to Plaintiff, whose testimony Judge Feldman found credible):

> A. He pulled me over. He, put his chest, his left chest into my left hand. So I'm out like this (indicating). He walked over, put his chest in my left hand and said, that's it, you're under arrest.
>
> Q. Okay.
>
> A. Or, no, he didn't say that. He said you're going to jail.

(Trial Tr. vol. 2, 234:22–235:3; *see also* Trial Tr. vol. 3, 487:20 ("now you're going to jail.").)

> Having decided to arrest plaintiff, Officer Hogg decided to employ a "straight arm bar technique" to forcibly bring [Plaintiff] to the ground. *The technique was demonstrated to the Court during the trial*. Based on the trial testimony and the technique's demonstration, it is of little surprise to this Court that "[t]he plethora of excessive force cases show that the use of arm bar techniques to gain control of an arrestee often result in injury to the arrestee." *Fischer v. Hoven*, No. l:16-CV-01056-CBK, 2018 WL 2012908, at *6 (D.S.D. Apr. 30, 2018).

(Decision and Order 30-31, , ECF No 116.)  Judge Feldman stated in his decision:

> "I agree with Dr. Williams's testimony that under the facts presented here, use of this particular technique to effectuate plaintiff's arrest 'was unreasonable and unnecessary.'" [Trial] Tr. vol. 2, at 144–45. [Plaintiff] was unarmed, outnumbered, and made no attempt to flee. "[T]he need for force, if any, was minimal at best." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) .

(Decision and Order 31, ECF No 116.) It is clear from the Decision and Order that specifically under these circumstances, the officer's application of the arm bar was not appropriate. Defendants also cite to *McKnight v Vasile,* No. 11-CV-6328P, 2017 WL 1176051 (W.D.N.Y. Mar. 30, 2017)*,* stating:

> Judge Feldman impugns the legality of a trained, wide-spread, force technique, which has already been addressed and deemed appropriate in cases of active resistance by the Western District in *McKnight* v. *Vasile*, as well as various Districts throughout the country. There is no legal basis for the Court's suggestion that the arm bar technique is per se unlawful.

(Def.s' Mem. of Law 7.) The Honorable Marian W. Payson's determination in *McKnight* that Officer Vasile did not use excessive force was based on her application of the *Graham* objective reasonableness standard, which required consideration of the totality of the circumstances. *McKnight*, 2017 WL 1176051, at *25 ("Considering the totality of the circumstances, I find that Vasile's use of a 'straight arm bar' technique to attempt to gain control of McKnight was not unreasonable."). Judge Payson did not state the arm bars were improperly proformed, and the plaintiff did not raise any claims of injury due to the arm bar being improperly proformed.

The circumstances surrounding the arrest and use of force on Plaintiff are very different from those in *McKnight*. Here, Plaintiff's dog, Bailey, had just been shot and killed by a man right in front of her. She was rightfully distraught and angry. She

had done nothing wrong, and the Officer Hogg's reaction to her anger and frustration was unreasonable in light of the totality of the circumstances that they themselves created by shooting her dog and then yelling at her and ordering her to leave her own property, without telling her why they were there or providing their names and badge numbers. The trial judge properly applied the *Graham* test to the specific facts of this case. Defendants' claim that the Decision and Order declares the use of the "straight arm bar" technique "per se unlawful" is incorrect. What Judge Feldman found was that the officer's use of the technique in this case was improperly executed in that he "slammed" Plaintiff to the ground instead of guiding her to the ground as he had been taught was the proper method of employing that technique.

### Point IV -Qualified Immunity

Defendants claim the "standard of acceptable force during a physical encounter with an arrestee is 'hazy' at best in this jurisdiction." (Def.s' Mem. of Law 21, Nov. 15, 2019, ECF Nos. 120–25.) Defendants state that "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier v. Katz*, 533 US 194, 205 (2001). In determining whether a right is clearly established, only "Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law" is relevant. *Terebesi* v. *Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). Thus, Defendants' arguments that the law is not clearly established based on *McKnight* and *Digennaro* is incorrect.

[I]n the context of excessive force, the Fourth Amendment reasonableness inquiry tends to converge with the qualified immunity reasonableness inquiry. *'Jackson V. Mastrangelo*, 6:17-CV-06448 EAW, 2019 WL 4686456, at *4 (W.D.N.Y. Sept. 26, 2019) (quoting *Spencer v. Sullivan County*, 18-cv-365, 2019 WL 4514011, at *7 n.5 (W.D.N.Y. Sept. 19, 2019); see *Saucier v. Katz*, 533 U.S. 194, 210 (2001) (Ginsburg, J., concurring in the judgment) (stating that "paradigmatically, the determination of police misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question: Taking into account the particular circumstances confronting the defendant officer, could a reasonable officer, identically situated, have believed the force employed was lawful?").

(Decision and Order 42–43, ECF No 116.) Judge Feldman then includes an excerpt

from a then-recent decision by Judge Payson:

As Magistrate Judge Payson recently explained: Certainly, as established caselaw makes clear, the extent to which, if at all, an arrestee presents a danger to the officers and the nature and degree of the arrestee's resistance to the arrest are important considerations in the context of analyzing whether qualified immunity applies to a challenged use of force. *See Betts v. Rodriquez*, 2017 WL 2124443, *4 (S.D.N.Y. 2017) ("the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances[,] [including] whether the suspect poses an immediate threat to the safety of the officers or others [and] whether he is actively resisting arrest or attempting to evade arrest by flight") (internal quotations omitted); *Ahern v. City of Syracuse*, 411 F. Supp. 2d 132, 152 (N.D.N.Y. 2006) ("[i]n the context of balance the same factors it considers in determining reasonable force under the Fourth Amendment: the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest.") ; *Bantum v. City of New York*, 2001 WL 705889, *2 (S.D.N.Y. 2001) (whether a defendant is entitled to immunity for the force used during an arrest "requires an analysis of a variety of factors including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest") ( internal quotations omitted).

*Warr v. Liberatore*, No. 13-CV-6508P, 2019 WL 4072662, at *5 (W.D.N.Y. Aug. 29, 2019). Judge Feldman then correctly applied the test to the situation presented by the credible trial testimony:

> Having already engaged in the reasonableness analysis in finding excessive force was used during plaintiff's arrest, the Court need not repeat itself. Suffice it to say that given the particular circumstances confronting defendants [Officers] Hogg and Prinzi, their actions were not "objectively reasonable." *Cf. Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("We need no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case.").

(Decision and Order 43–44.) Defendants claim that "[t]here is simply no way to reconcile Judge Payson's decision in *McKnight* with Judge Feldman's decision in the current matter." (Def.s' Mem. of Law 21.) This is not the case. Once an officer's duty to act or refrain from acting is "clearly established," an officer cannot prevail on the second prong of the qualified immunity analysis by claiming, or pointing to, confusion over the right's constitutional source. The "proper inquiry is whether the right itself— rather than its source—is clearly established." *Russo* v. *City of Bridgeport*, 479 F.3d 196, 212 (2d. Cir. 2007); *see, e.g., Poe* v. *Leonard*, 282 F.3d 123, 137-39 (2nd Cir. 2002). "[C]ourts should define the 'clearly established' right at issue on the basis of the 'specific context' of the case." *Tolan* v. *Cotton*, 572 U.S. 650, 657 (2014), *quoting Saucier*, 533 U.S. at 201 and *citing Anderson*, 483 U.S. at 640–41. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope* v. *Pelzer*, 536 U.S. 730, 741 (2002), and "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even

though existing precedent does not address similar circumstances." *District of Columbia* v. *Wesby*, 138 S. Ct. 577, 590 (2018), *quoting Brosseau* v. *Haugen*, 543 U.S. 194, 199 (2004).

In other words, "the absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established." *Johnson* v. *Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001). "'[T]he salient question … is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014), quoting *Hope v. Pelzer,* 536 U.S. at 741 (alteration in original). "Of course, in an obvious case, the standards [from a prior case] can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen,* 543 US at 199 (citing *Hope v. Pelzer*, 536 U.S. at 738, as one such "case where the Eighth Amendment violation was 'obvious'").

Further, "[e]ven if this or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other courts 'clearly foreshadow a particular ruling on the issue.'" *Scott* v. *Fischer*, 616 F3d 100, 104–05 (2nd Cir. 2010) (internal citations omitted) (relying on decisions by other Circuits finding similar searches unconstitutional, even though the Second Circuit had not yet reached the issue, in concluding that the defendant was not entitled to immunity); *accord, Terebesi* v. *Torreso*, 764 F.3d at 231; *see also Higginbotham* v. *City of New York*, 105 F. Supp. 3d 369, 378 (SDNY 2015). Thus, even

if no prior court had held that it was unconstitutional for a police officer to throw an arrestee to the ground and then for officers to get on top of the arrestee, placing their full body weight on top of her, Defendants here are still not entitled to qualified immunity because decisions by the Supreme Court and the Second Circuit clearly demonstrated that, as of 2013, based on the totality of the circumstances presented in this case, the force used by Officers Hogg and Prinzi against Plaintiff was unreasonable and excessive.

When a reviewing court reviews a qualified immunity claim post-trial, it must view the facts in the light most favorable to the non-movant. *O'Hara* v. *City of New York*, 570 F. App'x 21, 23 (2d Cir. 2014). Considering both prongs of the qualified immunity test as well as *O'Hara*, the Court will not disturb Judge Feldman's denial of qualified immunity.

## CONCLUSION

Defendants did not show the decision was clearly erroneous, or show that there were additional facts unknown at the time of the decision that would change the outcome, or show that the trial court overlooked facts or controlling law Defendants raised at the time of the decision. Therefore, the Court denies Defendants' motion (ECF No. 120) for reconsideration of both the Judgment and the Decision and Order. The Clerk of Court is directed to close the case.

IT IS SO ORDERED.

Dated:   July 31, 2020
         Rochester, New York                  MARK. W. PEDERSEN
                                              United States Magistrate Judge